No. 25-4901

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KRISTI NOEM, *et al.*,

*Appellants,*

v.

National TPS Alliance, *et al.*,

*Appellees.*

On Appeal from the United States District Court
for the Northern District of California

## EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27-3

## PLAINTIFFS' MOTION FOR STAY PENDING APPEAL

(relief requested by August 19, 2025)

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
Drew.C.Ensign@usdoj.gov

WILLIAM H. WEILAND
*Acting Assistant Director*

ANNA L. DICHTER
*Senior Litigation Counsel*

LAUREN BRYANT
CATHERINE ROSS
AMANDA SAYLOR
ERIC SNYDERMAN
JEFFREY M. HARTMAN
*Trial Attorneys*

# TABLE OF CONTENTS

INTRODUCTION..................................................................................1

BACKGROUND ...................................................................................4

ARGUMENT ........................................................................................6

    I.      THE GOVERNMENT WILL SUCCEED ON THE MERITS...........6

          A.     Section 1254a Bars Judicial Review of APA Claims.....................6

          B.     The Government Is Likely to Prevail on the Merits of Plaintiffs' APA Challenge to the Secretary's TPS Terminations ..11

          C.     Plaintiffs' APA Challenge to the Secretary's Selection of a Termination  Date Will Fail on Appeal.......................................15

          D.     The Secretary Is Likely to Prevail on Plaintiffs' Equal Protection Claim ........................................................................16

    II.     THE NON-MERITS FACTORS FAVOR A STAY............................19

    III.    AT MINIMUM, THE STAY MUST BE NARROWED ....................21

    IV.    PROCEEDINGS BELOW SHOULD BE STAYED FOR THIS COURT TO CONSIDER REASSIGNMENT TO A DIFFERENT JUDGE ............................................................................................22

CONCLUSION...................................................................................25

CERTIFICATE OF COMPLIANCE

EXHIBIT 1
    Opinion, *National TPS Alliance, et al.*, *v. Noem*, *et al.*,
        3:25-cv-05687-TLT (July 31, 2025)

EXHIBIT 2
    Transcript of Proceedings, *National TPS Alliance, et al.*, *v. Noem*, *et al.*,
        3:25-cv-05687-TLT (July 29, 2025)

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Azar v. Alina v. Health Serv.*,
   587 U.S. 566 (2019) ............................................................ 9

*Bouarfa v. Mayorkas*,
   604 U.S. 6 (2024) ........................................................... 9, 15

*Trump v. CASA*,
   606 U.S. —, 2025 WL 1773631 (June 27, 2025) ..................... 21, 22

*CASA, Inc. v. Noem*,
   2025 WL 2028397 (4th Cir. July 21, 2025) (stay order) ............ 1, 2, 3

*CASA, Inc. v. Noem*,
   — F. Supp. 3d —, 2025 WL 1907378 (D. Md. July 10, 2025) ............. 15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) .......................................................... 14

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ................................................ 10

*Immgrant Defenders Law Cntr. v. Noem*,
   — F.4th—, 2025 WL 2080742 (9th Cir. July 18, 2025) ................ 6, 21

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019) ........................................................ 3, 13

*Dep't of State v. Munoz*,
   602 U.S. 899 (2024) .......................................................... 20

*DHS v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020) .......................................................... 17, 18

*FDA v. Wages and White Lion Invs.*,
   145 S. Ct. 898 (2025) ...................................................... 15, 16

*Fiallo v. Bell*,
   430 U.S. 787 (1977) ..................................................... 7, 16, 20

*Garland v. Ming Dai*,
   593 U.S. 357 (2021) .......................................................... 14

*Hotel & Rest. Emps. Union, Loc. 25 v. Smith*,
  846 F.2d 1499 (D.C. Cir. 1988) ................................................................... 7

*In re Ellis*,
  356 F.3d 1198 (9th Cir. 2004) ............................................................... 22, 23

*INS v. Legalization Assistance Project*,
  510 U.S. 1301 (1993) ................................................................................. 19

*Maryland v. King*,
  567 U.S. 1301 (2012) ................................................................................. 19

*McNary v. Haitian Refugee Center, Inc.*,
  498 U.S. 479 (1991) ................................................................................. 8, 9

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................... 13

*Nat'l Council of La Raza v. Cegavske*,
  800 F.3d 1032 (9th Cir. 2015) ................................................................... 22

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................. 19, 20

*Noem v. Nat. TPS Alliance*,
  — S. Ct. —, 2025 WL 1427560 (May 19, 2025) ............................. 1, passim

*Patel v. Garland*,
  596 U.S. 328 (2022) ............................................................................... 6, 15

*Ramos v. Wolf*,
  975 F.3d 872 (9th Cir. 2020) ............................................................ 8, passim

*Rank v. Nimmo*,
  677 F.2d 692 (9th Cir. 1982) ..................................................................... 15

*Sagana v. Tenorio*,
  384 F.3d 731 (9th Cir. 2004) ..................................................................... 20

*Trump v. Boyle*,
  606 U.S. —, 2025 WL 2056889 (July 23, 2025) .............................. 1, passim

*Trump v. Hawaii*,
  585 U.S. 667 (2018) ............................................................................ 9, passim

*United States v. Tohono O'odham Nation*,
  563 U.S. 307 (2011) ..................................................................................... 7

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
 429 U.S. 252 (1977) ................................................................ 17, 19

## STATUTES
### The Immigration and Nationality Act of 1952, as amended:

5 U.S.C. § 701(a)(2) ................................................................ 15

5 U.S.C. § 705 ........................................................................ 6, passim

5 U.S.C. § 706 ........................................................................ 22

8 U.S.C. § 1229a .................................................................... 20

8 U.S.C. § 1229b(b) ................................................................ 21

8 U.S.C. § 1252(a)(5) .............................................................. 9

8 U.S.C. § 1254a ...................................................................... 1

8 U.S.C. § 1254a(b)(2) ............................................................ 4

8 U.S.C. § 1254a(b)(2)(B)(ii) ................................................. 15

8 U.S.C. § 1254a(b)(3)(A) ...................................................... 4

8 U.S.C. § 1254a(b)(3)(B) ...................................................... 4, 20

8 U.S.C. § 1254a(b)(3)(C) ...................................................... 15

8 U.S.C. § 1254a(d)(3) ............................................................ 15

8 U.S.C. § 1254a(b)(5)(A) ...................................................... 3, passim

8 U.S.C. § 1254a(b)(1)(B) ...................................................... 4, passim

8 U.S.C. § 1254a(b)(1)(B)(i) .................................................. 11

8 U.S.C. § 1254a(b)(1)(B)(ii) ................................................. 11

28 U.S.C. § 1651(a) ................................................................ 22

28 U.S.C. § 2106 .................................................................... 22

## <u>OTHER AUTHORITIES</u>

*Designation of Honduras Under [TPS]*,
    64 Fed. Reg. 524-02 (Jan. 5, 1999) ................................................ 5

*Extension of the [TPS] Designation for Honduras*,
    88 Fed. Reg. 40,304-01 (June 21, 2023) ....................................... 5

*Termination of the Designation of Honduras for [TPS]*,
    90 Fed. Reg. 30,089-01 (July 8, 2025) ............................... 5, passim

*Designation of Nepal for [TPS]*,
    80 Fed. Reg. 36,346-02 (June 24, 2015) ..................................... 13

*Extension of the [TPS] Designation for Nepal*,
    88 Fed. Reg. 40,317-01 (June 21, 2023) ....................................... 5

*Termination of the Designation of Nepal for [TPS]*,
    90 Fed. Reg. 24,151-01 (June 6, 2025) ............................... 5, passim

*Designation of Nicaragua Under [TPS]*,
    64 Fed. Reg. 526-01 (Jan. 5, 1999) ................................................ 5

*Extension of the [TPS] Designation for Nicaragua*,
    88 Fed. Reg. 40,294-01 (June 21, 2023) ....................................... 5

*Termination of the Designation of Nicaragua for [TPS]*,
    90 Fed. Reg. 30,086-01 (July 8, 2025) ............................... 5, passim

Executive Order No. 14,159 ................................................... 12, 13

## INTRODUCTION

Less than four months ago, a California district court stayed the Secretary of Homeland Security's termination of Temporary Protected Status ("TPS") for Venezuela. This Court declined to stay that order pending appeal, but the Supreme Court stepped in to grant that relief, with just one noted dissent. *Noem v. Nat. TPS Alliance* ("*NTPSA I*"), 2025 WL 1427560 (May 19). In doing so, the Court necessarily determined both that the government was likely to succeed on the merits and that the balance of harms favored giving effect to the Secretary's termination during the pendency of the litigation. This case involves the same plaintiff seeking the same relief with respect to the termination of TPS for Honduras, Nicaragua, and Nepal. The district court stayed the terminations, in blatant disregard of the Supreme Court's order. *See Trump v. Boyle*, 2025 WL 2056889 (July 23) (Supreme Court decisions on interim relief "squarely control" like cases). This Court should correct that error and stay the district court's order, in line with the Fourth Circuit's recent denial of interim relief in another TPS challenge. *See CASA, Inc. v. Noem*, 2025 WL 2028397 (4th Cir. July 21).

As its name suggests, TPS is *temporary* by design. Two of the three decisions challenged by the plaintiffs here concern temporary status given to individuals from Honduras and Nicaragua because of Hurricane Mitch—in 1998. The Secretary determined that this 1998-hurricane-based provisional status was no longer warranted in 2025. The third challenged decision is the termination of Nepal's TPS designation, which was based on a 2015 earthquake.

1

For decades, Secretaries across administrations have terminated TPS in similar circumstances—*i.e.*, when a country no longer meets the statutory conditions for designation. Yet the district court suggested that Secretary Noem's termination of temporary statuses that had persisted as long as a quarter century was somehow akin to the moral abominations of slavery and "the transatlantic slave trade," declaring that the "Court … does not forget that this country has bartered with human lives." Op.17-18 n.1. The district court further invoked the specter of the 19th century Chinese Exclusion Act, opining that "Plaintiffs here face similar tides." Op.18 n.2. The upshot, in the district court's view, was that the challenged terminations demanded that immigrants "atone for their race, leave because of their names, and purify their blood." *Id.*

The district court's decision is as rhetorically intemperate as it is legally unsound. Indeed, as the Supreme Court already recognized in *NTPSA I*, the decision below is flawed from top-to-bottom.

Start with jurisdiction. There isn't any. Congress has adopted an extremely clear and broad jurisdictional bar, providing: "There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." §1254a(b)(5)(A).[1] The decisions below are just such "determination[s] … with respect

---

[1] Statutory citations are to Title 8 except where noted.

to … termination[s]." *Id.* Yet the district court held that this unequivocal language did not bar even a single one of Plaintiffs' claims. Instead, the court reasoned that "the plain text leads to absurd results," so it could simply flout that textual bar. Op.18-19 & n.1 (citation omitted).

The district court's APA analysis fares little better. Rather than analyzing the Secretary's published reasoning, the district court decided that the Secretary possessed subjective bad intent and the resulting decision was thus somehow illegally "preordained." Op.21. But that is not true and, in any event, not a cognizable APA claim. *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). The court also ignored the Secretary's actual reasoning (and the administrative records) to contend that she had not explained a change in policy about the wind-down period after the termination.

The district court's equal protection reasoning is equally infirm. Just as in *NTPSA I*, the court relied on a mish-mash of "evidence" remote in time and taken out of context—none of which had anything to do with the Secretary's rational and reasoned policy determinations. Instead, the district court reasoned that the Secretary was biased against *all* immigrants. Indeed, the district court identified only a single statement by the Secretary that mentioned any one of the three countries at issue by name, and that statement merely described the need for "migration management" and "repatriation flights" for Honduras. That anodyne statement hardly establishes unconstitutional animus. The district court's reasoning here would bar the Secretary from ever terminating a TPS designation, no matter the facts. That is not the law.

3

The remaining equitable factors strongly support the Government. Indeed, they are materially identical to *NTPSA I*, and the same result should obtain here. *Boyle,* 2025 WL 2056889 (stays "inform how a court should exercise its equitable discretion in like cases"). Even if any equitable relief were warranted here, the stay is plainly overbroad.

This Court should grant a stay pending appeal.

## BACKGROUND

The Secretary may designate a country for TPS if, among other reasons, an earthquake, flood, drought, epidemic, or other environmental disaster "result[s] in a substantial, but temporary, disruption of living conditions in the area affected," and the country is "unable, temporarily, to handle adequately the return" of its nationals. §1254a(b)(1)(B). Aliens covered by a TPS designation may receive work authorization and cannot be removed. §1254a(a).

Initial TPS designations are discretionary, and the Secretary must periodically review them to determine whether the conditions underlying the initial designation continue to be met. §1254a(b)(2), (b)(3)(A). If, as relevant here, the Secretary determines that the foreign state "no longer continues to meet the conditions for designation," she "shall terminate the designation." §1254a(b)(3)(B).

The TPS statute bars judicial review of TPS determinations: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." §1254a(b)(5)(A).

4

In 2015, Nepal was designated for TPS when an earthquake resulted "in a substantial, but temporary, disruption of living conditions in the area affected" and "Nepal [had] officially requested designation for TPS." 80 Fed. Reg. 36,346-02 (June 24, 2015). That designation was most recently extended until June 24, 2025. 88 Fed. Reg. 40,317-01 (June 21, 2023).

Secretary Noem terminated Nepal's TPS designation, effective August 5, after determining that "substantial reconstruction from the earthquake's destruction such that there is no longer a disruption of living conditions" and "Nepal is able to handle adequately the return of its nationals." 90 Fed. Reg. 24,151-01 (June 6, 2025).

In 1999, Honduras and Nicaragua were designated for TPS due to "the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch" that rendered both countries "unable, temporarily, to handle adequately the return of [their] nationals." 64 Fed. Reg. 524-02 (Jan. 5, 1999); 64 Fed. Reg. 526-01 (Jan. 5, 1999). Most recently, those designations were extended for 18 months ending on July 5, 2025. 88 Fed. Reg. 40,304-01 (June 21, 2023); 88 Fed. Reg. 40,294-01 (June 21, 2023).

Secretary Noem terminated both countries' TPS designations, effective September 8, because Hurricane Mitch "no longer cause[d] a substantial, but temporary, disruption in living conditions in the area affected" and the countries were able to adequately handle the return of their nationals. 90 Fed. Reg. 30,089-01 (July 8, 2025) (Honduras); 90 Fed. Reg. 30,086-01 (July 8, 2025) (Nicaragua).

The National TPS Alliance and seven individual plaintiffs challenged the Nepal, Nicaragua, and Honduras terminations under the APA and moved for a stay of agency action under 5 U.S.C. §705. Dkt.1, 17. On July 31, after full briefing, court-issued interrogatories, and oral argument, the district court granted Plaintiffs' motion. Dkt.73 ("Op."). The district court denied the government's motion to stay its order. Dkt.87. The government appealed on August 1. *See Imm. Def. Law Cntr. v. Noem*, 2025 WL 2080742, *4 (9th Cir. July 18) (appealability of §705 stays).

## ARGUMENT

## I.   THE GOVERNMENT WILL SUCCEED ON THE MERITS

### A.   Section 1254a Bars Judicial Review of APA Claims

The district court's order will not survive appeal and should be stayed. *See NTPSA I*, 2025 WL 1427560 at *1. The Secretary's decision to terminate a TPS designation implicates sensitive domestic and foreign policy judgments reached following consultation with relevant agencies. §1254a(b)(1)(B). Congress therefore unambiguously barred courts from second-guessing those determinations: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. §1254a(b)(5)(A).

The judicial-review bar is broad. *First*, Congress prefaced "determination" with the term "any." *Id.* As the Supreme Court explained "the word 'any' has an expansive meaning." *Patel v. Garland*, 596 U.S. 328, 338 (2022) (cleaned up). The provision thus

6

captures determinations "of whatever kind." *Id. Second*, the phrase "with respect to" likewise has "a broadening effect," as it "ensur[es] that the scope of [the] provision covers not only its subject but also matters relating to that subject." *Id.* at 339. When Congress has stripped a court of jurisdiction "in respect to" certain claims, the Supreme Court has construed that as a "broad prohibition." *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011). The TPS statute thus plainly commits to the Secretary's unreviewable authority any and all determinations relating to any TPS termination. *Id.*

Reinforcing this interpretation, "the Government's political departments [are] largely immune from judicial control" in the immigration context, *Fiallo v. Bell*, 430 U.S. 787, 792 (1977), particularly when making the sensitive foreign policy judgments at issue here. The Executive had long exercised inherent authority to afford temporary immigration status based on its assessment of conditions in foreign states, even before there was any "specific statutory authority" for such relief. *Hotel & Rest. Emps. Union, Loc. 25 v. Smith*, 846 F.2d 1499, 1510 (D.C. Cir. 1988) (per curiam). That authority included the discretion "not to extend [protected] status" to a particular class of aliens, and the D.C. Circuit had recognized that such decisions were "unreviewable." *Id.* Congress legislated against that backdrop when it enacted the TPS statute and codified the understanding that "[t]here is no judicial review" of such determinations. §1254a(b)(5)(A).

Plaintiffs' claims fall squarely within §1254a(b)(5)(A)'s prohibition on judicial review. Dkt.17. They directly challenge the Secretary's "determination[s] … with respect

7

to the … termination … of a designation, of a foreign state" for TPS. §1254a(b)(5)(A). And, in a since-vacated decision—strikingly absent from the district court's analysis, Op.14-19—this Court held that the statute "preclude[s] direct review of the Secretary's country-specific TPS determinations." *Ramos v. Wolf*, 975 F.3d 872, 889 (9th Cir. 2020), *vacated upon rehearing en banc*, 59 F.4th 1010, 1011 (9th Cir. 2023). The statute could not be clearer: Courts lack any authority to review or stay TPS determinations. §1254a(b)(5)(A).

The district court flagrantly bypassed that judicial review bar, concluding that the term "determination" empowered it to review the Secretary's TPS terminations to see if they were "based on an objective review of country conditions." Op.21; *see* Op.15-20. The sweeping review envisioned by the district court eviscerates the statutory bar and is wrong for two independent reasons.

*First,* nothing in the TPS statute distinguishes between substantive or procedural review. Instead, it bars *any* review of a "determination" with respect to a TPS "termination." §1254a(b)(5)(A). Yet the district court fixated on the term "determination" in a vacuum without meaningfully attending to the terms "with respect to" or "termination," even though those terms plainly bar review of the Secretary's TPS terminations. Op.15-20.

This Court previously rejected the analogy that the district court drew to *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), given that "the TPS statute … differs in both text and context" from the statute at issue there. *Ramos*, 975 F.3d at 890 (9th

Cir. 2020); Op.15-16. And *McNary* itself emphasized that Congress *could* bar judicial review of collateral challenges if it used more expansive language. 498 U.S. at 494. Congress did so here: barring any "statutory or nonstatutory" challenge to "*any determination* of the [Secretary] *with respect to* the determination, or *termination* or extension of a designation" of TPS. §§1252(a)(5), 1254a(b)(5)(A) (emphasis added); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (INA provisions limiting judicial review provide "clear and convincing evidence of congressional intent to preclude judicial review").[2]

The infirmity of the district court's decision is made manifest by its suggestion that these disaster-related TPS terminations were comparable to the "transatlantic slave trade." Op.18 n.1. "[I]t is wholly inapt to liken that morally repugnant [conduct] to a facially neutral policy denying certain foreign nationals the privilege of" *temporary* protection in the United States based on decades-past natural disasters. *Trump v. Hawaii*, 585 U.S. 667, 710 (2018) (discussing Japanese internment). The district court cannot conjure jurisdiction from a non sequitur, speculation about the Executive's use of its foreign policy powers, or narrow a statutory limit on review based on policy concerns.

---

[2] The district court's revisionist history, Op.17, is misplaced because "legislative history is not the law" and Courts "won't allow ambiguous legislative history to muddy clear statutory language." *Azar v. Alina v. Health Serv.*, 587 U.S. 566, 579 (2019). Moreover, legislative history indicating that "[t]here shall be no judicial review of the Attorney General's determination with respect to the designation or termination or extension of a designation, of a foreign state," 135 Cong. Rec. H7501-03, at 7,512 (daily ed. Oct. 25, 1989), is hardly evidence that Congress intended to subject TPS determinations to APA review.

Op.17-18; Dkt.87 at 3-6 (emphasizing that the district court drew these comparisons to determine the scope of the judicial-review bar).

*Second*, even if some collateral procedural challenges were reviewable, the district court's decision empowers Plaintiffs to directly (and impermissibly) challenge the Secretary's discretionary TPS terminations. Op.21-22. Plaintiffs did not challenge a guidance document or regulation distinct from a termination, and the district court never pinpointed any statutory criteria that the Secretary overlooked. Instead, Plaintiffs claim the Secretary's terminations "were based on a preordained, political decision to terminate TPS wholesale, rather than the objective country conditions review the statute requires." Dkt.17 at 15; Op.21. Plaintiffs further objected to the information the Secretary used to guide her terminations. Dkt.17 at 17. But those are precisely the types of ordinary APA claims that fall within the core of §1254a(b)(5)(A)'s judicial review bar. *Ramos*, 975 F.3d at 889.

If Plaintiffs' claims were permitted despite §1254a(b)(5)(A), no APA challenge to any TPS termination would ever be barred—all a litigant would need to do is allege that the Secretary's determinations were driven by a policy preference. *See DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019) (recognizing that "almost any challenge to [a determination] could be recast as a challenge to its underlying methodology"). Congress's jurisdictional limitation cannot be circumvented so easily. Secretary Noem terminated the TPS designations for Nepal, Honduras, and Nicaragua,

10

and Congress shielded the substance of her reasoning from judicial review. The district court's order should be stayed for that reason alone.

## B. The Government Is Likely to Prevail on the Merits of Plaintiffs' APA Challenge to the Secretary's TPS Terminations

Even if a "narrow" APA claim could survive the judicial-review bar, the Government will likely succeed on the underlying merits, too.

Consistent with the statute, Secretary Noem considered conditions in Nepal, Honduras, and Nicaragua, and ultimately decided that termination of TPS for each country was warranted. §1254a(b)(1)(B); 90 Fed. Reg. at 24,152-53 (Nepal); 90 Fed. Reg. at 30,088 (Nicaragua); 90 Fed. Reg. at 30,091 (Honduras). The Federal Register notices show that the Secretary consulted with appropriate Government agencies and considered the statutory factors, including whether (1) a natural disaster resulted in "a substantial, but temporary, disruption of living conditions in the area affected," (2) the foreign state is unable, temporarily, to adequately handle its nationals' return, and (3) the country requests TPS designation. §1254a(b)(1)(B)(i)-(iii).

Regarding Nicaragua and Honduras, the Secretary concluded that the conditions caused by Hurricane Mitch in 1998 had improved in the intervening 26 years and both countries could adequately handle their nationals' return. 90 Fed. Reg. at 30,088 (Nicaragua); 90 Fed. Reg. at 30,091 (Honduras). Nicaragua had improved its roads, school infrastructure, and access to healthcare, enjoyed a stable economy, and regularly accepted the return of its nationals. 90 Fed. Reg. at 30,088; *see* Dkt.63 (administrative

record). And in Honduras, which also accepted the return of nationals subject to removal orders, the majority of citizens gained access to water, sanitation, and electricity and, with international assistance, "Honduras has strengthened its disaster management capacity at the municipal and national levels[.]" 90 Fed. Reg. at 30,091; *see* Dkt.62 (administrative record).

Regarding Nepal, the Secretary concluded that termination was appropriate because "88.36% of damaged households" had been rebuilt since the 2015 earthquake, and Nepal "disbanded" its reconstruction authority. 90 Fed. Reg. at 24,153. The Secretary also considered "improvements to its preparedness and response capacity," "disaster-resilient housing, infrastructure, and community systems," "economic growth" and the increase of "purchasing power of lower income households," as well as the Nepalese government's capacity to accept aliens with removal orders. *Id*; *see* Dkt.64 (administrative record). Thus, the district court's conclusion that the Secretary's TPS terminations were "preordained" rather than based on statutory factors is belied by the evidentiary record. Op.21.

Contrary to the district court's reasoning, Op.22, there is nothing improper, let alone arbitrary or capricious, about the Secretary's brief references to Executive Order No. 14,159—and its directive that the Secretary should "ensur[e] that designations of [TPS] are consistent with" the statute and "are appropriately limited in scope and made only for so long as necessary to fulfill the textual requirements of that statute," Honduras Termination, 90 Fed. Reg. at 30,091 n.10 (quoting E.O. 14159)—where the

Secretary's determinations required an evaluation of inherently discretionary and foreign policy-oriented standard. §1254a(b)(1)(B). "A change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part).

Consideration of the Administration's immigration policy prerogatives within the Secretary's discretion-laden judgment about whether to terminate these TPS designations is exactly what our political system expects, and "a court may not set aside an agency's policymaking decision solely because it may have been … prompted by Administration priorities." *Dep't of Commerce*, 588 U.S. at 781. Indeed, "[i]t is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies." *Ramos*, 975 F.3d at 897-98. Plaintiffs' preference for their own policy views does not make the Secretary's determinations arbitrary and capricious.

Indeed, the Secretary actually considered evidence that Plaintiffs' motion claimed was overlooked. *Compare, e.g.*, Dkt.53 at 8-9 (asserting that the Secretary failed to consider U.S. State Department travel advisories for Honduras), *with* Dkt.62 at 3 (index showing that Secretary Noem considered the Honduras travel advisory). Consequently, much of the court's analysis, Op.22, boils down to an assertion that the Secretary's published determinations must catalog every piece of evidence considered and address

intervening country conditions unrelated to the initial TPS designation. The statute does not contain those requirements. §1254a(b)(3)(A)-(B). And "it is long since settled that a reviewing court is generally not free to impose additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (cleaned up).

The district court's conclusion that Secretary Noem's determinations should be stayed because she failed to expressly discuss inflation, political violence or crime, or recurrent weather events is a non sequitur. Op.22. The statute bars exactly that type of judicial second-guessing of the Secretary's substantive reasoning. §1254a(b)(5)(A); *see supra* at 6-10. Moreover, the district court's effort to selectively reweigh the country conditions evidence—with no apparent relationship to whether these countries can handle their nationals' return—lacks merit because under the APA a "court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Thus, even if review was available—it is not, *see* §1254a(b)(5)(A)—the government is likely to prevail on the merits of any APA challenge to the Secretary's TPS terminations because the district court's reasoning has no basis in law.

## C.  Plaintiffs' APA Challenge to the Secretary's Selection of a Termination Date Will Fail on Appeal

The Government is also likely to prevail against Plaintiffs' claim that the Secretary's 60-day transition period before the terminations took effect were improper.

