# No. 25-4901

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

———————

KRISTI NOEM, *et al.*,
*Appellants*,

vs.

NATIONAL TPS ALLIANCE, *et al.*,
*Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA, NO. 3:25-CV-05687-TLT
HONORABLE TRINA L. THOMPSON

———————

## RESPONSE IN OPPOSITION TO APPELLANTS' MOTION FOR STAY PENDING APPEAL

Emilou MacLean (SBN 319071)
emaclean@aclunc.org
Michelle (Minju) Y. Cho (SBN 321939)
mcho@aclunc.org
Amanda Young (SBN 359753)
ayoung@aclunc.org
ACLU FOUNDATION
OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111-4805
Telephone: (415) 621-2493

Ahilan T. Arulanantham (SBN 237841)
*Counsel of Record*
arulanantham@law.ucla.edu
CENTER FOR IMMIGRATION LAW
AND POLICY, UCLA SCHOOL OF LAW
385 Charles E. Young Dr. East
Los Angeles, CA 90095
Telephone: (310) 825-1029

*Attorneys for Appellees*

Additional Counsel for Appellees

Jessica Karp Bansal (SBN 277347)
jessica@ndlon.org
Lauren Michel Wilfong (*Pro Hac Vice*)
lwilfong@ndlon.org
NATIONAL DAY LABORER
ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew (*Pro Hac Vice*)
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, Suite 1H
San Diego, CA 92120
Telephone: (949) 603-7411

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ................................................. 3

STANDARD OF REVIEW ............................................................ 7

ARGUMENT ................................................................................ 7

    I.    DEFENDANTS CANNOT SHOW A STRONG
        LIKELIHOOD OF SUCCESS ON THE MERITS ........ 7

        A.    The District Court Had Jurisdiction Over
               Each of Plaintiffs' Claims.................................... 7

        B.    Defendants Cannot Show Likely Success on
               Plaintiffs' First APA Claim ................................ 14

        C.    Defendants Cannot Show Likely Success on
               Plaintiffs' Second APA Claim ........................... 19

        D.    Defendants Cannot Show Likely Success on
               Plaintiffs' Discrimination Claim........................ 21

    II.    DEFENDANTS FAIL TO SHOW IRREPARABLE
        HARM AND THE EQUITIES STRONGLY
        FAVOR POSTPONEMENT ......................................... 25

    III.    THE REQUESTED RELIEF IS NOT
        OVERBROAD ............................................................... 29

    IV.    DEFENDANTS' REQUEST TO STAY
        PROCEEDINGS IS UNWARRANTED ...................... 31

CONCLUSION................................................................. 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Gardner,*
    387 U.S. 136 (1967) ................................................................... 14

*Al Otro Lado v. Wolf,*
    952 F.3d 999 (9th Cir. 2020) ...................................................... 7

*Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................... 22, 23

*Ave. 6E Invs., LLC v. City of Yuma,*
    818 F.3d 493 (9th Cir. 2016) .................................................... 23

*Biden v. Texas,*
    142 S. Ct. 926 (2021) ................................................................ 28

*Biden v. Texas,*
    597 U.S. 785 (2022) .................................................................. 14

*Bowe v. INS,*
    597 F.2d 1158 (9th Cir. 1979) ..................................................... 6

*CASA de Maryland, Inc. v. Trump,*
    355 F. Supp. 3d 307 (D. Md. 2018) ............................................. 8

*CASA, Inc. v. Noem,*
    2025 WL 1907378 (D. Md. July 10, 2025) ................................... 8

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    141 F.4th 976 (9th Cir. 2025) .............................................. 19, 20

*Centro Presente v. DHS,*
    332 F. Supp. 3d 393 (D. Ma. 2018) ............................................. 8

*City of Rialto v. W. Loading Corp.,*
    581 F.3d 865 (9th Cir. 2009) ..................................................... 11

*Cooper v. Harris,*
  581 U.S. 285 (2017) ............................................................ 7, 22

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) .................................................... 14, 19, 21, 24

*Doe #1 v. Trump,*
  957 F.3d 1050 (9th Cir. 2020) ....................................... 28

*Drs. for Am. v. Off. of Pers. Mgmt.,*
  2025 WL 1836009 (D.D.C. July 3, 2025) ................................. 29

*E. Bay Sanctuary Covenant v. Trump,*
  932 F.3d 742 (9th Cir. 2018) ........................................... 28

*FDA v. Wages & White Lion Investments, L.L.C.,*
  145 S. Ct. 898 (2025) ..................................................... 20

*Fiallo v. Bell,*
  430 U.S. 787 (1977) ...................................................... 14

*Gebhardt v. Nielsen,*
  879 F.3d 980 (9th Cir. 2018) ........................................... 12

*HECA v. Trump,*
  No. 1:25-cv-01464 (E.D.N.Y. July 1, 2025) ............................... 8

*ImmDef v.Noem,*
  2025 WL 1172442 (C.D. Cal. Apr. 16, 2025) .............................. 6

*Immigr. Defs. Law Cntr. v. Noem,*
  2025 WL 2017247 (9th Cir. July 18, 2025) ........................*passim*

*INS v. Legalization Assistance Project,*
  510 U.S. 1301 (1993) ............................................... 28, 29

*Judulang v. Holder,*
  565 U.S. 42 (2011) ....................................................... 14

*Krechman v. Cnty. of Riverside,*
  723 F.3d 1104 (9th Cir. 2013) ........................................... 31

*Kucana v. Holder,*
    558 U.S. 233 (2010) ..................................................... 13

*Maryland v. King,*
    567 U.S. 1301 (2012) ................................................... 29

*McNary v. Haitian Refugee Ctr.,*
    498 U.S. 479 (1991) ...................................... 10, 11, 14

*Merrill v. Milligan,*
    142 S. Ct. 879 (2022) ..................................................... 5

*Mi Familia Vota v. Fontes,*
    129 F.4th 691 (9th Cir. 2025)................................... 23

*Microsoft Corp. v. Motorola, Inc.,*
    696 F.3d 872 (9th Cir. 2012) ....................................... 7

*Mont. Wildlife Fed'n v. Haaland,*
    127 F.4th 1 (9th Cir. 2025)................................ 1, 5, 6

