No. 25-4901
(calendared for oral argument on August 19, 2025 by ACMS No. 9)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

KRISTI NOEM, *et al.*,

*Appellants,*

v.

National TPS Alliance, *et al.*,

*Appellees.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

**APPELLANTS' REPLY IN SUPPORT OF
A STAY PENDING APPEAL**

(relief requested by August 19, 2025)

———————————

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
Drew.C.Ensign@usdoj.gov

WILLIAM H. WEILAND
*Acting Assistant Director*

ANNA L. DICHTER
*Senior Litigation Counsel*

LAUREN BRYANT
CATHERINE ROSS
AMANDA SAYLOR
ERIC SNYDERMAN
JEFFREY M. HARTMAN
*Trial Attorneys*

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION .................................................................................................... 1

JURISDICTION .................................................................................................... 1

ARGUMENT ........................................................................................................ 3

    I.   THE GOVERNMENT WILL SUCCEED ON THE MERITS ........... 3

        A.  TPS Terminations Cannot Be Reviewed ......................................... 3

        B.  The Government Is Likely to Prevail on the Merits of
            Appellees' APA Challenge to the Secretary's TPS
            Terminations ........................................................................................ 6

        C.  Appellees' APA Challenge to the Wind-Down Periods Will
            Fail on Appeal ................................................................................... 9

        D.  The Secretary Is Likely to Prevail on Appellees' Equal
            Protection Claim ............................................................................ 10

    II.  THE EQUITABLE FACTORS FAVOR A STAY ............................... 13

    III. THE UNIVERSAL STAY EXCEEDED EQUITABLE LIMITS ...... 14

    IV. PROCEEDINGS BELOW SHOULD BE STAYED ........................... 15

CONCLUSION ................................................................................................... 17

CERTIFICATE OF COMPLIANCE

EXHIBIT 1
Order Denying Stay Pending Appeal,
    *National TPS Alliance, et al., v. Noem, et al.*, 3:25-cv-05687-TLT (Aug. 8, 2025).

EXHIBIT 2
Designation of Honduras for TPS, 64 Fed. Reg. 524 (Jan. 5, 1999)

EXHIBIT 3
Designation of Nicaragua Under Temporary Protected Status,
    64 Fed. Reg. 526 (Jan. 5, 1999)

EXHIBIT 4
Designation of Nepal for TPS, 80 Fed. Reg. 36,346 (June 24, 2015)

# TABLE OF AUTHORITIES

## <u>CASES</u>

*Abbott v. Perez,*
  585 U.S. 579 (2018)............................................................................ 2

*Bd. of Governors v. MCorp Fin., Inc.,*
  502 U.S. 32 (1991).............................................................................. 5

*Bldg. & Constr. Trades Dep't v. Allbaugh,*
  295 F.3d 28 (D.C. Cir. 2002) ............................................................ 6

*Bouarfa v. Mayorkas,*
  604 U.S. 6 (2024)............................................................................. 5, 9

*CASA, Inc. v. Noem,*
  — F. Supp. 3d. —, 2025 WL 1907378 (D. Md. July 10, 2025)................... 9

*Cntr. for Biological Diversity v. Bernhardt,*
  946 F.3d 553 (9th Cir. 2019).............................................................. 5

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019)............................................................................ 7

*DHS v. Regents of Univ. of Cal.,*
  591 U.S. 1 (2020)......................................................................... 11, 12

*DHS v. Thuraissigiam,*
  591 U.S. 103 (2020).......................................................................... 12

*Garcia v. USCIS,*
  — F.4th —, 2025 WL 2046176 (9th Cir. July 22, 2025)............................4, 6

*Garland v. Ming Dai,*
  593 U.S. 357 (2021)............................................................................ 8

*ImmDef v. Noem,*
  — F.4th —, 2025 WL 2080742 (9th Cir. July 18, 2025)..................1, passim

*Korab v. Fink,*
  797 F.3d 572 (9th Cir. 2014)............................................................ 11

*McNary v. Haitian Refugee Center, Inc.,*
498 U.S. 479 (1991) ................................................................................... 5

*Miller v. Gammie,*
335 F.3d 889 (9th Cir. 2003) (en banc) ..................................................... 2

*Montana Wildlife Fed'n v. Haaland,*
127 F.4th 1 (9th Cir. 2025) ................................................................... 3, 4

*Nakka v. USCIS,*
111 F.4th 995 (9th Cir. 2024) .................................................................... 6

*Nat'l Council of La Raza v. Cegavske,*
800 F.3d 1032 (9th Cir. 2015) ................................................................. 15

*Noem v. Nat. TPS Alliance,*
— S. Ct. —, 2025 WL 1427560 (May 19, 2025) ...............................1, 2, 13

*Oakland v. Lynch,*
798 F.3d 1159 (9th Cir. 2015) ................................................................... 9

*Ram v. INS,*
243 F.3d 510 (9th Cir. 2001) .................................................................... 11

*Ramos v. Wolf,*
975 F.3d 872 (9th Cir. 2020) .............................................................5, 6, 12

*Rank v. Nimmo,*
677 F.2d 692 (9th Cir. 1982) ................................................................... 10

*Sherley v. Sebelius,*
689 F.3d 776 (D.C. Cir. 2012) ................................................................... 7

*Trump v. Boyle,*
145 S. Ct. 2653 (2025) .................................................................. 1, 13, 14, 15

*Trump v. CASA,*
145 S. Ct. 2540 (2025) ............................................................................. 15

*Trump v. Hawaii,*
585 U.S. 667 (2018) ............................................................................10, 11

*United States v. Carrillo-Lopez,*
68 F.4th 1133 (9th Cir. 2023) .................................................................. 12

*United States v. Tohono O'odham Nation,*
  563 U.S. 307 (2011) .......................................................................... 6

*Vasquez Perdomo v. Noem,*
  — F.4th —, 2025 WL 2181709 (9th Cir. Aug. 1, 2025) ............................ 14

*Washington v. U.S. Dep't of State,*
  996 F.3d 552 (9th Cir. 2021) ............................................................. 5

## STATUTES

5 U.S.C. §701(a)(2) ............................................................................ 9

8 U.S.C. §1252(a)(2)(D) ..................................................................... 6

8 U.S.C. § 1254a(b)(2)(B)(ii) .............................................................. 9

8 U.S.C. § 1254a(b)(3)(C) .................................................................. 9

8 U.S.C. § 1254a(d)(3) ...................................................................... 9

8 U.S.C. § 1254a(b)(5)(A) ......................................................... 1, passim

8 U.S.C. § 1254a(b)(1)(B) ......................................................... 4, passim

28 U.S.C. §1292(a)(1) ................................................................. 1, 16

28 U.S.C. § 1651(a) ........................................................................ 16

28 U.S.C. § 2106 ........................................................................... 16

Pub. L. No. 101-649 ....................................................................... 13

## FEDERAL REGISTER NOTICES

*Designation of Honduras for TPS,*
  64 Fed. Reg. 524 (Jan. 5, 1999) ...................................................... 4, 8

*Designation of Nepal for TPS,*
  80 Fed. Reg. 36,346 (June 24, 2015) ................................................... 8

*Termination of the Designation of Honduras for [TPS],*
  90 Fed. Reg. 30,089-01 (July 8, 2025) ............................................... 11

*Termination of the Designation of Nepal for [TPS]*,
   90 Fed. Reg. 24,151-01 (June 6, 2025)............................................................11

*Termination of the Designation of Nicaragua for [TPS]*,
   90 Fed. Reg. 30,086-01 (July 8, 2025) ...........................................................11

## INTRODUCTION

Appellees' efforts to evade *Noem v. Nat. TPS Alliance* ("*NTPSA I*"), 2025 WL 1427560 (May 19), all but confirm that its rationale requires a stay here, where the merits even more decisively favor the government. *Trump v. Boyle*, 145 S. Ct. 2653 (2025) (decisions on interim relief "squarely control" like cases). There is "no judicial review" of a TPS termination. §1254a(b)(5)(A). Appellees' merits arguments transparently seek to supplant the Secretary's authority by reweighing evidence to reach their preferred outcome—a claim that is not cognizable under the APA, even where review is available. Appellees' reliance on statements unrelated to these terminations confirms that their equal protection claim similarly lacks merit. Indeed, Appellees' opposition does not cite a *single* statement specific to *any* of the three countries at issue here. The equities also favor the government, as the Supreme Court has already concluded. *NTPSA I*, 2025 WL 1427560.

This Court should grant a stay pending appeal.

## JURISDICTION

The Court's appellate jurisdiction under 28 U.S.C. §1292(a)(1) is clear. Ninth Circuit precedent squarely provides that §1292(a)(1) jurisdiction extends to an appeal of a §705 stay that prevents the Executive from implementing its preferred immigration policy pursuant to a statute enacted by Congress. *ImmDef v. Noem*, — F.4th —, 2025 WL 2080742, at *5 (9th Cir. July 18, 2025). That binding holding should be the

beginning and end of the Court's analysis. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

*ImmDef*'s jurisdictional analysis applies with equal force here. First, the order has the same practical effect as a preliminary injunction because it bars the Secretary from exercising her TPS authority and therefore, extends TPS to thousands of aliens, by mandating DHS to take specific actions like adjusting DHS's website. *See ImmDef*, 2025 WL 2017247 at *4. The district court justified its §705 stay by applying the injunction factors after adversarial briefing, court-issued interrogatories, and argument. Op.7. And the government has strongly challenged the order. *NTPSA I*, 2025 WL 1427560 at *1.

Second, the order inflicts "serious, perhaps irreparable" harm on the government because it impairs the government's "ability to implement immigration policy and foreign affairs as it sees fit." *ImmDef*, 2025 WL 2017247 at *5.

Third, "the government's inability to fully enact an immigration policy of its choice and to take steps to conduct foreign affairs … causes some measure of irreparable harm." *Id.* at *5. That is particularly so because the §705 stay forces the government to extend protection to aliens.

Finally, contrary to Appellees' assertion (Resp.5), §705 orders are enforceable by the issuing court, meaning they carry serious, coercive consequences sufficient to trigger a right to appeal. Indeed, when Appellees were dissatisfied with updates to DHS's website following a §705 stay in *Nat'l TPS Alliance v. Noem, et al.*, 25-cv-1766 (N.D. Cal.) (Dkt.200), they moved the Court to enforce its order. *See Abbott v. Perez*, 585 U.S.

579, 599 (2018) (order was sufficiently compulsory when litigant "had reason to believe that it would risk deleterious consequences" if they did not comply with it).

Appellees suggest (Resp.5-6) that *ImmDef* conflicts with *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 28 (9th Cir. 2025). Not so. Both cases applied the Supreme Court's *Carson* analysis. Moreover, *Montana Wildlife*, like *ImmDef*, concluded that APA relief that requires affirmative compliance steps (as here) is the practical equivalent of an injunction and is thus immediately appealable. 127 F.4th at 30.

## ARGUMENT

## I.  THE GOVERNMENT WILL SUCCEED ON THE MERITS

### A.  TPS Terminations Cannot Be Reviewed

Congress barred review of "any determination with respect to" a TPS termination. §1254a(b)(5)(A). The district court held that broad jurisdictional bar does not apply to Appellees' challenges to the Secretary's determinations.

Appellees make no effort to defend the centerpiece of the district court's jurisdictional analysis: that the Secretary's country-specific TPS terminations here were morally equivalent to the "transatlantic slave trade" and the "Chinese Exclusion Act"— meaning "the plain text does not control" since "'a literal application of the plain text leads to absurd results, the plain text does not control.'" Op.17-19 & nn.1-2 (citation omitted).

The district court's stay denial confirms the centrality of this reasoning. That second opinion stressed that these "footnotes" regarding the slave trade and Chinese

3

Exclusion Act addressed the crucial "truth and logic in this history," reiterating that "the Court 'did not forget that this country has bartered with human lives.'" Dkt.87 at 3-4 (citation omitted). Then, dispelling any doubt as to its principal rationale, the district court proceeded to block-quote its footnotes. *Id.* at 4-5.

The district court's two opinions thus make plain that moralizing rhetoric, not textual analysis, drove its holding that §1254a(b)(5)(A) did not bar judicial review. But the district court had no license to jettison the text enacted by Congress in favor of its own moral compass concerning centuries-old, bygone policies.

Appellees tellingly do not even *acknowledge* the district court's central rationale—though prominently raised by the government—let alone hazard a defense of it. That alone refutes most of the district court's reasoning.

To be sure, the district court supplemented its moral analogies—which spanned more than 1,500 words—with scattershot and ill-developed attempts to construe the judicial review bar's actual text, which Appellees unpersuasively attempt to rehabilitate here. As an initial matter, their reliance (Resp.14) on the presumption of judicial review is inapposite. That presumption has no role to play where, as here, Congress unequivocally enacted a bar to judicial review: "[t]here is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS, §1254a(b)(5)(A). *See Garcia v. USCIS*, — F.4th —, 2025 WL 2046176, at *8 (9th Cir. July 22, 2025).

4

For that reason, courts have routinely found that analogous statutes clearly and convincingly bar judicial review. *See Bd. of Governors v. MCorp Fin., Inc.*, 502 U.S. 32, 42, 44 (1991) (12 U.S.C. §1818(i)(1)); *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560-64 (9th Cir. 2021) (22 U.S.C. §2278(h) and 50 U.S.C. §4821(a)); *Cntr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019) (5 U.S.C. §805). Those binding cases— not unpersuasive district court decisions (Resp.8 n.3) that misread *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991)—should be followed here.