Congress provided that when the Secretary terminates a TPS designation for a specific country, the default minimum transition period is 60 days. §1254a(b)(3)(C). The Secretary has the "option" in her unfettered discretion to allow for a longer period if she deems it "appropriate in order to provide for an orderly transition." §1254a(b)(3)(C), (d)(3). Here, the Secretary expressly acknowledged that discretionary "option" and elected not to invoke it. The Secretary's discretionary decision whether to extend such an administrative grace is unreviewable under the APA. 5 U.S.C. §701(a)(2); *see Rank v. Nimmo*, 677 F.2d 692, 699 (9th Cir. 1982) (statute giving the VA Administrator the "option" to make specific payments made "clear that Congress intended to vest the widest discretion possible in the Administrator."); *CASA, Inc. v. Noem*, 2025 WL 1907378, at *16 (D. Md. July 10) (observing the discretionary nature of §1254a(d)(3)'s transition authority). And her selection of the 60-day default termination period provided by Congress, §1254a(b)(3)(C), cannot be arbitrary-and-capricious. *See CASA*, 2025 WL 1907378 at *16 (explaining that "Congress chose to allow for a termination with only 60 days of public notice"). It also is unreviewable by operation of the judicial-review bar at §1252(a)(2)(B)(ii). *See Bouarfa*, 604 U.S. at 13-15; *Patel*, 596 U.S. at 347. Moreover, neither Plaintiffs nor the Court have identified any "hard-and-fast commitment" by DHS to afford a specific post-termination period, let alone one that could have conceivably engendered any reliance interest for TPS recipients from these countries. *FDA v. Wages and White Lion Invs.*, 145 S. Ct. 898, 918-27 (2025).

The district court provided no rationale based in the statute (or a regulation) why the Secretary must provide at least six months of post-termination protection. Op.24. Moreover, the TPS terminations cited by the district court—remote in time, related to different countries, or both—do not establish a default six-month period: 4 had no post-termination period at all; 3 had periods shorter than six months; 6 had six-month periods; 4 had twelve-month periods; and 4 had eighteen-month periods. There was accordingly no "prevailing practice," as that discretionary variation does not establish a commitment to any particular post-termination period, rendering the change-in-position doctrine wholly inapplicable. Op.23; *see FDA*, 145 S. Ct. at 927.

## D.     The Secretary Is Likely to Prevail on Plaintiffs' Equal Protection Claim

Defendants are also likely to prevail on the merits of Plaintiffs' equal protection claim, even assuming the Court could review it. The Secretary's terminations are rational immigration determinations related to the Government's interests in securing the border, national security, and foreign policy that are "largely immune from judicial control." *Fiallo*, 430 U.S. at 792. The Secretary's determinations—reached after consultation with other agencies—are "plausibly related" to the Government's national-security interests and TPS's objectives. *Trump v. Hawaii*, 585 U.S. 667, 704-05 (2018); *see* §1254a(b)(1)(B). As the Supreme Court has made clear, courts cannot look behind facially legitimate actions to hunt for illicit purposes. *Hawaii*, 585 U.S. 667.

The deferential rational-basis standard set out in *Hawaii* applies here, because, as in *Hawaii*, TPS determinations "implicate 'relations with foreign powers'" and "involve

16

'classifications … defined in light of changing political and economic circumstances"—judgments that are "'frequently of a character more appropriate to either the Legislature or the Executive.'" *Hawaii*, 585 U.S. at 702 (citation omitted). *Hawaii* made clear that courts are "highly constrained" in this context; "'any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution.'" *Id.* at 704.

The Secretary's immigration policy decisions, based on conditions in foreign countries, easily pass muster under that standard. The Secretary consulted with appropriate governmental agencies, including the State Department, and determined that the conditions for each designation were no longer met. 90 Fed. Reg. 24,151-01 (Nepal); 90 Fed. Reg. 30,089-01 (Honduras); 90 Fed. Reg. 30,086-01 (Nicaragua). Those determinations are rational and related to the Government's legitimate interests in immigration, national security, and foreign policy. *Id.* Because the Secretary's determination strongly relates to TPS's objectives, the district court erred by looking behind it to find an Equal Protection violation. *Hawaii*, 585 U.S. at 704-05; Op.27-30.

Furthermore, Plaintiffs' equal protection claim would fail even under the more searching standard in *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977) if it applied. Plaintiffs must prove a racially "discriminatory purpose [was] a motivating factor in the [government's] decision," which they cannot do through cherry-picked statements taken out of context and without any direct link to the Secretary's determinations. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34-35 (2020)

17

(disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus."). The statements on which plaintiffs and the district court relied are wholly insufficient to show any discriminatory purpose.

The district court invoked quotes, social media posts, and media appearances from the Secretary and the President where they advocated for and promoted policies that curb immigration and decrease crime to suggest discriminatory motives underlie the terminations. *See* Op.28-29. But many of those statements were "remote in time and made in unrelated contexts" and therefore "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents*, 591 U.S. at 35; *see* Op.28-29; *see also* Dkt.87 at 8 (perceiving "odious undertones" in DHS press release identifying specific TPS holders who were convicted of crimes). Indeed, some—similar to those challenged and rejected in *Hawaii*—arose on the campaign trail. In any event, none reflects animus based on race or national origin because they are taken out of context. For example, the district court repeatedly cited Secretary Noem's discussion of countries not at issue here, Op.28 (citing Dkt.18-14, 18-18), or 2024 articles about campaign statements from other officials, Op.at 29 (citing Dkt. 18-19, 18-20, 18-23), that cannot show animus by *the Secretary* as the relevant decisionmaker, *see Ramos*, 975 F.3d at 897 (rejecting argument that White House officials' alleged animus could be a motivating factor in Secretary's TPS decisions).

President Trump and Secretary Noem seek to reduce illegal immigration, crime, and the abuse of temporary immigration status—policy goals that are reflected in their public statements. The district court's reasoning would leave virtually any immigration policy adopted by this Administration susceptible to an Equal Protection challenge. That is untenable. Even if *Arlington Heights* applied, the government is likely to prevail on the equal protection claim.

## II.   THE NON-MERITS FACTORS FAVOR A STAY

The remaining factors favor a stay, too. *See Nken*, 556 U.S. at 435. Most fundamentally, in granting a stay in *NTPSA I*, the Supreme Court has already accepted that the Government's equities warrant a stay pending appeal in like circumstances. *NTPSA I*, 2025 WL 1427560 at *1. That is because the Government and public share an interest in ensuring adherence to the process established by Congress, under which the Secretary has unreviewable authority over TPS designations. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). The Supreme Court's analysis in *NTPSA I* controls here. *Boyle*, 2025 WL 2056889 at *1.

Declining to issue a stay would result in "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-1306 (1993) (O'Connor, J., in chambers). Especially because the harm here arises in an area that implicates "a fundamental

sovereign attribute exercised by the Government's political departments[,] largely immune from judicial control." *Fiallo*, 430 U.S. at 792. Permitting these TPS designations to continue would override the Secretary's considered judgment that TPS must be terminated because there is not a "substantial, but temporary, disruption of living conditions" that prevent aliens from returning to those countries. §1254a(b)(3)(B).

Plaintiffs maintain that termination could lead to the loss of employment or health benefits, possible removal, and family separation. Dkt.17 at 22-23, 53 at 13. But the end of TPS's inherently *temporary* protection is not equivalent to a final removal order under §1229a, and the loss of associated benefits is inherent in the temporary status Congress crafted. *See Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004) (rejecting due-process challenge to temporary worker program). Moreover, "removal alone cannot constitute the requisite irreparable injury" to justify a stay. *Nken*, 556 U.S. at 435.

The district court was also wrong to rely on the "prospect" of family separation *if* plaintiffs were ultimately removed and if their families chose not to join them abroad. Op.31. That is an unfortunate possible consequence of *any* removal proceeding, as aliens have no constitutional right to live in the United States. *Dep't of State v. Munoz*, 602 U.S. 899, 915-16 (2024) ("it is a fallacy to leap … to the conclusion that United States citizens have a fundamental right that can limit how Congress exercises the Nation's sovereign power to admit or exclude foreigners.") (cleaned up). Congress has crafted other remedies to address individualized harms associated with family

20

separation. *See, e.g.*, 1229b(b). Nothing prevented Plaintiffs from pursuing durable immigration relief in the years or decades in which they have had TPS or from doing so now.

As the Supreme Court concluded, because the equities favor the government, it should be allowed to implement these TPS terminations pending appeal. *NTPSA I*, 2025 WL 1427560 at *1.

## III.  AT MINIMUM, THE STAY MUST BE NARROWED

The Court should at least narrow the district court's universal stay. Universal injunctions "fall[] outside the bounds of a federal court's equitable authority under the Judiciary Act [of 1789]." *CASA*, 2025 WL 1773631 at *8. Those equitable limitations constrain §705 stays, too. *Imm. Def.*, 2025 WL 2080742 at *5. Thus, in *Immigrant Defenders*, this Court narrowed §705 relief to the plaintiff's "current and future clients," invoking *CASA* given the similarities between §705 relief and preliminary injunctions. *Id.* That precedent compels the same conclusion here.

The district court's rationale for exceeding its equitable authority rings hollow. Op.35-36. *CASA* explicated a fundamental constraint on equity; it was not limited to challenges to executive orders. 2025 WL 1773631, at *8; Op.35. *Immigrant Defenders*'s application of *CASA* to §705 relief also applies wholesale here. Op.35-36. In both cases, Plaintiffs have standing because of their relationship with identifiable individuals affected by a specific immigration action. Plaintiffs' professed inability to identify their current members provides no license for "the court to exceed its [equitable] power"

and would create perverse incentives for organizational plaintiffs to keep poor membership records. *CASA*, 2025 WL 2080742 at *30. Finally, the possibility of future universal *vacatur* of the terminations under 5 U.S.C. §706 does not support a universal *stay* under a different provision, §705. *CASA*, 2025 WL 2080742 at *30; Op.36. Accordingly, this Court should at least narrow the universal stay.

## IV.  PROCEEDINGS BELOW SHOULD BE STAYED FOR THIS COURT TO CONSIDER REASSIGNMENT TO A DIFFERENT JUDGE

This Court should also exercise its inherent and supervisory powers to stay lower court proceedings pending resolution of this appeal because the government, in its opening brief, intends to seek reassignment to "preserve the appearance of justice" and because it appears Judge Thompson will have "substantial difficulty" in "putting out of [her] mind" her previously expressed views on the actions at issue. *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004) (en banc); 28 U.S.C. §§1651(a), 2106. Judge Thompson's opinion used extreme rhetoric with no bearing on this case. A judge is unlikely to be able to set aside, on remand, publicly announced views that a policy requires aliens to "atone for their race … and purify their blood" or an analogy to the horrors of the transatlantic slave trade. Op.1; *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1046 (9th Cir. 2015) (reassigning when judge's views were "both well-established and inappropriately strong"). All the more so here, where Judge Thompson demonstrated eagerness to ignore precedent. Her interrogatories to the parties injected new issues into the case, uniformly in plaintiffs' favor. For example, Judge Thompson incorrectly and

irrelevantly attacked the Supreme Court's precedential decision in *CASA* as based on "limited briefing and no argument." Dkt. 60 at 1. She relied on a spurious distinction to evade *NTPSA I* and ignored *Boyle*'s admonition that the Supreme Court's emergency rulings "squarely control[]" in "like cases." Op.34-35; *Boyle*, 2025 WL 2056889. At the hearing, Judge Thompson admonished counsel for the Government "to think about … what it is that you're defending," compared the Supreme Court's emergency decisions to "the [S]tar [C]hamber," and opined that third-country removals—which are not at issue here—are "almost an ode to past years of enslavement." Tr. 6:8-10, 45:12, 65:23-25. Judge Thompson even permitted an amicus brief for the plaintiffs but rejected one for the government. Op.6. In anticipation of the government's reassignment request, and to "preserve the appearance of justice," *Ellis*, 356 F.3d at 1211, the Court should stay proceedings below.

## **CONCLUSION**

The Court should enter a stay pending appeal and stay proceedings in the

district court.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
drew.c.ensign@usdoj.gov

WILLIAM H. WEILAND
*Acting Assistant Director*

ANNA L. DICHTER
*Senior Litigation Counsels*

JEFFREY M. HARTMAN
ERIC SNYDERMAN
LAUREN BRYANT
AMANDA SAYLOR
CATHERINE ROSS
Dated: August 8, 2025          *Trial Attorneys*

24

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 27(d), I certify that the attached motion: contains one-inch margins; uses double-spaced text except as otherwise permitted; is proportionally spaced using Garamond typeface; uses a typeface of 14 points; and contains 5,595 words, excluding any accompanying documents authorized by Rule 27(a)(2)(B). This pleading was scanned for viruses and malware by Microsoft CrowdStrike Falcon and determined to be free of malicious software.

<div align="right">

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 8, 2025, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. Appellees were served using the ACMS system.

<u>/s/ Drew C. Ensign</u>
DREW C. ENSIGN
*Deputy Assistant Attorney General*

## **EXHIBIT 1**

Opinion, *National TPS Alliance, et al.*, *v. Noem*, *et al.*, 3:25-cv-05687-TLT (July 31, 2025).

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL TPS ALLIANCE, et al., | Case No. 25-cv-05687-TLT |
| Plaintiffs, | |
| v. | **ORDER GRANTING PLAINTIFFS' MOTION TO POSTPONE** |
| KRISTI NOEM, et al., | Re: ECF 17 |
| Defendants. | |

The freedom to live fearlessly, the opportunity of liberty, and the American dream. That is all Plaintiffs seek. Instead, they are told to atone for their race, leave because of their names, and purify their blood. The Court disagrees.

Pending before the Court is Plaintiffs' motion to postpone effective date of agency action. ECF 17. Defendants filed an opposition on July 14, 2025. ECF 45. Plaintiffs filed a reply on July 18, 2025. ECF 53. The Court heard oral argument on July 29, 2025.

Having considered the parties' briefs, the relevant legal authority, oral argument, and for the reasons below, the Court **GRANTS** the motion to postpone. The Court orders that the TPS terminations shall be postponed to preserve the status quo and until a hearing on the merits on November 18, 2025. Postponement will be subject to extension at the November 18, 2025 hearing.

## I.    BACKGROUND

### A.    Plaintiffs and Nepal, Honduras, and Nicaragua TPS Holders

The parties concede that each of the individually named Plaintiffs have not suffered any felony or misdemeanor convictions. None have violated the law, and each have maintained their obligations parenting, working, and abiding by the rules imposed on them as TPS holders. All

United States District Court
Northern District of California

Plaintiffs are legally present in the United States because of TPS.  *See* 8 U.S.C. § 1254a.

Plaintiffs S.K. and Sandhya Lama are Nepali TPS holders.  ECF 1 ("Compl.") ¶¶ 19–20.

Plaintiff S.K. is 33 years old, a native of Nepal, came to the United States in 2011 on a student visa to attend college, and has been a TPS holder since 2016.  ECF 17-7 ¶ 2.  S.K. has been a theater manager for almost 9 years to support herself and her family in Nepal.  *Id.* ¶¶ 4–5. S.K. also volunteers in Oakland for an organization that provides a safe space for artists, musicians, and community members.  *Id.* ¶ 6.  Without TPS, S.K. would not be able to support herself financially, would be forced to abandon her plans of going back to school to study data science, and would be separated from her U.S. citizen fiancé.  *Id.* ¶¶ 9–11.

Plaintiff Lama is 43 years old, a native of Nepal, and has been in the United States since 2008.  ECF 17-6 ¶ 2.  She came to the United States in 2008 to study at a university in Virginia, received her master's degree in 2014, and has been a TPS holder since 2015.  *Id.* ¶¶ 2, 6.  She is a single mother of three U.S. citizen children, a sole provider, and is currently a CXO Multi Site Lead LC for Amazon.  *Id.* ¶¶ 2, 10–13.  If forced to return to Nepal, Lama's children would lose opportunities, and one of Lama's children would not be able to get medical treatment for her severe allergies.  *Id.* ¶ 15.  Returning to Nepal would also be dangerous because Lama's family has suffered persecution from the Maoist (communist) party in Nepal, including having their ancestral house bombed and brother being taken as hostage.  *Id.* ¶¶ 4, 16.

Plaintiffs Denis Molina, Johny Silva, Teofilo Martinez, and Patricia Carbajal are Honduran TPS holders.  Compl. ¶¶ 15–16, 21.

Plaintiff Molina is 49 years old, a native of Honduras, and has been in the United States since 1997.  ECF 17-2 ¶¶ 4–5.  He applied for and has maintained TPS since Hurricane Mitch hit Honduras.  *Id.* ¶ 5.  He has been a church pastor for over 22 years and works various jobs in construction and as a mechanic to support his family, which includes a wife and four children.  *Id.* ¶¶ 6–12. Two of his children, one aged 4 and another 22, have been diagnosed with autism and require special programs to support their development.  *Id.* ¶¶ 9, 13.  He is the sole breadwinner for his family.  *Id.* ¶ 12.  If TPS terminates, Molina fears that he will not be able to support his family in Honduras and, if his entire family relocates to Honduras, his children will lose the

2

1    support of special programs for their development. *Id.* ¶¶ 12, 14.

2         Plaintiff Silva is 29 years old, a native of Honduras, and came to the United States when he

3    was three-years old. ECF 17-3 ¶ 2. He was granted TPS after Hurricane Mitch. *Id.* ¶ 4. Silva is a

4    Certified Nursing Assistant at Stanford Hospital and relies on his TPS for work authorization. *Id.*

5    ¶¶ 10, 13. Without TPS, Silva and his son, approximately 9 years old and diagnosed with autism,

6    will lose their health insurance. *Id.* ¶ 13. Silva will also lose his job, not be able to contribute to

7    his family's rent, will have to abandon his dreams of becoming a nurse, and be separated from the

8    rest of his family. *Id.* ¶¶ 13–14, 16.

9         Plaintiff Martinez is 57 years, a native of Honduras, and has been on TPS since 1999. ECF

10   17-8 ¶ 2. He is a licensed soccer instructor, a licensed realtor, and owns a landscaping business.

11   *Id.* ¶ 9. He has also been volunteering with the Honduran Consulate for the last 7 years, is on the

12   executive committee for NTPSA, and co-hosts a radio show for TPS holders. *Id.* Without TPS,

13   Martinez would be separated from his partner of over 25 years, lose his job, and not be able to

14   travel for his volunteer work with NTPSA. *Id.* ¶¶ 15, 18.

15        Plaintiffs Elena Hernandez and O.C. are Nicaraguan TPS holders. Compl. ¶¶ 17–18.

16        Plaintiff Hernandez is 67 years old, is a native of Nicaragua, came to the United States in

17   1996 because her family was targeted by the Nicaraguan government, and was granted TPS in

18   1999. ECF 17-4 ¶ 3. Plaintiff Hernandez has worked at an aquatic plant nursery, cleaning

19   company, and as a shop steward with TPS. *Id.* ¶ 7. Plaintiff Hernandez has asthma and a heart

20   condition that requires daily medication. *Id.* ¶ 9. Without TPS, Plaintiff Hernandez would lose

21   her health insurance and social security income even though she has paid into social security for

22   more than 25 years. *Id.* ¶¶ 9, 11. She would lose her job, be separated from her family, have no

23   way of supporting herself, and worries that her health will rapidly decline without continued

24   access to healthcare. *Id.* ¶¶ 10, 12, 14. Given her family history and views, she may also face

25   persecution in Nicaragua. *Id.* ¶ 14

26        Plaintiff O.C. is 60 years old, a native of Nicaragua, and has lived in the United States

27   since 1997. ECF 17-5 ¶¶ 2–3. He came to the United States after being involuntarily conscripted

28   into the military in Nicaragua at the age of 33. *Id.* ¶ 4. Since coming to the United States, O.C.

United States District Court
Northern District of California

3

1   started a janitorial business and currently works for a company that prepares juices and salads for

2   local restaurants. *Id*. ¶ 5. O.C. has diabetes and, without TPS, O.C. would lose his job and the

3   health insurance that he relies on to stay healthy. *Id*. ¶ 7.

4       Plaintiff National TPS Alliance ("NTPSA") is a non-profit with headquarters in Los

5   Angeles, California. Compl ¶ 11. NTPSA provides immigration services and has over 1,000

6   Honduran, Nepali, and Nicaragua TPS holder members that would suffer harm if TPS was

7   terminated, including: R.A., Rajbin Shrestha, G.M., M.A, Patricia Carbajal, J.M., A.C., and J.L.

8   Compl. ¶¶ 11–14, 138.

9       R.A. is 26 years old and a native of Nepal. *Id*. ¶ 138(a). She came to the Unites States in

10  2016 after applying for and receiving TPS. ECF 17-9 ¶ 2. R.A. has worked as a front-line worker

11  at U.S. San Francisco hospital during the COVID pandemic, a patient navigator/clinical trial

12  coordinator, and as a labor and delivery nurse. *Id*. ¶¶ 6–9. R.A. applied for an EB-3 green card

13  for skilled workers in 2024 and her paperwork is still pending. *Id*. ¶ 10. If her TPS terminates,

14  she would lose her job, and her green card application would be considered abandoned if she left

15  the United States. *Id*. ¶ 11.

16      Rajbin Shrestha is 47 years old, a native of Nepal, came to the United States in 1997, and

17  has been on TPS since Nepal was designated in 2015. ECF 17-11 ¶ 2. Shrestha is an IT analyst,

18  has three U.S. citizen children, aged 17, 16, and 6, and was able to buy a house in the United

19  States. *Id*. ¶¶ 9, 11. Without TPS, Shrestha's family risks separation, and Shrestha will not be

20  able to work and provide for his children and elderly parents. *Id*. ¶¶ 13–14.

21      G.M. is 46 years old, a native of Honduras, and came the United States as a teenager.

22  Compl. ¶ 138(b). He is a husband, father of two U.S. citizen children agreed 2 and 22, and a

23  worker who pays his taxes. *Id*. If his TPS terminations, he will not be able to work to support his

24  2 year old daughter and worries that bringing her to Honduras would put her in danger. *Id*. He

25  also fears for his safety in Honduras. *Id*.

26      M.A is 75 years old, a native of Honduras, and is a grandmother to 13 U.S. citizen

27  grandchildren. Compl. ¶ 138(c). She is retired after decades of working two jobs at time, cleaning

28  homes, working at hotels, and caring for children and veterans. *Id*. G.M. also has several adult

United States District Court
Northern District of California

United States District Court
Northern District of California

1   children with TPS. *Id*. If her and her children's TPS terminates, she fears for her and her

2   children's safety in Honduras and fears for her grandchildren's safety if brought to Honduras. *Id*.

3   M.A. fears separation from her grandchildren. *Id*.

4        Patricia Carbajal is 46 years old, a citizen of Honduras, came to the United States when she

5   was 18, and received TPS after the Honduras hurricane. ECF 17-12 ¶¶ 2, 6. Carbajal has worked

6   as a nanny, worked in in restaurants, and currently works in excavation and construction. *Id*. ¶ 8.

7   She is a single mother and currently supports her elderly father in Honduras through remittances.

8   *Id*. ¶¶ 9, 11. Without TPS, Carbajal will lose her work authorization and, as a single mother with a

9   young daughter, fears the violence against women in Honduras. *Id*. ¶¶14–15.

10       J.M. is 57 years old, a native of Honduras, and has been in the United States for the past 27

11  years. Compl. ¶ 138(e). He originally received a scholarship to study fashion in the United States,

12  returned to Honduras after he completed the program, but returned to the United States after facing

13  discrimination as a gay man in Honduras. *Id*. He went to college and worked for clothing

14  companies and a fashion designer. *Id*. He recently lost his job due to stress from losing TPS and

15  has not been able to find work because his work authorization is set to expire with his TPS. *Id*.

16  He is no longer able to provide for housing and now receives Medicaid for his daily diabetes

17  medication. *Id*. He fears returning to Honduras because of his age and sexual orientation. *Id*.

18       A.C. is 54 years old, is a native of Honduras, has been in the United States since 1997, and

19  has been a TPS holder since 1999. ECF 17-10 ¶ 2. A.C. has worked in gardening, metal work, in

20  the offshore drilling industry, in construction, and is currently a shift leader in the ship repair

21  industry. *Id*. ¶¶ 5–6. After Hurricane Katrina in 2005, A.C. helped clean up and rebuild New

22  Orleans. *Id*. ¶ 6. During the Covid-19 pandemic, A.C. was an essential worker for a company that

23  constructed barges for the transportation of petroleum. *Id*. ¶ 6. Without TPS, A.C. would lose his

24  ability to work, and not be able to take and pass a pilot exam after investing approximately

25  $35,000 in pilot training. *Id*. ¶ 9.

26       J.L. is 60 years old, a native of Nicaragua, and has lived in the United States for almost 30

27  years. Compl. ¶ 138(f). For the past 20 years, J.L. has worked as a manufacturing technician in a

28  semiconductor factor. *Id*. He has a pacemaker and takes daily medication to manage for heart

failure.  *Id.*  Without TPS, he would lose his job, his driver's license, and access to healthcare.  *Id.*
He worries that he would not receive adequate medical care and face political persecution in
Nicaragua.  *Id.*

Defendants are the Secretary of Homeland Security Kristi Noem, the United States
Department of Homeland Security ("DHS"), and the United States of America.  Compl. ¶¶ 22 –
24.  The termination notices imposed in connection with this proceeding began on June 6, 2025.
On June 6, 2025, the Secretary published a federal registrar notice that terminated TPS for Nepal
effective August 5, 2025.  *See* 90 Fed. Reg. 24151–54.  On July 8, 2025, the Secretary published
federal registrar notices that terminated TPS for Honduras and Nicaragua effective September 8,
2025.  *See* 90 Fed. Reg. 30089–92; 90 Fed. Reg. 30086–89.

**B.  Procedural History**

On July 7, 2025, Plaintiffs filed a complaint alleging that Defendants' termination of TPS
for Nepal, Honduras, and Nicaragua violate the Administrative Procedure Act and the Fifth
Amendment.  ECF 1 ("Compl.") ¶¶ 154–165.

On July 8, 2025, Plaintiffs filed a motion to postpone effective date of administrative
action.  ECF 17.  Defendants filed an opposition on July 14, 2025.  ECF 45.  Plaintiffs filed a reply
on July 18, 2025.  ECF 53.

On July 24, 2025, the Court denied Immigration Reform Law Institute's motion for leave
to file amicus brief.  ECF 58.  The Court, however, granted Amici States' motion for leave to file a
proposed brief.  ECF 59.  On July 28, 2025, the Court granted Amici City and Counties' motion
for leave to file an amici brief.  ECF 66.  Defendants also filed Administrative Records for Nepal
Honduras, and Nicaragua terminations on July 28, 2025.  ECF 62–64.

The parties provided responses to the Court's questions regarding Plaintiffs' motion to
postpone.  ECF 65, 67.  The Court heard oral argument on July 29, 2025.