*Nakka v. USCIS,*
    111 F.4th 995 (9th Cir. 2024)........................ 11, 12, 13

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................... 2, 4

*NTPSA v. Noem,*
    No. 25-2120 (9th Cir.)................................................... 3

*NTPSA v. Noem,*
    773 F. Supp. 3d 807 (N.D. Cal. 2025) ......................... 8

*NTPSA v. Noem,*
    2025 WL 1427560 (U.S. May 19, 2025) ....................... 5

*Nat'l Urb. League v. Ross,*
    977 F.3d 698 (9th Cir. 2020) ....................................... 7

*Patel v. Garland,*
    596 U.S. 328 (2022) ................................................... 11

iv

*Perez Perez v. Wolf*,
   943 F.3d 853 (9th Cir. 2019) ...................................................... 13

*Proyecto San Pablo v. I.N.S.*,
   189 F.3d 1130 (9th Cir. 1999) .................................................... 11

*Ramos v. Nielsen*,
   321 F. Supp. 3d 1083 (N.D. Cal. 2018) ...................................... 8

*Ramos v. Nielsen*,
   709 F. Supp. 3d 871 (N.D. Cal. 2023) ...................................... 19

*Ramos v. Wolf*,
   975 F.3d 872 (9th Cir. 2020) ................................................ 8, 24

*Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*,
   2025 WL 1825431 (D.D.C. July 2, 2025) ................................... 29

*Reno v. Cath. Soc. Servs., Inc.*,
   509 U.S. 43 (1993) ...................................................................... 10

*Richards v. United States*,
   369 U.S. 1 (1962) ........................................................................ 10

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ......................................... 8

*Sw. Airlines Co. v. FERC*,
   926 F.3d 851 (D.C. Cir. 2019) ............................................ 20, 21

*Texas v. United States*,
   40 F.4th 205 (5th Cir. 022) ......................................................... 4

*Trump v. Boyle*,
   145 S. Ct. 2653, 2654 (2025) .............................................. 26, 28

*Trump v. CASA, Inc.*,
   145 S. Ct. 2540, 2553 (2025) .............................................. 29, 31

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ............................................................. 24, 25

*Trump v. Wilcox,*
    145 S. Ct. 1415 (2025) .............................................................. 25

*United States v. Texas,*
    143 S. Ct. 51 (2022) ................................................................. 28

*Vasquez Perdomo v. Noem,*
    2025 WL 2181709 (9th Cir. Aug. 1, 2025) ................................. 30

## Statutes

8 U.S.C. § 1254a....................................................................*passim*

28 U.S.C. § 1292(a)(1) ......................................................................... 4

"Protecting the American People Against Invasion."
    90 Fed. Reg. 8443 (Jan. 29, 2025)............................................. 16

90 FR 19217 (May 6, 2025)............................................................. 16

90 FR 30086 (Jul. 8, 2025)...................................................... 17, 25

## INTRODUCTION

Defendants' stay request suffers from a threshold defect: there is no appellate jurisdiction over the district court's order. *See Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 29 (9th Cir. 2025). The order here only sets aside agency action. It does not require Defendants to do anything, and expires in three months.

The order's limited duration also shows there is no emergency. Defendants articulate no concrete harm from the order, let alone harm arising in the next few weeks. "[T]he Executive Branch's desire to enact a policy is not sufficient to satisfy the irreparable harm prong." *Immigr. Defs. Law Cntr. v. Noem*, 2025 WL 2017247, at *5 (9th Cir. July 18, 2025) (*ImmDef*). Defendants assert the equities are controlled by the Supreme Court's stay order in a different TPS case, but the Supreme Court gave no reasons for that ruling, the merits claims were entirely different, and Plaintiffs' equities here are stronger. Indeed, Defendants themselves called that case "distinguishable."

In contrast, staying the decision below would cause catastrophic irreparable harm, as the district court's detailed factual findings show. *See* Defendants' Motion for Stay Pending Appeal ("Mot."), Ex. 1 (Dkt. 73,[1] Order Granting Plaintiffs' Motion

---

[1] Citations to "Dkt." refer to the docket in the district court case below.

1

to Postpone, hereinafter "Order") at 30-32. A stay would strip
employment authorization from approximately 60,000 lawfully-
present individuals, the vast majority of whom have lived here for
more than 25 years. In addition to losing their jobs, health
insurance, driver's licenses, and educational and career
opportunities, some would face immigration detention and
deportation to countries the State Department still labels
dangerous, as well as separation from their American children—
40,000 of whom live with the TPS holders at issue here. Dkt. 17-16
¶¶ 12, 19, 25.

If this Court stays the district court's order now, but then
finds the terminations unlawful upon more fulsome review, the
harm caused in the interim would be almost entirely irreversible.
In contrast, a stay now coupled with later reversal would cause no
harm.

On the merits, Defendants have not made a "strong showing
[they are] likely to succeed." *Nken v. Holder*, 556 U.S. 418, 425-26
(2009). Every court to consider Defendants' subject matter
jurisdiction argument under 8 U.S.C. § 1254a(b)(5)(A) has rejected
it, because it ignores how the word "determination" is used both in
this statute and in others governing jurisdiction in immigration
cases.

Nor have Defendants shown likely success on either of Plaintiffs' APA claims or their constitutional claim. Ample evidence supports the district court's factual finding that Defendants did not undertake the country conditions review required by the APA and the TPS statute. And Defendants still offer no coherent explanation for the Secretary's departure from two decades of unbroken agency practice providing at least a six-month transition period when terminating TPS, despite black-letter administrative law doctrine requiring acknowledgment of and explanation for such a change. Finally, Defendants complain of "intemperate" rhetoric in the district court's factual findings regarding discrimination, but cannot defend *their* statements equating TPS holders with "invaders" who "poison the blood" of the country. A wealth of evidence shows the district court's finding that these and other statements reflect animus is not clear error. Plaintiffs' discrimination claim easily satisfies both the *Arlington Heights* standard, which governs here under current law, and the higher threshold set by *Trump v. Hawaii.*

## JURISDICTIONAL STATEMENT

Defendants never explain why this Court has appellate jurisdiction, even though they just briefed this issue in *NTPSA v.*