Despite Appellees' claims (Resp.10-11), *McNary* did not transform the word "determination" to permit sweeping judicial review wherever it appears in the U.S. Code. Rather, as this Court previously explained that *McNary* is inapposite here because "the TPS statute … differs in both text and context[.]" *Ramos*, 975 F.3d at 890. *McNary* concluded that collateral policy challenges were available where the relevant statute only channeled review of determinations on *individual* applications for benefits into other courts; in contrast, the statute here bars review entirely of TPS determinations *at* the policy level, where the Secretary must regularly make sensitive foreign and immigration policy judgments about country-specific TPS designations. §1254a(b)(5)(A). Moreover, *McNary*'s "determination" analysis is inapplicable because §1254a(b)(5)(A) uses the sweeping terms "any," "determination," and "with respect to" to expand the scope of the review bar. *See Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (judicial review limitations provide "clear and convincing evidence of congressional intent to preclude judicial

review"); *United States v. Tohono O'odham Nation*, 563 U.S. 307, 312 (2011) (bars applying "in respect to" certain claims effect a "broad prohibition").[1]

Even assuming that §1254a(b)(5)(A) permitted some collateral challenges, Appellees' challenges would not be among them. This action attempts an end-run around the judicial-review bar, made plain by their reliance on a "duty to conduct a review of country conditions" and their efforts to reweigh country conditions evidence. Resp.9. The statute cannot so creatively evaded: it bars all review of determinations that are related to the termination of temporary protected status. §1254a(b)(5)(A).

## B. The Government Is Likely to Prevail on the Merits of Appellees' APA Challenge to the Secretary's TPS Terminations

Even if a "narrow" APA claim could survive the judicial-review bar, Appellees' claims lack merit. Start with their claim that the terminations here were impermissibly "preordained" by an executive order. Resp.15-17. That claim fails at every level.

For one, it would not be a problem if the Secretary had followed an executive order that made the policy decisions underlying the terminations at issue. "[T]he President's power necessarily encompasses general administrative control of those executing the laws, through the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (cleaned

---

[1] *Nakka v. USCIS*, 111 F.4th 995 (9th Cir. 2024), is inapposite. It evaluated a different provision (8 U.S.C. §1252(a)(2)(D)), and it misinterpreted *McNary*'s narrow holding for all the reasons Judge Bress persuasively explained in his opinion in *Garcia*, 2025 WL 20461746 at *13, calling for *Nakka* to be overruled. (Resp.11-12). The Court need not and should not repeat *Nakka*'s error here. *See Ramos*, 975 F.3d at 890.

up). And, contrary to the district court's rationale (Op.22; Resp.16), it not unlawful to "implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). The Constitution does not permit Appellees or the district court to countermand the President's determinations of policy for the executive branch. *See Sherley*, 689 F.3d at 784 (rejecting argument that the NIH disregard comments in favor of *reducing* research where President Obama's E.O. mandated research *expansion*). And "a court may not set aside an agency's policymaking decision solely because it may have been … prompted by Administration priorities." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). The district court's conclusion that it would be a legal problem for the terminations to be "preordained" by an executive order contravened the constitutional structure of the Executive Branch.

In all events, the executive order did not preordain any results but instead merely directed the Secretary to "ensure[] that designations of [TPS] are consistent" with the statute and "appropriately limited in scope and made for only so long as may be necessary to fulfill" the statute. The order did not require the Secretary to take any particular action with respect to any TPS designation, and it preordained nothing but careful review of each designation for statutory compliance.

Regardless, the Secretary's reasoning rebuts any suggestion that she failed to consider country conditions. Mot.11-12. These TPS designations relate to a 2015 earthquake (Nepal) and 1998 hurricane (Honduras and Nicaragua) and whether those disasters mean that those countries are "unable, temporarily, to handle adequately" the

return of their citizens. §1254a(b)(1)(B)(ii). Congress requires the Secretary to periodically review each designation to decide "whether the conditions for [a] *designation*" under §1254a(b)(1) (emphasis added) "continue to be met." The Secretary did so. The statute nowhere requires a comparative analysis of conditions at the time of each subsequent TPS extension. §1254a(b)(3)(A)-(C). Nor does it require the Secretary to address whether U.S. citizens face risks when traveling to the countries. Resp.17-18 (citing, e.g., Dkt.54-3, Honduras travel advisory).

Indeed, the district court never explained why its preferred evidence, such as Nepal's inflation rate in 2025 (Op.22), is relevant under the statute or Nepal's original designation, which never mentioned inflation. 80 Fed. Reg. 36,346-50 (2015). The same goes for "political violence and crime" in Honduras (Op.22; Resp.17), which was likewise never mentioned in its original TPS designation. 64 Fed. Reg. 524 (1999). And, contrary to Appellees' assertion (Resp.19), the Secretary was not required to explain why she declined to discuss irrelevant evidence in the termination notices. §1254a(b)(1)(B)-(C). Because courts are "generally not free to impose additional judge-made procedural requirements on agencies," the district court's a-textual analysis will not survive appeal. *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (cleaned up).[2]

---

[2] To reiterate, this discussion of the Secretary's analysis of specific country conditions underlying specific TPS terminations lies at the core of the judicial-review bar and underscores that Appellees' claims are precisely the sort that Congress meant to bar.

Appellees' APA claim is also doomed because the district court never found that the voluminous administrative records (Dkts.62-64, 77-79)—spanning thousands of pages—underlying the Secretary's TPS terminations could not support a termination. Nor did it specifically trace the extra-record statements Appellees rely upon (Resp.15) to the particular countries at issue, much less to the country conditions underlying these TPS designations. Op.22.

## C. Appellees' APA Challenge to the Wind-Down Periods Will Fail on Appeal

Under the statute, Appellees cannot prevail on their claim that the Secretary must provide a six-month transition period. The statutory default transition period is 60 days. §1254a(b)(3)(C); *CASA, Inc. v. Noem*, 2025 WL 1907378, *16 (D. Md. July 10) ("Congress chose to allow for a termination with only 60 days of public notice."). The Secretary's selection of a transition period *is* covered by §1254a(b)(5)(A) because the termination date the Secretary selects and announces in a TPS termination notice is a "determination" "with respect to" a "termination."

Even if the judicial-review bars did not apply, ordinary administrative law principles would compel the same result. The statute contains clear discretionary language that commits the termination date to the Secretary's discretion: It provides the Secretary with the "option"—that is, "the right or power to choose" BLACK'S LAW DICTIONARY (12th ed. 2024)—whether to select a particular transition that "the [Secretary] determines to be appropriate." §1254a(d)(3); 5 U.S.C. §701(a)(2); 8 U.S.C. § 1252(a)(2)(B)(ii); *see Bouarfa*, 604 U.S. at 16-19; *Oakland v. Lynch*, 798 F.3d 1159, 1165

(9th Cir. 2015) (the APA does not apply to action "committed to agency discretion by law"); *Rank v. Nimmo*, 677 F.2d 692, 699 (9th Cir. 1982) (statute giving the VA Administrator the "option" to make specific payments made "clear that Congress intended to vest the widest discretion possible in the Administrator").

Even if this issue were reviewable, the Secretary committed no error because DHS has no across-the-board policy about the length of post-termination periods. The chart Appellees themselves created (Dkt.28) reflects that post-termination wind-down periods have varied from zero days to 18 months. Appellees play word games, attempting to paper over this variation, by saying that the across-the-board policy is to provide at least a six-month wind-down period. But that is descriptively false—the Secretary has sometimes given *no* additional post-termination wind-down period—and ignores the statutory 60-day default period. The wide variation in post-termination periods is best read to show that there is no across-the-board policy at all.

In any event, even if this claim were meritorious, it could at most justify relief regarding the wind-down period—not the terminations themselves.

## D.   The Secretary Is Likely to Prevail on Appellees' Equal Protection Claim

The district court's remarkable conclusion that the Secretary was motivated by animus against immigrants is unlikely to survive appeal. *See* Mot.16-19.

At the threshold, the district court selected the wrong legal standard. Mot.16-17. Its own rationale—that the Secretary exhibited "animus against immigrants," Op.28— confirms that *Trump v. Hawaii*, 585 U.S. 667 (2018), governs any equal protection claim.

10

Aliens have no fundamental right to be in the United States, and alienage is not a protected class. *Korab v. Fink*, 797 F.3d 572, 577 (9th Cir. 2014). *Federal* classification amongst aliens—which is inherent in the country-specific TPS statute—is subject only to rational basis review. *Id.* (discriminatory *state* classifications receive heightened scrutiny); *see Ram v. INS*, 243 F.3d 510, 517 (9th Cir. 2001) ("'Line-drawing' decisions made by Congress or the President in the context of immigration and naturalization must be upheld if they are rationally related to a legitimate government purpose."). And even if TPS designations could be conceived as a race-based classification, the Secretary's country-conditions focused determinations are facially legitimate and cannot be disturbed. *Cf. DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 34 (2020) ("Latinos make up a large share of" the relevant population, so "virtually any generally applicable immigration policy could be challenged on equal protection grounds" if that were enough to state a claim).

Appellees resist *Hawaii*'s application, not because TPS determinations do not involve sensitive foreign, immigration, and national security considerations and policies, but because they lack evidence that Secretary Noem's TPS determinations were anything other than facially legitimate (Resp.24-25). *See* 90 Fed. Reg. 24,151, 24,151-54 (Nepal); 90 Fed. Reg. 30,089, 30,089-92 (Honduras); 90 Fed. Reg. 30,086, 30,086-89 (Nicaragua). Appellees' attempt (Resp.24-25) to distinguish *Hawaii* because it involved aliens outside the United States ignores the fact that only people who actually need the district court's ordered relief (those without alternative immigration status) have no

lawful right to indefinitely remain in the United States. *See DHS v. Thuraissigiam*, 591 U.S. 103, 119 (2020).

Regardless, the district court's conclusions cannot stand even on their own terms. Mot.17-18. The animus finding was plainly erroneous because it relied on statements taken out of context and without direct links to the Secretary's determinations. *See Regents*, 591 U.S. at 34-35 (disparate impact, unusual recission history, and pre- and post-election statements failed "to raise a plausible inference that the recission was motivated by animus"). Even now, Appellees can point only to statements without any direct connection to the Secretary's TPS determinations for the three separate countries (Resp.22). For example, Appellees cite (Resp.22) the Secretary's comment about "gangs doing damage and harming people" without acknowledging that the Secretary was referring to *Venezuelan* TPS holders who engaged in unlawful activity. They also rely on a press statement issued by DHS *after* the district court's §705 order. (Resp.22) (citing Dkt.82-1). This Court previously found disconnected statements of that sort insufficient to establish an Equal Protection claim even under *Arlington Heights*. *See Ramos*, 975 F.3d at 896-99. It is likely to do so again here.

Furthermore, Appellees fail to acknowledge that the "strong presumption of [lawmakers'] good faith" in the *Arlington Heights* analysis. *See United States v. Carrillo-Lopez*, 68 F.4th 1133, 1140 (9th Cir. 2023). The same presumption applies to the Executive's implementation of that law. Appellees mention (Resp.23-24) the "historical background" and "events leading up to the challenged decision" factors but ignore that

TPS was enacted as a *temporary* program providing shelter on a discretionary basis. Pub. L. No. 101-649, 104 Stat. 4978. Moreover, those considerations here show that the Secretary concluded, following consultation with appropriate Government agencies, that conditions in Nepal, Honduras, and Nicaragua improved and temporary protection was no longer necessary. That does not come close to establishing animus under *Arlington Heights*.

This Court is likely to correct these legal and factual errors, and it should stay the district court's order pending appeal.

## II. THE EQUITABLE FACTORS FAVOR A STAY

The remaining factors favor a stay. The Supreme Court has already concluded that the Government's equities warrant a stay pending appeal here. *NTPSA I*, 2025 WL 1427560 at *1. The harms Appellees articulate (Resp.25-26), including loss of work authorization and possible future removal, are the same sorts of arguments the Supreme Court found unpersuasive in *NTPSA I. See* Stay Opp., *Noem v. Nat'l TPS All.*, No. 24A1059, 2025 WL 1371808, at *16-18 (May 8, 2025) ("a stay would strip work authorization from nearly 350,000 people living in the U.S., expose them to deportation to an unsafe country, and cost billions in economic losses nationwide"). Appellees' assertion (Resp.26) that the Supreme Court's *NTPSA I* decision is distinguishable lacks merit because *NTPSA I* controls like cases involving TPS terminations, which necessary involve sensitive domestic and foreign policy considerations. *See Boyle*, 145 S. Ct. at 2654. Appellees gesture at a waiver argument (Resp.26) lacks merit; the

government's successful opposition to administratively assigning this case to the same judge as *NTPSA I* hardly means that the Supreme Court's decision does not control, and the government has argued all along that that *NTPSA I*—which considered the same equitable factors presented by a TPS termination raised by the *same* organization—controls the analysis here. Dkt.45 at 22-24. Because it does, *see Boyle*, 145 S. Ct. at 2654, this Court should enter a stay pending appeal.

## III. THE UNIVERSAL STAY EXCEEDED EQUITABLE LIMITS

The Court should at least narrow the district court's universal stay as required by binding circuit precedent. *ImmDef*, 2025 WL 2080742 at *5. Appellees' reliance (Resp.30) on *Vasquez Perdomo v. Noem*, 2025 WL 2181709, *22 (9th Cir. Aug. 1, 2025), highlights the extent of the district court's overreach here, because that district court confined its TRO to *its* district to address allegedly indiscriminate detention. In contrast, the court here provided universal relief, transcending *all* equitable and geographic bounds. Appellees' implementation concerns (Resp.30-31), including sharing their members' names, are misplaced because TPS beneficiaries *affirmatively* register for TPS, §1254a(c)-(d), and they did not seek class certification under Rule 23 before seeking a §705 stay. Dkt. 1 at 4 ¶13 (Appellees represent 300 Honduran, 900 Nepali, and 25 Nicaraguan TPS holders).[3] Any difficulties crafting a stay provided no license for the

---

[3] It is unclear how NTPSA could know how many members of its organization are actually TPS recipients if it never collects identifying information, as it now claims (Resp.30). That concession alone counsels in favor of a narrow stay, not a universal

*Continued on next page.*

district court "to exceed its [equitable] power." *Trump v. CASA*, 145 S. Ct. 2540, 2562 (2025). The district court plainly abused its discretion, and its universal stay should be narrowed to apply only to the named plaintiffs. *Id.*

## IV.    PROCEEDINGS BELOW SHOULD BE STAYED

Judge Thompson's denial of the government's stay (Dkt.87) confirms that proceedings below should be stayed to "preserve the appearance of justice," while the parties brief a reassignment in the underlying appeal. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1046 (9th Cir. 2015). It is increasingly apparent that the district court's policy views are so entrenched that it is unable to objectively evaluate the facts and law. Most recently, in denying a stay, Judge Thompson repeated her extreme rhetoric, buttressed by articles cited by neither party, analogizing the termination of disaster-related TPS designations to the transatlantic slave trade. Dkt.87 at 3-5. And she again ignored (without rationale) *Boyle*'s direction that the Supreme Court's emergency rulings "squarely control[]" in "like cases." 145 S. Ct. at 2654; Dkt.87 at 9-10. Judge Thompson's views are thus demonstrably "well-established and inappropriately strong." *Cegavske*, 800 F.3d at 1046. How could a judge who perceives the end of decades-old *temporary* disaster-related protection as part of a "pattern[] of justice, injustice, and consequence," Dkt.87 at 3, morally analogous to the "transatlantic slave

---

one. Permitting an organization to obtain *broader* relief by keeping *less* detailed records would give organizations perverse incentives.

trade," (Op. 18 n.1) conceivably set aside those views—even if reversed on legal grounds on appeal—and fairly adjudicate this case?