**II.  LEGAL STANDARDS GOVERNING PLAINTIFFS' MOTION TO POSTPONE**

"The factors considered in determining whether to postpone agency action pursuant to §
705 substantially overlap with the *Winter* factors for a preliminary injunction."  *Immigrant
Defenders Law Center et al., v. Noem et al.*, No. 25-2581, 2025 WL 2080742, at *7 (9th Cir. July

1   18, 2025).  "There is substantial overlap . . . not because the two are one and the same, but because

2   similar concerns arise whenever a court order may allow or disallow anticipated action before the

3   legality of that action has been conclusively determined."  *Nken v. Holder*, 556 U.S. 418, 434

4   (2009).  The Court's review of Plaintiffs' motion to postpone is, therefore, guided by the

5   following *Winter* standards:

6   > Under the original Winter standard, a party must show "that he is
7   > likely to succeed on the merits, that he is likely to suffer irreparable
    > harm in the absence of preliminary relief, that the balance of equities
    > tips in his favor, and that an injunction is in the public interest."  Under
8   > the "sliding scale" variant of the Winter standard, "if a plaintiff can
    > only show that there are 'serious questions going to the merits'—a
9   > lesser showing than likelihood of success on the merits—then a
    > preliminary injunction may still issue if the 'balance of hardships
10  > tips *sharply* in the plaintiff's favor,' and the other two Winter factors
    > are satisfied.

11  *Immigrant Defenders*, 2025 WL 2080742, at *8.

12       Ultimately, whether to postpone is "an exercise of judicial discretion," and "[t]he propriety

13  of its issue is dependent upon the circumstances of the particular case."  *Nken*, 556 U.S. at 433

14  (internal citation omitted).  Plaintiffs bear "the burden of showing that the circumstances justify an

15  exercise of that discretion."  *Id*. at 433–34.

16  **III.    DISCUSSION OF TPS AND RELEVANT HISTORY**

17       The Court begins with a discussion of (A) the TPS statute; (B) the Congressional intent of

18  TPS; (C) the history of TPS for Nepal, Honduras, and Nicaragua; (D) the current Trump

19  administration's history with TPS; and (E) the Secretary's TPS terminations for Nepal, Honduras,

20  and Nicaragua.

21       **A.    The TPS Statute**

22       Temporary Protected Status ("TPS") was created by the Immigration Act of 1990

23  ("Immigration Act"),  Pub. L. No. 101-649, 104 Stat. 4978, and provides blanket relief to

24  nationals of countries based on specific country conditions findings.  8 U.S.C. § 1254a.

25       Pursuant to 8 U.S.C. § 1254a, the Secretary of Homeland Security may designate a country

26  for TPS if she finds that:

27

28       (A) … there is an ongoing armed conflict within the state and, due to

7

*United States District Court*
*Northern District of California*

such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;

(B) …

(i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

(ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

(iii) the foreign state officially has requested designation under this subparagraph; or

(C) … there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

In addition to making country conditions findings, the Secretary must follow other procedures such as engaging in "consultation with appropriate agencies of the Government" and publishing a "statement of the findings" and an estimate of the number of eligible foreign nationals. 8 U.S.C. § 1254a(b)(1). Periodically, the Secretary "shall review the conditions in the foreign state . . . for which a designation is in effect under this subsection and shall determine whether the conditions for such designation under this subsection continue to be met." *Id.* at § 1254a(b)(3). If the Secretary finds that the conditions are no longer met, she "shall terminate the designation by publishing notice in the Federal Register of the determination." *Id.* Termination is not effective "earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent previous extension." *Id.* If the conditions are still met, the Secretary may extend the designation "for an additional period of 6 months (or, in the discretion of the [Secretary], a period of 12 or 18 months)." *Id.*

To qualify for TPS, an individual must meet certain criteria including having been "continuously physically present in the United States since the effective date of the most recent designation," he or she must have "continuously resided in the United States since such date as the [Secretary] may designate," he or she must timely register for TPS, and he or she must not have a disqualifying criminal record. *Id.* at § 1254a(c). An individual who has been convicted of any felony or 2 or more misdemeanors in the United States does not qualify for TPS. *Id.* at §

8

1254a(c)(2)(B).  Those who qualify for TPS are protected from removal and are granted work authorization.  *Id*. at § 1254a(a).  TPS applicants must also pay all fees associated with applying for TPS.  *Id*. at § 1254a(c)(1)(B).

**B.     Congressional Intent of TPS**

The Immigration Act created TPS in the context of Congress' concern for the United States' obligations under the United Nations Protocol Relating to the Status of Refugees.  H.R. Rep. No. 101-244, at 7 (1989).  Under the protocol, the United States committed itself to not return individuals to countries where they face threats to life or freedom because of persecution on the basis of race, religion, nationality, or other factors.  *Id*.  This principle of "nonrefoulment" is now recognized as binding as a rule of customary international law.  *See* JILL H. WILSON, *supra* at 1–2.

Another key factor motivating Congress at the time of the passage of TPS was the shortcomings of the Extended Voluntary Departure program ("EVD").  H.R. Rep. No. 101-244, at 7–8 (1989).  EVD allowed the Executive to use its discretion to grant administrative stays of removal for nationals of designated countries.  *See* WILSON, *supra* at 4.  In the late 1980s, congressional dissatisfaction with EVD grew for two main reasons.  First, members of Congress were unhappy with the wide discretion EVD gave to the executive and the arguably arbitrary standards for which EVD designation could be withheld.  *See* H.R. Rep. No. 101-244, at 8 (1989) (expressing "disappointment" at the executive's failure to provide relief to nationals of certain countries such that "legislation has become necessary").  Members of Congress lamented the lack of regulation of EVD.  *See* H.R. Rep. No. 101-245, at 11–12 (1989); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Bill Richardson) (emphasizing the need "to establish an orderly, systematic procedure for providing temporary protected status . . . because we need to replace the current ad hoc, haphazard regulations and procedures that exist today."); 135 Cong. Rec. H7501 (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (supporting a bill that "will standardize the procedure for granting temporary stays of deportation. Refugees, spawned by the sad and tragic forces of warfare, should not be subject to the vagaries of our domestic politics as well.").  Second, members of Congress viewed the purported legal basis of EVD with

9

skepticism.  *See* H.R. Rep. No. 101-245, at 11–12 (1989) ("This provision, which constitutes the sole statutory authority upon which EVD is based, clearly does not directly authorize deferring the deportation of an entire nationality of aliens.").  Thus, Congress created TPS and provided the Executive with a clear statutory basis and guidance.  8 U.S.C. § 1254a.

### C.    History of TPS for Nepal, Honduras, and Nicaragua

Nepal was designated for TPS in June 2015 after a 7.8 magnitude earthquake struck only 50 miles from Nepal's densely populated capital of Kathmandu.  80 Fed. Reg. 36346 (Jun. 24, 2015).  The earthquake impacted about one-third of the country's population and damaged approximately 750,000 homes.  *Id.*  Nepal's TPS designation was later extended because of sustained strained infrastructure, civil unrest, and inadequacies in safe housing, food, medicine, and education.  81 Fed. Reg. 74470 (Oct. 26, 2016).

Hurricane Mitch hit Honduras in late October 1998, causing "widespread heavy rain and severe flooding" in Honduras, Nicaragua, and other nearby countries that resulted in "thousands dead or missing" and "tremendous property, infrastructure, and crop damage."  *25 Years Later: Looking Back at the October Monster Named Mitch*, NOAA (Oct. 27, 2023).  Mitch was the second strongest October hurricane on record and the eighth strongest Atlantic hurricane.  *Id.*

In response to the devastation of Hurricane Mitch, on January 5, 1999, the Attorney General designated Honduras for TPS.  64 Fed. Reg. 524 (Jan. 5, 1999).  Over the next two decades, both Republican and Democratic administrations found that the conditions which warranted the initial TPS designation persisted.  *See* WILSON, *supra* at 11.  Moreover, DHS also found a "series of environmental events that have significantly impeded economic development and recovery, compounding the disruption in living conditions caused by Hurricane Mitch."  79 Fed. Reg. 62170 (Oct. 16, 2014); 88 Fed. Reg. 40304 (Jun. 21, 2023).  These conditions included drought, a tropical storm, a coffee-destroying fungus, flooding, an earthquake, and others.  *Id.*

Nicaragua was similarly hit by Hurricane Mitch and designated for TPS.  *See* 64 Fed. Reg. 526 (Jan. 5, 1999); 88 Fed. Reg. 40294 (Jun. 21, 2023) ("The devastation of Hurricane Mitch affected nearly 868,000 people.  Landslides and floods destroyed entire villages and caused extensive damages to the transportation network, housing, medical and educational facilities,

United States District Court
Northern District of California

10

water supply and sanitation facilities, and the agricultural sector.").  Nicaragua's TPS status was extended multiple times across Democratic and Republican administrations due to "recurrent" extreme weather events.  88 Fed. Reg. 40294 (Jun. 21, 2023).  Nicaragua was also found to be the fourth most affected country in the world by extreme weather events from 1996 to 2015.  *Id.*

The Trump administration first attempted to terminate the TPS designations for Nepal, Honduras, and Nicaragua during the President Trump's first term. WILSON, *supra* at 12, 19.  At around the same time, the first Trump administration also attempted to terminate TPS for El Salvador, Haiti, and Sudan.  *See* WILSON, *supra*.  These termination efforts were ultimately stalled by federal courts across the United States.  *See Ramos v. Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018), vacated and remanded sub nom, *Ramos v. Wolf*, 975 F.3d 872 (9th Cir. 2020), reh'g en banc granted, opinion vacated, 59 F.4th 1010 (9th Cir. 2023); *Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019).  The subsequent Biden administration rescinded the TPS terminations and extended designations.  *See, e.g.*, 88 Fed. Reg. 40304 (Jun. 21, 2023); 88 Fed. Reg. 40294 (Jun. 21, 2023).

## D.    The Current Administration and TPS

On the day President Trump took office for his second administration, President Trump issued an executive order titled, "protecting the American People Against Invasion" ("Invasion EO").  90 Fed. Reg. 8443 (Jan. 20, 2025).  The Invasion EO cited to an "unprecedented flood of illegal immigration into the United States" and stated the following about those in the United States:

> Many of these aliens unlawfully within the United States present significant threats to national security and public safety, committing vile and heinous acts against innocent Americans. Others are engaged in hostile activities, including espionage, economic espionage, and preparations for terror-related activities. Many have abused the generosity of the American people, and their presence in the United States has cost taxpayers billions of dollars at the Federal, State, and local levels.

*Id*. at § 1.  The Invasion EO ordered the Secretary of State, Attorney General, and DHS Secretary to "rescind the policy decisions of the previous administration that led to the increased or continued presence of illegal aliens in the United States, and align any and all departmental

11

1    activities with the policies set out by this order and the immigration laws." *Id*. § 16. This

2    included "ensuring that designations of Temporary Protected Status are consistent with the

3    provisions of section 244 of the INA (8 U.S.C. 1254a), and that such designations are

4    appropriately limited in scope and made for only so long as may be necessary to fulfill the textual

5    requirements of that statute." *Id*. § 16(b).

6          The Invasion EO would be cited in later decisions vacating or terminating TPS

7    designations. *See* 90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025); 90 Fed.

8    Reg. 24151 (Jun. 6, 2025). *See also* ECF 18-11 at 2 (citing "President Trump's promise to rescind

9    policies that were magnets for illegal immigration and inconsistent with the law" when vacating

10   Haiti's TPS extension). On January 27, 2025, in an email exchange between DHS officials, Tony

11   Pham wrote to Marc Rosenblum that "This is a project involving termination of TPS status and we

12   need to tell the data story if can be." ECF 18-5 at 2. *See also* ECF 18-6 at 4 (privilege log

13   showing a document labeled for Venezuela TPS "termination" on January 26, 2025). Tony Pham

14   also requested information on "the inter-relationship between the Columbia [sic] Honduras

15   Nicaragua Venezuela (CHNV) Parole Processes and TPS." ECF 18-5 at 3. The extension of

16   Venezuela's TPS status was vacated several days later which marked the first time a TPS

17   extension had ever been vacated. 90 Fed. Reg. 8805 (Feb. 3, 2025). USCIS officials also

18   communicated to "focus on any improvements" when evaluating country conditions. ECF 18-7 at

19   2. For example, a January 31, 2025 draft memo for the Secretary excluded food insecurity and

20   political repression and human rights from the country conditions considered for Venezuela. *See*

21   ECF 18-9.

22          These actions were taken in the context of repeated rhetoric by administration officials that

23   associated immigrants and TPS holders with criminal activity or other undesirable traits. During

24   Secretary Noem's confirmation hearing, Secretary Noem remarked that "the extension of over

25   600,000 Venezuelans as well is alarming when you look at what we've seen in different states,

26   including Colorado with gangs doing damage and harming the individuals and the people that live

27   there." ECF 18-14 at 28. She indicated that the extensions "will no longer be allowed." *Id*. In an

28   earlier news interview, future Secretary Noem similarly referred to immigrants as "some of the

United States District Court
Northern District of California

12

1  most dangerous people in the world" and that other countries were "empty[ing] out their prisons,

2  their mental institutions" and sending those individuals to the United States.  ECF 18-15 at 7.  In a

3  January 29, 2025 post on X, Secretary Noem announced that she would end a Biden order that

4  allowed Venezuelans to stay in the country and "violate our laws."  ECF 18-16 at 2.  In a March

5  20, 2025 post on X, Secretary Noem associated "migration management" with "sav[ing] American

6  lives and get[ting] criminals off our streets!"  ECF 18-17 at 2.  In a May 19, 2025 post on X, DHS

7  equated TPS holders with "MS-13 gang members," "known terrorists," and "murderers."  ECF 18-

8  18 at 2.  These statements are consistent with similar statements by President Trump including one

9  occurrence in which he stated that migrants were "poisoning the blood of our country."  ECF 18-

10  20 at 9–10.

### E.    Secretary Noem's TPS Terminations for Nepal, Honduras, and Nicaragua

12      Following a vacatur of Venezuela's TPS and a string of TPS terminations for Afghanistan,

13  Cameroon, and Haiti, Secretary Noem terminated TPS for Nepal on June 6, 2025.  90 Fed. Reg.

14  24151 (Jun. 6, 2025).  The terminations for Honduras and Nicaragua came one month later on July

15  8, 2025.  90 Fed. Reg. 30086 (July 8, 2025); 90 Fed. Reg. 30089 (July 8, 2025).  All three

16  termination notices cite the Invasion EO.  *See* 90 Fed. Reg. 24151 (Jun. 6, 2025); 90 Fed. Reg.

17  30089 (July 8, 2025); 88 Fed. Reg. 40304 (Jun. 21, 2023).

18      The Nepal termination notice focuses on the recovery efforts following the 2015

19  earthquake.  *See* 90 Fed. Reg. 24151 (Jun. 6, 2025).  The notice asserts that there have been

20  improvements in environmental disaster preparedness as well as substantial reconstruction

21  following the earthquake's destruction.  *Id*.  The notice concedes that "Nepal has continued to

22  experience subsequent regional environmental events, including flooding and landslides" and that

23  "Nepal remains one of the poorest countries in the world" but nevertheless finds that modest

24  economic growth (two percent) and reconstruction efforts support a termination of Nepal's TPS

25  designation.  *Id*.  The notice does not mention rising inflation, the effect of the Russian invasion of

26  Ukraine on Nepal's agricultural capacity, or the "triple threat of global economic effects, dire

27  environmental shocks, and the lingering impacts of the COVID–19 pandemic," which were

28  previously cited in the 2023 extension of Nepal's TPS status.  88 Fed. Reg. 40317 (Jun. 21, 2023).

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    The termination notice for Honduras emphasizes that the destruction of Hurricane Mitch

2    has largely been overcome, and that Honduras is "now a popular tourism and real estate

3    investment destination." 90 Fed. Reg. 30089 (July 8, 2025). The notice also cites new

4    infrastructure projects, foreign direct investment, and a Trump era program designed to support

5    the huge numbers of migrants Honduras expects the administration to deport. *Id*. Unlike previous

6    iterations of DHS notices on Honduras, the Honduras notice does not mention political violence or

7    crime. *See* 90 Fed. Reg. 30089 (July 8, 2025); 88 Fed. Reg. 40304 (Jun. 21, 2023). There is also

8    no mention of drought, tropical storms, coffee-destroying fungi, flooding, or earthquakes, all of

9    which had served as bases for extensions. *Id*.

10    The Nicaragua termination notice similarly notes that the devastation associated with

11    Hurricane Mitch no longer persists. 90 Fed. Reg. 30086 (July 8, 2025). The notice asserts that

12    Nicaragua "is now a growing tourism, ecotourism, agriculture, and renewable energy leader." *Id*.

13    The notice also cites improvements in infrastructure, education, health, and agriculture. *Id*. The

14    notice makes no mention of the recurrent weather events that previous extension notices had

15    highlighted. *See id*. For example, the notice does not mention Hurricane Julia, which flooded 800

16    homes in Nicaragua in October 2022, or Tropical Storm Bonnie, which that flooded 300 homes

17    just three months prior to Hurricane Julia. 88 Fed. Reg. 40294 (Jun. 21, 2023). The new notice

18    also omits the anti-democratic human rights violations and the humanitarian crisis which has led

19    to 108,000 people fleeing the country. *Id*.

20    **IV.    ANALYSIS OF PLAINTIFFS' MOTION TO POSTPONE**

21    Plaintiffs argue that the Court should postpone the Secretary's Nepal, Honduras, and

22    Nicaragua TPS terminations because (A) the Court has jurisdiction to grant relief; (B) Plaintiffs

23    are likely to succeed on the merits of their APA claims; (C) Plaintiffs are likely to succeed on the

24    merits of the Fifth Amendment claim; (D) Plaintiffs will suffer irreparable harm; (E) the balance

25    of harms and public interest weigh in favor of a stay; and (F) Plaintiffs seek proper relief. ECF 17.

26    **A.    The Court has Jurisdiction to Review Plaintiffs' Claims**

27    Defendants argue that (i) 8 U.S.C. §1254a(b)(5) and (ii) 8 U.S.C. § 1252(f) strip the Court

28    of jurisdiction. ECF 45 at 8–13.

### i. 8 U.S.C. § 1254a(b)(5) does not strip the Court of jurisdiction

Defendants argue 8 U.S.C. § 1254a(b)(5) prohibits judicial review of "any determination" by the Secretary "with respect to" TPS terminations. ECF 45 at 8–11. Plaintiffs argue that the Court may still consider decisions that are collateral to the Secretary's TPS terminations. ECF 53 at 1–4.

8 U.S.C. §1254a(b)(5) states "[t]here is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection."

The Court "begin[s] with the language of the statute." *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003). The Supreme Court has interpreted the words "a determination" to describe "*a single act* rather than a group of decisions or a practice or procedure employed in making decisions." *McNary v. Haitian Refugee Cent., Inc*, 498 U.S 479, 492 (1991) (emphasis added); *see also Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 56 (1993) ("We said that 'the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions."). Although the words "any" and "with respect to" in § 1254a(b)(5) arguably broaden the meaning of "determination," the operative word remains "determination." *See Bare v. Barr*, 975 F.3d 952, 967 (9th Cir. 2020) ("The statute governing asylum, 8 U.S.C. § 1158, provides that an alien 'may apply for asylum,' . . . and that the DHS Secretary or Attorney General 'may grant asylum to an alien who has applied,' . . . The operative word in the statute is 'grant.'"). The Court therefore focuses on the word "determination"; "any" and "with respect to" are not dispositive of the Court's interpretation. *See Small v. United States*, 544 U.S. 385, 388 (2005) ("The word 'any' considered alone cannot answer this question . . . we must look beyond that word itself.").

A review of the rest of § 1254a supports that "any determination" should be interpreted to mean the single act of deciding whether the country conditions continue to be met for the purposes of designating or terminating TPS. *See* 8 U.S.C. § 1254a(b)(3)(A) ("At least 60 days before end of the initial period of designation . . .the Attorney General . . . shall determine whether the conditions for such designation under this subsection continue to be met"); ("If the Attorney

15

United States District Court
Northern District of California

1  General determines under subparagraph (A) that a foreign state . . . no longer continues to meet the

2  conditions for designation under paragraph (1), the Attorney General shall terminate the

3  designation.").  As *McNary* explained, this single act does not include "general collateral

4  challenges to unconstitutional practices and policies used by the agency" in determining whether

5  to terminate TPS.  498 U.S. at 492.

6         Defendants' citation to *Patel v. Garland*, 596 U.S. 328 (2022) is not dispositive.  *Patel*

7  involved interpretation of the words "any judgment" in the context of a petitioner's request for a

8  federal court to review the "factual determinations" underlying an immigration court's denial of

9  discretionary relief.  596 U.S. at 335–36.  These factual determinations included "whether [a

10  petitioner] testified credibly and whether [a petitioner] had subjectively intended to misrepresent

11  himself as a citizen."  *Id*. at 335.  In contrast, here, the words "any determination" is in the context

12  of Plaintiffs' legal—not factual—claims that the Secretary erred in terminating TPS protections

13  for Nepal, Honduras, and Nicaragua under the APA and the Fifth Amendment.  "The APA thus

14  codifies for agency cases the unremarkable, yet elemental proposition reflected by judicial practice

15  dating back to *Marbury*: that courts decide legal questions by applying their own judgment."

16  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 391–92 (2024).  The APA "specifies that

17  courts, not agencies, will decide '*all* relevant questions of *law'* arising on review of agency action

18  . . . even those involving ambiguous laws—and set aside any such action inconsistent with the law

19  as they interpret it."  *Id*. at 392 (emphasis added).  *Patel*'s holding that courts lack jurisdiction to

20  review any judgments that underlie immigration courts' factual findings is therefore

21  distinguishable from Plaintiffs' statutory and constitutional challenges to the Secretary's TPS

22  terminations.  The Court, for example, need not determine whether there is an "ongoing conflict"

23  posing a serious threat to safety or an "earthquake, flood, drought, epidemic, or other

24  environmental disaster" in Honduras, Nepal, or Nicaragua to evaluate Plaintiffs' APA or Fifth

25  Amendment claims.  8 U.S.C. § 1254a(b).

26         *Patel* also does not preclude this Court's jurisdiction because *Patel* involved interpretation

27  of the word "judgment," whereas this case involves interpretation of the word "determination."  In

28  *Patel*, the Supreme Court interpreted the word "judgment" to broadly mean "any authoritative

16

1    decision" concerning factual determinations and recognized "Congress' choice to reduce

2    procedural protections in the context of discretionary relief."  596 U.S. at 337–38, 346.  However,

3    here, Congress passed the TPS statute out of a need to limit and guide the Executive's discretion

4    in granting stays of deportation.  *See* H.R. Rep. No. 101-244, at 8 (1989) (expressing

5    "disappointment" at the executive's failure to provide relief to nationals of certain countries such

6    that "legislation has become necessary").  Members of Congress lamented the lack of regulation of

7    EVD.  *See* H.R. Rep. No. 101-245, at 11–12 (1989); 135 Cong. Rec. H7501 (daily ed. Oct. 25,

8    1989) (statement of Rep. Bill Richardson) (emphasizing the need "to establish an orderly,

9    systematic procedure for providing temporary protected status . . . because we need to replace the

10   current ad hoc, haphazard regulations and procedures that exist today."); 135 Cong. Rec. H7501

11   (daily ed. Oct. 25, 1989) (statement of Rep. Sander Levine) (supporting a bill that "will

12   standardize the procedure for granting temporary stays of deportation. Refugees, spawned by the

13   sad and tragic forces of warfare, should not be subject to the vagaries of our domestic politics as

14   well.").  Congress' intent guides the Court's interpretation of "any determination" and, given that

15   the Supreme Court has interpreted "determination" to refer to a single act, the Court finds that

16   Defendants fail to provide sufficient justification to broaden the meaning of "determination."  *See*

17   *City of Los Angeles v. Barr*, 941 F.3d 931, 940 (9th Cir. 2019) ("In every case, 'it is the intent of

18   Congress that is the ultimate touchstone.'") (quoting *Arizona v. United States*, 567 U.S. 387, 453

19   (2012)); *Allen v. Milas*, 896 F.3d 1094, 1103 (9th Cir. 2018) ("The presumption of judicial

20   reviewability is so strong that only upon a showing of 'clear and convincing evidence of a contrary

21   legislative intent should the courts restrict access to judicial review.") (internal quotation omitted).

22        During oral argument, Defendant explained that the government seeks to preclude judicial

23   review of all factual *and* legal determinations under the TPS statute.  Defendants were also notably

24   silent regarding Plaintiffs' argument that barring all judicial review would allow the President to

25   grant or deny TPS as a lever for his negotiations with countries, and without concern for the

26   express guidelines that Congress requires in the TPS statute.  The Court shares this concern and

27

28

United States District Court
Northern District of California

does not forget that this country has bartered with human lives.[1] Nor does the Court shut its eyes

to the country's shifting attitudes towards immigrants.[2]

---

[1]    During oral argument, Plaintiffs argued that granting unfettered discretion over TPS terminations would allow the President to give or take TPS away from some country whenever he feels like it or for the purpose of trade negotiations.  The Court recognizes that the United States has a long history of transporting individuals against their will, to places unfamiliar to them, and for the purposes of trade.  For example, the United States was an active participant in the transatlantic slave trade which uprooted individuals in Africa and brought them to this continent. The emancipation of slaves saw the same pattern, but in reverse.  Many whites were uncomfortable with the idea of free non-white people in their communities, even if they had lived in the United States for generations. *See* OUSMANE K. POWER-GREENE, AGAINST WIND AND TIDE: THE AFRICAN STRUGGLE AGAINST THE COLONIZATION MOVEMENT (2014).  Plaintiffs' allegations echo these same traditions.  Plaintiffs allege that "Secretary Noem, President Trump, and members of the Trump campaign and administration have consistently used racist invective to describe their TPS decisions involving immigrants from non-white, non-European countries, including those involving the countries at issue here."  Compl. ¶ 5.

Plaintiffs also allege that "TPS holders are facing the imminent loss of legal status, and as a result, are already being forced to make the impossible choice whether to return to a country in crisis, remain in the United States without lawful immigration status, or uproot themselves again to try to find refuge in some third country."  Compl. ¶ 130.  Indeed, Plaintiffs here face violence and threats to their health if deported including Patricia Carbajal who fears sexual violence against herself and her daughter in Honduras, Maria Elena Hernandez who relies on U.S. insurance and medical care to treat her heart condition, or O.C. who will no longer be able to obtain the diabetes medication she needs to survive if TPS is terminated.  *See* ECF 17-4, 17-5, 17-12.