3

*Noem,*, No. 25-2120 (9th Cir.) (*NTPSA I*).[2] In prior cases, Defendants relied on 28 U.S.C. § 1292(a)(1), which confers jurisdiction over interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions." That statute does not confer jurisdiction here. First, the district court issued a "postponement" of the effective date of administrative action under Section 705 of the Administrative Procedure Act (APA), not an injunction. The Supreme Court and Fifth Circuit have held in similar contexts that stays of agency action are not injunctions. *Nken*, for example, held stays of removal are not injunctions for purposes of 8 U.S.C. § 1252(f)(2) because they merely "temporarily suspend[] the source of authority to act" by operating "upon the judicial proceeding itself" rather than "directing an actor's conduct." 556 U.S. at 428-29; *see also Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (same for Section 1252(f)(1), because "[t]here are meaningful differences between an injunction, which is a drastic and extraordinary remedy, and vacatur, which is a less drastic remedy") (cleaned up) (citation omitted).

Second, while the Supreme Court has read Section 1292(a)(1) to authorize appellate review over some interlocutory orders that are not injunctions because they have the "practical effect" of an

---

[2] The panel has not ruled on the issue.

injunction, that exception does not apply. The order below is not "directed to a party, enforceable by contempt, and designed to accord … substantive relief … in more than temporary fashion.'" *Mont. Wildlife Fed'n*, 127 F.4th at 28 (citation omitted). An agency action does *not* have the practical effect of an injunction where "the only action required of the government with respect to [the action] is that the agency refrain from enforcing it." *Id.* 29. Instead, as in *Nken*, the decision below does not order anyone to do anything, *see* Order 20, and merely states the terminations are "postpone[d]." *Id.* 37.

That the Supreme Court exercised jurisdiction to stay the district court's order in *NTPSA I*, 2025 WL 1427560 (May 19, 2025) does not show this Court has appellate jurisdiction now. The Supreme Court's stay decision came with no explanation; therefore it sets no precedent. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("To reiterate: The Court's stay order is not a decision on the merits"). Moreover, *NTPSA I* had no occasion to consider this Court's appellate jurisdiction, as Defendants invoked jurisdiction under Supreme Court Rule 23 and the All Writs Act, not Section 1292. *See* Application to Stay 1, *NTPSA I*, No. 24A1059 (S. Ct. May 1, 2025).

This Court's recent decision in *ImmDef* also does not establish appellate jurisdiction here. That decision cannot overrule *Montana*

5

*Wildlife Federation*, which it failed to cite. *See Bowe v. INS*, 597 F.2d 1158, 1159 n.1 (9th Cir. 1979) (panel is "obligated to follow the prior holdings of this court and is not free to overrule earlier holdings even if [it] consider[s] them ill-advised"). *ImmDef* is also distinguishable, as the administrative action there was more like an injunction: it involved not just the stay of agency action, but also "a stay of Remain in Mexico's *reimplementation*," which the district court granted to "preserve status [and] rights" under Section 705. 2025 WL 2017247 at *3, *6 (emphasis added); *see also ImmDef v. Noem*, 2025 WL 1172442, *6 (C.D. Cal. Apr. 16, 2025) ("ImmDef moves this Court for emergency relief to stay Defendants' reimplementation of MPP"), *25 ("the Court GRANTS ImmDef's application"). Thus, the underlying court order barred officials from taking specific actions, whereas the order here only "postpone[s]" the effective date of the agency's orders themselves.

While of course Defendants must still comply with this order by, for example, acknowledging it on their website and ceasing to enforce the TPS terminations, an order "is not injunctive in nature" when "the only action required of the government … is that the agency refrain from enforcing it." *Mont. Wildlife Fed'n*, 127 F.4th at 29.

6

## STANDARD OF REVIEW

To obtain a stay, Defendants must prove "irreparable injury is the more … likely outcome" "during the period before the appeal is likely to be decided." *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citation omitted); Ninth Cir. R. 27-3. They also must make "a strong showing [they are] likely to succeed," *Al Otro Lado*, 952 F.3d at 1006 (quoting *Nken*, 556 U.S. at 434), overcoming a "highly deferential" abuse-of-discretion standard, *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012), as well as the clear error standard for factual findings, where the Court "affirm[s] … so long as [a finding] is 'plausible'" "even if another [finding] is equally or more so." *Cooper v. Harris*, 581 U.S. 285, 293, 309 (2017). A stay is inappropriate where, as here, "the status quo would be seriously disrupted." *Nat'l Urb. League v. Ross*, 977 F.3d 698, 701 (9th Cir. 2020).

## ARGUMENT

## I. DEFENDANTS CANNOT SHOW A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

### A. The District Court Had Jurisdiction Over Each of Plaintiffs' Claims

1. Every court to consider the scope of Section 1254a(b)(5)(A) in the TPS context has rejected Defendants' contention that it bars

7

courts from ensuring the agency conforms to basic Administrative Procedure Act requirements.[3]

Defendants rely on the vacated panel decision in *Ramos v. Wolf*, 975 F.3d 872, 895 (9th Cir. 2020), *opinion vacated upon reh'g en banc*, 59 F.4th 1010 (9th Cir. 2023), but the pre-determination claim here was not raised there. And even if this Court ultimately both disagrees and adopts the Panel majority's view, Defendants cannot establish a "strong likelihood" of prevailing now, in this interim posture, on a theory that no court has adopted and seven have rejected.

2. Courts have consistently rejected Defendants' view because it contravenes the statute's plain text. Section 1254a(b)(5)(A) provides:

> There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection [i.e., subsection (b)].

---

[3] *See Saget v. Trump*, 375 F. Supp. 3d 280, 330-33 (E.D.N.Y. 2019); *Centro Presente v. DHS*, 332 F. Supp. 3d 393, 405-409 (D. Ma. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 319-322 (D. Md. 2018); *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1101-08 (N.D. Cal. 2018); *NTPSA I*, 773 F. Supp. 3d 807, 830 (N.D. Cal. 2025); *CASA, Inc. v. Noem*, 2025 WL 1907378, at *10 (D. Md. July 10, 2025); *HECA v. Trump*, No. 1:25-cv-01464 (E.D.N.Y. July 1, 2025), Dkt. 63 (granting motion to set aside); Order 15.