The Court has the full panoply of supervisory tools at its disposal in this appeal. 28 U.S.C. §§1292(a)(1), 1651(a), 2106. It should use those supervisory tools to stay proceedings below.

## **CONCLUSION**

The Court should enter a stay pending appeal and stay all district court proceedings.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

YAAKOV M. ROTH
*Principal Deputy Assistant Attorney General*
Civil Division

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
drew.c.ensign@usdoj.gov

WILLIAM H. WEILAND
*Acting Assistant Director*

ANNA L. DICHTER
*Senior Litigation Counsels*

JEFFREY M. HARTMAN
ERIC SNYDERMAN
LAUREN BRYANT
AMANDA SAYLOR
CATHERINE ROSS
Dated: August 18, 2025                   *Trial Attorneys*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 27(d), I certify that the attached motion: contains one-inch margins; uses double-spaced text except as otherwise permitted; is proportionally spaced using Garamond typeface; uses a typeface of 14 points; and contains 3,797 words, excluding any accompanying documents authorized by Rule 27(a)(2)(B). Appellant's reply conforms with the 3,800 word length limit requested by Appellees' Motion to Exceed the Word Limit. ACMS No. 15. This pleading was scanned for viruses and malware by Microsoft CrowdStrike Falcon and determined to be free of malicious software.

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 18, 2025, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. Appellees were served using the ACMS system.

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*

## **EXHIBIT 1**

Order Denying Stay Pending Appeal, *National TPS Alliance, et al., v. Noem, et al.*, 3:25-cv-05687-TLT (Aug. 8, 2025).

1

2

3

4                    UNITED STATES DISTRICT COURT

5                  NORTHERN DISTRICT OF CALIFORNIA

6

7    NATIONAL TPS ALLIANCE, et al.,          Case No.  25-cv-05687-TLT

8                      Plaintiffs,

9            v.                              **ORDER DENYING DEFENDANTS'
                                             MOTION TO STAY**
10   KRISTI NOEM, et al.,
                                             Re: Dkt. No. 75
11                    Defendants.

12

13          Defendants rely on recycled arguments to request that the Court stay its Order Granting

14   Plaintiffs' Motion to Postpone.  The Court has jurisdiction over Plaintiffs' claims, and Defendants

15   fail to meet their burden in showing a strong likelihood of success on the merits.

16          Pending before the Court is Defendants' motion to stay the Court's Order Granting

17   Plaintiffs' Motion to Postpone.  ECF 75.  Plaintiffs filed an opposition on August 7, 2025.  ECF

18   82.

19          Having considered the parties' briefs, the relevant legal authority, and for the reasons

20   below, the Court **DENIES** the motion to stay.

21   **I.    BACKGROUND**

22          The Court assumes the parties' familiarity with the factual background and only cites such

23   background to the extent necessary for this Order.

24          On July 31, 2025, the Court granted Plaintiffs' motion to postpone the Secretary's TPS

25   termination for Nepal, Honduras, and Nicaragua ("Postponement Order").  ECF 73.  Absent

26   postponement, TPS for Nepal was set to expire on August 5, 2025; TPS for Honduras and

27   Nicaragua on September 8, 2025.  *Id*. at 6.  The Court held that Plaintiffs were likely to succeed in

28   showing that the Secretary's TPS terminations was likely preordained, deviated from prior

1    practice without good reason, and motivated by racial animus.  *Id*. at 25–30.  Defendants conceded

2    that "each of the individually named Plaintiffs have not suffered any felony or misdemeanor

3    convictions" and conceded that Plaintiffs face irreparable harm absent relief.  *Id*. at 1, 30–32.

4         On August 1, 2025, Defendants filed a motion to stay the Postponement Order.  ECF 75.

5    On August 7, 2025, Plaintiffs filed an opposition.  ECF 82.  An initial case management

6    conference is scheduled for August 14, 2025, where the Court will discuss ways in which this case

7    can be expedited.  ECF 73 at 37.  The Court reserved November 18, 2025 for the parties' next

8    substantive motion hearing date.  *Id*.

9    **II.    LEGAL STANDARD**

10        "A stay is not a matter of right, even if irreparable injury might otherwise result."  *Nken v.*

11   *Holder*, 556 U.S. 418, 434 (2009) (quoting *Virginian R. Co*., 272 U.S. 658, 672 (1926)).  The party

12   requesting a stay bears the burden of showing that the following factors support a stay:

13            "(1) whether the stay applicant has made a strong showing that he is
             likely to succeed on the merits; (2) whether the applicant will be
14            irreparably injured absent a stay; (3) whether issuance of the stay will
             substantially injure the other parties interested in the proceeding; and
15            (4) where the public interest lies."

16   *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

17   **III.   DISCUSSION**

18        Defendants argue that (A) the Court lacks jurisdiction; (B) the balance of harms and public

19   interest favors a stay pending appeal; and (C) the Court should narrow its stay.

20        **A.    The Court has Jurisdiction to Grant Plaintiffs Relief**

21        Defendants argue that (i) the TPS statute bars plaintiffs' claims; (ii) Defendants are likely

22   to prevail on Plaintiffs' first APA claim that the terminations were preordained; (iii) Defendants

23   are likely to prevail on Plaintiffs' second APA claim that the terminations deviated from prior

24   practice without good reason; and (iv) Defendants are likely to prevail on Plaintiffs' Fifth

25   Amendment claim.  ECF 75 at 3–11.

26        **i.    The TPS Statute does not bar Plaintiffs' claims**

27        Defendants argue that the TPS statute, Section 1254a(b)(5)(A), bars Plaintiffs' claims, the

28   Court's footnotes are misplaced, Section 1252(a)(2)(B)(ii) precludes the Court's jurisdiction, and

United States District Court
Northern District of California

2

1    allowing Plaintiffs' APA claims to proceed would allow litigants to simply rely on policy

2    preferences for an APA claim.  ECF 75 at 3–6.  Plaintiffs argue that Defendants rely on the same

3    arguments that the Court has already addressed in its Postponement Order, Defendants'

4    "terminate-first, justify-later" policy does not warrant the Court's deference, and that Section

5    1252(a)(2)(B)(ii) does not preclude the Court's jurisdiction.  ECF 82 at 4–7.

6           The Postponement Order addresses Defendants' arguments concerning interpretation of the

7    TPS statute.  ECF 73 at 15–17.  Defendants fail to raise new argument or caselaw warranting

8    reconsideration.

9           Here, Plaintiffs challenge the collateral decisions underlying the Secretary's TPS

10   terminations, including "the collateral decision to end TPS for virtually every country that has it,

11   apparently because she has interpreted the President's Executive Order on 'Invasion' to require

12   that result."  ECF 60 at 4; *see also* ECF 1 ¶¶ 3, 44–71.  Although Defendants assert that no TPS

13   termination would ever be barred because "all a litigant would need to do is allege that the

14   Secretary's determinations were driven by an underlying policy preference," the Court here relied

15   on the available evidentiary record[1] and applicable caselaw to determine that Plaintiffs will likely

16   succeed on the merits of their APA and Fifth Amendment claims.

17          Defendants also mischaracterize the Postponement Order.  The Court's footnotes

18   addressed Plaintiffs' argument that "granting unfettered discretion over TPS terminations would

19   allow the President to give or take TPS away from some country whenever he feels like it or for

20   the purpose of trade negotiations" and recognized that Plaintiffs face the United States' shifting

21   immigration policies.  ECF 73 at 18 n.1–2.  There is truth and logic in this history.  *See Student*

22   *Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S 181, 386 (2023)

23   ("[A] page of history is worth a volume of logic.") (Jackson, K., dissenting) (quoting *New York*

24   *Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).  Indeed, the test of time may reveal patterns of

25   justice, injustice, and consequence.

26          For the benefit of the parties, the Court provides the below context and direct quotation to

27

28   _____
     [1] Defendants have since filed several errata to the administrative record.  *See* ECF 77–79.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the footnotes.

2       In sharing Plaintiffs' concern that "barring all judicial review would allow the President to

3    grant or deny TPS as a lever for his negotiations with countries," the Court did "not forget that this

4    country has bartered with human lives." ECF 73 at 17–18. The Court's footnote provided:

> During oral argument, Plaintiffs argued that granting unfettered
> discretion over TPS terminations would allow the President to give or
> take TPS away from some country whenever he feels like it or for the
> purpose of trade negotiations. The Court recognizes that the United
> States has a long history of transporting individuals against their will,
> to places unfamiliar to them, and for the purposes of trade. For
> example, the United States was an active participant in the
> transatlantic slave trade which uprooted individuals in Africa and
> brought them to this continent. The emancipation of slaves saw the
> same pattern, but in reverse. Many whites were uncomfortable with
> the idea of free non-white people in their communities, even if they
> had lived in the United States for generations. *See* OUSMANE K.
> POWER-GREENE, AGAINST WIND AND TIDE: THE AFRICAN STRUGGLE
> AGAINST THE COLONIZATION MOVEMENT (2014). Plaintiffs'
> allegations echo these same traditions. Plaintiffs allege that
> "Secretary Noem, President Trump, and members of the Trump
> campaign and administration have consistently used racist invective
> to describe their TPS decisions involving immigrants from non-white,
> non-European countries, including those involving the countries at
> issue here." Compl. ¶ 5.
>
> Plaintiffs also allege that "TPS holders are facing the imminent loss
> of legal status, and as a result, are already being forced to make the
> impossible choice whether to return to a country in crisis, remain in
> the United States without lawful immigration status, or uproot
> themselves again to try to find refuge in some third country." Compl.
> ¶ 130. Indeed, Plaintiffs here face violence and threats to their health
> if deported including Patricia Carbajal who fears sexual violence
> against herself and her daughter in Honduras, Maria Elena Hernandez
> who relies on U.S. insurance and medical care to treat her heart
> condition, or O.C. who will no longer be able to obtain the diabetes
> medication she needs to survive if TPS is terminated. *See* ECF 17-4,
> 17-5, 17-12.
>
> America has seen this pattern before. Many freed slaves were sent to
> countries to which they had no connection whatsoever. These efforts
> made "free blacks fearful of a mass deportation across the Atlantic
> Ocean reminiscent of the Middle Passage." POWER-GREENE, *supra* at
> 17 (describing resistance to white plans to send freed blacks to
> Liberia). Some states, such as Virginia, passed laws demanding freed
> slaves to leave. Eric Burn, *A Manumission in the Mountains: Slavery*

> *and the African Colonization Movement in Southwestern Virginia*, 33
> APPALACHIAN J. 164, 171 (2006).  In other cases, slaveowners made
> freedom conditional on leaving the United States. Mark J. Fleszar,
> *"My Laborers in Haiti Are Not Slaves": Proslavery Fictions and a*
> *Black Colonization Experiment on the Northern Coast, 1835-1846*,
> 26 J. SOC. HIST. 478, 478 (1993) (describing a Florida slaveowner
> requiring removal to Haiti as a condition for freedom). National
> Geographic has referred to this period of forced removal in U.S.
> history as "a racist initiative to remove as many free Black people as
> possible from American soil." Enrique Vaquerizo, *Were there sinister*
> *motives behind founding Liberia?*, NATIONAL GEOGRAPHIC (Jun. 18,
> 2025).  The results of this endeavor were devastating and one study
> found that removal to Liberia resulted in the "highest mortality rates
> in accurately recorded human history." Antonio McDaniel, *Extreme*
> *Mortality in Nineteenth-Century Africa: The Case of Liberian*
> *Immigrants*, 29 Demography 581, 581 (Nov. 1992).

*Id*. at 18.  The Court declined to "shut its eyes to the country's shifting attitudes towards

immigrants":

> Acceptance of immigrants has ebbed and flowed over the centuries of
> U.S. history. In the late 1700s, immigration was largely unregulated
> except that naturalization as a path to citizenship was explicitly
> limited to "free white persons" in one of the first laws adopted in the
> nascent nation.  *See* Naturalization Act of 1790, ch. 3, § 1, 1 Stat. 103,
> 103–04 (repealed 1795).  During this period, large numbers of African
> slaves were also brought into the country against their will.  As the
> United States industrialized in the late 19th century, large numbers of
> immigrants from southern and eastern Europe and other places flowed
> into the country. *Immigration to the United States, 1851–1900*,
> LIBRARY OF CONGRESS (2025). In reaction to this, the government
> excluded some non-white immigrants, most notably through the
> Chinese Exclusion Act which was upheld by the Supreme Court in a
> case which set the foundation for plenary power over immigration.
> *See* 22 Stat. 58 (1882); *Chae Chan Ping v. United States*, 130 U.S.
> 581 (1889).  *See also Fong Yue Ting v. United States*, 149 U.S. 698
> (1893).  The United States also limited Japanese immigration in the
> Gentlemen's Agreement of 1907.
>
> Plaintiffs here face similar tides.  For example, Plaintiff O.C. started
> his own small business, R.A. helped treat children with brain cancer,
> and Plaintiff Silva helps heart patients at Stanford Hospital, a kind of
> opportunity that would be unattainable in Honduras. ECF 17-3; ECF
> 17-5; 17-9.  Plaintiffs have been in the United States for decades and
> contributing to the American system.  Still, they face exclusion in the
> name of the President's Invasion EO.