America has seen this pattern before.  Many freed slaves were sent to countries to which they had no connection whatsoever.  These efforts made "free blacks fearful of a mass deportation across the Atlantic Ocean reminiscent of the Middle Passage."  POWER-GREENE, *supra* at 17 (describing resistance to white plans to send freed blacks to Liberia).  Some states, such as Virginia, passed laws demanding freed slaves to leave.  Eric Burn, *A Manumission in the Mountains: Slavery and the African Colonization Movement in Southwestern Virginia*, 33 APPALACHIAN J. 164, 171 (2006).  In other cases, slaveowners made freedom conditional on leaving the United States.  Mark J. Fleszar, *"My Laborers in Haiti Are Not Slaves": Proslavery Fictions and a Black Colonization Experiment on the Northern Coast, 1835-1846*, 26 J. SOC. HIST. 478, 478 (1993) (describing a Florida slaveowner requiring removal to Haiti as a condition for freedom).  National Geographic has referred to this period of forced removal in U.S. history as "a racist initiative to remove as many free Black people as possible from American soil."  Enrique Vaquerizo, *Were there sinister motives behind founding Liberia?*, NATIONAL GEOGRAPHIC (Jun. 18, 2025).  The results of this endeavor were devastating and one study found that removal to Liberia resulted in the "highest mortality rates in accurately recorded human history."  Antonio McDaniel, *Extreme Mortality in Nineteenth-Century Africa: The Case of Liberian Immigrants*, 29 Demography 581, 581 (Nov. 1992).

[2]    Acceptance of immigrants has ebbed and flowed over the centuries of U.S. history.  In the late 1700s, immigration was largely unregulated except that naturalization as a path to citizenship was explicitly limited to "free white persons" in one of the first laws adopted in the nascent nation. *See* Naturalization Act of 1790, ch. 3, § 1, 1 Stat. 103, 103–04 (repealed 1795).  During this

18

United States District Court
Northern District of California

1    However, Congress has not delegated Defendants' requested "[e]xtraordinary grant[] of

2    regulatory authority" by using "any" in the TPS statute. *West Virginia v. EPA*, 597 U.S. 697, 723

3    (2022); *see also  Nixon v. Missouri Municipal League*, 541 U.S. 125, 132, (2004) ("'any' means

4    different things depending upon the setting") (cleaned up).  "Extraordinary grants of regulatory

5    authority are rarely accomplished through modest words, vague terms, or subtle devices . . . Nor

6    does Congress typically use oblique or elliptical language to empower an agency to make a radical

7    or fundamental change to a statutory scheme." *West Virginia*, at 723. (cleaned up).  "Enabling

8    legislation is generally not an 'open book' to which the agency [may] add pages and change the

9    plot line." *Id.*

10    The Court, therefore, declines Defendants' invitation to rely on § 1254a(b)(5)'s use of

11    "any" to both ignore Supreme Court precedent interpreting the word "determination" and ignore

12    Congress' intent.  *See Catholic Social Services*, 509 U.S. at 64 ("[W]e avoided an interpretation of

13    8 U.S.C. § 1160(e) . . . that would have amounted to 'the practical equivalent of a total denial of

14    judicial review of generic constitutional and statutory claims,' . . . so here we avoid an

15    interpretation of § 1255a(f)(1) that would bar front-desked applicants from ever obtaining judicial

16    review of the regulations that rendered them ineligible for legalization."); *United States v.*

17    *Lazarenko*, 624 F.3d 1247, 1251 (9th Cir. 2010) ("In other words, because a literal application of

18    the plain text leads to absurd results, the plain text does not control.").

19

20    period, large numbers of African slaves were also brought into the country against their will.  As
21    the United States industrialized in the late 19th century, large numbers of immigrants from
southern and eastern Europe and other places flowed into the country. *Immigration to the United*
22    *States, 1851-1900*, LIBRARY OF CONGRESS (2025).  In reaction to this, the government excluded
some non-white immigrants, most notably through the Chinese Exclusion Act which was upheld
23    by the Supreme Court in a case which set the foundation for plenary power over immigration. *See*
22 Stat. 58 (1882); *Chae Chan Ping v. United States*, 130 U.S. 581 (1889). *See also Fong Yue*
24    *Ting v. United States*, 149 U.S. 698 (1893). The United States also limited Japanese immigration
in the Gentlemen's Agreement of 1907.
25        Plaintiffs here face similar tides.  For example, Plaintiff O.C. started his own small
26    business, R.A. helped treat children with brain cancer, and Plaintiff Silva helps heart patients at
Stanford Hospital, a kind of opportunity that would be unattainable in Honduras. ECF 17-3; ECF
27    17-5; 17-9.  Plaintiffs have been in the United States for decades and contributing to the American
system.  Still, they face exclusion in the name of the President's Invasion EO.
28

Accordingly, the Court finds that 8 U.S.C. § 1254a(b)(5) does not preclude the Court's jurisdiction over Plaintiffs' claims.

### ii.  8 U.S.C. § 1252(f)(1) does not strip the Court of jurisdiction.

Defendants argue that section 1252(f)(1) applies to the TPS statute and eliminates lower courts' authority to issue orders enjoining or restraining implementation TPS.  ECF 45 at 11–12. Plaintiffs argue that 1252(f)(1) only applies to injunctions and APA relief is not functionally the same as an injunction.  ECF 53 at 5.

8 U.S.C. 1252(f)(1) states:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

The Court finds that 1252(f)(1)'s reference to "enjoin or restrain" does not strip the Court of jurisdiction.  Here, Plaintiffs seek relief under the APA, which allows the Court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.  Plaintiffs' request for APA relief warrants a "presumption favoring judicial review."  *Sackett v. EPA*, 566 U.S. 120, 128 (2012).  Moreover, both the Ninth Circuit and Fifth Circuit have "rejected the argument that "§ 1252(f)(1) bars relief under the APA."  *Immigrant Defenders*, 2025 WL 2017247, at *10. Indeed, in *Nken,* the Supreme Court distinguished that a stay "simply suspend[s] judicial alteration of the status quo" while an injunction "directs the conduct of a party, and does so with the backing of [the Court's] full coercive powers."  *Nken v. Holder*, 556 U.S. 418, 428–29 (2009).  A postponement here would only preserve the status quo.

Accordingly, the Court finds that 8 U.S.C. § 1252(f)(1) does not strip the Court of jurisdiction.

### B.  Plaintiffs will Likely Succeed on the Merits of the Administrative Procedure Act Claims

Plaintiffs argue that their APA claims, involving Defendants' alleged preordained

United States District Court
Northern District of California

1    decisions and deviation from TPS prior practice and history, are likely to succeed on the merits.

2    ECF 17 at 15–19.

3            **i.    First APA Claim: Plaintiffs have shown that the Secretary's TPS**
               **terminations were likely preordained decisions and not based on country**

4              **conditions**

5            Plaintiffs' first APA claim alleges that the Nepal, Honduras, and Nicaragua TPS

6    terminations violate the APA because the terminations were preordained and therefore not based

7    on an objective review of county conditions.  ECF 1 at 152–57; ECF 17 at 15–17.  Plaintiffs argue

8    that the TPS terminations explicitly cite the invasion EO and improperly terminated TPS based on

9    positive improvements, rather than review of the initial natural disasters that affected the

10   countries.  ECF 17 at 16–17.  Defendants argue that it is not improper for an agency to come into

11   office with a policy preference.  ECF 45 at 13.  Defendants further argue that the Secretary's

12   terminations follow the TPS statute's requirements, which include review of the country

13   conditions.  *Id*. at 13–14.

14           The APA provides that "[a] person suffering legal wrong because of agency action, or

15   adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

16   entitled to judicial review thereof."  5 U.S.C. § 702.  "Courts must exercise their independent

17   judgment in deciding whether an agency has acted within its statutory authority, as the APA

18   requires."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  The APA also requires

19   Courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . .

20   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

21   706(2)(a).  "On such conditions as may be required and to the extent necessary to prevent

22   irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to

23   postpone the effective date of an agency action or to preserve status or rights pending conclusion

24   of the review proceedings."  5 U.S.C. § 705.

25           Here, Plaintiffs provide sufficient evidence to demonstrate that the Secretary's TPS Nepal,

26   Honduras, and Nicaragua terminations were based on a preordained determination to end the TPS

27   program, rather than an objective review of the country conditions.  Indeed, at the Secretary's

28   confirmation hearing—before the Secretary reviewed any country conditions reports—the

United States District Court
Northern District of California

21

1    Secretary said that TPS extensions will not be allowed to "go[] forward the way that they are."

2    ECF 18-14 at 104:20–21.  Before terminating TPS for Nepal, Honduras, and Nicaragua, the

3    Secretary also commented that TPS "was abused, exploited, and politicized" and "an immigration

4    scheme[] that make[s] Americans less safe." ECF 44-2.  Moreover, the TPS terminations

5    explicitly cite to President Trump's Invasion EO, which implied that those with TPS were

6    "illegal," contributed to an "invasion" and "significant threat to national security and public

7    safety," and "commit[ed] vile and heinous acts against innocent Americans."  The Secretary

8    admitted to following the Invasion EO as the President's directive.  *See* ECF 44-2 ("[W]hen the

9    president gives a directive, the Department of Homeland Security will follow it.").

10       In addition to the Secretary's statements, the Secretary has a history of systematically

11   attempting to limit TPS.  *See* 90 Fed. Reg. 8805 (Venezuela); 90 Fed. Reg. 28760 (Haiti); 90 Fed.

12   Reg. 20309 (Afghanistan); 90 Fed. Reg. 23697 (Cameroon).  The Secretary's Nepal, Honduras,

13   and Nicaragua TPS terminations also did not include a discussion of data that was previously

14   deemed relevant for prior TPS determinations.  *See Northwest Envt'l. Def. Ctr. v. Bonneville*

15   *Power Admin.*, 477 F.3d 668, 687 (9th Cir. 2007) ("[T]he agency must examine the relevant data

16   and articulate a satisfactory explanation for its action including a "rational connection between the

17   facts found and the choice made.") (quoting *Motor Vehicle Mfgs. Ass'n v. State Farm Mutual*

18   *Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  For example, the Secretary's Nepal TPS termination did

19   not mention inflation, the effect of the Russian invasion of Ukraine on Nepal's agricultural

20   capacity, or the effects of the COVID–19 pandemic.  *Compare* 90 Fed. Reg. 24151 *with* 88 Fed.

21   Reg. 40317.  The Honduras TPS termination did not mention political violence or crime.

22   *Compare See* 90 Fed. Reg. 30089 *with* 88 Fed. Reg. 40304.  Likewise, the Nicaragua TPS

23   termination ignored recurrent weather events, such as Hurricane Julia and Tropical Storm Bonnie.

24   *Compare* 90 Fed. Reg. 30086 *with* 88 Fed. Reg. 40294.

25       Exercising its "independent judgment in deciding whether [the Secretary] acted within

26   [her] statutory authority," the Court finds that Plaintiffs have provided sufficient evidence to

27   demonstrate a likelihood that the Secretary terminated TPS for Nepal, Honduras, and Nicaragua

28   based on a pre-ordained decision to limit TPS.  *See Loper Bright Enterprises v. Raimondo*, 603

22

U.S. 369, 412 (2024).

Accordingly, the Court finds that Plaintiffs will likely succeed on the merits of their first APA claim.

### ii.    Second APA Claim: Plaintiffs have shown that the Secretary's TPS terminations deviated from prior practice without good reason

Plaintiffs' second APA claim alleges that the TPS terminations violate the APA because the terminations broke from past practice concerning orderly transition periods without explanation. *See* ECF 1 at 158–161; ECF 17 at 17–19. Plaintiffs argue that the prior practice for ending TPS protections that had been in place for longer than 3 years was to provide no less than six-months to transition, but here the Secretary only gave 60 days without an explanation for the change. ECF 17 at 17. Defendants argue that the TPS statute gives the Secretary the authority to terminate TPS protections with a 60-day timeline. ECF 45 at 15.

"The change-in-position doctrine asks two questions." *FDA v. Wages and White Lions*, LLC, 145 S. Ct. 898, 918 (2025). "The first is whether an agency changed existing policy." *Id.* Once a change in agency position is identified, the doctrine poses a second question: Did the agency "display awareness that it *is* changing position" and offer "good reasons for the new policy"? *Id.*

Regarding the first question, Plaintiffs have provided sufficient evidence demonstrating that, for the past twenty-two years, since January 27, 2003, the prevailing practice of prior administrations was to provide at least 6 months after the TPS termination date for holders to transition. *See* ECF 28. Defendants do not meaningful dispute this practice in their opposition. *See* ECF 45 at 15–16. Given this prior practice of providing a six-month transition after termination, the Court finds that the Honduran, Nepal, and Nicaragua TPS Terminations change existing policy by only providing a 60-day transition. *See INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996) ("Though the agency's discretion is unfettered at the outset, if it announces and follows—by rule or by settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned . . .").

United States District Court
Northern District of California

1        Turning to the second question of whether the Secretary displayed an awareness of the

2   change and offered "good reasons" for the new policy, the Court must ask whether the Secretary

3   was "cognizant that longstanding policies may have 'engendered serious reliance interests that

4   must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212 (2016)

5   (quoting *F.C.C.*, 556 U.S. at 515).  Here, the Honduras and Nicaragua termination notices only

6   provide that "[a] sixty-day orderly period of transition is consistent with the precedent of previous

7   TPS country terminations and makes clear that the United States is committed to clarity and

8   consistency."  *See* 90 Fed. Reg. 30091, 30088.  Because these notices fail to explain how a 60-day

9   transition period is consistent with the agency's twenty-two year practice of providing at least a 6

10  month transition period, the Court finds that Plaintiffs will likely succeed on the merits of their

11  second ADA claim as to Honduras and Nicaragua.  *See Encino Motorcars*, 579 U.S. at 222

12  ("It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an

13  interpretation to be an arbitrary and capricious change from agency practice.'") (internal citation

14  omitted).

15       Regarding Nepal, the Nepal termination notice states that "there is no longer an

16  environmental disaster or other situation causing substantial, but temporary, disruption of living

17  conditions and that Nepal can adequately handle the return of its nationals, and considering other

18  relevant factors, the Secretary has determined that a 60-day transition period is sufficient and in

19  accord with Executive Order 14159."  90 Fed. Reg. 24153.  In a footnote, the Secretary

20  "recognized that certain previous TPS terminations allowed for an extended transition" but said

21  that "certain other TPS designations were terminated without allowing for an extended transition

22  period."  *Id*. at n. 24.  The Court finds that the Secretary's footnote alluding to "certain other TPS

23  designations [being] terminated without allowing for an extended transition period" failed to

24  acknowledge the twenty-two year practice of providing at least a 6 month transition period and did

25  not provide sufficient explanation for departure.  *See Enicino Motorcars*, 579 U.S. at 222 ("[T]he

26  Department offered barely any explanation.  A summary discussion may suffice in other

27  circumstances, but here—in particular because of decades of industry reliance on the

28  Department's prior policy—the explanation fell short of the agency's duty to explain why it

<div style="writing-mode: vertical-rl">United States District Court
Northern District of California</div>

1   deemed it necessary to overrule its previous position.”); *Dep't. of Homeland Sec.et al., v. Regents*

2   *of the University of California et al.*, 591 U.S. 1, 30 (2020) (“[T]he rescission memorandum

3   contains no discussion of forbearance or the option of retaining forbearance without benefits.

4   Duke ‘entirely failed to consider [that] important aspect of the problem.’ That omission alone

5   renders Acting Secretary Duke’s decision arbitrary and capricious.  But it is not the only

6   defect.  Duke also failed to address whether there was ‘legitimate reliance’ on the DACA

7   Memorandum.”).

8          Accordingly, the Court finds that Plaintiffs will likely succeed on the merits of their second

9   APA claim.

10         **C.    Plaintiffs will Likely Succeed on the Merits of their Fifth Amendment Claims**

11         The Fifth Amendment states that “No person shall. . . be deprived of life, liberty, or

12   property, without due process of law; nor shall private property be taken for public use, without

13   just compensation.”  U.S. CONST. amend V.

14         Plaintiffs argue that they are likely to succeed in showing that Defendants violated the

15   equal protection process clause of the Fifth Amendment.  ECF 19–22.  Plaintiffs assert that (i)

16   *Arlington Heights*’ standard of racial animus applies to Plaintiffs’ Fifth Amendment claims; (ii)

17   Plaintiffs will likely succeed in showing racial animus under *Arlington Heights*; and (iii) Plaintiffs

18   would still likely succeed in showing animus under *Trump v. Hawaii.  Id.*

19              **i.   *Arlington Heights’* Standard Applies to Plaintiffs’ Claims**

20         Plaintiffs argue that the Court should apply strict scrutiny under *Vill. of Arlington Heights*

21   *v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) when reviewing Plaintiffs’ Fifth Amendment

22   claim.  ECF 17 at 19–20.  Defendants argue that the Court should apply the rational basis test

23   under *Hawaii v. Trump*, 585 U.S. 667 (2018) because *Hawaii* applies to any law that would inhibit

24   the flexibility of the President to respond to changing world conditions.  ECF 45 at 16.

25         *Arlington Heights* involved claims that a board of trustee’s denial of law and moderate-

26   income housing was motivated by racial discrimination.  429 U.S. at 258–59.  The Supreme Court

27   held that a violation of the Fifth Amendment’s Equal Protection Clause requires “[p]roof of

28   racially discriminatory intent or purpose” and that a plaintiff need not “prove that the challenged

1  action rested solely on racially discriminatory purposes." 429 U.S. at 265.  The Supreme Court

2  recognized that a court's analysis into "whether invidious discriminatory purpose was a

3  motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of

4  intent as may be available."  *Id*. at 266.

5      *Trump v. Hawaii*, in contrast, involved the President's proclamation that "placed entry

6  restrictions on the nationals of eight foreign states whose systems for managing and sharing

7  information about their nationals the President deemed inadequate." 585 U.S. at 677.  The

8  Supreme Court limited the Court's review of "any rule of constitutional law that would inhibit the

9  flexibility of the President to respond to changing world conditions." 585 U.S. at 704.

10      The Court finds that *Arlington Heights* applies to Plaintiffs' claims.  *Arlington Heights*

11  governs claims of racial animus and Plaintiffs specifically allege that the Secretary's Nepal,

12  Honduras, and Nicaragua TPS terminations were motivated by racial animus.  *See* Compl. ¶¶ 86–

13  94, 156; *see also id*. ¶¶ 95–128.  *See Dep't of Homeland Security v. Regents of the Univ. of*

14  *California*, 591 U.S. 1, 34 (2020) ("To plead animus, a plaintiff must raise a plausible inference

15  that an 'invidious discriminatory purpose was a motivating factor" in the relevant decision.'")

16  (quoting *Arlington Heights*, 429 U.S. at 266 ); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200,

17  227 (1995) ("[A]ll racial classifications, imposed by whatever federal, state, or local governmental

18  actor, must be analyzed by a reviewing court under strict scrutiny.").  Defendants' reliance on

19  *Mathews v. Diaz*, 426 U.S. 67, 83 (1976), is inapposite because *Matthews* involved whether

20  Congress may condition medical insurance participation based on a five-year period and

21  admission for permanent residence.  426 U.S. at 69–71.  The case concerned whether Congress

22  may classify noncitizens based on class; there was no allegation of racial animus.  *Id*. at 79–80.

23      Although *Trump v. Hawaii*, 585 U.S. 667 (2018) constrains the Court's "inquiry into

24  matters of entry and national security," Defendants fail to explain how the Secretary's TPS

25  terminations concern matters of entry and national security.  Unlike the proclamation in *Trump v.*

26  *Hawaii*, which explained that "certain entry restrictions were necessary to prevent the entry of

27  those foreign nationals about whom the United States Government lacks sufficient information;

28  elicit improved identity-management and information-sharing protocols and practices from foreign

United States District Court
Northern District of California

26

1  governments . . . [and] the restrictions would most likely to encourage cooperation while

2  protecting the United States until such time as improvements occur," 585 U.S. at 679 (cleaned up),

3  Defendants here rely on a blanket assertion that TPS impacts matters of foreign relations.  As the

4  Court explained above, simply existing in the United States with TPS is not a crime.  Plaintiff TPS

5  holders are already located in the country and would not qualify for TPS if convicted of any felony

6  or 2 or more misdemeanors in the United States.  8 U.S.C. § 1254a(c)(2).

7      Accordingly, the Court applies the strict scrutiny standard under *Arlington Heights* to

8  Plaintiffs' equal protection claims.

9          **ii.    Plaintiffs are likely to succeed on showing that the Secretary's termination
           of TPS for Nepal, Honduras, and Nicaragua were motivated by racial**
10          **animus**

11     Plaintiffs argue the Secretary's statements, specific sequence of events, historical

12  background of the Secretary's decisions, and the disparate impact demonstrate racial animus.  ECF

13  17 at 20–22.  Defendants argue that Plaintiffs cannot establish racial animus because the Ninth

14  Circuit has already rejected Plaintiffs' arguments in *Ramos*, Plaintiffs fail to provide a direct link

15  between their evidence and the Secretary's decision, Plaintiffs rely on statement by President

16  Trump and not the Secretary, the Secretary's terminations were based on evidence, and the

17  Secretary has spoken in favor of immigration policy that focuses on America's economy and

18  security interests.  ECF 45 at 18–20.

19     "Under *Arlington Heights*, a plaintiff must 'simply produce direct or circumstantial

20  evidence demonstrating that a discriminatory reason more likely that not motivated' the defendant

21  and that the defendant's actions adversely affected the plaintiff in some way."  *Ave. 6E Invs., LLC*

22  *v. City of Yuma, Ariz.*, 818 F.3d 493, 504 (9th Cir. 2016) (internal quotations omitted).  "A

23  plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the

24  challenged action, but only that it was a 'motivating factor.'"  *Id*.  "The court analyzes whether a

25  discriminatory purpose motivated the defendant by examining the events leading up to the

26  challenged decision and the legislative history behind it, the defendant's departure from normal

27  procedures or substantive conclusions, and the historical background of the decision and whether

28  it creates a disparate impact."  *Id*.

United States District Court
Northern District of California

27

1    Plaintiffs' direct and circumstantial evidence cannot be ignored.  Secretary Noem has

2    described immigration as an "invasion happening on purpose . . . to remake the foundation of this

3    country."  ECF 18-15 at 7:14–15.  Moreover, at her confirmation hearing, on January 15, 2025,

4    Secretary Noem stated that TPS "has been abused and manipulated by the Biden administration."

5    ECF 18-14 at 104:18–19.  Before reviewing any country conditions reports, Secretary Noem also

6    stated that TPS "will no longer be allowed . . . extensions going forward the way that they are," *id*.

7    at 104:19–21, and commented that TPS was "an immigration scheme[] that make[s] Americans

8    less safe," ECF 44-2.  When describing what was "seen in different states," the Secretary stated

9    that there were "gangs doing damage and harming the individuals and the people that live there."

10   *Id*. at 104:24–25; 105:1–2.  After meeting with the Honduran Minister of Foreign Affairs, the

11   Secretary described the need for "migration management" and "reparation flights."  ECF 18-17.

12   Her agency broadly described individuals with TPS as "poorly vetted migrants" that included

13   "MS-13 gang members to known terrorists and murderers."  ECF 18-18.

14        These statements reflect the Secretary's animus against immigrants and the TPS program

15   even though individuals with TPS hold lawful status—a protected status that was expressly

16   conferred by Congress with the purpose of providing humanitarian relief.  *See* 8 U.S.C. §

17   1254a(c); H.R. 101-244 at 8; H.R. 101-245 at 11–12.  Their presence is not a crime.  Rather, TPS

18   holders already live in the United States and have contributed billions to the economy by legally

19   working in jobs, paying taxes, and paying contributions into MediCare and Social Security.  ECF

20   17-15 (Postel Decl.); 17-18 (Morten Decl.).  By stereotyping the TPS program and immigrants as

21   invaders that are criminal, and by highlighting the need for migration management, Secretary

22   Noem's statements perpetuate the discriminatory belief that certain immigrant populations will

23   replace the white population.  *See* ECF 17-20 (Young Decl.).  Although the Secretary's statements

24   "may appear innocent or only mildly offensive to one who is not a member of the targeted group,"

25   the statements are "in reality . . . intolerably abusive or threatening when understood from the

26   perspective of a plaintiff who is a member of the targeted group."  *McGinest v. GTE Service*

27   *Corp*., 360 F.3d 1103, 1116 (9th Cir. 2004); *see also Mi Familia*, 129 F.4th at 727 ("[T]he term

28   'illegals' can evidence racial animus for members of the Latino community in Arizona).  Indeed,

United States District Court
Northern District of California

28

United States District Court
Northern District of California

1  code words may demonstrate discriminatory intent.  *Ave. 6E Invs*, 818 F.3d at 504.

2    The political climate surrounding the Secretary's comments on immigrants further

3  supports the likelihood of racial animus.  *See Mi Familia*, 129 F.4th at 728 (courts should consider

4  "the political climate leading to" the challenged action).  President Trump campaigned with a

5  message that migrants were "poisoning the blood of our country."  ECF 18-20 at 8–9.  The

6  President has also asked why people "could not come from nice countries . . . like Denmark,

7  Switzerland, and Norway."  ECF 18-23.  Vice President Vance has also stated, "What Donald

8  Trump has proposed doing is we're going to stop doing mass parole.  We're going to stop doing

9  mass grants of Temporary Protected Status."  ECF 18-19 at 2.  Moreover, on January 20, 2025, the

10  day President Trump took office,  President Trump issued the Invasion EO, which connected TPS

11  with an "invasion" and "illegal" and painted "aliens" as presenting "significant threats to national

12  security and public safety, committing vile and heinous acts against innocent Americans."  *See*

13  Invasion EO (titled "Protecting the American People Against Invasion" and requiring review of

14  TPS).  After these statements were made, Secretary Noem admitted that "when the president gives

15  a directive, the Department of Homeland Security will follow it."  ECF 44-2.  Indeed, the

16  Secretary also cited the Invasion EO in her Nepal, Honduras, and Nicaragua TPS terminations.

17  *See* 90 Fed. Reg. 30089–91; 90 Fed. Reg. 24151–53; 90 Fed. Reg. 30088.

18    In totality, Plaintiffs have produced sufficient evidence demonstrating racial and

19  discriminatory animus in support of their Fifth Amendment claim.  Color is neither a poison nor a

20  crime.

21    Therefore, Plaintiffs have provided sufficient evidence to establish that Plaintiffs will

22  likely succeed on the merits of their Fifth Amendment claim.  The Court declines Defendants'

23  request to ignore the evidence described above based on a vacated Ninth Circuit precedent.

24     iii. **Even under the rational basis standard, Plaintiffs will likely succeed on the merits of their Fifth Amendment Claim**

25

26    Given the strength of the evidence, Plaintiffs' Fifth Amendment claim would also likely

27  succeed on the merits even if the Court applied the rational basis test.  Defendants argue that the

28  Secretary's termination decisions were plausibly related to the Government's border security,

United States District Court
Northern District of California

1  foreign relations interests, and the objectives of the TPS program but fail to explain how TPS

2  holders impact border security and foreign relations interests.  Although "[t]he President has vital

3  power in the field of foreign affairs, so does Congress, and the President does not have the

4  authority to override immigration laws enacted by Congress." *Biden v. Texas*, 597 U.S. 785, 830

5  (2022) (Alito, S., dissenting).  "[W]hen the President takes measures incompatible with the

6  expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only

7  upon his own constitutional powers minus any constitutional powers of Congress over the matter."

8  *Id.* (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952)).