Review of *the rest of subsection (b)*—which Defendants never bother to analyze—makes clear that "determination" here refers to the Secretary's conclusion that a nation satisfies certain country conditions requirements relevant to TPS decisionmaking. For example, during the periodic review process the Secretary must:

> *determine* whether the conditions for … designation … continue to be met" and publish "*such determination* (including the basis for *the determination*, and, in the case of *an affirmative determination*, the period of extension of designation[)]

8 U.S.C. § 1254a(b)(3)(A) (emphases added); *see also* 8 U.S.C. § 1254a(b)(3)(B) (referring to "*the determination*" that conditions require termination) (emphasis added); 1254a(b)(3)(C) (mandating extension if Secretary "does not *determine*" that country no longer meets conditions for designation) (emphasis added).

Thus, the statute's use of the words "determine" and "determination" makes clear that Section 1254a(b)(5)(A) bars review of country conditions assessments—such as the kinds of claims commonly litigated in individual asylum cases. In contrast, the statute does not use "determination" to refer to predicate procedural obligations, such as consultation requirements, notification obligations, or—of relevance here—the agency's duty to conduct a review of country conditions rather than deciding to terminate first and cherry-picking conditions information to serve

9

that political end. Challenges to the agency's failures to follow its obligations in those respects remain cognizable.

Nor does "determination … under *this* subsection" in Section 1254a(b)(5)(A) (emphasis added), refer to issues addressed in *other* subsections, such as the length of any wind-down period—which is discussed in subsection (d) rather than (b). Neither these nor the many other actions, decisions, and judgments the Secretary can take regarding TPS constitute "determinations" under this statute; if Congress thought they did, it would have called them that. *See Richards v. United States*, 369 U.S. 1, 11 (1962) ("a section of a statute should not be read in isolation from the context of the whole Act").

3. Contrary to Defendants' suggestion, the district court rightly focused on the statute's text, and in particular on "determination," as doing so comports with both Supreme Court and Ninth Circuit precedent consistently reading jurisdiction-stripping statutes barring review of "determinations" to preserve review over claims alleging defects in agency decisionmaking processes. Order 15 (citing *McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 492 (1991) ("collateral" challenge to agency practices cognizable despite statute barring review of "determination[s]") and *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 55-58 (1993) (applying *McNary* to find jurisdiction over challenges to practice governing

10

legalization applications)); *see also Proyecto San Pablo v. I.N.S.*, 189 F.3d 1130, 1138 (9th Cir. 1999) (challenge to pre-adjudication practices cognizable).

*McNary* and its progeny confirm this Court has jurisdiction. Under the principle they establish, a claim does not challenge a "determination" unless it seeks relief that would *dictate the substantive outcome* of the underlying agency decision. Here, nothing in the relief Plaintiffs seek would bar the Secretary from making a termination decision, provided she follows the requisite procedures and acts with permissible motives. *See generally City of Rialto v. W. Loading Corp.*, 581 F.3d 865, 875 (9th Cir. 2009) (canvassing several precedents before recognizing key "distinction between precluded judicial review ... and [permissible] judicial review of 'methods' and other collateral issues") (citation omitted)).

4. Defendants suggest *McNary* is distinguishable because Section 1254a(b)(5)(A) uses "any" and "with respect to," Mot. 6-7 (citing *Patel v. Garland*, 596 U.S. 328, 338 (2022)), but the statute in *Patel* did not contain the word "determination." Moreover, the Court barred review only of factual claims, rather than legal ones, and relied on other context clues not present here. *Patel*, 596 U.S. at 339 (citing amendment history of 8 U.S.C. § 1252(a)(2)(D)). This Court subsequently read *Patel not* to foreclose challenges to agency policies and procedures. *Nakka v. USCIS*, 111 F.4th 995, 1003, 1009

11

(9th Cir. 2024). Plaintiffs' interpretation also gives "any" meaning: there are many "determinations" so labeled in subsection (b) to which "any" refers. Ultimately, "[t]he word 'any' considered alone cannot answer this question … we must look beyond that word itself." Order 15 (quoting *Small v. United States*, 544 U.S. 385, 388 (2005)).

Defendants also ignore that when Congress wants to write "unreviewable authority" into law, Mot. 7, it knows how to do so. *See Nakka*, 111 F.4th at 1005 (describing "the *McNary* blueprint"). This statute does not bar review of "any cause or claim," or "all questions of law or fact." *Cf. Gebhardt v. Nielsen*, 879 F.3d 980, 984-85 (9th Cir. 2018) (statute specifying decisions were in Secretary's "sole and unreviewable discretion" barred review of all but constitutional claims). The mere use of "any" or "with respect to" does not suffice.

5. Plaintiffs' second APA claim is cognizable for the additional reason that it focuses on the length of the orderly transition period, which is addressed in subsection (d) of the statute, whereas Section 1254a(b)(5)(A) concerns only determinations made under subsection (b).

Perhaps sensing this fatal defect, Defendants gesture at jurisdictional provisions they never mentioned when opposing Plaintiffs' motion, arguing this claim is barred by a provision

12

governing relief from removal and the APA's general prohibition on review of decisions committed to agency discretion. Mot. 15 (citing 8 U.S.C. § 1252(a)(2)(B)(ii)) and 5 U.S.C. § 701(a)(2)).

These new suggestions are equally meritless. Those provisions do not apply both because subsection (d) of the TPS statute does not "use[] the word 'discretion' or any synonym," *Perez Perez v. Wolf*, 943 F.3d 853, 867 (9th Cir. 2019), and an orderly transition period is not a form of "relief." *See Nakka*, 111 F.4th at 1004 (explaining that Section 1252(a)(2)(B) should be interpreted with reference to its heading, "which refers to '[d]enials of discretionary relief'") (quoting 8 U.S.C. § 1252(a)(2)(B)); *see also Kucana v. Holder*, 558 U.S. 233, 246 (2010) (holding Section 1252(a)(2)(B)(ii) requires explicit textual commitment to agency "discretion" by "specif[ication]" in statute).

While subject matter jurisdiction defects are not waivable, Defendants' failure to raise these arguments in opposition to Plaintiffs' motion counsels strongly against relying on them in this alleged emergency posture. At minimum, if the Court is inclined to consider them, it should order supplemental briefing.