*Id*. at 18–19, n.2.

Accordingly, as discussed in the Postponement Order, the Court finds that it has

5

jurisdiction and the TPS Statute does not bar Plaintiffs' claims.

> ### ii.    Defendants have not made a strong showing that they will prevail on Plaintiffs' First APA claim that the terminations were preordained

Defendants argue that the Secretary considered the country conditions for Nepal, Honduras, and Nicaragua, the TPS terminations cannot be set aside solely based on the administration's priorities, and the Secretary is not required to discuss every piece of evidence considered.  ECF 75 at 7–9.  Plaintiffs argue that Defendants mischaracterize Plaintiffs' claims, ignore the Postponement Order and record in this case, and fail to make a strong showing that the Secretary's TPS terminations were based on the county conditions reports.  ECF 82 at 7–9.

The Postponement Order addresses Defendants' arguments concerning Plaintiffs' first APA claim that the TPS terminations were preordained.  ECF 73 at 21–22.  Defendants fail to raise new argument or caselaw warranting the reconsideration.

As discussed in the Postponement Order, Plaintiffs will likely succeed in showing that the Secretary's terminations were based on a preordained decision to end TPS rather than a review of country conditions for Nepal, Honduras, and Nicaragua: "at the Secretary's confirmation hearing—before the Secretary reviewed any country conditions reports—the Secretary said that TPS extensions will not be allowed to "go[] forward the way that they are . . . the Secretary also commented that TPS 'was abused, exploited, and politicized" and 'an immigration scheme[] that make[s] Americans less safe.'"  *Id.*  Defendants fail to explain how these statements, in addition to the Secretary's history of systematically attempting to limit TPS and the Invasion EO's references to TPS holders as "illegal," contributing to an "invasion, being a "significant threat to national security and public safety," and "commit[ting] vile and heinous acts against innocent Americans" are not evidence that that the TPS terminations were preordained.  Again, as explained in the Postponement Order, Defendants conceded that the individual Plaintiffs here have not committed any criminal violations.  ECF 73 at 1.  Although TPS holders are not citizens, TPS holders are not illegally in the United States.  8 U.S.C. § 1254a.  "Their presence is not a crime."  *Id.* at 28.  "TPS holders already live in the United States and have contributed billions to the economy by legally working in jobs, paying taxes, and paying contributions into MediCare and Social Security."  *Id.*

1    The majority of TPS holders are in the workforce and "contribute $10.3 billion per year and pay

2    $2.2 billion annually in federal and state taxes."  *Id*. at 32–33.

3         Accordingly, Defendants have not made a strong showing that they will prevail on the

4    merits of Plaintiffs' APA challenge to the Secretary's TPS terminations.

5              **iii.  Defendants have not made a strong showing that they will prevail on
                      Plaintiffs' Second APA claim that the terminations deviated from practice**

6              **without good reason**

7         Defendants argue that the Secretary has unfettered discretion to extend a termination's

8    transition period, the Secretary's discretion is unreviewable, and there has been no hard-and-fast

9    commitment by DHS to a specific post-termination period.  ECF 75 at 9–10.  Plaintiffs argue that

10   Defendants have consistently provided at least a six-month transition period.  ECF 82 at 9–10.

11        The Postponement Order addresses Defendants' arguments concerning the Secretary's

12   discretion and DHS's previous practices concerning termination periods.  *See* ECF 73 at 23–25.

13   Defendants fail to raise new argument or caselaw warranting the reconsideration.

14        Notably, Defendants fail to address Plaintiffs' evidence regarding the prior administrations

15   providing at least 6 months after the TPS termination date for holders to transition.  *See* ECF 28

16   (appendix regarding "TPS Terminations and Associated Orderly Transition Periods Prior to

17   Current Trump Administration").  To the extent Defendants argue that the Court lacks jurisdiction

18   under 8 U.S.C. § 1252(a)(2)(B)(ii), Defendants fail to show how 1252(a)(2)(B)(ii)'s mandate

19   concerning discretionary relief applies to this case.  *See Nakka v. USCIS*, 111 F.4th 995, 1004 (9th

20   Cir. 2024) ("We disagree with the Government that the 'plain language of the statute and the

21   rationale of *Patel*' compel the conclusion that § 1252(a)(2)(B)(i) strips federal courts of

22   jurisdiction over Plaintiffs' claims.").

23        Accordingly, the Court finds that Defendants fail to make a strong showing that they will

24   prevail on the merits of Plaintiffs' second APA claim that the terminations deviated from practice

25   without good reason.

26              **iv.  Defendants have not made a strong showing that they will prevail on the
                      merits on Plaintiffs' Fifth Amendment Claims**

27

28   Defendants argue that Plaintiffs' Fifth Amendment claim is likely to fail because Plaintiffs

United States District Court
Northern District of California

7

1 cherry-picked the Secretary's statements out of context.  ECF 75 at 10–11.  Plaintiffs argue that

2 there is a plausible basis to infer that an invidious discriminatory purpose was a motivating factor,

3 the Secretary's statements reflect an animus against immigrants and TPS generally, DHS recently

4 issued a statement that further demonstrates animus, and Plaintiffs are likely to succeed on the

5 merits of their Fifth Amendment claim.   ECF 82 at 10–14.

6          The Postponement Order addresses Defendants' Fifth Amendment arguments concerning

7 the Secretary's statements and the political climate.  *See* ECF 73 at 25–30.  Defendants fail to raise

8 new argument or caselaw warranting the reconsideration.

9          The Postponement Order explains why Plaintiffs will likely succeed on the merits of their

10 Fifth Amendment claim under both *Arlington Heights* and *Trump v. Hawaii*.  *Id.* at 27–30.

11 The Court's finding of racial animus is further supported by Defendants' August 1, 2025 press

12 release, which provided "some examples of criminal aliens who exploited the TPS program" and

13 stated "TPS has been abused as a *de facto* amnesty program to allow unvetted aliens to remain in

14 the U.S. indefinitely."  ECF 82-1.  These statements contain odious undertones that are both

15 contrary to the Defendants' concession that the Plaintiff TPS holders here have not suffered any

16 felony or misdemeanor.  The statements further categorize all TPS holders as criminals based on

17 the acts of a few.  This insidious assumption perpetuates racial animus and is an example of

18 stereotyping.  *See* ECF 73 at 28–29.  As explained in the Postponement Order, those that have

19 been convicted of a felony or 2 or more misdemeanors will not hold TPS and are therefore not

20 representative of TPS holders as a whole.  *See* ECF 73 at 8 (citing 8 U.S.C. § 1254a(c)(2)(B)).

21          Accordingly, the Court finds that Defendants will likely not prevail on the merits on

22 Plaintiffs' Fifth Amendment claim.

23                                        *          *          *

24          In the Postponement Order, the Court analyzed the plain language, congressional intent,

25 and precedent interpreting the TPS statute and held that the Court has jurisdiction over Plaintiffs'

26 claims.  Based on the strength of Plaintiffs' arguments and evidentiary support, the Court then

27 found that the record demonstrates that Plaintiffs will likely succeed on the merits of their APA

28 and Fifth Amendment claims.  Defendants conceded that Plaintiffs suffered no criminal record and

United States District Court
Northern District of California

8

agreed that Plaintiffs would suffer harm.  Defendants also do not dispute the Court's findings concerning the Secretary's statements, and Defendants do not meaningfully challenge the Court's finding that Plaintiffs will likely succeed on the merits on their APA and Fifth Amendment claims. Therefore, the Court finds that Defendants' recycled arguments fail to provide a strong showing that either the Court lacks jurisdiction or Defendants will likely succeed on the merits.

      **B.**    **Defendants Fail to Show that the Balance of Harm Strongly Favors a Stay Pending Appeal**

Defendants argue that the balance of harms and public interest favor a stay because the government and public share an interest in ensuring adherence with the process established by Congress, declining a stay would intrude into the workings of the branch of Government, TPS is inherently temporary, noncitizens do not have a constitutional right to live with their family, Plaintiffs can pursue alternative immigration relief, and the Supreme Court stayed a district court's § 705 stay of Secretary Noem's termination of Venezuela's TPS designation.  ECF 75 at 9–13. Plaintiffs argue that they would suffer harm if the Court stayed its Postponement Order, Defendants failed to show irreparable injury given that the Court placed this case on an expedited schedule, and Defendants would not suffer irreparable harm from pausing agency action.  ECF 82 at 14–18.

The Postponement Order addresses Defendants' arguments concerning the balance of harms and the public interest.  ECF 73 at 30–34. Defendants' motion to stay again fails to identify the exact foreign policy or national interest at stake.  *See id.* at 34.  Defendants' harm is further minimized given that the Court will expedite the case schedule.

      **C.**    **Postponement is Required for Complete Relief**

Defendants argue that the Court should narrow the stay to individual Plaintiffs because Plaintiffs can be easily identifiable, any practical difficulties do not warrant equitable relief, and there is no basis for relief based on the "speculative possibility" that the Court could vacate the Secretary's terminations under 5 U.S.C. 706(2)(A).  ECF 75 at 13–14.  Plaintiffs argue that limiting the TPS terminations to the individual Plaintiffs would result in errors and requiring Plaintiff NTPS to share its membership list would raise additional issues with the First

1    Amendment.  ECF 82 at 19–20.

2         The Postponement Order addresses Defendants' arguments concerning the scope of relief,

3    *Trump v. Casa*, and *Immigrant Defenders Law Center*.  *See* ECF 73 at 34–37.  Defendants fail to

4    raise new argument or caselaw requiring reconsideration of the Court the Court to reconsider the

5    scope of relief.  The facts here show that that Plaintiffs would not be able to obtain complete relief

6    absent postponement of the TPS terminations:

7                   Although Defendants assert that USCIS could issue individual notices
                    that continue the benefits for named Plaintiffs under TPS, Defendants
8                   fail to offer how Defendants would coordinate with Plaintiffs'
                    employers, the states and cities of counties in which Plaintiffs reside,
9                   hospitals, ICE, and local law enforcement to ensure that Plaintiffs are
                    not subject to removal or otherwise detained after the TPS
10                  terminations go into effect.  Any error in coordination or
                    communication would result in a direct violation of the TPS statute.
11

12   ECF 73 at 36.  *See Vasquez Perdomo v. Noem*, No. 25-4312, 2025 WL 2181709, at *21 (9th Cir.

13   Aug. 1, 2025) ("How would a federal agent who is about to detain a person whose identity is not

14   known, based on some combination of the person's ethnicity, language, location, and occupation,

15   discern in advance whether that person is on the list of individuals that agents are enjoined from

16   stopping?").

17        To the extent Defendants seek to compel Plaintiff NTPS to provide a list of its members,

18   such a requirement is likely unconstitutional and therefore not practical.  *See Crowe v. Oregon*

19   *State Bar*, 989 F.3d 714, 729 (9th Cir. 2021) ("[L]ike the 'freedom of belief,' freedom from

20   compelled association 'is no incidental or secondary aspect of the First Amendment's

21   protections.'") (internal quotation omitted); *Vasquez Perdomo v. Noem*, No. 25-4312, 2025 WL

22   2181709 at *22 ("The inadequacy of a list-of-protected-people injunction is multiplied because the

23   list would have to include all of the members of the plaintiff associations . . . Requiring

24   organizations to share membership lists with Defendants could raise additional constitutional

25   problems regarding the freedom of association and privacy.").

26        The postponement does not enjoin or otherwise limit the Secretary's ability to terminate

27   TPS incompliance with the TPS statute and APA.  Indeed, "[t]he Secretary remains free to

28   terminate TPS status for any country pursuant to the statutorily prescribed procedures Congress

United States District Court
Northern District of California

has enacted." *Haitian Evangelical Clergy association v. Trump*, No. 25-cv-1464, 2025 WL 1808743, at *11 (E.D.N.Y. July 1, 2025).

Accordingly, the Court finds that postponement of the TPS terminations for Nepal, Honduras, and Nicaragua is required to afford Plaintiffs complete relief.

## IV.    CONCLUSION

For the reasons stated above, the Court **DENIES** Defendants' motion to stay.  An initial case management conference is scheduled for August 14, 2025.  November 18, 2025 is reserved for the parties' next substantive motion hearing date.

IT IS SO ORDERED.

Dated: August 8, 2025

TRINA L. THOMPSON
United States District Judge

# **EXHIBIT 2**

Designation of Honduras for TPS, 64 Fed. Reg. 524 (Jan. 5, 1999)

Dated: December 22, 1998.

**Elaine Marquis-Brong,**

*Deputy State Director, Division of Support Services.*

[FR Doc. 99–123 Filed 1–4–99; 8:45 am]

**BILLING CODE 4310–40–M**

---

# DEPARTMENT OF THE INTERIOR

## National Park Service

## National Register of Historic Places; Notification of Pending Nominations

Nominations for the following properties being considered for listing in the National Register were received by the National Park Service before December 25, 1998. Pursuant to section 60.13 of 36 CFR Part 60 written comments concerning the significance of these properties under the National Register criteria for evaluation may be forwarded to the National Register, National Park Service, 1849 C St. NW, NC400, Washington, DC 20240. Written comments should be submitted by January 20, 1999.