9      Accordingly, even under the rational basis standard, the Court finds that Plaintiffs will

10  likely succeed on the merits of their Fifth Amendment claim.

11      **D.    Plaintiffs will Suffer Irreparable Injury Absent Postponement**

12      Plaintiffs argue that TPS holders will suffer irreparable harm absent relief.  ECF 17 at 22 –

13  23.  During oral argument, Defendants conceded that Plaintiffs will suffer harm but argued that

14  TPS is temporary in nature and Plaintiffs could have obtained citizenship status.

15      Plaintiffs must show that they will suffer irreparable harm absent relief.  *See Porretti v.*

16  *Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (citing *Winter*, 555 U.S. at 20).  "If a plaintiff

17  bringing such a claim shows he is likely to prevail on the merits, that showing will almost always

18  demonstrate he is suffering irreparable harm as well." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th

19  Cir. 2023) (cleaned up).

20      As discussed above, the Court finds that the Plaintiff will likely succeed on the merits of

21  their APA and Fifth Amendment claims.  Plaintiffs will suffer irreparable harm if the TPS

22  termination proceeds.  First, the loss of work authorization will be devastating to TPS holders, as

23  TPS holders will no longer be able to provide food or housing for their families.  *See Landon v.*

24  *Plasencia*, 459 U.S. 21, 34 (1982) ("Plasencia's interest here is, without question, a weighty one.

25  She stands to lose the right to stay and live and work in this land of freedom.") (internal quotations

26  omitted); s*ee also* ECF 17-18 ("41% of TPS holders owned homes."); ECF 17-15 ("Nearly one-

27  quarter (22%) of Honduran TPS households have mortgages").  The loss of employment is also

28  likely to lead to the loss of health insurance for TPS holders and their dependents.  Such a loss

would be life threatening to Plaintiffs like Maria Elena Hernandez who relies on insurance to manage her heart condition and O.C. who suffers from diabetes. *See* ECF 17-4; ECF 17-5. Health insurance also provides benefits to Plaintiffs' children some of whom are U.S. citizens and suffer from conditions that need constant management. *See* ECF 17-3.

Families also face the prospect of separation. Indeed, "[t]he right to live with and not be separated from one's immediate family is a right that ranks high among the interests of the individual." *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013) (cleaned up). Plaintiff Jhony Silva, for example, will be forced to decide whether to bring his autistic son to Honduras, where his son will not be able to receive the care he needs, or leave his son behind in the United States. *See* ECF 17-3. Plaintiff Patricia Carbajal will need to decide whether to leave her daughter behind in the United States or bring her to Honduras where Plaintiff and her daughter are likely to face sexual violence. *See* ECF 17-12. The approximate 41,627 children that risk being left behind in the United States may grow up without their parents or be forced into foster care. *See* ECF 17-16. "These are substantial injuries and even irreparable harms." *Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017).

Moreover, TPS holders, some of whom have been legally present in the United States for more than two decades, will lose their drivers' licenses, lose their ability to pursue educational and career opportunities, and face deportation. *See* ECF 17-3 (declaration of Plaintiff who was brought to the United States when he was three years old); ECF 17-7; 17-9. Those who leave may be barred from legal permanence residence even if they currently qualify for them. *See* ECF 17-15 ("If TPS holders who entered the U.S. without inspection choose to leave upon termination, they may be subject to a ten-year bar on re-entry, even if they are otherwise eligible for legal permanent residence pathways."). Those that are deported also risk being send to third-countries where they have no ties. *See* ECF 17-19 ¶ 20. Even if Plaintiffs are not deported, those that remain will become undocumented, unable to work in the formal economy, and unable to get an education. ECF 17-6.

Defendants' arguments are not convincing. Defendants do not contest the aforementioned harms that Plaintiffs stand to face if the termination goes forward, *see* ECF 45 at 20–22, and

1   conceded during oral argument that Plaintiffs would suffer harm.  Although Defendants argue that

2   Plaintiffs could obtain lawful status, "pathways to lawful status are rare for individuals who

3   arrived in the last several years" and "if a TPS holder's TPS ends and they fall out of lawful status,

4   then they will not be eligible to change status to a different non-immigrant status."  ECF 17-19 ¶

5   21.

6       Accordingly, the Court finds Plaintiffs will suffer irreparable harm absent postponement of

7   Nepal, Honduras, and Nicaragua TPS terminations.

8       **E.      The Balance of Harms and Public Interest Weigh in Favor of Postponement**

9       Plaintiffs argue that the balance of equities and public interest weigh in favor of granting

10  relief.  ECF 17 at 25.  Defendants argue that a delay in the Secretary's decisions undermines

11  United States foreign policy and national interest, and that the public has an interest in ensuring

12  that the process established by Congress is followed.  ECF 45 at 23–24.  Defendants also argue

13  that the Supreme Court's recent stay in *Noem v. Nat. TPS Alliance et al.,* No. 24A1059, 2025 WL

14  1427560 (May 19, 2025) ("NTPSA I") shows the strength of Defendants' position.  *Id.* at 23.

15      When the government is the opposing party, the balancing of the "harm to the opposing

16  party and weighing the public interest" merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The

17  Ninth Circuit "has consistently balanced the public interest on the side of the plaintiffs against the

18  public interest on the side of the government to determine where the public interest lies."  *Index*

19  *Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020).

20      The Court finds that the public has an interest in postponing the TPS terminations.

21      First, the economy will suffer if TPS holders are forced to leave the country.  *See All. for*

22  *the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) ("The effect on the health of the

23  local economy is a proper consideration in the public interest analysis.").  Termination of TPS for

24  Nepal, Honduras, and Nicaragua will result in a $1.4 billion loss to the United States economy.

25  ECF 52-1 at 9.  Given that the vast majority of TPS holders are in the work force, loss of TPS will

26  depress economic activity.  *See* ECF 17-16; 61-1 at 11 ("Approximately 87% of TPS holders in

27  the United States participate in the labor force, a substantially higher rate than the U.S. labor force

28  participation rate overall (about 62%)").  This will result in reductions in tax revenue and Social

United States District Court
Northern District of California

32

United States District Court
Northern District of California

1   Security and Medicare contributions for the United States.  ECF 52-1.  A recent study based on

2   census data found that TPS holders contribute $10.3 billion per year and pay $2.2 billion annually

3   in federal and state taxes.  ECF 17-18; *see also* ECF 61-1 ("TPS holders contributed $170.5

4   million to state and local taxes in California, $126 million in New York, and $13.8 million in

5   Illinois.").  Termination of TPS for Honduras alone will result in a loss of $73 million in Social

6   Security contributions and $17 million in Medicare contributions.  ECF 17-16.  Similarly,

7   termination of TPS for Nepal will result in a loss of $28 million in Social Security contributions

8   and $6.7 million in Medicare contributions, and termination of TPS for Nicaragua will result in a

9   loss of $4 million in Social Security contributions and $968,301 in Medicare contributions.  *Id.*

10      Not only will the government bring in less tax revenue if these TPS terminations go

11   forward, but it will also have to expend more money to enforce the termination.  ECF 17-18.

12   Deportation costs could amount to $863 million.  *Id.*  Moreover, because TPS holders would lose

13   their employer-based health insurance by losing TPS, the cost of public health care will increase

14   by increasing the proportion of immigrants on public health care and thereby increasing public

15   expenditures on emergency care provided to uninsured patients.  *See* ECF 52-1; *see also* 61-1 at

16   17 – 18 ("A rise in the rate of uninsurance means a greater share of the burden of paying for health

17   care will be shifted to local governments and communities.").

18      Second, postponing the TPS terminations will maintain families.  *See* ECF 52-1 at 5. *See*

19   *Solis-Espinoza v. Gonzales*, 401 F.3d 1090, 1094 (9th Cir. 2005) ("Public policy supports

20   recognition and maintenance of a family unit.  The Immigration and Nationality Act ("INA") was

21   intended to keep families together.  It should be construed in favor of family units and the

22   acceptance of responsibility by family members.").

23      Third, termination of TPS would reduce public safety by reducing the amount of

24   individuals, here TPS holders, who would otherwise report a crime or cooperate with law

25   enforcement.  ECF 52 at 15; *see also* ECF 61-1 ("It is well-documented that undocumented

26   immigrants are less likely to report crimes, including violent crimes, when they fear police contact

27   will bring adverse immigration consequences.").

28      Fourth, termination of TPS would harm communities by reducing contributions to housing

1    wealth and property tax revenue.  *See* ECF 61-1 at 10 ("TPS homeowners contribute at least $19

2    billion in housing value nationally, adding to their communities' housing wealth and property tax

3    revenues, an important source of funding for amici").  Communities also risk losing TPS holders

4    who would otherwise volunteer in community organizations, committees, or community groups.

5    ECF 61-1 at 10–11; *see also id*. at 11 ("30% of TPS holders are actively involved in their

6    communities, through neighborhood organizations, their children's schools, church, work

7    organizations or events, sports teams, and other activities.").

8        Finally, the public has an interest in both preventing TPS holders from being wrongfully

9    removed and in the Executive Branch's compliance with the APA.  *See East Bay Sanctuary*

10   *Covenant v. Biden*, 993 F.3d 640, 678 (9th Cir. 2021) ("[T]he public interest is served by

11   compliance with the APA.") (quoting *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018));

12   *Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing aliens from being

13   wrongfully removed, particularly to countries where they are likely to face substantial harm.").

14       Although Defendants argue that a delay in the Secretary's decisions would undermine

15   United States foreign policy and national interests, Defendants have failed to identify the exact

16   foreign policy or national interest at stake.  Defendants' citation to the Supreme Court's stay in

17   *NTPSA I* is also not binding because the Supreme Court granted a stay in *NTPSA I* on the Supreme

18   Court's shadow docket.  *NTPSA I* lacks reasoning to support the stay and the claims in *NTPSA I*

19   are distinguishable from Plaintiffs' claims in the instant case.  *NTPSA I* was brought in the context

20   of a vacatur rather than, as here, a determination to terminate TPS.  The Plaintiffs here have also

21   been in the county for more than 10 years.

22       Accordingly, the Court finds that the balance of harms and the public's interest weighs in

23   favor of granting Plaintiffs' motion to postpone.

24   **F.    Postponement of Agency Action is Proper Scope of Relief**

25       Defendants argue that Plaintiffs impermissibly seek a universal injunction in violation of

26   the Supreme Court recently held are unlawful under *Trump v. Casa*.  ECF 45 at 24–25.  Plaintiffs

27   argue that the Court may grant relief because the APA explicitly permits courts to "issue all

28   necessary and appropriate process to postpone the effective dat*e* of an agency action."  5 U.S.C. §

United States District Court
Northern District of California

705.  ECF 53 at 15.

Here, Plaintiffs' requested relief, to postpone the Honduran, Nepal, and Nicaragua TPS terminations, is properly within the scope of the APA.  Although Defendants argue that the Supreme Court's recent decision in *Trump v. Casa* precludes a postponement or stay, *Trump v. Casa* involved universal injunctions and explicitly did not "resolve the distinct question of whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action." 2025 WL 1773631, *8 n. 10.  *Trump v. Casa* is also factually distinguishable from the facts of the instant case because *Trump v. Casa* involved from the President's executive order. *Id.* at *4 ("The plaintiffs—individuals, organizations, and States—sought to enjoin the implementation and enforcement of President Trump's Executive Order No. 14160.").  In comparison, Plaintiffs here seek relief from an agency action—not an action by the president.

Plaintiffs' requested relief is also expressly authorized by the text of the APA.  The APA grants the Court with the authority to "issue all necessary and appropriate process to postpone the effective date of an *agency action* or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added), and "further *requires* courts to 'hold *unlawful and set aside* agency action, findings, and conclusions found to be . . . not in accordance with law,'" *Loper Bright*, 603 U.S. at 391 (quoting 5 U.S.C. § 706).  The Court's authority to grant relief against agency actions is therefore rooted in the statute's legislative history, which indicates that the Court must serve "'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright*, 603 U.S. at 391 (quoting *Morton Salt*, 338 U.S. 632, 644 (1950)).  Setting aside an agency action is the standard remedy for APA cases.  *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

*Immigrant Defenders Law Center ("ImmDef") et al., v. Noem et al.*, No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025) does not require the Court to limit postponement to the individual named Plaintiffs.  There, *ImmDef*, an organizational plaintiff, sought relief against the government's reimplementation of Migrant Protection Protocols ("MPP") because

United States District Court
Northern District of California

35

United States District Court
Northern District of California

1    reimplementation would impair ImmDef's ability to represent their clients.  2025 WL 2017247 at

2    *6–8.  The Ninth Circuit "limit[ed] the district court's § 705 Stay order to exempting ImmDef's

3    [current and future] clients from [Migrant Protection Protocols] MPP."  *Id*. at *14 (internal

4    quotations omitted).  In contrast, here, individual Plaintiffs seek relief from the Secretary's TPS

5    termination decisions and the standard remedy for these actions is to set aside an agency's action if

6    the action is found to be unlawful.  *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall ... *set

7    aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

8    discretion, or otherwise not in accordance with law[.]") (emphasis added).

9         Moreover, unlike the *Immigrant Defenders* stay order, which enjoined the government

10   from reimplementing MPP, an order here would only postpone the Secretary's TPS terminations

11   until the next step of the litigation.  A postponement would also not enjoin the Secretary from

12   making further TPS determinations.  *See Postpone*, BLACK'S LAW DICTIONARY ("To put off to a

13   later time; to change the date or time for (a planned event or action) to a later one.") (12th ed.

14   2024).  "The Secretary remains free to terminate TPS status for any country pursuant to the

15   statutorily prescribed procedures Congress has enacted."  *See Haitian Evangelical Clergy

16   association v. Trump*, No. 25-cv-1464, 2025 WL 1808743, at *11 (E.D.N.Y. July 1, 2025).  As

17   Plaintiffs conceded during oral argument, the postponement will ultimately end if the Court later

18   finds that Plaintiffs fail to meet the standard for vacatur under summary judgment.  *See Ohio v.

19   EPA*, 603 U.S. 279, 290 (2024) ("Stay applications are nothing new.  They seek a form of interim

20   relief perhaps as old as the judicial system of the nation.") (internal quotations omitted).

21        Finally, limiting postponement to the individual Plaintiffs here would be impractical.

22   Although Defendants assert that USCIS could issue individual notices that continue the benefits

23   for named Plaintiffs under TPS, Defendants fail to offer how Defendants would coordinate with

24   Plaintiffs' employers, the states and cities of counties in which Plaintiffs reside, hospitals, ICE,

25   and local law enforcement to ensure that Plaintiffs are not subject to removal or otherwise

26   detained after the TPS terminations go into effect.  Any error in coordination or communication

27   would result in a direct violation of the TPS statute.  *See* 8 U.S.C. 1254a(d)(4) ("An alien provided

28   temporary protected status under this section shall not be detained by the Attorney General on the

basis of the alien's immigration status in the United States.").

Accordingly, the Court finds the scope of Plaintiffs' relief, requesting a postponement or stay of Nepal, Honduras, and Nicaragua TPS terminations, proper.

## V.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion to postpone is **GRANTED**.  5 U.S.C. § 705.

The matter is set for an initial case management conference on August 14, 2025.

No later than August 7, 2025, the parties shall file a joint case management conference statement addressing (1) whether Defendants intend to appeal this Court's Order and (2) ways in which this case can be expedited.

The Court reserves November 18, 2025 for hearing.

This Order resolves ECF 17.

**IT IS SO ORDERED.**

Dated: July 31, 2025

TRINA L. THOMPSON
United States District Judge

## **EXHIBIT 2**

Transcript of Proceedings, *National TPS Alliance, et al.*, *v. Noem*, *et al.*, 3:25-cv-05687-TLT (July 29, 2025).

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____

**National TPS Alliance, et al,** )
) No. 3:25-cv-05687-TLT
Plaintiff, )
)
vs. )
) San Francisco,
**Noem, et al,** ) California
) July 29, 2025
Defendant. ) 1:57 p.m.
_____ )

**BEFORE:  THE HONORABLE TRINA L. THOMPSON, JUDGE**

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**MOTION HEARING**</u>

Official Court Reporter:
**Andrea K. Bluedorn, RMR, CRR**
Official Court Reporter-Remote
California Northern District
14418 S 42nd Street
Phoenix, Arizona 85044
(715) 965-2298

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

2

1            **A P P E A R A N C E S**

2

3     For the Plaintiff:
          UCLA SCHOOL OF LAW
4         CENTER FOR IMMIGRATION LAW AND POLICY
          By:  **Ahilan Thevanesan Arulanantham, Esq.**
5         385 Charles E Young Drive East
          Box 951476
6         Los Angeles, CA 90095

7     For the Plaintiff:
          HAITIAN BRIDGE ALLIANCE
8         By:  **Erik Matthew Crew, Esq.**
          4569 Alvarado Canyon Rd, Ste H
9         San Diego, CA 92120

10    For the Plaintiff:
          ACLU OF NORTHERN CALIFORNIA
11        By:  **Emilou MacLean, Esq.**
          39 Drumm Street
12        San Francisco, CA 94111

13     For the Plaintiff:
          NATIONAL DAY LABORER ORGANIZING NETWORK
14        By:  **Jessica Karp Bansal, Esq.**
          1030 S. Arroyo Parkway, Ste 106
15        Pasadena, CA 91105

16

17    For the Plaintiff:
          ACLU OF NORTHERN CALIFORNIA
          By:  **Michelle Young Cho, Esq.**
18        39 Drumm Street
          San Francisco, CA 94111

19

20

          For the Defendant, Kristi Noem:
21        DOJ-CIV
          OFFICE OF IMMIGRATION LITIGATION-DISTRICT COURT SECTION
22        By:  **William Weiland, Esq.**
          Post Office Box 868
23        Ben Franklin Station
          Washington, DC 20044

24

25

                    UNITED STATES DISTRICT COURT

3

1                         **P R O C E E D I N G S**

2

3          COURTROOM DEPUTY:   Now calling case number

4   25-CV-05687, National TPS Alliance et al versus Noem et al.

5   Counsel, please come forward to the podium and state your

6   appearances beginning with the plaintiffs.

7          MR. ARULANANTHAM:  Good afternoon, Your Honor.  Ahilan

8   Arulanantham from the UCLA Center for Immigration Law and

9   Policy for the plaintiffs, National TPS Alliance.

10          THE COURT:  Good afternoon.

11          MS. BANSAL:  Good afternoon, Your Honor.  Jessica

12   Bansal also for the plaintiffs from the National Day Laborer

13   Organizing Network.

14          THE COURT:  Good afternoon.

15          MS. MACLEAN:  Good afternoon, Your Honor.  Emilou

16   MacLean from the ACLU of Northern California also for the

17   plaintiffs.

18          THE COURT:  Good afternoon.

19          MS. CHO:  Good afternoon.  Michelle Cho for the

20   plaintiffs, ACLU of Northern California.

21          THE COURT:  Good afternoon.

22          ERIK CREW:  Good afternoon, Your Honor Erik Crew of

23   Haitian Bridge Alliance for the plaintiffs.

24          THE COURT:  Good afternoon, sir.

25          On behalf of the defendant.

4

```
 1              MR. WEILAND:  Yes, good afternoon, Your Honor.  Will
 2   Weiland for the Government.
 3              THE COURT:  Thank you.  Good afternoon.
 4              Now, before we get started, I would like to just kind
 5   of set the stage and the tone.  I am very purposeful in
 6   allowing each of you 45 minutes to address the Court because I
 7   know that I provided questions.  Usually I just hand them to
 8   you but as a courtesy, and because this is such an important
 9   argument, I provided you questions in advance.
10              Thank you for answering my initial questions.  It's
11   exceptionally helpful.  There was a volume of information from
12   me to digest and sleep is now a stranger.  But in addition to
13   that, thank you also for organizing the information by country.
14   That really was exceptionally helpful to me as I was trying to
15   digest all that I had to read.
16              Finally, we will take a 15 minute break.  Those of you
17   who are married to your electronics and need to confer with
18   your offices, you will have an opportunity to do so, then
19   you'll have an additional 15 minutes apart in order to address
20   the Court.
21              Why is it that I don't have electronics in here now?
22   Because as you can hear, there are all these tones that we're
23   hearing.  Our Marshals and our court security will confiscate
24   those phones.  If they happen to be beige and they go with my
25   dress, they will be mine, so, please, those of you in the
```

UNITED STATES DISTRICT COURT

5

1    audience, please turn off your phones.

2         Every time we hear a phone, the court reporter, I, or

3    my courtroom deputy, we will be distracted.  And it may be at a

4    point that we really need to hear something that's of upmost

5    importance.  And if the record isn't clear, it is not helpful

6    to anyone that is in here.

7         Now, this case is before me for a motion to postpone

8    the effective date of administrative action.  That means the

9    request is that I stay a previous administrative action that is

10   contemplated.  Before the Court are members of the community

11   who are Honduran, Nepali, and Nicaraguan.  They're all TPS

12   holders.

13        They come from the State of Connecticut, California,

14   Georgia, Virginia, and Florida.  These holders -- TPS

15   holders -- I believe all parties would agree that none have

16   committed a crime.  Let's get that out there now.  None have

17   committed a crime so that we understand what TPS holders are.

18        These are individuals who travelled in the wake of

19   disaster to the open arms of the United States.  The United

20   States welcomed these individuals because of disaster or

21   because of some turmoil within their own country.  Either their

22   country asked us to consider welcoming them with open arms or

23   they arrived and asked for TPS consideration.  Some individuals

24   have been here for almost their entire lifetime.  They have

25   worked, they have contributed to the community, they have paid

UNITED STATES DISTRICT COURT

1    taxes, and they have paid to stay with no tangible pathway to

2    citizenship.  This is something the Court recognizes at the

3    onset.

4           One of the primary decisions I need to make is whether

5    the Court has jurisdiction.  I know that this is one of

6    statutory interpretation.  I do not take that part of my task

7    lightly.  I want you to really spend some time with this.  And

8    I also want you to think about the oath that each of you took

9    as you became lawyers and what it is that you're defending when

10   you're sitting in this courtroom today.

11          We're looking at language and words matter.  And we're

12   looking at whether we're talking about an individual act or a

13   group of acts and how that impacts the interpretation that I'm

14   going to have to exercise in looking at these issues.  Whether

15   you're asking me to take a literal interpretation that is

16   consistent with the congressional intent, whether there are any

17   limits on executive discretion, did Congress intend for there

18   to be unfettered discretion and the Court never get involved in

19   individuals being able to make decisions without any judicial

20   review.

21          Does it, in effect, have a practical effect of

22   precluding all judicial review.  Again, don't take it lightly.

23   Are we talking about single act or a cluster of acts?  Are

24   there clear and convincing reasons contrary to the legislative

25   intent?

UNITED STATES DISTRICT COURT

1           And then, finally, I recognize the tension between 8

2    USC Section 1252(f) and the tension that it has with 5 USC

3    Section 705.  There is an argument that indicates that the

4    Court is barred from providing relief, whether it's under the

5    APA or other statutory language, whether the Court has the

6    ability to grant a stay or to postpone the effective date.  The

7    Court also must take a look at what we call collateral issues

8    and consequences and whether decisions were made because they

9    were pretextual, because they were seeking to obtain a

10   preordained result, whether there was racial animus, and

11   whether it was arbitrary and capricious.

12           These are the things that speak to me the loudest when

13   I read all of your briefing and companion documents.  If I am

14   astray and I am not focused on the correct information during

15   your argument, you will have an opportunity to address that.

16   If you ignore one of my questions, you do that at your own

17   peril.

18           I have taken the time and labor of going through this

19   entire record and also looking at the case law and trying to

20   grapple with the terms of the statutory language.  But also who

21   we are as Americans in the United States and the promises that

22   we make to individuals when they arrive here and whether we're

23   saying you get to come here for a temporary period of time but

24   there is no pathway for you to become a citizen.  There is no

25   pathway for you to get beyond those every six month fees that

8

```
 1    you pay.  There is no pathway for you to be other than someone
 2    who is a temporary guest of the United States.
 3            So with that invitation, it's not indicating my
 4    decision on any matter.  These are areas that I'm grappling
 5    with and I want you to provide me clarity.  Counsel for the
 6    Government, as I indicated, I know that you wanted to be able
 7    to have your electronics with you, I will give you that 15
 8    minutes.  If you need more than that when you need to confer
 9    with your office, please let me know.
10            MR. ARULANANTHAM:  Yes, Your Honor.
11            THE COURT:  Thank you.  All right.
12            Counsel for plaintiff.
13            MR. ARULANANTHAM:  Thank you, very much, Your Honor.
14            That context is very helpful.  With the Court's
15    permission, I'll discuss jurisdiction and the scope of relief,
16    and then my co-counsel, Ms. Bansal, will discuss the merits of
17    the APA claims, and then I'll come back up with our remaining
18    time and talk about the discrimination claim, if that's okay
19    with Your Honor.
20            THE COURT:  That's perfectly okay.  That's perfectly
21    fine and integrate in those questions that I provided you.
22            MR. ARULANANTHAM:  Will do.
23            THE COURT:  Thank you.
24            MR. ARULANANTHAM:  So I just want to start when it
25    comes to the scope of relief and the posture with two threshold
```

UNITED STATES DISTRICT COURT

9

1 points.  We -- our goal and our hope is we will eventually move

2 for summary judgment in this case and try to persuade Your

3 Honor that all three terminations are unlawful, but we can't do

4 that before next week.  But next week, August 5th, is the day

5 that the termination for TPS for Nepal will kick in unless the

6 Court grants this motion.

7    And I say this because I'm thinking about the question

8 that Your Honor had asked about what is the appropriate Winter

9 standard, and this is actually an area on balance of hardships

10 and this is actually a rare area where both sides agree.  Both

11 sides agree that under Ninth Circuit Law, we can win not just

12 by showing a likelihood of success on the merits and that the

13 bounds of hardships tips in our favor, but also we can win if

14 we show that the sharply -- the bounds of hardship sharply tip

15 in our favor and we just have serious questions on the merits,

16 which is a lower, you know, showing with respect to the merits.

17    And I say this -- I won't belabor it because I can see

18 that Your Honor has grappled with the record -- but there's

19 7,500 Nepali TPS holders.  They've lived here on average about

20 14 and a half years.  This is all in the record.  I can point

21 to you specifically if needed.

22    There's about 3,500 American children who live with

23 those TPS holders.  One of them, Sandhya Lama, is one of our

24 plaintiffs.  She has come here.  She's in the courtroom.  She

25 has three minor U.S. citizen children so she will lose her job

1    on August 5th unless the Court postpones it.

2            A month later, September 8th, is the last day that

3    50,000 Hondurans -- 52,000 Hondurans and about 3,500

4    Nicaraguans -- would have status.  We think -- like I said, I

5    think we can do the case quickly.  I don't think we can tee up

6    a summary motion judgment for Your Honor to decide it before

7    September 8th.

8            Again, there's about 35,00 American children -- some

9    of them are small -- their parents will lose their jobs and the

10   harm is not only to their family.  It's massive harm to their

11   families obviously and to them, but also other people, Jhony

12   Silva, one of our plaintiffs, he's a certified nursing

13   assistant at Stanford hospital in the cardiac unit.  Other

14   people obviously replacing that person if he gets fired, that's

15   not good for the hospital.  The medical care suffers.