6. Finally, Defendants suggest review generally should be limited in immigration cases, but even in the context of admissions at the border, when DHS exercises discretionary authority "under the APA, DHS's exercise of discretion within that statutory

13

framework must be reasonable and reasonably explained." *Biden v. Texas*, 597 U.S. 785, 806-07 (2022). Defendants also ignore the strong presumption favoring judicial review of agency action, which requires that Defendants establish Congress's intent to strip jurisdiction by "clear and convincing evidence" where, as here, there would be no other forum in which to raise Plaintiffs' legal claims. *Abbott Labs v. Gardner*, 387 U.S. 136, 141 (1967)); *see also DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020) ("[t]he APA establishes a 'basic presumption of judicial review [for] one "suffering legal wrong because of agency action"'"). Defendants have not come close to satisfying the clear and convincing evidence standard.[4]

## B. Defendants Cannot Show Likely Success on Plaintiffs' First APA Claim

The district court carefully reviewed over 800 pages of record evidence and issued detailed findings establishing that Plaintiffs are likely to succeed on their claim that the challenged terminations "were based on a preordained determination to end the TPS program, rather than an objective review of country

---

[4] Defendants' suggestion that *Fiallo v. Bell*, 430 U.S. 787 (1977), somehow limits APA review in immigration cases cannot be reconciled with *Biden*, *Regents*, *McNary*, and various other cases engaging in such review. *E.g.*, *Judulang v. Holder*, 565 U.S. 42, 52-53 (2011) (holding policy governing exercise of discretion in deportation cases arbitrary under APA).

14

conditions." Order 21. Despite their rhetoric, Defendants do not contest that TPS decisions must be based on country conditions reviews, Mot. 11, and, therefore, that it would be unlawful to "preordain[]" the result of such reviews. Nor could they. The TPS statute requires the Secretary to extend a TPS designation unless the country "no longer meets the conditions for designation." 8 U.S.C. § 1254a(b)(3)(C). Those conditions include that the country is "unable, temporarily, to handle adequately the return" of its nationals. *Id.* § 1254a(b)(1)(B)(ii). To make that determination, the Secretary must "review the conditions in the foreign state." *Id.* § 1254a(b)(3)(A).

Significantly, the Secretary may *not,* consistent with this statutory scheme, terminate TPS simply because she believes termination would best serve the Administration's "immigration policy prerogatives." Mot. 13. Nonetheless, ample evidence—including explicit statements from President Trump and Secretary Noem about TPS—support the district court's finding that she did exactly that.

Defendants challenge the district court's factual findings, but utterly fail to show clear error. Instead, they simply ignore the most damning evidence against them. Then-candidate Trump promised to "revoke" TPS if elected because "[i]n my opinion, it's not legal." Dkt. 54 ¶ 3 & Ex. 1. On his first day in office, he directed the

Secretary to "align" TPS designations with the policies in his Executive Order, "Protecting the American People Against Invasion." 90 Fed. Reg. ("FR") 8443, 8446 (Jan. 29, 2025) ("EO"). It was not clear error to find that EO "implied that those with TPS were 'illegal,' contributed to an 'invasion' and 'significant threat to national security and public safety,' and 'commit[ed] vile and heinous acts against innocent Americans'"—even though TPS holders are lawfully present and ineligible for protection if they have more than a single misdemeanor. Order 22 (quoting EO).

Acting pursuant to the EO—which she cited in each decision—Secretary Noem proceeded to terminate TPS for seven countries over the next six months, stripping lawful status from over one million immigrants.[5] Order 22. She explicitly stated her decisions followed the President's "directive," and that she too views TPS itself as an illegitimate "immigration scheme[] that make[s] Americans less safe." *Id.*

While that evidence alone would suffice to disprove clear error at this preliminary stage, the district court also found manifest irregularities in the termination notices themselves, which show it

---

[5] South Sudan, which has approximately 200 TPS beneficiaries, received an automatic six-month extension because the Secretary failed to conduct a review by the statutory deadline. 90 FR 19217 (May 6, 2025).

16

was the Secretary's practice *not* to base her decisions on "an objective review of the country conditions," but instead a "preordained determination to end the TPS program." *Id.* 21. The Secretary repeatedly asserted TPS holders could safely return to their countries without considering crises that country conditions experts at DHS and the State Department warned would prevent safe return—even though the TPS statute *required* her to consider those conditions. 8 U.S.C. § 1254a(b)(3)(A).

For example, USCIS country conditions experts concluded in May 2025 that Nicaragua "is experiencing political instability and a humanitarian crisis that continue to render the country temporarily inadequate to handle the return of its nationals." Dkts. 63 at 2, row 9 & 63-1 (Nicaragua CAR) at NicAR000044. But the Secretary's termination notice asserts Nicaragua can "adequately handle the return of its nationals" without saying *anything* about its political instability or humanitarian crisis. 90 FR 30086, 30088 (Jul. 8, 2025); *see also* Order 22 (failure to mention hurricanes and tropical storms). The Honduras termination never mentioned "political violence or crime," Order 22, even though the State Department and DHS country conditions experts deemed Honduras unsafe on those bases.[6] Dkt. 54-3; *see also* Dkt. 62 at 2,

---

[6] Defendants assert the Secretary considered the State Department's warning because it was included in the CAR. Mot.

17

row 9; Dkt. 62-1 at Honduras AR000029 (May 1, 2025 USCIS Memo concluding "Honduras is not considered safe for returning nationals").

The record shows these were not one-off errors, but rather a pattern that repeats through all the Secretary's termination decisions. The Secretary repeatedly maintained TPS holders could safely live in countries that DHS had found unsafe weeks earlier, or that the State Department *still* deems too dangerous even to visit. She did so not by distinguishing prior decisions or giving less weight to certain conditions, but by simply omitting any reference to the conditions that made the country unsafe. Order 22; *compare* Dkt. 18-8 (Jan. 9, 2025 Decision Memo for Venezuela) (concluding Venezuela continues to meet conditions for TPS designation based on, inter alia, political repression, human rights, and food security) *with* Dkt. 18-9 (Jan. 31, 2025 Decision Memo for Venezuela) (concluding the opposite three weeks later, without mentioning political repression, human rights, or food security); and Dkt. 18-12 *with* 90 FR 20309, 20310 (May 13, 2025) (similar, for Afghanistan).