**Carol D. Shull,**

*Keeper of the National Register.*

### ARKANSAS

**Benton County**

Wee Pine Knot (Benton County MRA), 319 Spring St., Sulphur Springs, 98001632

**Faulkner County**

Little, J.E., House, 427 Western Ave., Conway, 98001631

### CALIFORNIA

**Los Angeles County**

Warner Brothers Theatre, 478 W. 6th St., San Pedro, 98001633

**Sacramento County**

Winter House, 2324 and 2326 H St., Sacramento, 98001634

### COLORADO

**Arapahoe County**

Geneva House, 2305 W. Berry Ave., Littleton, 98001635

**Denver County**

Arcanum Apartments, 1904 Logan St., Denver, 98001629

### MISSOURI

**Jackson County**

Richards and Conover Hardware Company Building, 5200 W. 5th St., Kansas City, 98001636

**St. Clair County**

Osceola Public School Building, Jct. of Fifth and Pine Sts., Osceola, 98001638

### NEW JERSEY

**Passaic County**

Dundee Canal Industrial Historic District, George St., N along Dundee Canal, approx. 1.2 mi. to headgates opposite E. Clifton Ave., Passaic vicinity, 98001640

**Warren County**

Port Colden Historic District, Roughly along Port Colden Rd., Lock St., NJ 57, and Morris Canal Terrace, Washington Township vicinity, 98001639

### OHIO

**Franklin County**

Nafzger—Miller House, 110 Mill St., Gahanna, 98001641

**Stark County**

Martin, Brooke and Anna E. House (Architecture of Guy Tilden in Canton, 1885—1905, TR), 1627 Market Ave. N., Canton, 98001642

**Warren County**

Waynesville Engine House and Lockup, 260 Chapman St., Waynesville, 98001643

### SOUTH CAROLINA

**Charleston County**

Wilkinson—Boineau House, 5185 SC 174, Adams Run, 98001644

**Pickens County**

Easley High School Auditorium, 112 Russell St., Easley, 98001646

**Sumter County**

Temple Sinai, 11 Church St., Sumter, 98001645

### VIRGINIA

**Arlington County**

Buckingham Historic District, Roughly bounded by N. 5th, N. Oxford, and N. 2nd Sts., and N. Glebe Rd., Arlington, 98001649

**Culpeper County**

Signal Hill, 16190 Germanna Hwy., Culpeper vicinity, 98001650

**Isle Of Wight County**

Oak Creek, 34457 Lee's Mill Rd., Franklin vicinity, 98001648

**Orange County**

Orange Commercial Historic District, Roughly along Madison and Main Sts., Orange, 98001651

[FR Doc. 99–127 Filed 1–4–99; 8:45 am]

**BILLING CODE 4310–70–P**

---

# DEPARTMENT OF JUSTICE

## Immigration and Naturalization Service

[INS No. 1964–98; AG Order No. 2201–98]

RIN 1115–AE26

## Designation of Honduras Under Temporary Protected Status

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice.

**SUMMARY:** This notice designates Honduras for the Temporary Protected Status (TPS) program. Under section 244(b)(1) of the Immigration and Nationality Act, as amended (the Act), the Attorney General is authorized to grant TPS in the United States to eligible nationals of designated foreign states or parts of such states (or to eligible aliens who have no nationality and who last habitually resided in such designated states) upon finding that such states are experiencing ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions.

**EFFECTIVE DATES:** This designation is effective on January 5, 1999 and will remain in effect until July 5, 2000.

**FOR FURTHER INFORMATION CONTACT:** Michael Valverde, Residence and Status Branch, Adjudications, Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–3228.

**SUPPLEMENTARY INFORMATION:**

### What is Temporary Protected Status?

The TPS statute (section 244 of the Immigration and Nationality Act) grants eligible nationals of designated countries temporary immigration status. TPS beneficiaries are granted a stay of removal and work authorization for the designated TPS period and for any extensions of the designation. TPS does not lead to permanent resident status.

### Why Is Honduras Being Designated for the TPS Program?

Hurricane Mitch swept through Central America causing severe flooding and associated damage in Honduras. Based on a thorough review by the Departments of State and Justice, the Attorney General finds that, due to the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch, Honduras is unable, temporarily, to handle adequately the return of Honduran nationals.

### Who Is Eligible for Honduran TPS?

Nationals of Honduras (or aliens having no nationality who last

habitually resided in Honduras) who have been "continuously physically present" in the United States since January 5, 1999 and have "continuously resided" in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

Any national of Honduras who has already applied for, or plans to apply for, asylum, but whose asylum application has not yet been approved, may also apply for TPS. An application for TPS does not preclude or adversely affect an application for asylum or any other immigration benefit. Denial of an application for asylum or any other immigration benefit does not affect an alien's ability to register for TPS, although the grounds of denial may also lead to denial of TPS. For example, an alien who has been convicted of an aggravated felony is not eligible for asylum or TPS.

An alien who is granted TPS is eligible to register for any extension of the TPS program that may be made. However, nationals of Honduras who do not file a TPS application during the initial registration period will have to satisfy the requirements for late initial registration under 8 CFR 244.2(f)(2) in order to be eligible for TPS registration during any extension of designation. The requirements for late initial registration specify (1) that the applicant must have been in valid immigrant or nonimmigrant status during the initial registration period, (2) or had an application for relief from removal or change of status pending or under review during the initial registration period, and (3) must register no later than sixty (60) days from the expiration of such status or pendency of such application.

## How Do I Register for TPS?

| If | Then |
|---|---|
| You are a national of Honduras (or an alien having no nationality who last habitually resided in Honduras) registering for TPS and employment authorization. | You must complete and file: (1) Form I–821, Application for Temporary Protected Status ($50 filing fee), (2) Form I–765, Application for Employment Authorization ($100 filing fee), and (3) $25 Fingerprint Fee |
| You already have employment authorization or do not require employment authorization. | You must complete and file: (1) Form I–821 with $50 filing fee, (2) Form I–765, Application for Employment with no filing fee, and (3) $25 Fingerprint Fee |
| You are registering for TPS and employment authorization and are requesting a fee waiver. | You must complete and file: (1) Appropriately documented fee waiver request and requisite affidavit (and any other information) in accordance with 8 CFR 244.20, (2) Form I–821, and (3) Form I–765. (4) $25 Fingerprint Fee. There is no fee waiver for the Fingerprint Fee. |

To register for TPS for all conditions described in the above chart, you must include two identification photographs (1½″ x 1½″) and supporting evidence as provided in 8 CFR 244.9 (evidence of identity and nationality, and proof of residence).

### Where Should I Register for TPS?

Nationals of Honduras (or eligible aliens who have no nationality and who last habitually resided in Honduras) must register for TPS by submitting an application to the INS Service Center that has jurisdiction over where the applicant lives.

If you live in Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont, Virginia, West Virginia, or in the U.S. Virgin Islands, mail your application to:
Vermont Service Center, ATTN: TPS, 75 Lower Welden Street, St. Albans, VT 05479.

If you live in Arizona, California, Guam, Hawaii or Nevada, mail your application to:
California Service Center, ATTN: TPS, 24000 Avila Road, 2nd Floor, Laguna Niguel, CA 92677–8111.

If you live in Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, or Texas, mail your application to:
Texas Service Center, P.O. Box 850997, Mesquite, TX 75185–0997.

If you live elsewhere in the United States, please mail your application to:
Nebraska Service Center, P.O. Box 87821, Lincoln, NE 68501–7821.

## Notice of Designation of Honduras Under Temporary Protected Status Program

By the authority vested in me as Attorney General under section 244 of the Immigration and Nationality Act, as amended (8 U.S.C. 1254a), I find, after consultation with the appropriate agencies of the Government, that:

(1) There exists an environmental disaster in Honduras, and, due to this disaster, which has substantially disrupted living conditions, Honduras is unable, temporarily, to handle adequately the return of Honduran nationals (or aliens having no nationality who last habitually resided in Honduras);

(2) Honduras officially has requested that it be granted TPS designation; and

(3) Permitting nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) to remain temporarily in the United States is not contrary to the national interest of the United States.

Accordingly, it is ordered as follows:

(1) Honduras is designated for TPS under section 244(b)(1)(B) of the Act.

Nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) who have been "continuously physically present" since January 5, 1999 and have "continuously resided" in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

(2) I estimate that there are no more than 100,000 nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) in the United States who are eligible for TPS.

(3) Except as may otherwise be provided, applications for TPS by nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) must be filed pursuant to the provisions of 8 CFR part 244. Aliens who wish to apply for TPS must file an Application for Temporary Protected Status, Form I–821, together with an Application for Employment Authorization, Form I–765, during the registration period, which begins on January 5, 1999 and will remain in effect until July 5, 1999.

(4) A fee prescribed in 8 CFR 103.7(b)(1) (fifty dollars ($50)) will be charged for each Application for Temporary Protected Status, Form I–821, filed during the registration period.

(5) A fee prescribed in 8 CFR 103.7(b)(1) (one hundred dollars ($100)) will be charged for each Application for Employment Authorization, Form I–

765, filed by an alien requesting employment authorization. An alien who already has employment authorization or who does not wish to request employment authorization must nevertheless file Form I–765, together with Form I–821, for data gathering purposes. In such cases, however, no fee needs to be submitted with Form I–765.

(6) A fee prescribed 8 CFR 103.7(b)(1) (twenty-five dollars ($25)) for fingerprinting must be submitted with the Form I–821.

(7) Pursuant to section 244(b)(3)(A) of the Act, the Attorney General will review, at least 60 days before July 5, 2000, the conditions in Honduras to determine whether the conditions for designation of Honduras under the TPS program continue to exist. Notice of that determination, including the basis for the determination, will be published in the **Federal Register**. If there is an extension of designation, late initial registration for TPS shall be allowed only pursuant to the requirements of 8 CFR 244.2(f)(2).

### Where Can I Find Information About the TPS Program?

Information concerning the TPS program for nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) will be available at the Service Internet Website, located at *www.ins.usdoj.gov,* the Application Support Center Information Line, at 1–888–557–5398, and at local Immigration and Naturalization Service offices upon publication of this notice.

Dated: December 31, 1998.

**Janet Reno,**
*Attorney General.*
[FR Doc. 98–34849 Filed 12–31–98; 3:02 pm]
**BILLING CODE 4410–10–P**

---

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

**[INS No. 1965–98; AG Order No. 2202–98]**

**RIN 1115–AE26**

### Designation of Nicaragua Under Temporary Protected Status

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice.

---

**SUMMARY:** This notice designates Nicaragua for the Temporary Protected Status (TPS) program. Under section 244(b)(1) of the Immigration and Nationality Act, as amended (the Act), the Attorney General is authorized to grant TPS in the United States to eligible nationals of designated foreign states or parts of such states (or to eligible aliens who have no nationality and who last habitually resided in such designated states) upon finding that such states are experiencing ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions.

**EFFECTIVE DATES:** This designation is effective on January 5, 1999 and will remain in effect until July 5, 2000.

**FOR FURTHER INFORMATION CONTACT:** Michael Valverde, Residence and Status Branch, Adjudications, Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–3228.

**SUPPLEMENTARY INFORMATION:**

### What Is Temporary Protected Status?

The TPS statute (section 244 of the Immigration and Nationality Act) grants eligible nationals of designated countries temporary immigration status. TPS beneficiaries are granted a stay of removal and work authorization for the designated TPS period and for any extensions of the designation. TPS does not lead to permanent resident status.

### Why Is Nicaragua Being Designated for the TPS Program?

Hurricane Mitch swept through Central America causing severe flooding and associated damage in Nicaragua. Based on a thorough review by the Departments of State and Justice, the Attorney General finds that, due to the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch, Nicaragua is unable, temporarily, to handle adequately the return of Nicaraguan nationals.

### Who Is Eligible for Nicaraguan TPS?

Nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) who have been ''continuously physically present'' since January 5, 1999 and have ''continuously resided'' in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

Any national of Nicaragua who has already applied for, or plans to apply for, asylum, but whose asylum application has not yet been approved, may also apply for TPS. An application for TPS does not preclude or adversely affect an application for asylum or any other immigration benefit. Denial of an application for asylum or any other immigration benefit does not affect an alien's ability to register for TPS, although the grounds of denial may also lead to denial of TPS. For example, an alien who has been convicted of an aggravated felony is not eligible for asylum or TPS.

An alien who is granted TPS is eligible to register for any extension of the TPS program that may be made. However, nationals of Nicaragua who do not file a TPS application during the initial registration period will have to satisfy the requirements for late initial registration under 8 CFR 244.2(f)(2) in order to be eligible for TPS registration during any extension of designation. The requirements for late initial registration specify:

(1) that the applicant must have been in valid immigrant or nonimmigrant status during the initial registration period, or

(2) had an application for relief from removal or change of status pending or under review during the initial registration period, and

(3) must register no later than sixty (60) days from the expiration of such status or pendency of such application.

### How Do I register for TPS?

| If | Then |
|---|---|
| You are a national of Nicaragua (or an alien having no nationality who last habitually resided in Nicaragua) registering for TPS and employment authorization. | You must complete and file: (1) Form I–821, Application for Temporary Protected Status ($50 filing fee), (2) Form I–765, Application for Employment Authorization ($100 filing fee), and (3) $25 Fingerprint Fee |
| You already have employment authorization or do not require employment authorization. | You must complete and file: (1) Form I–821 with $50 filing fee, (2) Form I–765, Application for Employment with no filing fee, and (3) $25 Fingerprint Fee |

## **EXHIBIT 3**

Designation of Nicaragua Under Temporary Protected Status, 64 Fed. Reg. 526 (Jan. 5, 1999)

**526** **Federal Register** / Vol. 64, No. 2 / Tuesday, January 5, 1999 / Notices

765, filed by an alien requesting employment authorization. An alien who already has employment authorization or who does not wish to request employment authorization must nevertheless file Form I–765, together with Form I–821, for data gathering purposes. In such cases, however, no fee needs to be submitted with Form I–765.

(6) A fee prescribed 8 CFR 103.7(b)(1) (twenty-five dollars ($25)) for fingerprinting must be submitted with the Form I–821.

(7) Pursuant to section 244(b)(3)(A) of the Act, the Attorney General will review, at least 60 days before July 5, 2000, the conditions in Honduras to determine whether the conditions for designation of Honduras under the TPS program continue to exist. Notice of that determination, including the basis for the determination, will be published in the **Federal Register**. If there is an extension of designation, late initial registration for TPS shall be allowed only pursuant to the requirements of 8 CFR 244.2(f)(2).

### Where Can I Find Information About the TPS Program?

Information concerning the TPS program for nationals of Honduras (or aliens having no nationality who last habitually resided in Honduras) will be available at the Service Internet Website, located at *www.ins.usdoj.gov,* the Application Support Center Information Line, at 1–888–557–5398, and at local Immigration and Naturalization Service offices upon publication of this notice.

Dated: December 31, 1998.