16           There's another client of ours, an anonymous

17   plaintiff, RA, who is doing complex deliveries.  He's a nurse

18   in a hospital in Texas doing complex labor deliveries.  So I

19   say all this to say if Your Honor rules with us today but then

20   in, I don't know, four months or five months after we've all

21   had more sleep and you've read more carefully and you've

22   received more briefing you decide that actually the Government

23   is right and we were wrong, what is the harm to them?

24           And the harm to them is the people who lived here for

25   26 years got to live here for another five months.  Right.  And

11

1   that some portion of them who would have been detained and

2   deported and the families separated and all of that, it didn't

3   happen for four months and then they get did vulnerable to it.

4   Right.

5          But flip it the other way, you rule for them today and

6   after more fulsome review decide we're correct, how much of the

7   harm that happens in between could you actually fix if the

8   people were detained and some of them are deported, people lose

9   their health insurance, people lose their jobs, people are

10  evicted from their homes, all of this.  Almost all of that harm

11  is irreparable.  So I do think this is a case where the balance

12  of hardships tips very sharply in our favor.

13         So I think we can do more than show serious questions

14  on the merits, but I do think that's all we have to show in

15  order to win this hearing today because all we're asking for is

16  a postponement until we can get to final adjudication which we

17  think should be just a couple months.  They've produced the

18  administrative record to us -- certified administrative

19  record -- and they've filed it to the Court as well so I think

20  we're well on our way to actually being able to finally decide

21  the case.

22         With that said, I'll move to jurisdiction unless the

23  Court has questions about that.

24         THE COURT:  No.  I think one of my questions was how

25  much time did you think you would need in order to prepare a

12

 1   motion for summary judgment.  You indicated four to five months

 2   so I'm aware of that time frame so jurisdiction is

 3   exceptionally important so I'd like you to spend some time with

 4   that.

 5        MR. ARULANANTHAM:  Yes.  And just -- last second

 6   before we get to that, the courtroom deputy told us two dates

 7   that you -- I think those are potential summary judgment dates.

 8   We have to confer briefly, but I think we might be able to --

 9   certainly the second one, the November date and maybe even the

10   earlier one.

11        Okay.  Jurisdiction.  So the first thing Your Honor

12   said today about -- or not the first thing, one of the things

13   you said about 1252(f)(1) so that was actually resolved in our

14   favor by ImmDef case.  ImmDef held -- just the one from last

15   week -- ImmDef held that 1252(f)(1) does not bar relief under

16   the APA by postponement relief or vacatur under the APA because

17   the APA -- when the Court issues relief under the APA, it's not

18   fundamentally injunctive in nature.

19        And it's an odd doctrine because at some basic level

20   the Court is telling the Government, look, this agency action

21   is void.  You can't enforce it.  But the Courts have long drawn

22   a distinction, it goes back to the purpose of the APA, as Your

23   Honor was suggesting in the questions from -- that we got this

24   morning.  The Courts have distinguished between the Federal

25   Court's power sitting over an agency where the Court is acting

UNITED STATES DISTRICT COURT

13

almost like the -- like a veto or something like that where you operate directly on the rule to say vacate it because it's illegal or postpone it, the lesser form of relief, what is what we're asking for today.

And in that situation, it acts directly on the rule. It does not directly enjoin people, like telling people what to do. That's still true, of course they have to follow it, and if they break it, if they violate that, then we can come back to the Court and say, Your Honor, they're violating your rule, and then maybe we get to contempt or something like that but that's a second step.

You know, all that the APA authorizes is it treats the Court as though you're like a super legislative body in a sense directly enforcing over the agency and that's a holding of ImmDef so it resolves that jurisdictional question. You know, there's several pages of briefing from both sides about 1252(f). That's off the table. We have won that argument.

Now the core of it is about the TPS statute, 1254a(b)(5)(A), which says there's no review of any determination with respect to a designation, termination, or extension under the subsection which is (b). Right. And that's their core argument.

They say that means we have essentially carte blanche to make whatever TPS decisions we want and the Courts can't touch it.

14

1          THE COURT:  Now do you believe Congress intended that

2   unfettered discretion for an agency?

3          MR. ARULANANTHAM:  Absolutely not.

4          THE COURT:  Or for a member of the Executive Branch?

5          MR. ARULANANTHAM:  Absolutely not.  I do not believe

6   that Your Honor.  Certainly not on this statute.

7          And I'll get into the words in a great amount of

8   detail, but I want to say two things which I think should color

9   how the Court reads the statute.  One, it's a very basic point.

10  We've been litigating TPS cases now since 2018.  They have made

11  this argument and in every TPS case.

12          They have lost it every single time.  So there are

13  seven -- there's four cases in the first Trump Administration

14  where they made this jurisdictional argument.  They lost every

15  one of them in the District Court.  There's been three this

16  time around, the Venezuela case, the Haiti case -- which is the

17  Haitian Evangelical Churches Association -- and the Casa v

18  Noem, the Afghanistan and Cameroon case.

19          Every single court has rejected their view of the

20  statute.  Obviously Your Honor will decide for yourself, but

21  I'm just saying, you know, they've never won this argument.

22  Two judges of the Ninth Circuit in a two-to-one decision in

23  Ramos -- which was the appeal of Judge Chen's ruling the first

24  time around brought a portion of their argument -- not as to

25  the constitutional claim but as to the other claims -- over a

UNITED STATES DISTRICT COURT

15

1    very strong dissent and that was reversed en banc.

2           It was vacated en banc, wiped off of the books.  And

3    that's it.  They only brought a portion and even that was

4    reversed en banc.  So just to say we've been doing well on this

5    part of the struggle.

6           The second thing I want to say that should color your

7    interpretation of the statute as your question already suggests

8    what they're asking for as an agency is the unreviewable power

9    to strip thousands of people of their most basic liberties, the

10   right to live in this county and to work here free from

11   detention and deportation for any reason.  Because even if they

12   do it for a reason, which violates the statute, on their view,

13   there's no review.  Even if they do it on a time schedule,

14   which is not when the statute authorizes it.  Like if they

15   decide later than what the statute authorizes or they decide

16   earlier, you know, their view is there's no review.

17          If the president decides tomorrow he wants to, you

18   know, use TPS as a lever for his trade negotiations involving

19   tariffs with some other country, in either direction, give TPS

20   to China or take TPS away from some country which is in the

21   midst of a crisis whenever he feels like it.  On their view,

22   they could do that and nothing would -- the Court, the fact

23   that Congress wrote a statute with all of these rules in it

24   about procedures and timing and criteria would make no

25   difference.

UNITED STATES DISTRICT COURT

1    So I know Your Honor has been interested and has

2    applied major questions doctrine in immigration cases in the

3    recent past.  And your questions -- obviously Your Honors

4    questions suggest Loper-Bright and these other progeny, what do

5    they have to do with this.  They say they have nothing to do

6    with it.

7    We think they have everything to do with this case

8    because the Supreme Court and other Federal Courts have been

9    disinclined to give agencies extraordinary power over the

10   liberties of people without some ability for the Courts to

11   constrain the agency to make sure they're complying with the

12   law.  And that, ultimately, is the dispute that we have about

13   the scope of this jurisdictional statute.

14   Now when we get into the words, in our view the

15   keyword in 1254a(b)(5)(A) is determination.  What the Attorney

16   General has -- what Federal Courts cannot review is any

17   determination with respect to designation, termination, or

18   extension under (b).  And determination is actually a narrow

19   term.  It doesn't refer broadly to any decision any judgment,

20   like in Patel, any cause or claim, no, it actually refers to

21   something very specific in the statute.

22   And there's two ways, you know.  That first is looking

23   at the word determined and determination in (b) which is

24   something that they are briefing for all they say they never

25   bothered to actually just do.  And if you just search up in

17

1    (b), look in (b)(3) in periodic review, look in determinations,

2    you'll see determine determinations several times.

3          And always what it is referring to is the Attorney

4    General's conclusion that a country either does or does not

5    meet the criteria for continued TPS designation.  And what are

6    those criteria?  It's that the country is unsafe to accept the

7    return of its nationals.

8          So, for example, Your Honor, this statute prevents us

9    from coming here and arguing -- which is what we would like to

10    do -- but it bars us from coming and arguing that Nicaragua is

11    actually extraordinarily unsafe, which it is.  The State

12    Department Travel Advisory says that.

13          But we can't come and say, oh, the substantial

14    evidence shows Nicaragua is unsafe, and, therefore, you know,

15    that you should reverse this decision.  But what we can do is

16    challenge collateral practices that are outside of it.  So

17    like, you know, we can't disagree over the country conditions,

18    but if actually what we're doing is not doing country

19    conditions assessment and they just made their own decision in

20    advance we're going to end all of the TPS countries for reasons

21    that are outside of the statutory criteria, that we can

22    litigate.

23          We can litigate timing claims, which we haven't

24    brought in this case but we're looking at it carefully.  You

25    know, if they make the decision too early or they make the

UNITED STATES DISTRICT COURT

18

1    decision too late, we could challenge that.  So those kinds of

2    claims are still preserved under the statute.

3         What is barred is challenges to the country conditions

4    assessment itself.  And then two of the things -- sorry, the

5    other reason why, you know, that why I think it's clear that

6    the termination has this narrow meaning is because the Supreme

7    Court has read that same term to apply to -- as Your Honor put

8    it just earlier today -- individual acts.  And I -- that

9    language individual acts is the language of McNary, which is a

10   Supreme Court case about immigration jurisdictional statutes

11   using the word determination.

12        It could not get more specific than that.  And it's

13   not the only case.  McNary -- there's another one a couple

14   years later, Catholic Social Services, and there's Ninth

15   Circuit cases.  All of those interpret the word determination.

16   There's a whole body of doctrine in the Ninth Circuit about

17   what is and isn't a determination in immigration statute.

18        And you can see from these collateral challenges to

19   practices that go to a group of cases are cognizable, where as

20   individual challenges to the particular individual, you know,

21   act as you call it or particular determination are not

22   cognizable.  And, here, our claim, as I said, is that there's a

23   pretext that the agency is using to actually violate the basic

24   kind of structure of the statute.

25        They're not doing country conditions review at all,

UNITED STATES DISTRICT COURT

19

1    good faith, meaningful, honest country -- objective country

2    conditions review at all.  And that claim is clearly

3    cognizable.  We have two other claims I just want to briefly --

4    that's our core -- the pretext claim, that's the first APA

5    claim.

6         The two other claims I want to mention -- our second

7    APA claim is the wind down period they provided.  I should say

8    the second claim is only relevant if we lose on the first one.

9    Right.  Because if we win on the first one, then the decision

10   should be postponed because the decision itself is illegitimate

11   because it's pretextual.

12        The second claim is even if you think the decision is

13   legitimate, there's a question about how long they gave people

14   to live here.  They gave people who have been living here for

15   26 years -- or for the Nepalis, it's for 14 years on average

16   and 10 years since they had TPS -- they gave them two months to

17   leave the country.  It's awful.  It's truly awful.

18        But in addition to being awful, it is also contrary to

19   what they have done over the history of the TPS statute.  My

20   co-counsel will talk about this in detail.  But the time period

21   they provided is far, far less than they ever provided before.

22   The amount of time that people are entitled to under the

23   statute, that's in (d), that's --

24        THE COURT:  That's the 6, 12, or 18 months?

25        MR. ARULANANTHAM:  Yes.  Well it's 6, 12 or 18 is for

UNITED STATES DISTRICT COURT

1    the extension.  Then the time period for how long -- if they

2    terminate it -- how long do you give people, then that's -- I

3    don't think it's 6, 12, 18.  They have more discretion than

4    that.

5          They have a broader range of times to pick.  Very

6    commonly, they've done one year.  That was very common.  But my

7    co-counsel will talk about this in more detail.

8          My point is just about the jurisdiction stripping.

9    All of the law -- the rules about that are in (d).  And that

10   matters because the stripping provision doesn't bar decision

11   making over (d).  It's say in -- the stripping decision, right,

12   1254a(5)(A), it says in -- it bars review of the determinations

13   considering designation determination extension under this

14   subsection.  That's (b).

15         And so if you want to challenge something entirely

16   different, you want to challenge how they're doing

17   registration, you want to challenge how they're doing the wind

18   down period which is this claim or things like that, that's

19   outside of (b), and, therefore, are not covered by the

20   stripping provisions.  Those are completely different reasons,

21   totally separate from McNary and everything, it's just the

22   scope of the stripping provision does not cover this section.

23         And the last thing, the constitutional claim, in my

24   view, there's obviously a mountain of cases that say if

25   Congress wants to actually prevent the Courts from hearing a

```
 1    constitutional challenge like a race discrimination
 2    challenge -- which is our challenge here -- they have to write
 3    it really clearly.  They have to at least say the word
 4    constitutional in the statute, and they haven't done that here.
 5         And there's many cases which are very clear about
 6    that.  They barely press it.  You know, there's definitely
 7    justice over the race discrimination claim.
 8         I just had one other thing I think I wanted to say
 9    about jurisdiction unless Your Honor has -- I would have Patel
10    because Your Honor had specifically asked about it, but do you
11    have any questions before I get to Patel that you would like to
12    discuss?
13         THE COURT:  No.  I have no other discuss.  Please
14    address Patel and then succinctly make sure it's real clear
15    your three times, pretext, etcetera.
16         MR. ARULANANTHAM:  Will do.  Thank you, Your Honor.
17         So Patel, the statute in Patel does not use the word
18    determination so, you know, that's the first and most obvious
19    difference.  Instead -- goodness.
20         THE COURT:  One moment.
21         MR. ARULANANTHAM:  It used the word -- the statute in
22    Patel does not use the word determination.  It uses the word
23    judgment.  And that difference matters for all of the reasons I
24    was just talking about like there's no comparable case law like
25    McNary and all of these cases construing the word judgment
```

22

1    narrowly like there is with determination.  There is no

2    statutory tie up like this to determine -- in determination.

3          So and that's really the first basic difference.  It's

4    not about the word determination.  You should focus instead, in

5    our view, about the specific cases that are about that term

6    rather than a case that is about some different term in a

7    jurisdictional statute.

8          And the second thing I would say is Patel is a claim

9    about an error of fact.  The claim there is the agency has made

10   a factual mistake in denying -- it's about understanding this

11   person's false statement, whether it was a intentionally false

12   statement claim to citizenship in that case.  And there's a big

13   difference, a world of difference between factual claims being

14   barred from review and legal claims being barred from review.

15         And this goes back to your questions about

16   Loper-Bright.  Loper-Bright says Federal Courts have the power

17   to decide legal questions.  Factual questions, there is a long

18   history sometimes of giving final decision making power to

19   agencies over factual questions because Federal Courts say what

20   the law is whether the Federal Court is going to be the final

21   word on the facts or not varies on -- you know, depending on

22   the scheme and whatnot.  And so it's a very easy -- much easier

23   thing to find that Congress has intended to give preclusive

24   factual determination power to the agency and a much harder

25   thing to say the agency has the power to make legal conclusions

23

1    without any review and Patel is only doing the former, it's

2    only doing factual claims.

3         Let me answer the Court's question about the three

4    claims.  All right.  So we have two APA claims and then the

5    constitutional claim.

6         Our first APA claim is that their decision making

7    process as to TPS in general, including as to these three, is a

8    sham really.  Our claim is they're not doing objective country

9    conditions review.  It's all pretext because they decided

10   already that they're going to effectively end TPS for all of

11   the countries in habit.  That's our first APA claim.

12        Our second claim -- which you only get to if we lose

13   on the first claim; it's a subsidiary claim -- is that they did

14   not give people enough time to leave when they cut off TPS.

15   And it's not just like objectively like, oh, they need more

16   time.  So they had a practice -- they had a practice of giving

17   people longer periods of time, at least one year, when they've

18   had TPS for any substantial length of time.

19        And, here, people have 26 years or a decade of TPS,

20   they have a practice of giving people at least a year, not just

21   two months.  And if they're going to change that, they have to

22   acknowledge that they're changing it.  That's what the APA

23   requires.  They have to acknowledge they're changing it and

24   they have to give valid reasons for which this is legitimate.

25        And the reasons they're giving that you have to stop

UNITED STATES DISTRICT COURT

24

```
 1    the invasion or something.  It makes no sense as applied to
 2    people like this who are so deeply embedded in this country
 3    that have lived here for so long.
 4         The third claim is a constitutional claim.  It's
 5    cognizable under the APA because the APA also allows you to set
 6    aside agency action if it's in violation of the constitution.
 7    But the claim is they are motivated by discrimination just like
 8    in Mi Familia Vota and under cases under Arlington Heights and
 9    I'll talk about that after -- with the Court's permission after
10    we finish with the merits.
11         And I want to ask Your Honor -- Your Honor, some of
12    the questions that you gave us both on Friday and today, I
13    think if I remember right, go to the relevance of the shadow
14    docket orders and the scope of relief that's available.  Should
15    we talk about that now, or would you prefer I talk about it
16    after the APA merits?
17         THE COURT:  After.  And I appreciate you succinctly
18    sharing the claims.  And this is why, as I said earlier, when
19    your phones are going off or there's movement and we see the
20    Marshals coming forward, our attention is distracted, and I'm
21    protecting my court reporter.  I want to make sure we get
22    everything down.
23         If it happens again, they're going to ask you to leave
24    so I'm trying to keep you from being excluded from the
25    audience.  So please make sure all your phones are off.  And
```

25

1  thank you for repeating that portion.  I'm sorry it may have

2  impacted your time.

3        Counsel, you may approach.

4        MS. BANSAL:  Thank you, Your Honor.

5        So I'm going to start with our first APA claim which

6  is the pretext claim that my co-counsel described.  This claim

7  is that the termination of TPS for Nepal, Honduras, and

8  Nicaragua violates the APA because it was arbitrary and

9  capricious and contrary to law because it wasn't based on

10  country conditions, as the statute requires.  Your Honor had

11  several questions about the purpose of the TPS statute.

12        THE COURT:  So what is the purpose of the APA?

13        MS. BANSAL:  To start with, the TPS statute -- that

14  statute was designed to correct problems that Congress had

15  identified with the prior regime where there was a program

16  called extended voluntary departure that was not governed by

17  statue.  And Congress was concerned that that led to decisions

18  that were not transparent, that were overly political, and that

19  didn't provide any stability to beneficiaries of the program

20  and so Congress wanted to replace that ad hoc scheme that was

21  purely discretionary, that didn't have any standards, and they

22  wanted to create standards to say how do you decide when a

23  country gets nationality based humanitarian relief.

24        How long does it last and when and why can it end.

25  And the statute that they wrote strictly constrains when a TPS

UNITED STATES DISTRICT COURT

1    designation can end.  It can only end if the secretary

2    determines, after reviewing country conditions -- so this is

3    the periodic review in (b)(3)(A) of the statute.  The secretary

4    has to -- shall review is what the statute says -- country

5    conditions and shall determine whether the conditions for

6    designation continue to be met.

7         Unless she determines that the country conditions are

8    no longer met, unless she makes an affirmative determination

9    looking at country conditions and says it is safe to go back

10   now, the designation is extended.  That's in (b)(3)(C).  That's

11   the default.

12        Your Honor asked also about the APA. I think the

13   relevance here that the purpose of the APA and Loper-Bright, as

14   my co-counsel said, it recognizes that it's the province of

15   this Court to make sure the secretary is complying with that

16   statute that was specifically designed to set forth legislative

17   rules for the program.  What we have alleged here and what the

18   record shows is the secretary is not making decisions based on

19   country conditions, and you can see that from three things.

20        You can see that, first, from defendants own

21   statements, Your Honor.  So on day one coming into office for

22   the second administration, President Trump after promising to

23   revoke TPS, issues executive order 14159 protecting the

24   American people against invasion.  The premise of that order in

25   the introduction it says, you know, there's an invasion.

UNITED STATES DISTRICT COURT

27

1          That's the title of the order that, quote, illegal

2     aliens, are, quote, committing vial and heinous acts against

3     innocent Americans.  And in order to address that, Section 16

4     of the order directs the Secretary of Homeland Security to

5     rescind policies that led to the presence of, quote, illegal

6     aliens, and to make sure the Department's actions are aligned

7     with the policies of the executive order including by reviewing

8     TPS designations to make sure they are appropriately limited.

9          Now Secretary Noem, it's clear from her public

10    statements understands this as a directive to rescind TPS

11    because it promotes the presence of undocumented immigrants and

12    is not aligned with the policies in that executive order.  So

13    one week later, one week after the president issues this order

14    on January 29th, she announces the first TPS termination of

15    this administration.  And I know Your Honor had asked, you

16    know, how many countries that the Government has reviewed for

17    TPS over the last six months and which decisions have been

18    terminations and which have been extensions, and I want to be

19    clear Venezuela is the first termination.

20         They have all been terminations with the one exception

21    of South Sudan for which the Secretary made no decision.  She

22    did not decide to extend.  She has not granted an extension to

23    any country.

24         South Sudan, I believe, is a group of about 200

25    beneficiaries and the Secretary simply didn't make a decision

UNITED STATES DISTRICT COURT

28

1    about South Sudan.  And the statute says if you don't make a

2    decision, the designation is extended.  There was an automatic

3    extension.

4           Other than that, every decision, every time a country

5    comes up for TPS review, Venezuela, Haiti, Afghanistan,

6    Cameroon, Nepal, Nicaragua, Honduras, of course the decision is

7    determining.  And so in explaining that first decision a week

8    after the executive order, Secretary Noem said when the

9    president gives a directive, the Department of Homeland

10   Security will follow it.  We are getting direction on how

11   this -- that's the TPS program -- works from the president of

12   the United States.  And that's filed at docket 44-2, Your

13   Honor.

14          Three weeks later, the Secretary terminates TPS or

15   rolls back the extension of TPS for Haiti.  And, again, there's

16   a press release.  In the press release, the agency says this,

17   "the decision to roll back TPS for Haiti is part of President

18   Trump's promise to rescind policies that are magnets for

19   illegal immigration and inconsistent with the law."

20          About a month later, they terminate TPS for

21   Afghanistan.  They described the decision as restoring

22   integrity to the immigration system, implying the previous

23   designation had compromised integrity.  The same for Nicaragua,

24   the same for Honduras, Your Honor.

25          It's clear from these statements that Secretary Noem

UNITED STATES DISTRICT COURT

1    is driven by an understanding that TPS itself -- at least

2    existing designations -- are illegitimate and she's been

3    directed to end them.  But that is not what she says in the

4    Federal Register Notices.  So the Federal Register Notice is

5    the official announcement and explanation of the decision.

6         And the Federal Register Notices say that she has

7    terminated TPS for Nepal, for Honduras, for Haiti because the

8    country conditions have improved.  But if you look closely at

9    those decisions, Your Honor, in particular, if you compare them

10   as you have done in our brief and decisions to the Court

11   questions to the decisions immediately prior, it's clear this

12   is not a typical country conditions review that is happening.

13        So, for example, Honduras was designated -- or it was

14   extended its TPS designation in 2023 in part because of

15   staggering levels of crime in that country that make it unsafe.

16   The Secretary's determination decision doesn't find crime has

17   improved.  It doesn't say it's -- it doesn't even address

18   crime; one of the key reasons that the agency had previously

19   found TPS was appropriate.

20        You see the same thing in each termination decision

21   under this administration, Your Honor.  So Nicaragua, political

22   instability and a humanitarian crisis.  That is a reason that

23   that country has TPS.  It is not addressed in the termination

24   notice.

25        Food security -- food insecurity in Nepal is mentioned

UNITED STATES DISTRICT COURT

30

```
 1    six times in the extension notice from 2023.  It's not

 2    mentioned in the termination notice.  That suggests, Your

 3    Honor, that the country conditions review has changed.

 4            When you look also at the Department of State Travel

 5    Advisories that are in the record, it shows the same thing.

 6    Honduras, for example, the State Department recommends that

 7    people reconsider travel there due to crime.  The State

 8    Department -- which is one of the agencies that the Department

 9    of Homeland Security consults with about TPS -- says that's the

10    main reason it's not safe there.  But if you look at the

11    termination notice, it's not even addressed.

12            It is implausible, Your Honor, that a good faith

13    review of country conditions and that deciding whether it's

14    safe to return to a country would not address the primary

15    reason the State Department says it's not safe.

16            THE COURT:  Now, the Government is saying that I'm

17    being enticed to look at the Secretary's decision as opposed to

18    the decision process.  What is your response?

19            MS. BANSAL:  So, I want to be clear that the

20    Government does say that we're challenging the facts.  So we're

21    not asking this Court to say, for example, you know,

22    Afghanistan -- the example we give is that they said in 2023,

23    there was unprecedented deterioration of women's rights.  This

24    time around, they don't mention it.  They say instead tourism

25    has improved in Afghanistan.
```

UNITED STATES DISTRICT COURT

1          So we're not asking the Court to say whether tourism

2     in Afghanistan has improved or not.  This Court doesn't --

3     that's what the jurisdiction stripping statute covers, factual

4     determinations about country conditions.  What we're asking

5     this Court to do is say would a good faith, objective country

6     conditions analysis for this country actually fail to even

7     address the basis for which it has TPS.  And then to look at

8     the public statements, so look at those deficiencies in

9     combination with the public statements of defendants and

10    conclude -- as we've argued -- that defendants are not basing

11    their decisions on country decisions.

12         Instead, they made a decision and what they are doing

13    is looking for country conditions that support it, and ignoring

14    country conditions that don't.  And this is demonstrated

15    especially clearly, Your Honor, in the first decision from this

16    administration where they sort of developed this approach and

17    that's from Venezuela.  Over the course of three weeks from

18    January 9th to January 31st, the Government, the Department of

19    Homeland Security, goes from saying it is not safe -- they have

20    an official decision memo; it's Exhibit 8 in the record from

21    January 9th -- looks at the conditions in Venezuela, they say

22    it's not safe to return, TPS has to be extended.

23         Three weeks later, they end TPS and they say it is

24    safe.  It is safe for Venezuelans to return to that country.

25    Now if you look at Exhibit 9, that's the decision memo

UNITED STATES DISTRICT COURT

32

1    supporting that decision.

2         It doesn't find that the agency was wrong on January

3    9th.  What they do, the agency -- one of the reasons the agency

4    said on January 9th was you can't return is food insecurity.

5    They say that's the primary reason for the mass exodus from

6    Venezuela, there's not enough food.  On January 31st, they just

7    delete that section.

8         Same for political oppression and human rights.  On

9    January 9th, DHS looks and they say the human rights situation

10   has deteriorated and is getting worse.  On January 31st, they

11   don't come to a different factual determination, they just

12   delete that section.

13        Your Honor had asked a question about consideration of

14   extra record evidence.  So if the Court should be looking at

15   other evidence -- at this type of evidence in this case, and so

16   I want to address that.  Of course the Court can consider extra

17   record evidence as well as the merits and equities.  That's

18   very clear.