Defendants now attempt to defend the Secretary's conspicuously incomplete country conditions assessments with a new theory, arguing the TPS statute does not require her to

---

13. But it was not clear error for the district court to reject such assertions, given the termination notice says nothing about crime.

"address intervening country conditions unrelated to the initial TPS designation." Mot. 13-14. But that rationale appears nowhere in the decisions, and *"post hoc* rationalizations" cannot justify them. *See Regents*, 591 U.S. at 22. Moreover, historically Defendants *have* addressed such conditions during the periodic review. *Ramos v. Nielsen*, 709 F. Supp. 3d 871, 885 (N.D. Cal. 2023) (finding DHS's "current policy" of considering intervening conditions when making TPS decisions "is a long standing one"). "If [DHS] is correct in its litigating position … then the agency changed its standard" and "must supply a reasoned analysis" for the change. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 995 (9th Cir. 2025) (citation omitted). It has not done so.

## C. Defendants Cannot Show Likely Success on Plaintiffs' Second APA Claim

Defendants also fail to show a strong likelihood of success on Plaintiffs' challenge to the Secretary's departure from DHS's two-decades-long practice of providing at least six months' notice of TPS terminations. Defendants assert the Secretary's decision to give just 60 days' notice to immigrants who have lived lawfully in this country for 26 years (Honduras and Nicaragua) or 10 years (Nepal) "cannot be arbitrary-and-capricious" because it does not violate the TPS statute. Mot. 15.

19

But, as the district court correctly held, black letter administrative law provides that even where an agency's discretion is "unfettered at the outset, if it announces and follows—by rule or settled course of adjudication—a general policy by which its exercise of discretion will be governed, an irrational departure from that policy (as opposed to an avowed alteration of it) could constitute action that must be overturned." Order 23 (quoting *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996)); *see also Ctr. for Biological Diversity*, 141 F.4th at 999 (holding agency violated APA by failing to explain its "change[]d course"); *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 858 (D.C. Cir. 2019) (agency's "consistent practice, whether adopted expressly in a holding or established impliedly through repetition, sets the baseline from which future departures must be explained").

The Supreme Court's recent decision in *FDA v. Wages & White Lion Investments, L.L.C.*, 145 S. Ct. 898 (2025), did not alter this longstanding "change-in-position" doctrine. Mot. 15. *White Lion* simply held the agency action challenged in that case was "sufficiently consistent" with earlier "voluminous and discursive" informal agency guidance—i.e., that there had been no change in position at all. 145 S. Ct. at 910, 919.

Not so here. The district court did not clearly err in finding that, for over two decades, Defendants have provided at least a six-

20

month orderly transition period when terminating a TPS designation. Order 23 (citing Dkt. 28). Defendants "d[id] not meaningful[ly] dispute this practice" in their opposition to Plaintiffs' motion to postpone, *id.*, so their new argument disputing that practice is waived. Mot. 16. It is also wrong. Defendants' newly-presented examples of terminations without transition periods, *id.*, all occurred *over 20 years ago* and pertained to countries that had been designated for fewer than three years. *See* Dkt. 28. They are consistent with Defendants' unbroken practice over the past two decades of providing at least a six-month transition period—*including* when terminating TPS for the exact countries at issue here. *Id.* (12-month and 18-month orderly transition periods provided in 2017 and 2018 in connection with TPS terminations for Honduras, Nepal, and Nicaragua). Courts have found the APA requires more explanation when departing from a practice manifested in just three prior agency decisions. *See Sw. Airlines*, 926 F.3d at 858. Here there are more than a dozen.

### D. Defendants Cannot Show Likely Success on Plaintiffs' Discrimination Claim

To prevail on their discrimination claim, Plaintiffs had to show "that an 'invidious discriminatory purpose was a motivating factor' in the relevant decision." *Regents*, 591 U.S. at 34 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266

21

(1977)). The district court found that test satisfied. On appeal, this Court must uphold that finding so long as it is "plausible," even if another finding would also be plausible. *Cooper*, 581 U.S. at 293.

Defendants attack the district court order as "intemperate," but ignore that the Secretary and the President have made repeated, demonstrably-false statements, both before and after taking office, that TPS holders are dangerous invaders. The Secretary insinuated TPS holders were part of "gangs doing damage and harming" people, though no evidence supports that claim. Order 12-13, 28. She proclaimed TPS allowed "poorly vetted" noncitizens, including "MS-13 gang members" and "terrorists and murderers," *id.*, to enter the United States, even though TPS is only available to people *already here*, and TPS holders are "vetted" every 6-to-18 months and are ineligible if they have more than a single misdemeanor. 8 U.S.C. § 1254a(c)(2)(B). And she described immigration as an "invasion happening on purpose … to remake the foundation of this country." Order 28. After the district court granted the Section 705 motion, DHS doubled down on these false statements, issuing a press release claiming TPS "allow[s] unvetted aliens to remain in [the] U.S.," and has "been exploited to allow criminal aliens to come to our country and terrorize American citizens." Dkt. 82-1, Ex. 1.

22

The district court did not clearly err in crediting expert testimony establishing that these statements "stereotyp[e] the TPS program and immigrants as invaders that are criminal," and "perpetuate the discriminatory belief that certain immigrant populations will replace the white population," and placing them in the long historical context of anti-immigrant racism. Order 28 (citing Dkt. 17-20).

The record refutes Defendants' baseless claims that these statements are "remote in time [or] made in unrelated contexts." Mot. 18. In fact, they are contemporaneous statements *about TPS*. This Court has upheld discrimination claims on *far* less evidence. *See, e.g., Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 505-06 (9th Cir. 2016) (statements about minorities invoking negative stereotypes evinced discriminatory animus); *Mi Familia Vota v. Fontes*, 129 F.4th 691, 724-29 (9th Cir. 2025) (reference to "illegals" and "political climate leading to" challenged action supported animus finding).