**Janet Reno,**
*Attorney General.*
[FR Doc. 98–34849 Filed 12–31–98; 3:02 pm]
**BILLING CODE 4410–10–P**

---

### DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service**

**[INS No. 1965–98; AG Order No. 2202–98]**

**RIN 1115–AE26**

### Designation of Nicaragua Under Temporary Protected Status

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Notice.

**SUMMARY:** This notice designates Nicaragua for the Temporary Protected Status (TPS) program. Under section 244(b)(1) of the Immigration and Nationality Act, as amended (the Act), the Attorney General is authorized to grant TPS in the United States to eligible nationals of designated foreign states or parts of such states (or to eligible aliens who have no nationality and who last habitually resided in such designated states) upon finding that such states are experiencing ongoing armed conflict, environmental disaster, or other extraordinary and temporary conditions.

**EFFECTIVE DATES:** This designation is effective on January 5, 1999 and will remain in effect until July 5, 2000.

**FOR FURTHER INFORMATION CONTACT:** Michael Valverde, Residence and Status Branch, Adjudications, Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–3228.

**SUPPLEMENTARY INFORMATION:**

### What Is Temporary Protected Status?

The TPS statute (section 244 of the Immigration and Nationality Act) grants eligible nationals of designated countries temporary immigration status. TPS beneficiaries are granted a stay of removal and work authorization for the designated TPS period and for any extensions of the designation. TPS does not lead to permanent resident status.

### Why Is Nicaragua Being Designated for the TPS Program?

Hurricane Mitch swept through Central America causing severe flooding and associated damage in Nicaragua. Based on a thorough review by the Departments of State and Justice, the Attorney General finds that, due to the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch, Nicaragua is unable, temporarily, to handle adequately the return of Nicaraguan nationals.

### Who Is Eligible for Nicaraguan TPS?

Nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) who

have been ''continuously physically present'' since January 5, 1999 and have ''continuously resided'' in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

Any national of Nicaragua who has already applied for, or plans to apply for, asylum, but whose asylum application has not yet been approved, may also apply for TPS. An application for TPS does not preclude or adversely affect an application for asylum or any other immigration benefit. Denial of an application for asylum or any other immigration benefit does not affect an alien's ability to register for TPS, although the grounds of denial may also lead to denial of TPS. For example, an alien who has been convicted of an aggravated felony is not eligible for asylum or TPS.

An alien who is granted TPS is eligible to register for any extension of the TPS program that may be made. However, nationals of Nicaragua who do not file a TPS application during the initial registration period will have to satisfy the requirements for late initial registration under 8 CFR 244.2(f)(2) in order to be eligible for TPS registration during any extension of designation. The requirements for late initial registration specify:

(1) that the applicant must have been in valid immigrant or nonimmigrant status during the initial registration period, or

(2) had an application for relief from removal or change of status pending or under review during the initial registration period, and

(3) must register no later than sixty (60) days from the expiration of such status or pendency of such application.

### How Do I register for TPS?

| If | Then |
|---|---|
| You are a national of Nicaragua (or an alien having no nationality who last habitually resided in Nicaragua) registering for TPS and employment authorization. | You must complete and file: (1) Form I–821, Application for Temporary Protected Status ($50 filing fee), (2) Form I–765, Application for Employment Authorization ($100 filing fee), and (3) $25 Fingerprint Fee |
| You already have employment authorization or do not require employment authorization. | You must complete and file: (1) Form I–821 with $50 filing fee, (2) Form I–765, Application for Employment with no filing fee, and (3) $25 Fingerprint Fee |

**Federal Register** / Vol. 64, No. 2 / Tuesday, January 5, 1999 / Notices **527**

| If | Then |
|---|---|
| You are registering for TPS and employment authorization and are requesting a fee waiver. | You must complete and file: (1) Appropriately documented fee waiver request and requisite affidavit (and any other information) in accordance with 8 CFR 244.20, (2) Form I–821, and (3) Form I–765. (4) $25 Fingerprint Fee. There is no fee waiver for the Fingerprint Fee. |

To register for TPS for all conditions described in the above chart, you must include two identification photographs (1½'' x 1½'') and supporting evidence as provided in 8 CFR 244.9 (evidence of identity and nationality, and proof of residence).

### Where Should I Register for TPS?

Nationals of Nicaragua (or eligible aliens who have no nationality and who last habitually resided in Nicaragua) must register for TPS by submitting an application to the INS Service Center that has jurisdiction over where the applicant lives.

If you live in Connecticut, Delaware, the District of Columbia, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Vermont, Virginia, West Virginia, or in the U.S. Virgin Islands, mail your application to:
Vermont Service Center, ATTN: TPS, 75 Lower Welden Street, St. Albans, VT 05479.

If you live in Arizona, California, Guam, Hawaii or Nevada, mail your application to:
California Service Center, ATTN: TPS, 24000 Avila Road, 2nd Floor, Laguna Niguel, CA 92677–8111.

If you live in Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, or Texas, mail your application to:
Texas Service Center, P.O. Box 850997, Mesquite, TX 75185–0997.

If you live elsewhere in the United States, please mail your application to:
Nebraska Service Center, P.O. Box 87821, Lincoln, NE 68501–7821.

### As a Nicaraguan National, Can I File an Application for Adjustment of Status to That of Lawful Permanent Resident Under the Nicaraguan Adjustment and Central American Relief Act (NACARA), and Also File an Application for TPS?

Yes. Nicaraguans can apply for either TPS or adjustment under section 202 of NACARA, or both. The filing of an application for TPS or a grant of TPS status will not have any adverse effect on applications for relief under NACARA.

### What Is the Difference Between These Two Programs?

Temporary Protected Status is, as its name implies, temporary protection from removal during the designation period(s). It is not a permanent entitlement to remain in the country or permanent relief from removal. Under section 244(b)(1) of the Act, the publication of this notice permits nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) who have been ''continuously physically present'' since January 5, 1999 and have ''continuously'' resided in the United States since December 30, 1998 to apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999. A national of Nicaragua granted TPS can lawfully remain in the United States during the designated period and is entitled to employment authorization.

In contrast to TPS, section 202 of NACARA provides an avenue for certain Nicaraguans and their Nicaraguan and Cuban national dependents to apply for permanent relief from removal. The interim rule governing applications for adjustment to permanent resident status under section 202 of NACARA was published in the **Federal Register** on May 21, 1998, at 63 FR 27823. A Nicaraguan is eligible to adjust his or her status to that of lawful permanent resident if:

(1) it can be established that he or she has been continuously physically present in the United States since December 1, 1995 (not counting absences totaling 180 days or less);

(2) he or she is not inadmissible to the United States under all provisions of section 212(a) of the Act not excepted by section 202(a)(1)(B) of NACARA; and

(3) he or she applies for such adjustment prior to April 1, 2002.

If an adjustment application under section 202 of NACARA is approved, the applicant will receive lawful permanent resident (LPR) status. A person who is an LPR may apply to become a United States citizen after the requisite time.

Nicaraguans who are interested in either or both programs are urged to review the specific eligibility and filing requirements for those programs before applying.

### Notice of Designation of Nicaragua Under Temporary Protected Status Program

By the authority vested in me as Attorney General under section 244 of the Immigration and Nationality Act, as amended (8 U.S.C. 1254a), I find, after consultation with the appropriate agencies of the Government, that:

(1) There exists an environmental disaster in Nicaragua, and, due to this disaster, which has substantially disrupted living conditions, Nicaragua is unable, temporarily, to handle adequately the return of Nicaraguan nationals (or aliens having no nationality who last habitually resided in Nicaragua);

(2) Nicaragua officially has requested that it be granted a TPS designation; and

(3) Permitting nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) to remain temporarily in the United States is not contrary to the national interest of the United States.

Accordingly, it is ordered as follows:

(1) Nicaragua is designated for TPS under section 244(b)(1)(B) of the Act. Nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) who have been ''continuously physically present'' since January 5, 1999 and have ''continuously resided'' in the United States since December 30, 1998, may apply for TPS within the registration period which begins on January 5, 1999 and ends on July 5, 1999.

(2) I estimate that there are no more than 45,000 to 70,000 nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) in the United States who are eligible for TPS.

(3) Except as may otherwise be provided, applications for TPS by nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) must be filed pursuant to the provisions of 8 CFR part 244. Aliens who wish to apply for TPS must file an Application for Temporary Protected Status, Form I–821, together with an Application for Employment Authorization, Form I–765, during the registration period, which begins on January 5, 1999 and will remain in effect until July 5, 1999.

(4) A fee prescribed in 8 CFR 103.7(b)(1) (fifty dollars ($50)) will be

**528** Federal Register / Vol. 64, No. 2 / Tuesday, January 5, 1999 / Notices

charged for each Application for Temporary Protected Status, Form I–821, filed during the registration period.

(5) A fee prescribed in 8 CFR 103.7(b)(1) (one hundred dollars ($100)) will be charged for each Application for Employment Authorization, Form I–765, filed by an alien requesting employment authorization. An alien who already has employment authorization or who does not wish to request employment authorization must nevertheless file Form I–765, together with Form I–821, for data gathering purposes. In such cases, however, no fee needs to be submitted with Form I–765.

(6) A fee prescribed in 8 CFR 107.7(b)(1) (twenty-five dollars ($25)) for fingerprinting must be submitted with the Form I–821.

(7) Pursuant to section 244(b)(3)(A) of the Act, the Attorney General will review, at least 60 days before July 5, 2000, the conditions in Nicaragua to determine whether the conditions for designation of Nicaragua under the TPS program continue to exist. Notice of that determination, including the basis for the determination, will be published in the **Federal Register**. If there is an extension of designation, late initial registration for TPS shall be allowed only pursuant to the requirements of 8 CFR 244.2(f)(2).

### Where Can I Obtain Information About the TPS program?

Information concerning the TPS program for nationals of Nicaragua (or aliens having no nationality who last habitually resided in Nicaragua) will be available at the Service Internet Website, located at *www.ins.usdoj.gov*, the Application Support Center Information Line, at 1–888–557–5398, and at local Immigration and Naturalization Service offices upon publication of this notice.

Dated: December 31, 1998.

**Janet Reno,**

*Attorney General.*

[FR Doc. 98–34848 Filed 12–31–98; 3:02 pm]

**BILLING CODE 4410–10–P**

---

## PAROLE COMMISSION

### Sunshine Act Meeting

**AGENCY HOLDING MEETING:** Department of Justice, United States Parole Commission.

**DATE AND TIME:** 9:30 a.m., Wednesday, January 6, 1999.

**PLACE:** 5550 Friendship Boulevard, Suite 400, Chevy Chase, Maryland 20815.

**STATUS:** Closed—Meeting.

**MATTERS CONSIDERED:** The following matter will be considered during the closed portion of the Commission's Business Meeting: Appeals to the Commission involving approximately two cases decided by the National Commissioners pursuant to a reference under 28 CFR 2.27. These cases were originally heard by an examiner panel wherein inmates of Federal prisons have applied for parole or are contesting revocation of parole or mandatory release.

**AGENCY CONTACT:** Tom Kowalski, Case Operations, United States Parole Commission, (301) 492–5962.

Dated: December 30, 1998.

**Michael A. Stover,**

*General Counsel, U.S. Parole Commission.*

[FR Doc. 98–34838 Filed 12–31–98; 10:27am]

**BILLING CODE 4410–31–M**

---

## PAROLE COMMISSION

### Sunshine Act Meeting

**AGENCY HOLDING MEETING:** Department of Justice, United States Parole Commission.

**TIME AND DATE:** 10:30 a.m., Wednesday, January 6, 1999.

**PLACE:** 5550 Friendship Boulevard, Suite 400, Chevy Chase, Maryland 20815.

**STATUS:** Open.

**MATTERS TO BE CONSIDERED:** The following matters have been placed on the agenda for the open Parole Commission meeting:

1. Approval of minutes of previous Commission meeting.
2. Reports from the Chairman, Commissioners, Legal, Chief of Staff, Case Operations, and Administrative Sections.
3. Proposed Amendments to the Interim Regulations for D.C. Code Prisoners. Amendments to the following regulations will be discussed:

(a) § 2.76: Reduction in minimum sentence.
(b) D.C. Youth Rehabilitation Act:

§ 2.71: Application for parole;
§ 2.75: Reconsideration proceedings;
§ 2.87: Reparole.

(c) "Attempted murder" in Category III of the D.C. Guidelines.
(d) § 2.80: "Current offense" for probation violators.
(e) Medical and geriatric parole:

§ 2.77: Medical parole;
§ 2.78: Geriatric parole;

(f) § 2.63: Rewarding Assistance to Law Enforcement.

**AGENCY CONTACT:** Tom Kowalski, Case Operations, United States Parole Commission, (301) 492–5962.

Dated: December 30, 1998.

**Michael A. Stover,**

*General Counsel, U.S. Parole Commission.*

[FR Doc. 98–34839 Filed 12–31–98; 10:31 am]

**BILLING CODE 4410–31–M**

---

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

### Sunshine Act Meeting

December 29, 1998.

*Time and Date:* 11:00 a.m., Wednesday, January 6, 1999

*Place:* Room 6005, 6th Floor, 1730 K Street, N.W., Washington, D.C.

*Status:* Open

*Matters to be Considered:* The Commission will consider and act upon the following:

1. *Secretary of Labor* v. *Capitol Cement Corp.,* Docket Nos. WEVA 95–194–M, etc. (Issues include whether the judge denied Capitol due process by conducting a hearing when a witness asserted the Fifth Amendment privilege against self-incrimination; properly concluded that violations of 30 C.F.R. §§ 56.12016 and 56.15005 by Capital resulted from its unwarrantable failure to comply with the standards; and properly concluded that the negligence of two supervisors is imputable to Capitol for civil penalty purposes.)

Any person attending an open meeting who requires special accessibility features and/or auxiliary aids, such as sign language interpreters, must inform the Commission in advance of those needs. Subject to 29 C.F.R. § 2706.150(a)(3) § 2706.160(d).

**CONTACT PERSON FOR MORE INFO:** Jean Ellen (202) 653–5629/202 708–9300 for TDD Rely/1–800–877–8339 for toll free.

**Jean H. Ellen,**

*Chief Docket Clerk.*

[FR Doc. 98–34845 Filed 12–31–98; 1:38 am]

**BILLING CODE 6735–01–M**

---

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

### Sunshine Act Meeting

December 29, 1998.