19        It's also clear on the merits of the APA claim the

20   Court can consider extra record evidence as well for two

21   reasons.  First, in the Department of Commerce case, the

22   Supreme Court says where there is a pretext claim where the

23   evidence shows that the explanation the agency gave for its

24   actions is incongruent with the decision making process, Courts

25   can look to extra record evidence.

UNITED STATES DISTRICT COURT

33

1      The second exception -- and both of these are laid out

2  in the Ninth Circuit's Lands Council decision -- is where extra

3  record evidence is necessary to see if the agency has

4  considered all relevant factors.  Here, the fact that the State

5  Department, for example, says don't step foot in Honduras

6  because of crime, is relevant to figuring out if DHS assessed

7  all relevant factors when they decided it was safe to go to

8  Honduras.

9      But if this Court wishes, the certified administrative

10 record has been filed.  It was filed yesterday.  It appears, at

11 first glance, voluminous.

12      THE COURT:  Would you like to share the number of

13 pages for each country.

14      MS. BANSAL:  I believe it is over a thousand, Your

15 Honor.  But in the index, the different entries are labeled

16 according to whether they pertain to the main rule, end quotes,

17 or whether they're non governmental sources.  The vast majority

18 of documents in that administrative record are articles and

19 reports.

20      The actual agency documents from this decision, it's

21 just 30 to 50 pages, Your Honor, for each country.  And just as

22 a preview, again, if the Court wishes to consider -- which is

23 the Court is not required to do in issuing postponement relief

24 to stop irreparable harm -- that record supports our claims,

25 Your Honor.

34

```
1          That record shows as of May 1st of this year, so two
2   months ago, DHS found it is not safe to return to Honduras
3   because of the political violence and claim.  That's at AR 29
4   of the Honduras Certified Administrative Record.
5          Similarly for Nicaragua, again, on May 1st, two months
6   ago, DHS found that Nicaragua cannot adequately handle the
7   return of its nationals.  That's at AR 44 of the Nicaragua
8   Certified Administrative Record.  And we would be more than
9   willing, Your Honor, if the Court finds it useful to provide --
10  even tomorrow -- supplemental briefing on that record if the
11  Court finds it useful.  We don't think the Court has to
12  consider that record but it certainly can now that it has been
13  filed with the Court.
14          I'll turn to your second APA claim.  I want to make
15  sure I leave time for my co-counsel.
16          THE COURT:  Let's see.  Time track.
17          COURTROOM DEPUTY:  Eight more minutes.
18          THE COURT:  Eight minutes.
19          MS. BANSAL:  I'll be quick.
20          Our second claim, as cocounsel mentions, is a
21  completely separate claim that the Court only has to reach if
22  we lose on the pretext claim.  And this claim is based on the
23  change in position doctrine, as Your Honor recognized.  The
24  Supreme Court has recently reaffirmed that Law in FDA versus
25  Wages and White Lions.  It's a very simple rule.
```

UNITED STATES DISTRICT COURT

35

```
 1          If an agency is going to abandon a past practice --
 2     which it's doing here, so on the Docket 28, we filed a chart
 3     with all the terminations of TPS designation on the 35 year
 4     history of the program.  It's organized by the date of
 5     termination, Your Honor, and you can see that in the last 22
 6     years, every single time they terminate TPS, the Government
 7     provides at least -- at least six months, and, more commonly,
 8     12 or 18 months.
 9          So that's a clear past practice.  The agency has to
10     acknowledge it if they're going to change.  They failed that
11     first step here.  That's the first step, simply acknowledge
12     that this is a change.
13          Secretary Noem denied there was any past practice and
14     defendants continued to do that here.  If you look at page 14
15     of their response.  If the Court goes onto the second step, the
16     requirement is that the agency provide a reasonable explanation
17     for this change, why has it stopped.
18          It was fine for 22 years to give people six months at
19     least to prepare for this dramatic change.  Why did they decide
20     it's all of a sudden not appropriate anymore.  The only
21     explanation, the only new explanation Secretary Noem has
22     provided is to cite to the executive order, the invasion
23     executive order.
24          It's not rational, Your Honor, to deny at least that
25     six month period that's been given to every other group of TPS
```

36

1    holders for 22 years in order to stop a, quote, unquote,

2    invasion of illegal immigrants.  It has no reasoning with

3    respect to this population.

4          THE COURT:  When you see the word invasion, how do you

5    interpret that?  And, first, exclude what has not happened.

6    There's no national security at-war risk right now.  These

7    individuals have not committed any crime, so what are you --

8    what is your interpretation of invasion?

9          MS. BANSAL:  With the Court's permission and given the

10   time, I would like to leave that to the my co-counsel because

11   it's very relevant to our discrimination claim.

12         THE COURT:  All right.

13         MS. BANSAL:  Thank you.

14         MS. ARULANANTHAM:  Thank you, Your Honor.

15   Unfortunately invasion refers to this racist great replacement

16   theory ideology that the U.S. will be taken over by non white

17   immigrants.  This is set out in some detail in professor Elliot

18   Young's declaration and also in some of the other news articles

19   describing commenting on the presidents and Secretary Noem's

20   use of that term.

21         It doesn't make me happy to say it, but that's the

22   answer to your question, Your Honor, and there's no other way

23   to understand it because of the reason that you said why would

24   that be -- people who lived here for 26 years and ten years,

25   what does it mean to call them an invasion.  That makes no

UNITED STATES DISTRICT COURT

37

1    sense, especially if as Your Honor said, if they commit two

2    misdemeanors or a single felony, they're ineligible for TPS so

3    invasion isn't about security in some objective sense, it's

4    about race politics, unfortunately.

5          So this then gets to the discrimination claim, and the

6    Government spends a lot of time trying to argue that you should

7    close your eyes to all of the evidence and focus only on some

8    narrow set of evidence at issue in Trump v. Hawaii.  And I

9    think we could win under Trump v. Hawaii standard because this

10   invasion executive order is cited in each of the decisions.

11         It's the reason the Secretary gives -- it's in a

12   footnote in each decision, but it's the reason -- she said I'm

13   doing this review pursuant to the president's direction from

14   that invasion executive order.  And if you look at the invasion

15   executive order, it mentions TPS.  This is in our

16   supplemental -- in our answers to the questions from Friday.  I

17   believe it's section 16b of the invasion executive order

18   directs the Secretary to, you know, do a review of TPS and

19   ensure it's limited, you know, consistent with the statutes

20   purpose or something like that.

21         But why are you saying that in an executive order

22   about an invasion.  It's obviously because it's some level in

23   the mind of the administration, the president and the

24   Secretary, they're connecting these two things.  So I do think

25   we would have an argument even under Trump v. Hawaii where

UNITED STATES DISTRICT COURT

38

1    you're limited to the statements of the decision makers about

2    this decision and the four corners of the order.

3        But as Your Honor supplemental questions suggest,

4    there is no way under existing law -- you know, the Supreme

5    Court wants to change it, that's something that could happen in

6    the future, but under existing law, there is no argument for

7    applying Trump v. Hawaii's very limited standard to claims

8    brought by people who have lived here lawfully for decades.

9    And the simplest way to see that is to look at the Supreme

10   Court's decision in the DACA case which is DHA v. Regents,

11   which we cite in our supplemental paper and also the Ninth

12   Circuit's decision which is a more fulsome decision of this

13   same point.

14       And there in Supreme Court -- I'm quoting now -- the

15   Supreme Court said to plead animus, plaintiff must raise a

16   plausible inference that Nvidia's discriminatory purpose was a

17   motivating factor in the decision.  And then they cite

18   Arlington heights -- which is the case that all this --

19   obviously Your Honor knows this law and the -- that's where

20   this comes from.  And they go on to say district impact, the

21   procedural sequence -- which is the things that my co-counsel

22   was just talking about -- contemporaneous statements are all

23   relevant.

24       So all of this evidence, Your Honor, don't -- you

25   don't have to -- you cannot actually under the doctrine close

UNITED STATES DISTRICT COURT

39

your eyes.  You have to look, unfortunately, at all of the

things that the president said.  I won't repeat them all here.

        We've got them there calling people animals, comparing

them to snakes, all of this invasion rhetoric, people coming

from Asian, Africa, and South America, all of that is relevant.

And when you compare it to the facts -- this is the last thing

I'll say on it.  When you compare it to the facts of Mi Familia

Vota, or any of those other Ninth Circuit cases, Avenue 6E,

Pacific Shores, even McGuinness, to McGuinness, the facts are

better.  But our facts are overwhelming stronger.  We have so

much more evidence from the decision makers from the highest

people in the country just expressing naked racial animus

against this community.

        And if there's any claim in which -- if Arlington

Heights means anything, the constitutional protection on

decision making motivated by race discrimination means

anything, it has to apply in a case where they called people

lawfully residing here for decades a bunch of invaders.  That

is as pure an expression of animus that you could find.

        They say they're poisoning the blood and there's more

than enough evidence under any normal discrimination standard.

I'm guessing my time is up.  Is that right?

        I'll save discussion on the scope of relief and the

state docket and all that for reply, with the Court's

permission.

UNITED STATES DISTRICT COURT

40

```
 1            THE COURT:  Thank you.  Counsel, you may proceed.
 2            MR. WEILAND:  Thank you, Your Honor.
 3            It's the defendant's position obviously that the
 4   resolution of this motion begins and ends with the judicial
 5   review bar of 8 USC 1254a(b)(5)(A) which states that there is
 6   no judicial review of any determination with respect to the
 7   designation, termination, or extension of designation of a
 8   foreign state.  Plaintiffs focus on the word determination but
 9   they pull it out of that language that surrounds it.  Any
10   determination has a broadening effect to this scope of the
11   determinations that this court has not put into review.
12            As does the language "with respect to."  Both of those
13   have a broadening effect.  And these are very similar.  Your
14   Honor asked about Patel v. Garland.  To the statute in that
15   case which barred any judgment regarding the granting of
16   relief.
17            THE COURT:  But here we're not talking about judgment,
18   we're talking about determination.  So my earlier question to
19   counsel is that language pertaining to a single act or does it
20   have a different interpretation when we're looking at a cluster
21   of acts?
22            MR. WEILAND:  I think I can answer this question
23   perhaps by saying that it applies to any determination just
24   like any judgment in Patel.  It was anything related to the
25   decision making so any determination being made here.
```

UNITED STATES DISTRICT COURT

41

```
 1          So not just a singular act which is where they misread
 2   McNary and Reno and AFLCIO.  Those were all very specific
 3   languages that a -- a determination respecting an application.
 4   That's a much narrower formulation of the judicial review bar
 5   in those cases.
 6          And McNary itself acknowledged that the Congress could
 7   draw a broader prohibition if it wanted to and it did.  It said
 8   any determination with respect to.  So that's the defendant's
 9   position on the interpretation of the --
10          THE COURT:  And that brings me to an earlier question
11   I posed to plaintiff, are you suggesting that the intent of
12   Congress was to preclude any judicial review?  Because you're
13   giving it a very broad definition.  So does that mean that the
14   Courts are precluded from reviewing any actions under this
15   statute?
16          MR. WEILAND:  Yes.  That is the position of the
17   Government that this is a broad not judicial review bar.
18          THE COURT:  Now if I were -- for purposes of
19   argument -- if I were to disagree with that interpretation and
20   Loper-Bright gives me the ability to examine the statutory
21   language, what is your position?
22          MR. WEILAND:  Obviously, Your Honor always has
23   jurisdiction to determine its own jurisdiction so I'm not
24   certain what position you're asking for.
25          THE COURT:  Okay.  You may proceed.
```

UNITED STATES DISTRICT COURT

42

```
 1          MR. WEILAND:  But we think the language is -- or
 2     defendant certainly thinks the language is extraordinarily
 3     broad and that there's no distinction between the term judgment
 4     and determination.  That's why we think Patel is the
 5     appropriate lens through which to review or read this language.
 6          THE COURT:  If I were to disagree with that
 7     interpretation that it's the same as Patel and that it's not
 8     the same, that it's much more narrow, do you still have an
 9     argument or does your argument fail in determines of whether
10     judicial review is appropriate whether I have jurisdiction?
11          MR. WEILAND:  I think that would depend upon what you
12     wanted to look at, Your Honor.  So if you -- as I understand
13     your question, you're -- if you interpreted it narrowly, then I
14     guess my follow up would have to be how narrowly?  What do you
15     think is beyond review of the Court and what isn't?
16          THE COURT:  Uh-huh.
17          MR. WEILAND:  They acknowledge that you're not
18     permitted to look behind the decision at the facts and reweigh
19     the evidence -- but I'll get to this a little about in pretext
20     again -- but that's exactly what they're asking you to do.
21     They're asking you to compare what the evidence considered was,
22     what weight it was given compared to what was done by previous
23     Secretaries of Homeland Security and then to determine that
24     this decision, this determination was not sufficient.
25          You can't -- they can't eat their cake and still have
```

UNITED STATES DISTRICT COURT

43

```
 1    it too.  They can't argue that you should be able to consider

 2    everything she didn't look at but then say you're not allowed

 3    to look at what she looked it.  It doesn't make sense.

 4         THE COURT:  Well, they make the distinction of factual

 5    versus legal.  So I'm just -- I'm going to not interrupt any

 6    further.  I'm going to let you get through your presentation.

 7    I may have some follow up questions though.

 8         MR. WEILAND:  Certainly, Your Honor, though and I'm

 9    here to answer any questions you may have to the best of my

10    ability.

11         Your Honor also asked about judicial review under

12    1252(f)(1) and I don't think that the argument is full close by

13    immigrant defenders -- or at least the defendants I should say.

14    The defendants don't believe that -- in that it doesn't speak

15    to restraining the actions of the executive.  So here they're

16    asking you to withhold the termination from taking effect.

17         You would be restraining the Secretary in that regard.

18    And it's for that reason defendants assert that the judicial

19    review bar of 1252(f)(1) to the extent it applies to 1254a also

20    applies here.  Your Honor asked in some of your questions about

21    the presidential effect of stays from the Supreme Court.

22         THE COURT:  On the shadow docket.

23         MR. WEILAND:  Yes, on the emergency docket.  Yes, Your

24    Honor.  We asserted and we put this in our answer to Your Honor

25    that the stay in NTPSA one, this was the very same question
```

UNITED STATES DISTRICT COURT

44

1    that was before the Court in that case postponing the effective

2    date of a vacatur and postponing the effective date of

3    termination.  And another judge in this district granted the

4    705 stay.

5           It was upheld by the Ninth Circuit and the Supreme

6    Court with only one dissent stayed that decision.  We --

7    defendants assert that that is a precedent that Your Honor

8    should consider.

9           THE COURT:  Is it your position that this case is

10   identical to that case?

11          MR. WEILAND:  Substantially similar I think is the --

12   is an appropriate -- because that case was on a slightly less

13   solid footing as far as the Government's position.  It was

14   dealing with vacaturs of extension decisions.  Here, Your Honor

15   is confronted with the starkest exercise of the secretaries

16   authority and actual termination, and so we think the president

17   -- the precedent is stronger here than in those -- in those --

18   in that other case.

19          THE COURT:  Would you agree that the shadow docket

20   doesn't give factors or provide their reasoning or give any

21   guidance to District Court and that we're speculating in some

22   ways as to why they reached that determination?

23          MR. WEILAND:  I would agree with that, Your Honor.

24   That decision was only -- and my colleagues have pointed out

25   only two paragraphs and didn't dig into the rationale for their

UNITED STATES DISTRICT COURT

45

1    decision.  But the counter point to that the defendants rely on

2    and think is telling is that Hollingsworth v. Perry explains

3    what the Supreme Court has to find in order to grant such a

4    stay of a lower court order.

5           And that does show they have to have found that there

6    was a likelihood that the Government would succeed on the

7    merits and the ballots and the harms and favor the Government.

8    So, yes, Your Honor is correct we are affirming from their

9    order that finding but they could never reach that finding

10   otherwise.

11          THE COURT:  Well, but again, you're inviting me to

12   speculate, enter the star chamber not knowing which factor may

13   have weighed heavier than others, whether this case is in

14   alignment, distinguishable, or whether there was some hardcore

15   factors this court should consider because it's just the

16   determination that I have, I don't really have the reasoning.

17   So that's what I'm trying to find out.  Do you agree with me on

18   that that I don't have any reasoning, I don't have factors, I

19   don't have any information about which factor weighed more

20   heavy than others, what was the itemized reasoning for the

21   decision, I just have a decision.

22          MR. WEILAND:  That's correct, Your Honor.  You just

23   have a decision.

24          THE COURT:  All right.

25          MR. WEILAND:  And if I might touch on this at least

UNITED STATES DISTRICT COURT

46

 1   with regards to the jurisdictional review bar or the judicial

 2   review bar here, plaintiffs acknowledge, again, that they don't

 3   -- that it would be inappropriate for you to weigh the facts

 4   and the conclusions in the determination, that you can't

 5   reassess the determination.  But then they say that they're not

 6   asking you to do that so that they're not precluded by the

 7   judicial review bar, but then when they argue, their likelihood

 8   of success on the APA claim, that's exactly what they ask you

 9   to do.

10        They ask you to take a look at what Secretary Noem

11   thought was important, what she considered, what her conclusion

12   was as it compared to other conclusions that may have been

13   drawn by a different Secretary of Homeland Security previously,

14   how that may have compared with other termination decisions in

15   the past.  And that is all asking you to look behind the

16   determination itself to determine that they are likely to

17   succeed on the APA claim but they themselves acknowledge that's

18   exactly the kind of review that's barred by 1254a.

19        And so, again, defendants assert that this case or

20   this motion should resolve on the jurisdictional grounds.

21   Addressing the pretextual argument which I think is their

22   primary APA argument --

23        THE COURT:  Let me go back to something on

24   jurisdiction.  Under 5 USC 705, would Congress have intended

25   for reviewing courts to be limited in their ability to postpone

UNITED STATES DISTRICT COURT

47

1    agency actions if justice so required?

2              MR. WEILAND:  Under the APA, Your Honor.

3              THE COURT:  Yes, sir.

4              MR. WEILAND:  No.  Certainly that grants jurisdiction

5    unless Congress takes it away elsewhere which is what they've

6    done here in 1254a.  And as far as the purpose of TPS and the

7    -- the hemming in of executive discretion, think -- the

8    defendants would assert that's a bit of a -- the wrong

9    viewpoint to understand what Congress did.

10             Yes, they wanted to restrain in some ways the

11   unfettered discretion of the executive, but they also

12   recognized their legislation was occurring in a broad history

13   of unfettered discretion of the executive with regards to

14   immigration and foreign policy.  And so the TPS statute is not

15   created -- does not create this broad authority.  It fits

16   within that broad authority, and, therefore, it doesn't -- it

17   restrains it only so much as it specifically states.

18             And it also recognizes -- and this gets to, again, to

19   the jurisdictional argument that the defendants are making

20   here -- that the -- while Congress may have wanted to restrain

21   the exercise of the executive authority with regards to

22   immigration and foreign policy, defendants asserted it had no

23   intention to create a judicial restraint on that as well which

24   is why there is this provision precluding judicial review.

25             If I could next turn to this argument about pretext,

UNITED STATES DISTRICT COURT

48

```
 1    Your Honor.  This is perhaps the classic example that Justice
 2    Thomas warned of in his dissent in the Department of Congress
 3    case.  This is the creation of fabrication of pretext by the
 4    stringing together of Tweets, comments, and whatnot to
 5    fabricate -- well, not to fabricate -- but to argue and advance
 6    a theory of the case that the decision making is a pretext.
 7         But Department of Commerce was a very limited factual
 8    scenario that is being taken far beyond those limited facts
 9    here.  It was -- if Your Honor looks at the opinion and the
10    underlying documentation, it revolves around a letter, March
11    26th of 2018, from Secretary Congress Wilbur Ross that said the
12    citizenship question should have been put on the census for
13    the -- because he was asked by the Department of Justice to
14    include it.  And that was the only reason he gave for his doing
15    so.
16         THE COURT:  And this is in 2018 that you're referring
17    to?
18         MR. WEILAND:  Yes, Your Honor.  I'm giving the
19    background to the Department of Commerce case because I think
20    it's instructive or informative to understand the scope of
21    plaintiff's pretext argument and how far they've taken --
22         THE COURT:  While you're doing that, take into
23    consideration ECF 17-20, paragraph 24 with regard to comments
24    that were made by our president in 2018 so that we have context
25    and the whole picture.
```

UNITED STATES DISTRICT COURT

49

```
 1        MR. WEILAND:  Yes, Your Honor.  I mean, I understand
 2   the president in campaigning and in -- and the Whitehouse has
 3   also made certain comments.  The point I am making is that the
 4   in the Department of Commerce, it was a very singular
 5   justification that was determined to have been largely
 6   fabricated through -- by channel communications with the
 7   Department of Justice to ask for the citizenship question to be
 8   added to the sentences.
 9        Here, Secretary of Homeland Security Noem has never
10   hidden the fact that this is a policy reviewing immigration
11   policies in the United States following the president's
12   executive orders and taking a look at -- a hard look at the
13   immigration programs of the United States is something she's
14   not doing.
15        She's -- this is not a hidden thing.  This is not a
16   pretext.  This is something that is part in parcel of the new
17   administration coming into office with its own interpretation
18   of what the immigration policies of the United States should
19   look like.  And --
20        THE COURT:  Well, when you said what the United States
21   should look like, to clarify the record -- and I just was
22   troubled by something that just is pushing this question that
23   our president spoke very favorable by about countries like
24   Denmark, Switzerland, and Norway.  And when I saw the passage
25   that's in ECF 17-20, there was a clear quote in which he spoke
```

UNITED STATES DISTRICT COURT

50

1    very disfavorably about countries like El Salvador, Honduras,

2    and Haiti, and I believe it doesn't escape any of our memory

3    the vernacular of what kind of countries those were that people

4    were coming from.

5            And so with that in mind, addressing their pretext

6    argument, racial animus, etcetera, how should I interpret that

7    information?  And that's brought on by your indication of what

8    Americans should look like.

9            MR. WEILAND:  No.  No.  I'm saying that this is a --

10   the administration -- I'm certainly not asserting in any way --

11   and I don't -- I'm saying the administration has come in with a

12   differing view, a policy view, and it is not a pretext to have

13   a differing view in any policy.  And this is acknowledged in

14   the Department of Commerce case itself which is the sort of

15   founding principal that you can bring a pretextual assertion

16   under APA.

17           A change in administration brought on -- I mean the

18   quote from the case is a change in administration brought on by

19   people casting their votes is a perfectly reasonable basis for

20   an executive agencies reappraisal of the costs and benefits of

21   its program and that's certainly all I am asserting -- or the

22   defendants are asserting with regards to the legal argument

23   that this was a pretextual decision.  New administrations are

24   allowed to come in with new policy views.  And they're allowed

25   to take steps to enact those policy views.

UNITED STATES DISTRICT COURT

51

1          And the Court also said that -- the Supreme Court also

2     said in that case the Court may not set aside an agencies

3     policy when making decisions solely because it might have been

4     prompted by differing administration of priorities.  And so

5     from a -- from the standpoint of reviewing this as a pretext,

6     the defendants pushback on the concept that this is a pretext,

7     it is policy making.

8          Finally, with regards to Your Honor's consideration of

9     the likelihood of success, it is true the parties have a

10    different interpretation of what standard of review should

11    apply to your -- if you do find that you have jurisdiction to

12    review, your review of the decision.  The defendant's position

13    is obviously that the rational basis standard elaborated in

14    Trump v. Hawaii is what applies and that if a facially

15    legitimate reason is given that is satisfactory.  That case

16    dealt with some of the same comments that have been raised here

17    including one Your Honor just asked me about but determined

18    that it -- the facially --

19         THE COURT:  I'm looking at that through the lens of

20    pretextual and preordained so I want to be clear why I'm

21    looking at those factors, but, go ahead.

22         MR. WEILAND:  I understand.  Thank you, Your Honor.

23         In that case, considering very similar statements or

24    some of the exact same statements made from 2016 or so, the

25    Court still found that any policy towards aliens is vitality

UNITED STATES DISTRICT COURT

52

1    and intricately interwoven with contemporaneous policies in

2    regard to the conduct of foreign relations.  And this was one

3    of your -- I believe your questions about even what the

4    standard of review ought to apply to if you do get to the point

5    of conducting a review of the decision.  And -- and I think

6    Your Honor phrased it in terms of national security, but it's

7    broader than that.

8         It's the assertion that any decision, particularly in

9    here where we're talking about the designation of particular

10    countries of whether or not they continue to have TPS status,

11    that is intricately interwoven with the conduct of foreign

12    relations.  There's simply no way to pull that out and that is

13    something that the Supreme Court has traditionally and

14    historically for hundreds of years recognized is subject to

15    rational basis review and -- or at least -- they have applied

16    rational basis review.  I misspoke if I gave you the impression

17    the rational basis review test has been around for centuries.

18         But it applies to immigration in particular because

19    that is a vital policy -- foreign policy considerations are

20    vitally interwoven.  And the categories -- the case, Trump v.

21    Hawaii applied Matthews to aliens who were present and applied

22    the rational basis review in Matthews v. Diaz to categories of

23    aliens who had been admitted in order to make a humane response

24    to a national catastrophe.  And even in that context -- very

25    similar to the context we have here -- the Court applied a

UNITED STATES DISTRICT COURT

53

1    narrow standard review.

2           So this is why defendants assert that the rational

3    basis applies to your review of the determination should you

4    get there and that on their face, they're facially legitimate.

5    And there is no -- as plaintiffs concede, no looking behind the

6    curtain to see -- or to reweigh the evidence as they want you

7    to by pointing out those things they think should be considered

8    or commented on which are simply beyond the scope of this

9    court's jurisdiction to review even under their understanding

10   of 1254a(b)(5)(A).

11          And then if I might address scope of relief, Your

12   Honor.

13          THE COURT:  Yes.

14          MR. WEILAND:  We think it's important to recognize

15   that in the recent decision of Immigrant Defenders Law Center

16   v. Noem, that was a 705 case and they applied Trump v. Casa to

17   limit it to the parties before the Court.  And Your Honor had

18   some questions about the practicality of doing that or how DHS

19   would do that.

20          I haven't -- those came before the hearing.  I haven't

21   an immediate answer, but I would ask, you know, leave of the

22   Court to provide whatever I can from my client with regards to

23   the practicality of that.  Obviously we think the association

24   in representing its members knows who those people are and can

25   identify them, and -- and measures might be able to be taken in

UNITED STATES DISTRICT COURT

54

1  that regard, but I would like to be able to answer your

2  question more fully on how that would happen.

3      Regardless, we think it's clear that it -- the how it

4  happens is less important than it ought to happen, that the

5  case stands for the purpose -- for the point that your relief

6  should be no broader than as is necessary to provide relief to

7  the plaintiffs before you.  And that's Casa and also Immigrant

8  Defenders from the Ninth Circuit recently.

9      THE COURT:  Okay.  Thank you.  You still have time

10  remaining, but if this is the time where you would like to

11  break, just let me know.