The other *Arlington Heights* factors, including "[t]he historical background" and "events leading up to the challenged decision," further support the district court's decision. 429 U.S. at 267. President Trump has accused nonwhite immigrants, including TPS holders, of "poisoning the blood of our country" and compared them unfavorably to overwhelmingly white countries "like

23

Denmark, Switzerland, and Norway." Order 29. The EO characterizes immigrants, including TPS holders, as invaders and echoes false claims that they are dangerous criminals. Order 22, 28.

Secretary Noem explicitly linked the President's animus against TPS holders to her termination decisions, stating that she ended TPS consistent with "the president's heart and desire," and that "when the president gives a directive, the Department of Homeland Security will follow it." Dkt. 44-2 at 6.[7]

Defendants assert the discrimination claim is governed by *Trump v. Hawaii*, 585 U.S. 667 (2018), rather than *Arlington Heights*, Mot. 16-17, but that assertion is foreclosed by *Regents*, as the otherwise-divided panel of this Court unanimously agreed in *Ramos*. 975 F.3d at 896 (vacated majority opinion), 926 (Christen, J., dissenting). *Hawaii* preceded *Regents*, and concerned claims by noncitizens seeking entry from abroad, challenging the exercise of presidential power where there was "persuasive evidence" that

---

[7] The Secretary's explicit acknowledgment that she sought to effectuate the President's motives, as well as her own racist statements, distinguish this case from *Ramos*, where there was "no evidence linking the President's animus to the TPS terminations." 975 F.3d at 897; *accord Regents*, 591 U.S. at 35 (record contained no discriminatory statements by key decisionmakers, and statements by President Trump were not "contemporary").

"national security concerns" existed. *Hawaii*, 585 U.S. at 706. Those factors are not present here. Order 2627.

Even if *Hawaii*'s deferential standard applies, Defendants cannot show a likelihood of success because they cannot explain away the irrationality of the "Invasion" EO, on which each termination decision at issue relies. 90 FR at 24152 n.10; 90 FR at 30088 n.4; 90 FR at 30091 n.10. Moreover, not a shred of evidence supports a rational connection between the terminations and "national-security interests and TPS's objectives." Mot. 16; *see* Order 29-30.

Finally, Defendants argue that without a stay, "virtually any immigration policy adopted by this Administration [will be] susceptible to an Equal Protection challenge." Mot. 19. But not every immigration action taken by this Administration draws explicit support from the President's and Secretary's statements of animus. The administration is free to pursue its policy goals, but not out of animus.

## II. DEFENDANTS FAIL TO SHOW IRREPARABLE HARM AND THE EQUITIES STRONGLY FAVOR POSTPONEMENT

Defendants have never seriously disputed that the TPS terminations would trigger catastrophic harm and dramatically alter the status quo. Plaintiffs would suffer irreversible injury from a stay, which would strip them of legal status, employment

25

authorization, and related benefits; expose them to detention and deportation to unsafe countries; separate families; and trigger massive economic losses. Order 30-32; *see also id.* 2-3 (Plaintiff Lama forced to take American teenage daughter to Nepal without adequate medical care for serious illness; Plaintiff Silva, certified nursing assistant at Stanford Hospital, separated from 9-year-old autistic American child). Many of these harms would be irreversible.

Defendants rely on the Supreme Court's stay order in *NTPSA I*, but it contains no reasoning, and therefore is not precedent.[8] Further, *NTPSA I* involved a district court order indefinitely postponing agency action; whereas this one lasts only until November. The APA merits claims were also entirely different, as the district court found. Order 34. Defendants themselves characterized *NTPSA I* as "distinguishable." Opp. to Admin. Mot. to Relate 6, *Ramos*, No. 3:18-cv-01554-EMC (N.D. Cal. Jul 8, 2025), Dkt. 266. And the affected population here is more deeply connected to this country, as the vast majority have lived here lawfully for over 25 years, and, collectively, have more than 40,000 American children.

---

[8] In contrast, *Trump v. Wilcox*, 145 S. Ct. 1415 (2025) contained several paragraphs of reasoning, allowing the Court to apply it as "inform[ative]" in *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025).

"Defendants … conceded … that Plaintiffs will suffer harm" if the terminations go into effect, Order 31-32, but contend that harm is "inherent[]" in the temporary nature of TPS. Mot. 20. However, the statute compels TPS extensions if conditions so warrant. 8 U.S.C. § 1254a(b)(3). Further, "the shortening of [] time in the United States and acceleration of [] removal … may constitute irreparable injury." *Ramos*, 336 F. Supp. 3d at 1087; *see also Doe v. Becerra*, 704 F. Supp. 3d 1006, 1017 (N.D. Cal. 2023), *abrogated on other grounds by Doe v. Garland*, 109 F.4th 1188 (9th Cir. 2024) (even limited time at liberty in the U.S. affects family, employment, and education). Defendants further suggest—without evidence— that Plaintiffs could have secured "durable immigration relief," Mot. 21, but the district court correctly found such relief largely unavailable, Order 32, as the expert testimony shows. Dkt 17-19 ¶ 22.

Defendants' suggestion that any restraint on their preferred immigration policy constitutes irreparable harm, Mot. 19-20, contravenes *ImmDef*, which reaffirmed "the mere existence of the Executive Branch's desire to enact a policy is not sufficient to satisfy the irreparable harm prong." 2025 WL 2017247, at *5.[9] It

---

[9] While the Ninth Circuit found harm to the government in *ImmDef*, that was because *ImmDef* concerned a policy that requires "time- and labor-intensive" "negotiation with a foreign

also contravenes the Supreme Court's repeated refusal to stay orders enjoining federal immigration policy. *See, e.g.*, *Biden v. Texas*, 142 S. Ct. 926 (2021) (mem.) (agency policy governing border processing); *United States v. Texas*, 143 S. Ct. 51 (2022) (mem.) (Secretary's enforcement priorities guidance). Like other litigants, "the Government may pursue and vindicate its [institutional injury] interests in the full course of this litigation," but it has no right to an automatic stay. *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778 (9th Cir. 2018) (cleaned up). Otherwise, "no act of the executive branch … could be the subject" of interim relief. *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).

None of Defendants' authorities counsel otherwise. Defendants suggest TPS decisions arise "in an area that implicates 'a fundamental sovereign attribute exercised by the Government's political departments.'" Mot. 19-20 (quoting *Fiallo*, 430 U.S. at 792). But that was equally true of the *Texas* cases, *supra*. It also ignores that TPS was created *by Congress* to constrain agency action. Order 9-10. Defendants also cite *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers), but there the court concluded the balance of harms weighed in the government's favor in part because an order would not prevent

---

sovereign." *Id.* As the district court found, no record evidence supports a comparable government interest here. Order 34.

individuals "possibly eligible for relief ... from suing in their own right." *Id.* 1306. Here, in contrast, a stay would allow Defendants to remove TPS holders from the country during the pendency of the litigation. Defendants also cite *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers), but that case concerned "an ongoing and concrete harm to [] law enforcement and public safety interests," which Defendants do not allege here.

## III.   THE REQUESTED RELIEF IS NOT OVERBROAD

Defendants argue this Court should narrow the stay, relying on *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2553 (2025). Mot. 21-22. But postponing agency action is "properly within the scope of the APA," and narrowing relief "would be impractical." Order 34-37.

*First*, *CASA* "explicitly declined to extend its holding to the APA context." *ImmDef,* 2025 WL 2017247, at *14. The default rule remains that orders setting aside agency action apply universally. *See, e.g., Refugee & Immigr. Ctr. for Educ. & Legal Servs. v. Noem*, 2025 WL 1825431, at *50-51 (D.D.C. July 2, 2025) (vacating new asylum policy universally after Casa); *Drs. for Am. v. Off. of Pers. Mgmt.*, 2025 WL 1836009, at *22 n.17 (D.D.C. July 3, 2025) ("as this is a case involving APA vacatur, not a universal or national injunction, the Supreme Court's recent decision in [*Casa*] does not apply").

29

*Second*, "[r]equiring organizations to share membership lists with Defendants could raise [] constitutional problems regarding the freedom of association and privacy." *Vasquez Perdomo v. Noem*, 2025 WL 2181709, at *22 (9th Cir. Aug. 1, 2025). NTPSA justifiably fears that disclosing its members to Defendants "would completely undermine [their] members' confidence and trust in [them], and [] would also violate [their] commitment to their [members'] privacy." Dkt. 82-2 ¶ 20. *ImmDef* did not present these concerns because relief was limited to the organization's *clients*, and *ImmDef* attorneys are already required to enter notices of appearances informing the government who their clients are.

*Third*, the district court did not abuse its discretion in finding universal relief remains appropriate because it was necessary to provide complete relief to the parties. Order 36. As it found, practical barriers could result in lost employment, healthcare access, and even detention or removal of NTPSA members, as Defendants have never shown they could accurately match NTPSA's list to their own databases of TPS holders without Social Security numbers, A numbers, and other identifiers which NTPSA *does not maintain*. Dkt. 82-2 ¶ 16-17.

*Finally*, even assuming Defendants could establish a system to protect just NTPSA members, it would take time, during which NTPSA members would be unable to work and vulnerable to

30

detention and deportation. If this Court narrows the scope of relief, it should at minimum delay implementation until the parties can establish a system to effectively protect all NTPSA's members. *Cf. Trump v. CASA*, Inc., 145 S. Ct. at 2563 ("[T]he Executive Order shall not take effect until 30 days after the date of this opinion.").

## IV. DEFENDANTS' REQUEST TO STAY PROCEEDINGS IS UNWARRANTED

Defendants close with a meritless request that ***all*** proceedings be stayed "[i]n anticipation of" a forthcoming request to reassign this case. Mot. 23. A *potential* motion is no basis for a stay on any ground, let alone for the "rare and extraordinary" relief of reassignment, *Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1112 (9th Cir. 2013) (citation omitted). Moreover, Defendants' grab-bag of grievances does not come close to justifying reassignment, which this Court has rejected even where judges *actually* made intemperate remarks and serious legal errors. *Id*. 1112.

Plaintiffs will address Defendants' reassignment motion when filed. For now, Plaintiffs note only that Defendants have, again, attacked the integrity of federal judges who rule against them. *See* Mattathias Schwartz, *Marshals' Data Shows Spike in Threats Against Federal Judges*, N.Y. Times, May 27, 2025. Defendants' press release describes the opinion here as "disgusting," and attacks Judge Thompson as an "out of control"

"activist … Biden appointee." *See* Dkt. 82-1, Ex. 1. Such vitriol adds

fuel to a dangerous fire; it should not be rewarded.

## CONCLUSION

The government's Motion should be denied.

Dated:  August 15, 2025          Respectfully submitted,

By: */s/ Ahilan T. Arulanantham*
    Ahilan T. Arulanantham (SBN 237841)
    *Counsel of Record*
    arulanantham@law.ucla.edu
    CENTER FOR IMMIGRATION LAW AND
    POLICY, UCLA SCHOOL OF LAW
    385 Charles E. Young Dr. East
    Los Angeles, CA 90095
    Telephone: (310) 825-1029

By: */s/ Emilou MacLean*
    Emilou MacLean (SBN 319071)
    emaclean@aclunc.org
    Michelle (Minju) Y. Cho (SBN 321939)
    mcho@aclunc.org
    Amanda Young (SBN 359753)
    ayoung@aclunc.org
    ACLU FOUNDATION
    OF NORTHERN CALIFORNIA
    39 Drumm Street
    San Francisco, CA 94111-4805
    Telephone: (415) 621-2493

By: */s/ Jessica Karp Bansal*
    Jessica Karp Bansal (SBN 277347)
    jessica@ndlon.org
    Lauren Michel Wilfong
    lwilfong@ndlon.org
    NATIONAL DAY LABORER

32

ORGANIZING NETWORK
1030 S. Arroyo Parkway, Suite 106
Pasadena, CA 91105
Telephone: (626) 214-5689

Eva L. Bitran (SBN 302081)
ebitran@aclusocal.org
ACLU FOUNDATION
OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5236

Erik Crew
ecrew@haitianbridge.org
HAITIAN BRIDGE ALLIANCE
4560 Alvarado Canyon Road, 1H
San Diego, CA 92120
Telephone: (949) 603-7411

*Attorneys for Plaintiffs-Appellees*