*Time and Date:* 10:00 a.m., Wednesday, February 3, 1999

*Place:* Room 6005, 6th Floor, 1730 K Street, NW., Washington, DC

*Status:* Open

*Matters to be Considered:* The Commission will hear oral argument on the following:

1. *Secretary of Labor* v. *Windsor Coal Co.,* Docket No. WEVA 97–95 (Issues include whether substantial evidence supports the judge's determination that Windsor's violation of 30 CFR § 75.400 was not the result of its unwarrantable failure.)

*Time and Date:* 2:00 p.m., Wednesday, February 3, 1999

*Place:* Room 6005, 6th Floor, 1730 K Street, NW., Washington, DC

## **EXHIBIT 4**

Designation of Nepal for TPS, 80 Fed. Reg. 36,346 (June 24, 2015)

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

### National Institute on Aging; Notice of Closed Meeting

Pursuant to section 10(d) of the Federal Advisory Committee Act, as amended (5 U.S.C. App.), notice is hereby given of the following meeting.

The meeting will be closed to the public in accordance with the provisions set forth in sections 552b(c)(4) and 552b(c)(6), Title 5 U.S.C., as amended. The grant applications and the discussions could disclose confidential trade secrets or commercial property such as patentable material, and personal information concerning individuals associated with the grant applications, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.

*Name of Committee:* National Institute on Aging Special Emphasis Panel; Tracking the Life Course.

*Date:* July 31, 2015.

*Time:* 11:00 a.m. to 2:00 p.m.

*Agenda:* To review and evaluate grant applications.

*Place:* National Institute on Aging, Gateway Building, Suite 2C212, 7201 Wisconsin Avenue, Bethesda, MD 20892, (Telephone Conference Call).

*Contact Person:* Kimberly Firth, Ph.D., National Institutes of Health, National Institute on Aging, Gateway Building, 7201 Wisconsin Avenue, Suite 2C212, Bethesda, MD 20892, 301–402–7702, *firthkm@ mail.nih.gov.*

(Catalogue of Federal Domestic Assistance Program Nos. 93.866, Aging Research, National Institutes of Health, HHS)

Dated: June 18, 2015.

**Melanie J. Gray,**

*Program Analyst, Office of Federal Advisory Committee Policy.*

[FR Doc. 2015–15443 Filed 6–23–15; 8:45 am]

**BILLING CODE 4140–01–P**

## DEPARTMENT OF HOMELAND SECURITY

### U.S. Citizenship and Immigration Services

**[CIS No. 2568–15; DHS Docket No. USCIS– 2015–0003]**

**RIN 1615–ZB39**

### Designation of Nepal for Temporary Protected Status

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice.

**SUMMARY:** Through this Notice, the Department of Homeland Security (DHS) announces that the Secretary of Homeland Security (Secretary) has designated Nepal for Temporary Protected Status (TPS) for a period of 18 months, effective *June 24, 2015* through December 24, 2016. Under section 244(b)(1)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. 1254a(b)(1)(B), the Secretary is authorized to designate a foreign state (or any part thereof) for TPS upon finding that the foreign state has experienced an earthquake resulting in a substantial, but temporary, disruption of living conditions.

This designation allows eligible Nepalese nationals (and aliens having no nationality who last habitually resided in Nepal) who have continuously resided in the United States since June 24, 2015, and have been continuously physically present in the United States since *June 24, 2015* to be granted TPS. This Notice also describes the other eligibility criteria applicants must meet.

Individuals who believe they may qualify for TPS under this designation may apply within the 180-day registration period that begins on *June 24, 2015* and ends on December 21, 2015. They may also apply for Employment Authorization Documents (EAD) and for travel authorization. Through this Notice, DHS also sets forth the procedures for nationals of Nepal (or aliens having no nationality who last habitually resided in Nepal) to apply for TPS, EADs, and travel authorization with U.S. Citizenship and Immigration Services (USCIS).

**DATES:** This designation of Nepal for TPS is effective on *June 24, 2015* and will remain in effect through December 24, 2016. The 180-day registration period for eligible individuals to submit TPS applications begins *June 24, 2015,* and will remain in effect through December 21, 2015.

**FOR FURTHER INFORMATION CONTACT:**

• For further information on TPS, including guidance on the application process and additional information on eligibility, please visit the USCIS TPS Web page at *http://www.uscis.gov/tps.* You can find specific information about this designation of Nepal for TPS by selecting ''TPS Designated Country: Nepal'' from the menu on the left of the TPS Web page.

• You can also contact the TPS Operations Program Manager at the Family and Status Branch, Service Center Operations Directorate, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue NW., Washington, DC 20529–2060; or by phone at (202) 272–1533 (this is not a toll-free number). **Note:** The phone number provided here is solely for questions regarding this TPS Notice. It is not for individual case status inquires.

• Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http:// www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

• Further information will also be available at local USCIS offices upon publication of this Notice.

**SUPPLEMENTARY INFORMATION:**

### Table of Abbreviations

BIA—Board of Immigration Appeals
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FNC—Final Nonconfirmation
Government—U.S. Government
IJ—Immigration Judge
INA—Immigration and Nationality Act
OSC—U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices
SAVE—USCIS Systematic Alien Verification for Entitlements Program
Secretary—Secretary of Homeland Security
TNC—Tentative Nonconfirmation
TPS—Temporary Protected Status
TTY—Text Telephone
USCIS—U.S. Citizenship and Immigration Services

### What is Temporary Protected Status (TPS)?

• TPS is a temporary immigration status granted to eligible nationals of a country designated for TPS under the INA, or to eligible persons without nationality who last habitually resided in the designated country.

• During the TPS designation period, TPS beneficiaries are eligible to remain in the United States, may not be removed, and are authorized to work and to obtain EADs, so long as they continue to meet the requirements of TPS.

• TPS beneficiaries may be granted travel authorization as a matter of discretion.

• The granting of TPS does not result in or lead to lawful permanent resident status.

• To qualify for TPS, beneficiaries must meet the eligibility standards at INA section 244(c)(2).

• When the Secretary terminates a country's TPS designation through a separate **Federal Register** notice, beneficiaries return to the same immigration status they maintained before TPS, if any (unless that status has since expired or been terminated), or to any other lawfully obtained immigration status they received while registered for TPS.

### What authority does the Secretary have to designate Nepal for TPS?

Section 244(b)(1) of the INA, 8 U.S.C. 1254a(b)(1), authorizes the Secretary,

after consultation with appropriate U.S. Government (Government) agencies, to designate a foreign state (or part thereof) for TPS if the Secretary finds that certain country conditions exist.[1] The Secretary can designate a foreign state for TPS if the Secretary determines that one or more of three bases exist. One basis is if the Secretary finds that ". . . (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected, (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and (iii) the foreign state officially has requested designation for TPS. . . ." INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B).

Following the designation of a foreign state for TPS, the Secretary may then grant TPS to eligible nationals of that foreign state (or eligible aliens having no nationality who last habitually resided in that state). *See* INA section 244(a)(1)(A), 8 U.S.C. 1254a(a)(1)(A). Applicants must demonstrate that they satisfy all eligibility criteria, including that they have been "continuously physically present" in the United States since the effective date of the designation, which is either the date of the **Federal Register** Notice announcing the designation or such later date as the Secretary may determine, and that they have "continuously resided" in the United States since such date as the Secretary may designate. *See* INA sections 244(a)(1)(A), (b)(2)(A), (c)(1)(A)(i–ii); 8 U.S.C. 1254a(a)(1)(A), (b)(2)(A), (c)(1)(A)(i–ii).

## Why is the Secretary designating Nepal for TPS through December 24, 2016?

On April 25, 2015, a magnitude 7.8 earthquake struck Nepal. The earthquake's epicenter was less than 50 miles from the capital city, Kathmandu, and Pokhara, another major city in central Nepal. Approximately 25 to 33 percent of Nepal's population (over 8 million people) in 39 of Nepal's 75 districts has been affected by the earthquake. There have been numerous aftershocks since the April 25 earthquake, with the strongest striking on May 12 and measuring magnitude

7.3. The May 12 aftershock contributed to additional casualties and resulted in the collapse of some buildings that had suffered damage in the April 25 earthquake. The earthquake and its aftershocks have caused over 8,700 fatalities and more than 20,000 injuries, displaced millions of people, and resulted in destruction or significant damage to over 750,000 homes. The UN estimates 2.8 million people are in need of humanitarian assistance.

The earthquake severely damaged much of the country's infrastructure in the affected areas, including the capital of Kathmandu. Earthquake-related rubble litters urban population centers, and many roads have been destroyed or rendered impassable. Infrastructure damage from the earthquake has jeopardized food security, with over 1.4 million people estimated to be in need of food assistance. Displaced persons have varying access to basic services, such as shelter, water, sanitation, and hygiene and many continue to live outdoors. Medical care was also affected by the earthquake, with over 25 hospitals damaged and more than 900 village health facilities rendered nonfunctional. At least 950,000 children in Nepal are at risk of being unable to return to school or are learning in temporary structures because their schools have been destroyed, damaged.

The institutional capacity of the Nepalese government to respond to the immediate effects of the earthquake alone is low.

The April 25 earthquake and its aftershocks caused enormous damage in Nepal'srural areas that are difficult to access because of the mountainous terrain and limited numbers of undamaged roads. With the 2015 monsoon season starting this month, remote areas will face additional threats, including landslides and flooding, and providing aid to them may become more difficult.

Based upon review of these conditions and after consultation with appropriate Government agencies, the Secretary has determined that:

• There has been an earthquake, flood, drought, epidemic, or other environmental disaster in Nepal resulting in a substantial, but temporary, disruption of living conditions in the area affected. *See* INA section 244(b)(1)(B)(i), 8 U.S.C. 1254a(b)(1)(B)(i);

• Nepal is unable, temporarily, to handle adequately the return of aliens who are nationals of Nepal. *See* INA section 244(b)(1)(B)(ii), 8 U.S.C. 1254a(b)(1)(B)(ii);

• Nepal has officially requested designation for TPS. *See* INA section

244(b)(1)(B)(iii), 8 U.S.C. 1254a(b)(1)(B)(iii);

• The designation of Nepal for TPS will be for an 18-month period from *June 24, 2015* through December 24, 2016. *See* INA section 244(b)(2), 8 U.S.C. 1254a(b)(2);

• The date by which applicants for TPS under the designation of Nepal must demonstrate that they have continuously resided in the United States is June 24, 2015. *See* INA section 244(c)(1)(A)(ii), 8 U.S.C. 1254a(c)(1)(A)(ii);

• The date by which applicants for TPS under the designation of Nepal must demonstrate that they have been continuously physically present in the United States is *June 24, 2015,* the effective date of this designation of Nepal for TPS. INA sections 244(b)(2)(A), (c)(1)(A)(i), 8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i); and

• An estimated 10,000 to 25,000 nationals of Nepal (and persons without nationality who last habitually resided in Nepal) are (or are likely to become) eligible for TPS under this designation. INA section 244(b)(1), 8 U.S.C. 1254a(b)(1). This estimate is based on the total number of Nepalese nationals believed to be in the United States in a nonimmigrant status or without lawful immigration status.

## Notice of the Designation of Nepal for TPS

By the authority vested in me as Secretary under INA section 244, 8 U.S.C. 1254a, after consultation with the appropriate Government agencies, I designate Nepal for TPS under INA section 244(b)(1)(B), 8 U.S.C. 1254a(b)(1)(B), for a period of 18 months from June 24, 2015 through December 24, 2016.

**Jeh Charles Johnson,**
*Secretary.*

## Required Application Forms and Application Fees To Register for TPS

To register for TPS for Nepal, an applicant must submit each of the following two applications:

1. Application for Temporary Protected Status (Form I–821) with the form fee; and

2. Application for Employment Authorization (Form I–765).

• For administrative purposes, an applicant must submit an Application for Employment Authorization (Form I–765) even if no EAD is requested.

• If you want an EAD you must pay the Application for Employment Authorization (Form I–765) fee only if you are age 14 through 65.

• No fee for Application for Employment Authorization (Form I–

---

[1] As of March 1, 2003, in accordance with section 1517 of title XV of the Homeland Security Act of 2002, Public Law 107–296, 116 Stat. 2135, any reference to the Attorney General in a provision of the INA describing functions transferred from the Department of Justice to DHS "shall be deemed to refer to the Secretary" of Homeland Security. *See* 6 U.S.C. 557 (codifying the Homeland Security Act of 2002, tit. XV, section 1517).

765) is required if you are not requesting an EAD with an initial TPS application. Additionally, no fee is required if you are requesting an EAD and you are under the age of 14 or over the age of 65.

You must submit both completed application forms together. If you are unable to pay the required fees, you may apply for a waiver for these application fees and/or the biometrics services fee described below by completing a Request for Fee Waiver (Form I–912), or submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the application forms and fees for TPS, please visit the USCIS TPS Web page at *http://www.uscis.gov/ tps*. Fees for Application for Temporary Protected Status (Form I–821), Application for Employment Authorization (Form I–765), and biometric services are also described in 8 CFR 103.7(b).

**Biometric Services Fee**

Biometrics (such as fingerprints) are required for all applicants 14 years of age or older. Those applicants must submit a biometric services fee. As previously stated, if you are unable to pay for the biometric services fee, you may request a fee waiver by completing a Request for Fee Waiver (Form I–912) or by submitting a personal letter requesting a fee waiver, and providing satisfactory supporting documentation. For more information on the biometric services fee, please visit the USCIS Web site at *http://www.uscis.gov*. If necessary, you may be required to visit an Application Support Center to have your biometrics captured.

**Re-Filing a TPS Application After Receiving a Denial of a Fee Waiver Request**

If you request a fee waiver when filing your TPS and EAD application forms and your request is denied, you may refile your application packet with the correct fees before the filing deadline of December 21, 2015. If you attempt to submit your application with a fee waiver request before the initial filing deadline, but you receive your application back with the USCIS fee waiver denial, and there are fewer than 45 days before the filing deadline (or the deadline has passed), you may still refile your application within the 45-day period after the date on the USCIS fee waiver denial notice. You must include the correct fees or file a new fee waiver request. Your application will not be rejected even if the deadline has passed, provided it is mailed within those 45 days and all other required

information for the application is included. Please be aware that if you re-file your TPS application packet with a new fee waiver request after the deadline based on this guidance and that new fee waiver request is denied, you cannot re-file again. **Note:** Alternatively, you may pay the TPS application fee and biometrics fee (if age 14 or older) but wait to request an EAD and pay the EAD application fee after USCIS grants your TPS application.

**Mailing Information**

Mail your application for TPS to the proper address in Table 1.

TABLE 1—MAILING ADDRESSES

| If you: | Then mail your application to: |
|---|---|
| Would like to send your application by U.S. Postal Service. | USCIS, P.O. Box 7555, Chicago, IL 60680. |
| Would like to send your application by non-U.S. Postal Service courier. | Attn: Nepal TPS, 131 S. Dearborn 3rd Floor, Chicago, IL 60603. |

If you were granted TPS by an Immigration Judge (IJ) or the Board of Immigration Appeals (BIA), and you wish to request an EAD, please mail your application to the appropriate mailing address in Table 1. After you submit your EAD application and receive a USCIS receipt number, please send an email to the Service Center handling your application. The email should include the receipt number and state that you submitted a request for an EAD based on an IJ/BIA grant of TPS. This will aid in the verification of your grant of TPS and processing of your EAD application, as USCIS may not have received records of your grant of TPS by either the IJ or the BIA. To obtain additional information, including the email address of the appropriate Service Center, you may go to the USCIS TPS Web page at *http://www.uscis.gov/ tps*.

**E-Filing**

You cannot electronically file your application packet when applying for initial registration for TPS. Please mail your application packet to the mailing address listed in Table 1

**Supporting Documents**

*What type of basic supporting documentation must I submit?*

To meet the basic eligibility requirements for TPS, you must submit evidence that you:
• Are a national of Nepal or an alien having no nationality who last habitually resided in Nepal. Such

documents may include a copy of your passport if available, other documentation issued by the Government of Nepal showing your nationality (*e.g.,* national identity card, official travel documentation issued by the Government of Nepal), and/or your birth certificate with English translation accompanied by photo identification. USCIS will also consider certain forms of secondary evidence supporting your Nepalese nationality. If the evidence presented is insufficient for USCIS to make a determination as to your nationality, USCIS may request additional evidence. If you cannot provide a passport, birth certificate with photo identification, or a national identity document with your photo or fingerprint, you must submit an affidavit showing proof of your unsuccessful efforts to obtain such documents and affirming that you are a national of Nepal. However, please be aware that an interview with an immigration officer will be required if you do not present any documentary proof of identity or nationality or if USCIS otherwise requests a personal appearance. *See* 8 CFR 103.2(b)(9), 244.9(a)(1);

• Have continuously resided in the United States since June 24, 2015. *See* INA section 244(c)(1)(A)(ii); 8 U.S.C. 1254a(c)(1)(A)(ii); 8 CFR 244.9(a)(2); and

• Have been continuously physically present in the United States since June 24, 2015, the effective date of the designation of Nepal. *See* INA sections 244(b)(2)(A), (c)(1)(A)(i);8 U.S.C. 1254a(b)(2)(A), (c)(1)(A)(i).

You must also submit two color passport-style photographs of yourself. The filing instructions on the Application for Temporary Protected Status (Form I–821) list all the documents needed to establish basic eligibility for TPS. You may also find information on the acceptable documentation and other requirements for applying for TPS on the USCIS Web site at *www.uscis.gov/tps* under "TPS Designated Country: Nepal."

*Do I need to submit additional supporting documentation?*

If one or more of the questions listed in Part 4, Question 2 of the Application for Temporary Protected Status (Form I–821) applies to you, then you must submit an explanation on a separate sheet(s) of paper and/or additional documentation. Depending on the nature of the question(s) you are addressing, additional documentation alone may suffice, but usually a written explanation will also be needed.

**Employment Authorization Document (EAD)**

*How can I obtain information on the status of my EAD request?*

To obtain case status information about your TPS application, including the status of a request for an EAD, you can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833). If your Form I–765 Application for Employment Authorization has been pending for more than 90 days, and you still need assistance, you may request an EAD inquiry appointment with USCIS by using the InfoPass system at *https://infopass.uscis.gov.* However, we strongly encourage you first to check Case Status Online or call the USCIS National Customer Service Center for assistance before making an InfoPass appointment.

*When hired, what documentation may I show to my employer as proof of employment authorization and identity when completing Employment Eligibility Verification (Form I–9)?*

You can find a list of acceptable document choices on the "List of Acceptable Documents" for Employment Eligibility Verification (Form I–9). You can find additional detailed information on the USCIS I–9 Central Web page at *http://www.uscis.gov/I–9Central.* Employers are required to verify the identity and employment authorization of all new employees by using the Employment Eligibility Verification (Form I–9). Within 3 days of hire, an employee must present proof of identity and employment authorization to his or her employer.

You may present any document from List A (reflecting both your identity and employment authorization), or one document from List B (reflecting identity) together with one document from List C (reflecting employment authorization). You may present an acceptable receipt for List A, List B, or List C documents as described in the Form I–9 Instructions; the receipt for the application for replacement of a lost, stolen, or damaged employment authorization document is acceptable. A receipt for the application for an initial or renewal employment authorization is not an acceptable receipt. An EAD is an acceptable document under "List A." Employers may not reject a document based on a future expiration date.

*Can my employer require that I produce any other documentation to prove my current TPS status, such as proof of my Nepalese citizenship or proof that I have registered for TPS?*

No. When completing the Employment Eligibility Verification (Form I–9), including re-verifying employment authorization, employers must accept any documentation that appears on the "Lists of Acceptable Documents" for Employment Eligibility Verification (Form I–9) that reasonably appears to be genuine and that relates to you, or an acceptable List A, List B, or List C receipt. Employers may not request documentation that does not appear on the "Lists of Acceptable Documents." Therefore, employers may not request proof of Nepalese citizenship or proof of TPS registration when completing the Employment Eligibility Verification (Form I–9) for new hires or reverifying the employment authorization of current employees. If presented with EADs that are unexpired on their face, employers should accept such EADs as valid "List A" documents so long as the EADs reasonably appear to be genuine and to relate to the employee. Refer to the "Note to All Employees" section for important information about your rights if your employer rejects lawful documentation, requires additional documentation, or otherwise discriminates against you because of your citizenship status, immigration status, or national origin.

**Note to All Employers**

Employers are reminded that the laws requiring proper employment eligibility verification and prohibiting unfair immigration-related employment practices remain in full force. This Notice does not supersede or in any way limit applicable employment verification rules and policy guidance, including those rules setting forth reverification requirements. For general questions about the employment eligibility verification process, employers may call USCIS at 888–464–4218 (TTY 877–875–6028) or email USCIS at *I–9Central@dhs.gov.* Calls and emails are accepted in English and many other languages. For questions about avoiding discrimination during the employment eligibility verification process, employers may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Employer Hotline at 800–255–8155 (TTY 800–237–2515), which offers language interpretation in numerous

languages, or email OSC at *osccrt@usdoj.gov.*

**Note to Employees**

For general questions about the employment eligibility verification process, employees may call USCIS at 888–897–7781 (TTY 877–875–6028) or email at *I–9Central@dhs.gov.* Calls are accepted in English and many other languages. Employees or applicants may also call the U.S. Department of Justice, Office of Special Counsel for Immigration-Related Unfair Employment Practices (OSC) Worker Information Hotline at 800–255–7688 (TTY 800–237–2515) for information regarding employment discrimination based upon citizenship status, immigration status, or national origin, or for information regarding discrimination related to Employment Eligibility Verification (Form I–9) and E-Verify. The OSC Worker Information Hotline provides language interpretation in numerous languages.

To comply with the law, employers must accept any document or combination of documents from the Lists of Acceptable Documents if the documentation reasonably appears to be genuine and to relate to the employee, or an acceptable List A, List B, or List C receipt described in the Employment Eligibility Verification (Form I–9) Instructions. Employers may not require extra or additional documentation beyond what is required for Employment Eligibility Verification (Form I–9) completion. Further, employers participating in E-Verify who receive an E-Verify case result of "Tentative Nonconfirmation" (TNC) must promptly inform employees of the TNC and give such employees an opportunity to contest the TNC. A TNC case result means that the information entered into E-Verify from Employment Eligibility Verification (Form I–9) differs from Federal or state government records.

Employers may not terminate, suspend, delay training, withhold pay, lower pay, or take any adverse action against an employee based on the employee's decision to contest a TNC or because the case is still pending with E-Verify. A Final Nonconfirmation (FNC) case result is received when E-Verify cannot verify an employee's employment eligibility. An employer may terminate employment based on a case result of FNC. Work-authorized employees who receive an EAD may call USCIS for assistance at 888–897–7781 (TTY 877–875–6028). An employee who believes he or she was discriminated against by an employer in the E-Verify process based on citizenship status,

immigration status, or national origin, may contact OSC's Worker Information Hotline at 800–255–7688 (TTY 800–237–2515). Additional information about proper nondiscriminatory Employment Eligibility Verification (Form I–9) and E-Verify procedures is available on the OSC Web site at *http://www.justice.gov/crt/about/osc/* and the USCIS Web site at *http://www.dhs.gov/E-verify.*

**Note Regarding Federal, State, and Local Government Agencies (Such as Departments of Motor Vehicles)**

While Federal Government agencies must follow the guidelines laid out by the Federal, State, and local government agencies establish their own rules and guidelines when granting certain benefits. Each State may have different laws, requirements, and determinations about what documents you need to provide to prove eligibility for certain benefits. Whether you are applying for a Federal, State, or local government benefit, you may need to provide the government agency with documents that show you are a TPS beneficiary and/or show you are authorized to work based on TPS. Examples are:

(1) Your EAD that has a valid expiration date;

(2) A copy of your Notice of Action (Form I–797C) showing approval for TPS, if you receive one from USCIS.

Check with the government agency regarding which document(s) the agency will accept. You may also provide the agency with a copy of this **Federal Register** Notice.

Some benefit-granting agencies use the USCIS Systematic Alien Verification for Entitlements Program (SAVE) to verify the current immigration status of applicants for public benefits. If such an agency has denied your application based solely or in part on a SAVE response, the agency must offer you the opportunity to appeal the decision in accordance with the agency's procedures. If the agency has received and acted upon or will act upon a SAVE verification and you do not believe the response is correct, you may make an InfoPass appointment for an in-person interview at a local USCIS office. Detailed information on how to make corrections, make an appointment, or submit a written request to correct records under the Freedom of Information Act can be found at the SAVE Web site at *http://www.uscis.gov/save,* then by choosing ''How to Correct Your Records'' from the menu on the right.

[FR Doc. 2015–15576 Filed 6–23–15; 8:45 am]

**BILLING CODE 9111–97–P**

# DEPARTMENT OF HOMELAND SECURITY

## U.S. Citizenship and Immigration Services

[OMB Control Number 1615–0051]

## Agency Information Collection Activities: Monthly Report on Naturalization Papers, Form N–4, Extension, Without Change, of a Currently Approved Collection

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** 60-Day Notice.

**SUMMARY:** DHS, USCIS invites the general public and other Federal agencies to comment upon this proposed extension of a currently approved collection of information. In accordance with the Paperwork Reduction Act (PRA) of 1995, the information collection notice is published in the **Federal Register** to obtain comments regarding the nature of the information collection, the categories of respondents, the estimated burden (*i.e.* the time, effort, and resources used by the respondents to respond), the estimated cost to the respondent, and the actual information collection instruments.

**DATES:** Comments are encouraged and will be accepted for 60 days until August 24, 2015.

**ADDRESSES:** All submissions received must include the OMB Control Number 1615–0051 in the subject box, the agency name and Docket ID USCIS–2005–0032. To avoid duplicate submissions, please use only *one* of the following methods to submit comments:

(1) *Online.* Submit comments via the Federal eRulemaking Portal Web site at *www.regulations.gov* under e-Docket ID number USCIS–2005–0032;

(2) *Email.* Submit comments to *USCISFRComment@uscis.dhs.gov;*

(3) *Mail.* Submit written comments to DHS, USCIS, Office of Policy and Strategy, Chief, Regulatory Coordination Division, 20 Massachusetts Avenue NW., Washington, DC 20529–2140.

**FOR FURTHER INFORMATION CONTACT:** USCIS, Office of Policy and Strategy, Regulatory Coordination Division, Laura Dawkins, Chief, 20 Massachusetts Avenue NW., Washington, DC 20529–2140, telephone 202–272–8377 (comments are not accepted via telephone message). Please note contact information provided here is solely for questions regarding this notice. It is not for individual case status inquiries.

Applicants seeking information about the status of their individual cases can check Case Status Online, available at the USCIS Web site at *http://www.uscis.gov,* or call the USCIS National Customer Service Center at 800–375–5283 (TTY 800–767–1833).

**SUPPLEMENTARY INFORMATION:**

*Comments:*

You may access the information collection instrument with instructions, or additional information by visiting the Federal eRulemaking Portal site at: *http://www.regulations.gov* and enter USCIS–2005–0032 in the search box. Regardless of the method used for submitting comments or material, all submissions will be posted, without change, to the Federal eRulemaking Portal at *http://www.regulations.gov,* and will include any personal information you provide. Therefore, submitting this information makes it public. You may wish to consider limiting the amount of personal information that you provide in any voluntary submission you make to DHS. DHS may withhold information provided in comments from public viewing that it determines may impact the privacy of an individual or is offensive. For additional information, please read the Privacy Act notice that is available via the link in the footer of *http://www.regulations.gov.*

Written comments and suggestions from the public and affected agencies should address one or more of the following four points:

(1) Evaluate whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) Evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used;

(3) Enhance the quality, utility, and clarity of the information to be collected; and

(4) Minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.,* permitting electronic submission of responses.

## Overview of This Information Collection

(1) *Type of Information Collection:* Extension, Without Change, of a Currently Approved Collection.