12      MR. WEILAND:  Your Honor, I had asked for an

13  opportunity -- I might ask for an opportunity to answer some of

14  these additional questions if I could just consult my

15  electronic device.

16      THE COURT:  That's perfectly fine.  We'll take our

17  recess at this time.  We'll be in recess for 15 minutes.

18      I will place on the record the items that I have

19  reviewed, ECF 62, ECF is the Honduras compilation of materials

20  in terms of what's there, not digging in too deep.  ECF 63

21  refers to Nicaragua.  ECF 64 to Nepal.  These are the

22  administrative records that showed yesterday on our docket.

23      Before the Court is ECF 17, motion to postpone, and

24  all of the responsive documents can be found at 18, 35, and 53.

25  The Court posed questions using ECF 60.  The responses can be

UNITED STATES DISTRICT COURT

55

1    found at 65 and 67.  And the Court found that at least one of

2    the Amicus briefs were relevant to the questions that the Court

3    had.

4         The questions have been presented and uploaded and so

5    those who the Court declined to accept those Amicus briefs,

6    they can probably understand the scope of which I need

7    assistance.  So the Amicus brief found at 66 has been accepted

8    for filing.  There were supplemental questions provided to

9    counsel.  If I have leave, I will upload those as ECF 69.

10        Counsel both have indicated they may be requesting the

11   Court to allow them an opportunity to further delve into those

12   questions, please identify those, if any, after the break.

13        So, at this time, we'll be in recess for 15 minutes.

14   Thank you.

15

16     (Proceedings reconvene at 3:44 p.m.)

17        THE COURT:  All right.  Back on the record.

18        Counsel for the plaintiff, if you will, please come

19   forward.  Counsel for the defense has also had time to consult.

20   There are a couple areas I want to make sure that we go back to

21   and that's scope of relief.  And Arlington Heights.  McNary and

22   progeny, the difference between "A" and "any."

23        And then one moment.  I had something else highlighted

24   in my notes.  I had one other question but I think I'm going to

25   save that for the end because I may have misheard something.

UNITED STATES DISTRICT COURT

56

1          Counsel, with that in mind, you may proceed.

2          MR. ARULANANTHAM:  Thank you, Your Honor.  I'm going

3    to start by talking about the Supreme Court stay in the NTPSA

4    case which is also our case concerning Venezuela.  And I think

5    it's relevant that my friend doesn't really dispute anything we

6    said about the balance of hardships other than to talk about

7    this case.  So he's not disputing that thousands of people are

8    going to lose their jobs, that some number of them are going to

9    be detained and deported, that American children are going to

10   be -- get kicked off of their health insurance, all this.

11         He doesn't dispute that.  He just says but the Supreme

12   Court thought that -- you know, they granted the stay in the

13   NTPSA case and so you should do.  And I just have two things to

14   say.  Entirely agree with Your Honor and actually personally

15   feel very strongly about it.

16         You can only apply something if they have reasons.

17   You can follow the order.  Judge Chen obviously has to follow

18   it because it's the same case.  But if you're applying it in a

19   different case, it has to have reasons.

20         And if it doesn't have reasons, there's nothing to

21   apply.  It's impossible.  None of us knows how to apply it

22   because it has no reasons so I don't think it's a precedent in

23   that very technical sense.  That being said, there are

24   differences -- very important differences -- between that case

25   and this one, and I do think they're relevant if you're going

UNITED STATES DISTRICT COURT

57

1    to play the game of trying to imagine what they might have

2    written and then try to defer to that.

3           One huge difference is the length of residence.

4    Right.  Because the folks we're talking about lived here for 26

5    years.

6           Most of them -- and the Nepalis lived here for on an

7    average of 14 and they had TPS for more than 10.  Another

8    difference is the APA claims.  They're completely different.

9    The claim we presented to the Supreme Court in the Venezuela

10   case was about the power to vacate a decision.  It's not

11   even -- you won't see that word in our briefs anywhere.

12          It's not the same thing because what they were doing

13   was something fundamentally different.  They're going to take

14   back an extension.  We didn't make the pretext argument there

15   that we're making here, mainly because there was only

16   termination at that time.

17          Venezuela was the first decision they made.  Now they

18   had seven.  So you can see the pattern, you know, obviously you

19   couldn't see there.  So the merits are completely different.

20          And the last thing -- I don't want to belabor it but

21   I'll just mention it -- you know, there's a second paragraph of

22   this inscrutable two paragraph order in the NTPSA case.  That

23   paragraph protects -- gives an opening to protect some

24   Venezuelan TPS holders.  And we did actually.  We went back to

25   Judge Chen and there's some set of people protected.

UNITED STATES DISTRICT COURT

58

```
 1              They might have thought, I don't know, that the
 2    Supreme Court might have thought that that covered a lot of
 3    people and that might make the bounds hardship -- there's no
 4    way to know.  There's no way to know.  So I just think it's not
 5    something you can defer to.
 6              The scope of relief and the ImmDef case.  So, Your
 7    Honor, your questions today suggest that -- and we agree that
 8    ImmDef grants a stay.  You know, so it stops certain agency
 9    action.  And in that sense, it does exactly what we're
10    asking -- or something similar to what we're asking this court
11    to do which is postpone an agency action.
12              The reason we were talking about distinguishing is
13    because it limited the relief to the clients of ImmDef.  So
14    ImmDef there is acting as an organizational plaintiff, and
15    they're saying we represent clients and the Court said, well,
16    you can run relief for your clients and that gives you complete
17    relief.  And so we're not going to essentially enjoin the
18    re-implementation of the remaining Mexico program.
19              It's a program requiring asylum seekers to stay in
20    Mexico while they're litigating their cases.  That's what
21    ImmDef is about.  We're not going to re-implement that for
22    people who -- we're not going to bar that for people who are
23    not ImmDef clients.
24              In that sense, what we're asking for here is different
25    from what we're asking for there.  We're asking to postpone the
```

UNITED STATES DISTRICT COURT

59

1    termination itself and that would then benefit every Nepali,

2    Nicaraguan, and Honduran TPS holder.  And we're asking you to

3    not just limit it to the members of the National TPS Alliance.

4         So I want to say a couple things about why we want you

5    to do that, you know, even though it's different than what

6    happened in ImmDef and then talk about some of the things

7    related to this.  You know, in ImmDef, the plaintiffs harm was

8    that as lawyers they're not able to represent their clients

9    when their clients are stuck in Mexico.  That was their

10   standing theory.  And so the Court said, well, look, if all of

11   your clients are exempted from this, then you're protected.

12   Right.

13        Here, in contrast, to stop people from being detained

14   and to stop them from losing their jobs, that requires

15   immigration and then enrichment enforcement and then employers

16   and police officers stopping people about driver's licenses and

17   all kinds of people to know who is at TPS Alliance Member and

18   who is not.  And there's not a straightforward way to do that.

19        When he says, oh, you know, we think you can limit it

20   to just the NTPSA membership but it doesn't say how.  Like how

21   would you do that?  The TPS statute, for example -- I'll give

22   you detention as an example, Your Honor.  The TPS statute

23   clearly bans the detention of anybody who has TPS under

24   immigration law.

25        It says shall not detain.  That's what the statute

60

1    says.  If they're going on some worksite raid or they're, you

2    know, doing some other kind of enforcement action, how is the

3    ICE Officer supposed to ask in that moment and figure out

4    whether the person is a TPS Alliance Member or not.

5            So the principal is we are entitled to complete

6    relief.  That's the principal.  Right.  At a minimum, we're

7    entitled to complete relief on behalf of our clients.  And

8    there is no way to get complete relief for every member of the

9    TPS Alliance unless you grant relief to the entire TPS

10   community.  That's one thing I was going to say.

11           The other thing I was going to say was ImmDef

12   acknowledges that the normal rule in APA cases is that when you

13   postpone an agency action or you set aside an agency action,

14   you set aside it for everyone.  This goes back to something we

15   were talking about at the start of this argument today.  In an

16   APA case, the Court is sitting like with veto power.  Right.

17   That's what the APA did.

18           It created Federal judicial control over

19   administrative agency action.  And so normally -- and this is

20   what the DC circuit cases are still doing -- even after Casa

21   they're doing this -- they say we vacate the action.  It's

22   vacated.  It's not only vacated for one company or one litigant

23   before the Court, it's vacated period.

24           And that's the normal rule.  Now, ImmDef created an

25   exception for that and it pointed to these very specific

UNITED STATES DISTRICT COURT

61

```
 1    things.  It said, well, you know, Mexico and the U.S. are
 2    negotiating over this program so we're worried about the
 3    foreign policy.  We don't want to upset the foreign policy
 4    negotiations between those two.
 5           There's nothing like that here.  They haven't come and
 6    said to Your Honor you're going to mess up the foreign policy
 7    of the United States if you postpone these actions for like
 8    four months or five months.  So these are our arguments for why
 9    we really think it's appropriate for Your Honor for the scope
10    of the relief to be the same as it has been in administrative
11    agency action cases for ages, which is you postpone the rule
12    and that protects everybody in the TPS holder community.
13           Does the Court -- I wanted to make sure we talked
14    about that for a while, because if we were fortunate enough to
15    get there on the rest of it, that's obviously a very important
16    piece because, you know, there's thousands of peoples fates at
17    stake even for the next few months over that.  I don't know if
18    the Court has other questions about that subject.
19           THE COURT:  No.  But I do -- I would like you to
20    address McNary and progeny.
21           MR. ARULANANTHAM:  Yes.  All right.  So I'll start
22    with any.  Right.  Is that a good place to start on that
23    subject?
24           The statute in McNary is correct, said a
25    determination.  It didn't say any.  But it did say respecting a
```

UNITED STATES DISTRICT COURT

62

1    determination respecting an application.

2           So his argument about with respect to, which is the

3    other language, you know, I don't think that holds water

4    because McNary uses a very similar term. Lots of other

5    preclusion provisions use words like any or no, like there's no

6    decision or action in Demore v. Kim, the Jennings v.

7    Rodriguez.

8           Any cause or claim, there's often very broad language

9    used.  But the Court still has to look at what the operative

10   word is.  You know, "any" covers all determinations but it's

11   still only determinations.  It can't get broader.  It doesn't

12   make determination cover things that are, like, legal

13   conclusions or judgments or other things in the statute.

14          And if you look at the word determination, I'm going

15   back to the same point, there are multiple determinations

16   described in the statute in 1254a(b).  There's determinations

17   as to designate, separate different determinations to

18   terminate, different ones to extend.  Look at the word, you'll

19   see it appears multiple times in both the periodic review

20   section and the termination section.

21          Any just means it covers all of those.  That's all it

22   means.  It refers to like the five different uses of the word

23   determination in (b).  And then, you know, the other thing I

24   would say on this, Your Honor, is if their argument is right

25   that any determination means it covers not just determinations

UNITED STATES DISTRICT COURT

63

1    but also legal judgments and also judgments about the timing

2    and also, you know, judgments that they want to stop doing

3    objective country conditions review and make a sham and all of

4    these different things, then it really does give them

5    unreviewable authority to do anything they want.

6            You know, and I didn't hear him answer my

7    hypotheticals like why can't they give TPS to China even though

8    there's no objective basis for it to make a trade deal work.

9    Why can't they use it as a negotiating lever whenever they feel

10   like it to harm -- you know, to -- for some other unrelated

11   objective, and that is a reason to reject their interpretation

12   of the statute.  They have to have clear and convincing

13   evidence that this court -- the Congress intended to strip

14   judicial review and they don't have it.

15           You asked about Arlington Heights, Your Honor.  Shall

16   I -- is that a good spot to go next?

17           THE COURT:  Uh-huh.

18           MR. ARULANANTHAM:  You know, I just had a couple

19   things to say on this subject.  He didn't answer Regents.  Go

20   read the Supreme Court decision in Regents.

21           It says the claim of -- I quoted it.  I read you that

22   language earlier.  That's the case about immigrants,

23   undocumented youth, who have lived here for a long time.

24           It's immigration policy.  It's about the DACA program.

25   It couldn't be more immigration policy than that.  And the

UNITED STATES DISTRICT COURT

64

1   Supreme Court says to prove the race discrimination claim here,

2   there's a claim about animus.  You have to show there's an

3   animus purpose and it sights Arlington Heights.  That answers

4   the question.

5           Trump v. Hawaii is different for all the reasons we

6   talked about earlier and that your questions suggests.  He says

7   Matthews v. Diaz is different.  And Matthews v.  Diaz, it's

8   true it's a discrimination claim about people who are in the

9   United States, but it is not a claim alleging racial animus or

10  any other kind of animus.

11          The claim in Matthews v.  Diaz is that lawful

12  permanent residents who have been here more than five years are

13  being treated better than ones who have been here less than

14  five years, and it's a claim about the way the Medicare

15  benefits work.  They're giving it to some LPR's and not others.

16  And the Court said that kind of line drawing is subject only to

17  rational basis review.

18          And of course the immigration code is full of line

19  drawing like this.  Right.  Like you can get discretionary

20  relief if you've been here ten years, but not if you've been

21  here nine years.  You can get -- adjust your status when you've

22  turned 21, if you have a child who is 21 but not 20.  Tons of

23  lines like that.

24          And they say of course this is another one of those

25  lines that's only going to subject to rational basis review.

UNITED STATES DISTRICT COURT

65

1   That is night and day from a claim that the Government is

2   engaged in discrimination -- racial discrimination or other

3   kinds of hate filled, you know, animus driven decision making.

4   And as I said again, Regents -- which is an immigration case --

5   says that the way you analyze that is under Arlington Heights,

6   which is the same standard that me Mi Familia Vota uses.

7        I just want to say one other thing about equal

8   protection, Your Honor.  Exhibit 1720 that you pointed to

9   where, you know, that ugly remark was made, that was a meeting

10  about TPS.  And this context is there, it's in the opinion from

11  Judge Chen in the Ramos decision.  That was a meeting about

12  whether to grant permanent residence to people from El

13  Salvador, Haiti, and Honduras and some other countries, as you

14  said.

15       So it is a direct expression of animus as to this

16  population, the same people -- includes the same people that

17  we're talking about here today.  I have a couple things briefly

18  on the APA.  I don't know if Your Honor -- actually, are there

19  other things, questions you have, Your Honor?

20       THE COURT:  I am also taking a closer look at

21  irreparable harm.  And I believe I asked a question in the

22  first set of questions about where will people go, where will

23  they -- how long will they be detained?  Are they going to some

24  third-party country which is almost an ode to past years of

25  enslavement.  What -- what is the irreparable harm from your

UNITED STATES DISTRICT COURT

```
 1   lens representing your client?

 2          MR. ARULANANTHAM:  Your Honor, once they lose their

 3   TPS status, unless they have some other status to fall back

 4   on -- which very few of them do, and there's a declaration

 5   about that actually.  The Tolchin, T-O-L-C-H-I-N, declaration

 6   talks about how if they lose TPS status, you know, what are the

 7   other things people are to fall back on.  And it says, you

 8   know, she's an immigration lawyer with extensive experience.

 9   She says most of these people do not have another status.  If

10   they did, they would already have it and there are some people.

11          So all of the other people, they're then subject to

12   immigration enforcement, detention, and deportation.  And

13   people get detained -- as you may have seen, the Government is

14   detaining lots and lots of immigrants, jailing them.  And, yes,

15   Your Honor -- we briefed this -- they are potentially

16   removable.

17          The Government has taken the position that any country

18   that will take the person, they can be sent to.  Gives them

19   virtually no time, in many cases, to argue for protection

20   relief like convention against torture or withholding to people

21   being sent to those third countries.  This entire population is

22   subject to that same risk, all of that.

23          THE COURT:  And, again, are TPS holders -- have not

24   violated the law, have not committed a crime, a felony or

25   misdemeanor, working, and paying into taxes and Social
```

UNITED STATES DISTRICT COURT

67

1  Security?

2         MR. ARULANANTHAM:  Yes, Your Honor.  The record also

3  has evidence about the millions in lost Medicare and Social

4  Security taxes that will happen when all of those people lose

5  their jobs.  This is why -- so I'll Close with this except I'll

6  answer any question you want of course, Your Honor, but Tuesday

7  is the day when 17,000 people will lose their jobs.

8         Like, that harm is immediate.  The Government has

9  argued both in this case and others like, hey, they can apply

10  for asylum, they can seek other forms of relief.  The Tolchin

11  declaration answers that specifically because many of them are

12  not eligible.  Even the small number that are doesn't mean

13  they're going to win.

14         They can be detained while the asylum case is pending.

15  So there are plenty of reasons why that is not a guarantee.

16  That is separate from the employment, loss of medical

17  insurance, lose your driver's license, all of that kicks in the

18  minute that that status goes away.

19         The employers, you know, we've seen this, sadly, you

20  know, they're like I can't give you your job anymore and that

21  means look in this record how many people are supporting their

22  children, supporting their kids in school.  Denis Molina, an

23  autistic adult child, U.S. citizen, his healthcare is provided

24  through his job.  He's a pastor for that matter.  All of that

25  harm happens immediately, and that's why we --

UNITED STATES DISTRICT COURT

68

```
 1              THE COURT:  All of that harm happens without any wind

 2      down period and a very short window to relocate and handle your

 3      affairs, etcetera?

 4              MR. ARULANANTHAM:  That's right, Your Honor.  Under

 5      their interpretation -- which is they could give people no more

 6      time than next week.  For the 17,500 Nepalis, it happens on

 7      Tuesday.  And for the 52,000 -- I guess 55,000 or something

 8      total from Honduras and Nicaragua, it happens on September 9th.

 9              And all of that loss of job and then you can't drive

10      and the medical insurance, all of those things that are tied to

11      that, those kick in immediately.  And then the detention and

12      deportation, that is of course dependent on them going out and

13      getting arrested.  But they have made very clearly that's why

14      they want to do it.  They want to go arrest and detain and

15      deport as many people as they can so that harm is also going to

16      happen.

17              And if we are right, when we get to summary judgment

18      in November or whenever it is, that harm is absolutely

19      irreparable.  To me, honestly, that is the strongest argument

20      that we have.  I think we are definitely right on the merits.

21      But it's -- I recognize it's complicated.  There's a lot of

22      different law, this and that, but we surely have raised serious

23      questions here.

24              And every court on this determination question and any

25      and all of that, when that argument has been rejected by every
```

UNITED STATES DISTRICT COURT

69

```
1    district court to look at that question, seven District Courts
2    have said there is jurisdiction over the kinds of claims we're
3    talking about here.  And the only appellate court, like I said,
4    it got vacated -- it got reversed en banc -- or vacated en
5    banc.  So we surely raised serious questions.
6         And then if you -- if it turns out you have doubts
7    today and it turns out in October or November we were right and
8    you agree with it us, all the people detained and deported in
9    the interim, there's no way they're getting that back.  And
10   that I think is the strongest argument for why we would urge
11   you to grant the postponement motion now, set us at a fast
12   clock to summary judgment hearing in November -- or, you know,
13   we can work out the day obviously with Your Honor and the
14   Government -- and set us on a fast clock.
15        And then that's the relief we need.  And if we don't
16   persuade you in October or November, so be it, but today, for
17   purposes of what we're trying to do today, we strongly urge you
18   to postpone this agency action and do it for everyone, for all
19   of those people who would be protected so just act on the
20   agency rule and we can come back and have a more fulsome
21   litigation over it in the fall.
22        THE COURT:  Thank you.  Counsel, you may conclude.
23        MR. WEILAND:  Thank you, Your Honor.  I only want to
24   address the scope.
25        THE COURT:  I suggest you address whatever arguments
```

UNITED STATES DISTRICT COURT

70

1   were just made.

2          MR. WEILAND:  Okay.  First of all, with regards to the

3   scope, and I appreciate Your Honor's providing us the

4   opportunity to consult.  I am informed by my client that USCIS

5   could issue individual notices continuing the benefits for the

6   named plaintiffs and under TPS and that they would keep the

7   benefits they currently have so it is achievable, it is doable.

8   They're --

9          THE COURT:  You said you'll keep the benefits they

10  currently have?

11         MR. WEILAND:  Yes.  If Your Honor was to postpone --

12         THE COURT:  Uh-huh.

13         MR. WEILAND:  -- with regards to the plaintiffs before

14  you, USCIS could issue individual notices continuing the

15  benefits that they currently have.  And NTPSA as an association

16  has brought -- has a sort of standing on the benefit on behalf

17  of their members so they clearly know which members of their

18  association they're talking about.  And so it seems

19  dramatically feasible to limit the scope of any order to the

20  parties before this court.

21         THE COURT:  Please keep your voice up.  I think both

22  myself and the reporter, we're -- when you see us leaning in,

23  that's because we can't hear you.

24         MR. WEILAND:  My apologies, Your Honor.  I have a

25  tendency to trail off.

UNITED STATES DISTRICT COURT

71

```
 1          We think -- defendants assert that Trump v. Hawaii

 2    answered the question on decisions like this.  This is a

 3    decision about the designation of a country whether or not the

 4    conditions within the country continue to merit the

 5    designation.  These are decisions that the Secretary makes that

 6    are fraught with foreign policy implications.  Indeed, you

 7    know, that they don't point out but previously Secretary

 8    Blinken recommended that the Nepal TPS be terminated.

 9          THE COURT:  I'm sorry.  Blinken did what now?

10          MR. WEILAND:  Recommended to the Secretary Mayorkas

11    that Nepal's TPS be terminated with an 18 month --

12          THE COURT:  Was it -- did he recommend termination or

13    wind down period?

14          MR. WEILAND:  Well, he recommended termination with an

15    18 month wind down.

16          THE COURT:  Okay.  Thank you.

17          MR. WEILAND:  But -- and that's really the dispute.

18    Now, that's not what Secretary Mayorkas ended up doing, but

19    that was the recommendation.  But these are fraught -- these

20    determinations are fraught with foreign policy implications and

21    that's why defendants assert Trump V. Hawaii is the standard

22    under which this Court should conduct any review.

23          And then these next two points are somewhat connected.

24    My friend is absolutely correct.  I have no evidence with which

25    to dispute the declarations they have provided to this Court as
```

UNITED STATES DISTRICT COURT

72

1   far as the individual TPS holders and the hardships and fears

2   they are facing.  But I would like to at least be heard on

3   causation and redressability.

4          This has always been and this is the argument -- this

5   was in our briefing -- this has always been an aspect of the

6   program.  It is a temporary safe harbor.  It is not meant to be

7   permanent.  We have folks who have been here for a very long

8   time, yes.

9          Your Honor started I think the hearing with the

10  statement that there's no pathway for them.  That's not

11  necessarily true in all instances.  In fact, many TPS holders

12  have took the opportunity while here to find a pathway to

13  permanent status; they marry a U.S. citizen spouse, they apply

14  for LPR status.  They have become citizens over the years.

15         THE COURT:  And they're able to accelerate the

16  paperwork and get people to make a decision after 10, 15, 20

17  years?  There's no wait?

18         MR. WEILAND:  There are delays.  And we provided the

19  link to Your Honor, the Court, because there are any number of

20  different programs people can apply for and there are different

21  delays associated with the processing of that.

22         THE COURT:  What's just kind of the arc, what's the

23  arc of delay?

24         MR. WEILAND:  I guess I don't understand what you mean

25  by arc, Your Honor.  I apologize.

73

```
 1              THE COURT:  Can a delay be five months minimum, 12

 2     months, 13 years, 12 years?

 3              MR. WEILAND:  I think you see the longer ones with the

 4     -- based on the change in the asylum lasting for -- in the

 5     90's, I think that's when the change was made.  So some folks

 6     who have had asylum claims pending for a long time have been

 7     waiting.  But they've had employment authorization during that

 8     time frame.  They've been allowed to remain in the United

 9     States during that time frame.

10              So there are benefits that come that -- and folks can

11     apply for while waiting for the final adjudication.  And those

12     are all born out in the data.  Some are fast.  Months could be

13     possible, yes.  I don't have the data sheet in front of me so I

14     don't want to speak to any specific --

15              THE COURT:  The reason I ask is because you invited me

16     to take that into consideration.  And sitting in the Northern

17     District, I know I see cases where I -- people have been

18     waiting a long time, even some of the declarations in this case

19     seem to suggest that there has been a number of delays for a

20     number of people.

21              MR. WEILAND:  Yes, Your Honor.  I'm well aware of the

22     docket that the Northern District handles quite regularly.  So

23     there are pathways for folks.  There are pathways -- there have

24     been pathways since they had TPS and -- and the final point on

25     this is removing TPS doesn't make someone removable.
```

UNITED STATES DISTRICT COURT

74

```
 1              They have to be put into removal proceedings.  There
 2    is a process for that.  It simply stops the -- it ends the
 3    temporary protection from having to confront the removal
 4    proceeding, but it doesn't automatically result in somebody's
 5    deportation.  And so --
 6              THE COURT:  Do you stand by that latter statement,
 7    that taking away their protection does not automatically put
 8    them at risk of immediate deportation?
 9              MR. WEILAND:  That is not what I'm saying, Your Honor.
10    I'm not saying they're not at risk.  I'm saying it doesn't make
11    them deportable.
12              So the loss of TPS status doesn't mean somebody is
13    removable.  They have to be removable for some other reason.
14    They have to be here unlawfully with no lawful basis for
15    remaining.
16              THE COURT:  And if the TPS status is taken away, are
17    you telling that me that they have --
18              MR. WEILAND:  They could be placed into removal
19    proceedings is what I'm saying.  But they have the opportunity
20    through the removal proceedings to make their case for whether
21    or not they have a claim to asylum, convention against torture,
22    withholding of removal for hardship.
23              THE COURT:  I just want to make sure your statement is
24    that removing their TPS status does not automatically result in
25    their deportation.
```

UNITED STATES DISTRICT COURT

75

```
 1              MR. WEILAND:  Yeah.  It's not a basis for removal.
 2     But it does remove the protection they have from removal
 3     proceedings.  I will admit -- I do agree with that assertion on
 4     that front.
 5              And employment authorization, they would have to find
 6     another pathway to that.  But absent any questions Your Honor
 7     might have, that's all --
 8              THE COURT:  I believe you answered all of my
 9     questions.
10              MR. WEILAND:  Thank you, Your Honor.
11              THE COURT:  Thank you.  All right.  Thank you.
12              Thank you for your preparation.  The Court is going to
13     take this matter under submission for the next 48 hours and
14     then render its decision.  At this time, all prior orders
15     remain in full force and effect, and thank you for all
16     courtesy.
17
18              (The proceedings were concluded at 4:13 p.m.)
19                          ---oOo---
20
21
22
23
24
25
```

76

1

2

3

4

5                    **C E R T I F I C A T E**

6

7        I, ANDREA K. BLUEDORN, do hereby certify that I am

8   duly appointed and qualified to act as Official Court Reporter.

9        I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14        DATED this 7th day of August, 2025.

15

16

17

18                          /s/ Andrea K Bluedorn
                            Andrea K. Bluedorn, RMR, CRR
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT