No. 25-4901

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**NATIONAL TPS ALLIANCE, et al.**,
Appellees,

v.

**KRISTI NOEM, et al.**,
Appellants.

---

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-05687-TLT

---

**OPENING BRIEF FOR APPELLANTS**

---

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant
Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000
Drew.C.Ensign@usdoj.gov

WILLIAM H. WEILAND
*Acting Assistant Director*

LAUREN BRYANT
CATHERINE ROSS
AMANDA SAYLOR
ERIC SNYDERMAN
JEFFREY M. HARTMAN
*Trial Attorneys*

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ............................................................ 3

ISSUES PRESENTED .......................................................................... 3

STATEMENT OF THE CASE AND RELEVANT FACTS ...................... 5

    A.   The TPS Statute .......................................................................... 5

    B.   TPS Designation, Extension, and Termination of Honduras
         and Nicaragua Following a 1998 Hurricane ............................. 7

    C.   TPS Designation, Extension, and Termination for Nepal
         Following a 2015 Earthquake ................................................... 9

    D.   The District Court Universally Postponed the Terminations .. 11

SUMMARY OF ARGUMENT ................................................................ 11

STANDARD OF REVIEW ................................................................... 14

ARGUMENT ....................................................................................... 15

    I.    THE TPS STATUTE FORECLOSES JUDICIAL REVIEW
        OF PLAINTIFFS' CLAIMS .................................................... 15

    II.   PLAINTIFFS' APA CLAIMS ARE MERITLESS. .................... 29

    III.  PLAINTIFFS' EQUAL PROTECTION CLAIMS ARE
         MERITLESS ........................................................................ 44

    IV.  STATUTORY AND EQUITABLE CONTRAINTS
         FORECLOSE UNIVERSAL RELIEF ..................................... 61

CONCLUSION ................................................................................... 74

BRIEF FORMAT CERTIFICATION

STATEMENT OF RELATED CASES

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES
## CASES

*Am.-Arab Anti-Discrimination Comm. v. Reno*,
  70 F.3d 1045 (9th Cir. 1995) .................................................. 49

*Arctic Slope Regional Corp. v. FERC*,
  832 F.2d 158 (D.C. Cir. 1987) .............................................. 28

*Bd. of Governors v. MCorp Fin., Inc.*,
  502 U.S. 32 (1991) ................................................................. 21

*Biden v. Texas*,
  597 U.S. 785 (2022) ........................................................ 49, 63

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
  295 F.3d 28 (D.C. Cir. 2002) ................................................ 38

*Bouarfa v. Mayorkas*,
  604 U.S. 6 (2024) ................................................................... 20

*Cal. Cmtys. Against Toxics v. EPA*,
  688 F.3d 989 (9th Cir. 2012) ................................................ 44

*California v. Grace Brethren Church*,
  457 U.S. 393 (1982) ............................................................... 62

*Ctr. for Biological Diversity v. Bernhardt*,
  946 F.3d 553 (9th Cir. 2019) ................................................ 21

*De Beers Consol. Mines v. United States*,
  325 U.S. 212 (1945) ............................................................... 44

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ............................................................... 37

iii

*Department of Homeland Security v. Regents,*
    591 U.S. 1, 34-35 (2020)...............................................................56, 60

*Encino Motorcars, LLC v. Navarro,*
    579 U.S. 211 (2016) ................................................................... 41

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................... 29

*FDA v. Wages & White Lion,*
    604 U.S. 542 (2025) ................................................................... 40

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ..............................................................45, 47

*Galvan v. Press,*
    347 U.S. 522 (1954) ................................................................... 51

*Galvez v. Jaddou,*
    52 F.4th 821 (9th Cir. 2022) ..................................................... 62

*Garcia v. USCIS,*
    146 F.4th 743 (9th Cir. 2025) ................................................... 21

*Garland v. Aleman Gonzalez,*
    596 U.S. 543, 550 (2022)......................................................61, 63

*Garland v. Ming Dai,*
    593 U.S. 357 (2021) ................................................................... 36

*Gonzalez v. Herrera,*
    151 F.4th 1076 (9th Cir. 2025) ................................................. 21

*Gray v. Hudson,*
    28 F.4th 87 (9th Cir. 2022) ....................................................... 39

*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952)................................................................... 51

iv

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ........................................................ 27, 28

*Idrees v. Barr,*
    923 F.3d 539 (9th Cir. 2019) ........................................... 27, 28

*Imm. Def. Law Cntr. v. Noem,*
    145 F.4th 972 (9th Cir. 2025) ..................................... 3, 64, 65

*In re Ellis,*
    356 F.3d 1198 (9th Cir. 2004) ..................................... 71, 73, 74

*In Re Svenhard's Swedish Bakery,*
    —F.4th—, 2025 WL 2627837 (9th Cir. 2025) ..................... 18

*INS v. Legalization Assist. Proj.,*
    510 U.S. 1301 (1993) ........................................................... 70

*INS v. Yueh-Shaio Yang,*
    519 U.S. 26 (1996) .............................................................. 41

*Kiobel v. Royal Dutch Petroleum Co.,*
    569 U.S. 108 (2013) ............................................................ 49

*Kleindienst v. Mandel,*
    408 U.S. 753 (1972) ............................................................ 52

*Knauff v. Shaughnessy,*
    338 U.S. 537, 542 (1950) .................................................... 70

*Korab v. Fink,*
    797 F.3d 572 (9th Cir. 2014) .............................................. 46

*Lamar, Archer & Cofrin, LLP v. Appling,*
    584 U.S. 709 (2018) ............................................................ 16

*Maryland v. King,*
    567 U.S. 1301 (2012) ................................................................. 69

*Mathews v. Diaz,*
    426 U.S. 67 (1976) ..................................................................... 45

*McNary v. Haitian Refugee Center, Inc.,*
    498 U.S. 479 (1991) .............................................................. 19, 20

*Mi Familia Vota v. Fontes,*
    129 F.4th 691 (9th Cir. 2025) .................................................. 60

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*
    *Auto. Ins. Co.,*
    463 U.S. 29 (1983) ..................................................................... 38

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032 (9th Cir. 2015) ...................................... 71, 72, 73

*Nat'l TPS Alliance v. Noem,*
    150 F.4th 1000 (9th Cir. 2025) (*NTPSA I*) ........................ 3, passim

*Nicholas v. United States,*
    633 F.2d 829 (9th Cir. 1980) ................................................... 19

*Nobert v. San Francisco,*
    10 F.4th 918 (9th Cir. 2021) ................................................... 14

*Noem v. NTPSA,*
    — S. Ct. —, 2025 WL 2812732 ( 2025) ............................... 67, 70

*NTPSA v. Noem,*
    145 S. Ct. 2728 (2025) ........................................... 23, passim

*Oakland v. Lynch,*
    798 F.3d 1159 (9th Cir. 2015) ................................................. 27

*Patel v. Garland*,
596 U.S. 328 (2022) ............................................................ 15, 16, 18, 28

*Poursina v. USCIS*,
936 F.3d 868 (9th Cir. 2019) ................................................ 49

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008) ................................................. 50

*Ram v. INS*,
243 F.3d 510 (9th Cir. 2001) ................................................ 46, 50

*Ramos v. Wolf*,
975 F.3d 872 (9th Cir. 2020),
*vacated upon reh'g en banc*,
59 F.4th 1010 (9th Cir. 2023) .............................................. 12, passim

*Rank v. Nimmo*,
677 F.2d 692 (9th Cir. 1982) ................................................ 27

*Reeb v. Thomas*,
636 F.3d 1224 (9th Cir. 2011) ............................................. 19

*Reno v. CSS*,
509 U.S. 43, 64 (1993) ......................................................... 20

*River Runners for Wilderness v. Martin*,
593 F.3d 1064 (9th Cir. 2010) ............................................. 30, 34

*Sagana v. Tenorio*,
384 F.3d 731 (9th Cir. 2004) ................................................ 69

*San Luis & Delta-Mendota Water Auth. v. Locke*,
776 F.3d 971 (9th Cir. 2014) ................................................ 29

*Sanchez v. Mayorkas*,
593 U.S. 409 (2021) ............................................................ 48

*Shaughnessy v. Mezei,*
  345 U.S. 206 (1953) ........................................................... 45

*Sherley v. Sebelius,*
  689 F.3d 776 (D.C. Cir. 2012) ........................................ 38

*Truck Insur. Exch. v. Kaiser Gypsum Co., Inc.,*
  602 U.S. 268 (2024) .......................................................... 21

*Trump v. Boyle,*
  145 S. Ct. 2653(2025) ................................................. 68, 74

*Trump v. CASA, Inc.,*
  606 U.S. 831 (2025) .............................................. 64, 65, 66

*Trump v. Hawaii*
  585 U.S. 704 .......................................................... 13, passim

*TRW, Inc. v. Andrews,*
  534 U.S. 19 (2001) ........................................................... 19

*U.S. R.R. Ret. Bd. v. Fritz,*
  449 U.S. 166 (1980) ......................................................... 52

*United States v. Texas,*
  599 U.S. 670 (2023) ......................................................... 62

*Vega v. USCIS,*
  65 F.4th 469 (9th Cir. 2023) ........................................... 28

*Village of Arlington Heights v. Metro. Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ............................................... 13, passim

*Washington v. U.S. Dep't of State,*
  996 F.3d 552 (9th Cir. 2021) .......................................... 22

*West Virginia v. EPA,*
  597 U.S. 697 (2022) ......................................................... 22

## **STATUTES**

The Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1160(e)(1) ................................................................. 20

8 U.S.C. § 1101(a)(47), .............................................................. 69

8 U.S.C. § 1189(d)(2) ................................................................ 50

8 U.S.C. § 1229a(a)(3) ............................................................... 69

8 U.S.C. § 1252(a)(2)(B)(i) ....................................................... 15

8 U.S.C. § 1252(a)(2)(B)(ii) ............................................... 28, 29

8 U.S.C. § 1252a(b)(5)(A) ......................................................... 51

8 U.S.C. § 1252(f)(1) ............................................ 4, 14, 61, 62, 63

8 U.S.C. § 1254a(b)(1) ...................................................... 19, 23, 35

8 U.S.C. § 1254a(b)(1)(A) ......................................................... 48

8 U.S.C. § 1254a(b)(1)(B) ............................................... 6, 9, 30, 36

8 U.S.C. § 1254a(b)(1)(C) ................................................... 36, 48

8 U.S.C. § 1254a(b)(1)(B)(i) .............................................. 33, 34

8 U.S.C. § 1254a(b)(1)(B)(ii) ......................................... 33, 34, 35

8 U.S.C. § 1254a(b)(2) ............................................................... 6

8 U.S.C. § 1254a(b)(2)(A) ......................................................... 19

8 U.S.C. § 1254a(b)(3)(A) ........................................... 6, 26, 35, 67

8 U.S.C. § 1254a(b)(3)(B)..................................................... passim

8 U.S.C. § 1254a(b)(3)(C)................................... 17, 27, 35, 40

8 U.S.C. § 1254a(b)(5)(A)................................................... passim

8 U.S.C. § 1254a(c)................................................................ 67

8 U.S.C. § 1254a(d)(2)........................................ 6, 27, 28, 67

8 U.S.C. § 1254a(d)(3)............................................. 6, 26, 27

8 U.S.C. § 1329 ...................................................................... 20

## OTHER STATUTES

5 U.S.C. §701(a)(2)......................................................... 27, 28

5 U.S.C. § 705 ................................................................. passim

5 U.S.C. § 706 ............................................................... 62, 65

6 U.S.C. § 557 ........................................................................ 6

28 U.S.C. § 1292(a)(1)........................................................... 3

28 U.S.C. § 1341.................................................................... 62

28 U.S.C. § 1651(a) .............................................................. 71

28 U.S.C. § 2106.................................................................... 71

26 U.S.C. § 7429(f) ............................................................... 19

28 U.S.C. § 3625.................................................................... 19

## **REGULATIONS**

8 C.F.R. § 244.7 ....................................................................... 67

8 C.F.R. § 244.13(b) .............................................................. 41

8 C.F.R. § 244.17(a) .............................................................. 67

8 C.F.R. § 244.19 ............................................................... 27, 41

## **FEDERAL REGISTER NOTICES**

*Designation of Honduras Under Temporary Protected Status*,
   64 Fed. Reg. 524 (Jan. 5, 1999) .............................................. 7

*Designation of Nicaragua Under [TPS]*,
   64 Fed. Reg. 526 (Jan. 5, 1999) .............................................. 7

*Termination of the Designation of Nicaragua for [TPS]*,
   82 Fed. Reg. 59,636 (Dec. 15, 2017) .......................... 8, passim

*Termination of the Designation of Honduras for [TPS]*,
   83 Fed. Reg. 26,074 (June 5, 2018) ............................ 8, passim

*Continuation of Documentation for Beneficiaries of [TPS] Designations
   for Sudan, Nicaragua, Haiti, and El Salvador*,
   83 Fed. Reg. 54,764 (Oct. 31, 2018) ....................................... 8

*Continuation of Documentation for Beneficiaries of [TPS]
   Designations for Nepal and Honduras*,
   84 Fed. Reg. 20,647 (May 10, 2019) ...................................... 8

*Reconsideration and Rescission of Termination of the Designation of
   Nicaragua for [TPS]; Extension of the [TPS] Designation for
   Nicaragua*, 88 Fed. Reg. 40,294 (June 21, 2023) ................... 8

*Reconsideration and Rescission of Termination of the Designation of Honduras for [TPS]; Extension of the [TPS] Designation for Honduras*, 88 Fed. Reg. 40,304 (June 21, 2023)....................................8

*Designation of Nepal for [TPS]*, 80 Fed. Reg. 36,346 (June 24, 2015).......................................................9

*Termination of the Designation of Nepal for [TPS]*, 83 Fed. Reg. 23,705 (May 22, 2018)............................................9, passim

*Designation of Lebanon Under Temporary Protected Status Program*, 58 Fed. Reg. 7582 (Feb. 8, 1993) ................................................................22

*Termination of the Designation of Montserrat Under the [TPS] Program*, 69 Fed. Reg. 40,642 (July 6, 2004)........................................................22

*Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,064 (Sept. 26, 2016).....................................................22

## <u>INTRODUCTION</u>

The Secretary of Homeland Security (Secretary) has discretion to designate a foreign country for temporary protected status (TPS), giving eligible nationals from a designated country a reprieve from removal during the designation period. By statute, the Secretary must periodically review each designation and decide whether to extend or terminate it. TPS designations for Honduras, Nepal, and Nicaragua are at issue here.

All three countries were designated for TPS long ago based on short-term disruptions caused by natural disasters. Honduras and Nicaragua were designated for TPS in 1999 based on a 1998 hurricane, and Nepal was designated in 2015 based on an earthquake that year. During her required periodic review of the designations, the Secretary found that each country had adequately recovered from the natural disasters and could now accept the return of its nationals—indeed, each country regularly accepts removals of its nationals. So, as the statute requires, and as Secretaries have done dozens of times before, the Secretary terminated the designations.

1

The district court universally stayed the TPS terminations under 5 U.S.C. §705. The court concluded that the plaintiffs would likely succeed on each of their three Administrative Procedure Act (APA) claims—that the terminations were impermissibly preordained, that the 60-day winddown period for the terminations impermissibly departed from past agency practice without explanation, and that the terminations were motivated by unconstitutional anti-alien animus. Along the way, the district court compared removal of illegal aliens to the transatlantic slave trade, analogized the challenged actions to the Chinese Exclusion Act, and openly equated the Supreme Court to the infamous Star Chamber in the course of refusing to consider the Supreme Court's balancing of the equities in granting a stay of another judge's similar §705 order in a similar TPS case.

Those conclusions were flawed on jurisdictional, merits, and equitable grounds. This Court properly stayed the §705 order, recognizing that the government was likely to prevail on the merits and that the equitable factors favored a stay. It should now reverse. The district court lacked jurisdiction to hear these claims at all, so this Court should simply reverse and remand with instructions to dismiss. But if

this Court remands for further proceedings, the district court's injection of over-the-top rhetoric—which it highlighted and reiterated in a later order—and its manifest errors warrant reassignment to a different judge.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1331, except to the extent it lacked jurisdiction over claims or remedies for the reasons explained in the body of this brief. The Secretary timely appealed on August 1, 2025, within sixty days of the court's July 31 order. Fed. R. App. P. 4(a)(1)(B); 6-ER-706-07. This Court has jurisdiction to review the district court's universal postponement order under 28 U.S.C. §1292(a)(1). *Imm. Def. Law Cntr. v. Noem*, 145 F.4th 972, 893-85 (9th Cir. 2025); *Nat'l TPS Alliance v. Noem*, 150 F.4th 1000, 1014-15 (9th Cir. 2025) (*NTPSA I*).

## ISSUES PRESENTED

I.    Did the district court likely exceed its jurisdiction in reviewing the Secretary's TPS terminations, when 8 U.S.C. 1254a(b)(5)(A) specifies that "any determination" "with respect to" a termination is unreviewable?

3

II.     Are Plaintiffs likely to succeed on their APA claims, when the TPS terminations were based on a procedurally and substantively valid reasons and did not depart from any established agency policy?

III.    Are Plaintiffs likely to succeed on their equal protection claim, when the Secretary's determinations were facially valid and Plaintiffs produced no persuasive evidence of animus?

IV.     Did the district court abuse its discretion by entering universal preliminary relief, where the equities favored the government and 8 U.S.C. §1252(f)(1) barred that relief?

V.      Should this case be reassigned, if remanded, to preserve the appearance of justice?

4

## STATEMENT OF THE CASE AND RELEVANT FACTS

**A.     The TPS Statute**

The Immigration Act of 1990 established a program for providing temporary shelter in the United States on a discretionary basis for aliens from designated countries experiencing ongoing armed conflict, environmental disaster, or "extraordinary and temporary conditions" that temporarily prevent aliens' safe return or, in the case of environmental disasters, temporarily render the country unable to adequately handle the return of its nationals.  Pub. L. No. 101-649, 104 Stat. 4978.

As relevant here, the Secretary may, "after consultation with appropriate agencies of the Government," designate countries for TPS if she finds that

> (i)     there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,

> (ii)    the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and

> (iii)   the foreign state officially has requested designation under this subparagraph.

5

§1254a(b)(1)(B); *see* 6 U.S.C. § 557 (transferring functions to the Secretary).[1]

Initial TPS designations are discretionary and last "not less than 6 months and not more than 18 months." §1254a(b)(2). At least 60 days before the end of the initial designation and any subsequent extension, the Secretary must "review the conditions in the foreign state … for which a designation is in effect" and "determine whether the conditions for such designation … continue to be met." §1254a(b)(3)(A). If the foreign state "no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation[.]" §1254a(b)(3)(B).

A TPS termination "shall not be effective earlier than 60 days after the date the notice is published or, if later, the expiration of the most recent extension[.]" §1254a(b)(3)(B). The Secretary has the "option" to establish a termination date "after such period after the effective date as the [Secretary] determines to be appropriate in order to provide for an orderly transition." §1254a(d)(3). The Secretary "may" also "stagger the periods of validity of the [TPS] documentation and authorization in order to provide for an orderly" "termination of a foreign state." §1254a(d)(2).

---

[1] Unless noted, all statutory citations in this brief refer to Title 8.

Congress enacted a broad prohibition on judicial review of the Secretary's exercise of her TPS authority: "There is no judicial review of any determination of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection." §1254a(b)(5)(A).

## B. TPS Designation, Extension, and Termination of Honduras and Nicaragua Following a 1998 Hurricane

In 1999, Attorney General Reno designated Honduras and Nicaragua for TPS due to "the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch." 4-ER-408-10 (*Designation of Honduras Under [TPS]*, 64 Fed. Reg. 524 (Jan. 5, 1999); 5-ER-555-57 (*Designation of Nicaragua Under [TPS]*, 64 Fed. Reg. 526 (Jan. 5, 1999). The rationale for the TPS designation was that "Hurricane Mitch swept through Central America causing severe flooding and associated damage in" Honduras and Nicaragua, and that "due to the environmental disaster and substantial disruption of living conditions caused by Hurricane Mitch," the countries were "unable, temporarily, to handle adequately the return of [their] nationals." 4-ER-408-10; 5-ER-555-57.

7

In 2017 and 2018, respectively, following over a dozen intervening extensions, the Secretary terminated TPS for Nicaragua and Honduras because the conditions caused by Hurricane Mitch no longer persisted. 82 Fed. Reg. 59,636; 83 Fed. Reg. 26,074. Those terminations were stayed pending litigation, and, in 2023, Secretary Mayorkas rescinded the terminations and extended the designations. 83 Fed. Reg. 54,764; 84 Fed. Reg. 20,647; 88 Fed. Reg. 40,294; 88 Fed. Reg. 40,304.

On July 8, 2025, following the required review and consultation with appropriate agencies, Secretary Noem terminated TPS for both Honduras and Nicaragua, effective September 8, 2025. 3-ER-322-31; 3-ER-334-42; 4-ER-361-65; 5-ER-512-15. She determined that conditions resulting from Hurricane Mitch "no longer cause a substantial, but temporary, disruption in living conditions in the area affected" and that Honduras and Nicaragua are "no longer unable, temporarily, to handle adequately the return of [their] nationals." 5-ER-414; 4-ER-364; 3-ER-326-27; 4-ER-353-65. In particular, among other things, the Secretary stated that Honduras "is now a popular tourism and real estate investment destination," cited reports indicating that most Hondurans have access to water, sanitation, and electricity, and determined that the

8

Honduran government demonstrated "readiness to welcome back its nationals" including by "regularly accepting the return of its nationals with final removal orders over the last five years." 3-ER-327. Considering whether any putative reliance interests exist for those impacted by the termination decision, the Secretary observed that TPS designations are "time-limited" and that TPS notices "clearly notify aliens of the designations' expiration dates." 4-ER-364; 5-ER-415.

### C. TPS Designation, Extension, and Termination for Nepal Following a 2015 Earthquake

Nepal was designated for TPS when "a magnitude 7.8 earthquake struck Nepal" in April 2015, "resulting in a substantial, but temporary, disruption of living conditions in the area affected." Nepal was "unable, temporarily, to handle adequately the return of aliens who are nationals of Nepal," and it "officially requested designation for TPS." 6-ER-697-701 (80 Fed. Reg. 36,346). In 2018, after intervening extensions, the Secretary terminated Nepal's TPS designation when Nepal no longer met "the conditions for the designation of Nepal for TPS under … §1254a(b)(1)(B)." 83 Fed. Reg. 23,705. In 2023, following litigation that prevented the termination from taking effect, then-Secretary Mayorkas

9

rescinded the termination and extended the designation for 18 months until June 24, 2025. 84 Fed. Reg. 20,647; 88 Fed. Reg. 40,317.

On June 6, 2025, the Secretary terminated TPS for Nepal, effective August 5, 2025. 6-ER-556-59 (90 Fed. Reg. 24,151). The Secretary explained that, based on her review and consultation with appropriate agencies, Nepal has accomplished "substantial reconstruction from the earthquake's destruction such that there is no longer a disruption of living conditions," made "notable improvements in environmental disaster preparedness and response capacity," and is now "able to handle adequately the return of its nationals." 6-ER-557-61.

In particular, the Secretary cited reports that over 88% of damaged homes were rebuilt, over 90% of surveyed internally displaced persons had bought new homes, and over 81% of damaged health facilities were rebuilt. *Id.* And Nepal has regularly accepted the return of its nationals with final removal orders over the last five years. *Id.* Regarding reliance interests, the Secretary observed that TPS is "time-limited" and TPS notices "clearly notify aliens of the designations' expiration dates." *Id.*

**D.** **The District Court Universally Postponed the Terminations**

On July 7, the National TPS Alliance (NTPSA) and seven individual Plaintiffs challenged the terminations for Nepal, Honduras, and Nicaragua and moved to postpone the effective date of the Secretary's determinations. The district court granted the motion on July 31, 2025. 1-ER-2-38. The Secretary filed this appeal the next day, and the Court granted the Secretary's motion for a stay pending appeal on August 20. 6-ER-701-02; Dkt.19.

## SUMMARY OF ARGUMENT

Congress granted the Secretary discretionary authority to grant *temporary* protection for aliens from countries adversely impacted by major natural disasters which temporarily prevented them from adequately handling their nationals' return. Here, the Secretary made the unremarkable—and uncontestable—determination that after more than a quarter century, the conditions caused by a 1998 hurricane in Honduras and Nicaragua no longer existed and that the conditions caused by a 2015 earthquake in Nepal no longer prevented it from adequately handling the return of its citizens a decade later. Indeed, Secretary of State Blinken previously recommended the termination of

11

Nepal's TPS designation for the same reasons that Secretary Noem subsequently adopted.

The district court nevertheless flouted multiple bars on judicial review and entered universal relief staying Secretary Noem's reasoned TPS terminations. That decision is a blatant intrusion in the Secretary's unreviewable operation of the TPS statute and must be reversed.

Congress expressly barred judicial review of "any" "determination" "with respect to" a termination, which unambiguously covers the Secretary's determinations here. §1254a(b)(5)(A). That prohibition extends to the Secretary's discretionary selection of the effective date of her TPS terminations, which are additionally shielded from review by the Immigration and Nationality Act and ordinary administrative law principles. Indeed, in *Ramos*, this Court previously held that Plaintiffs' principal claim—that the Secretary was required to review intervening country conditions unrelated to an initial designation—was barred by §1254a(b)(5)(A). The same conclusion is warranted here.

Even if Plaintiffs' APA and equal protection claims were reviewable, each fails on the merits. The Secretary was not required to consider intervening country conditions because her periodic review is

focused on the conditions underlying the initial designation and, in all events, she thoroughly considered relevant country conditions and consulted with relevant agencies. Indeed, her decision to terminate TPS for Nepal aligns with Secretary Blinken's recommendation to do so. And the Secretary's selection of the default winddown period was not arbitrary-and-capricious because the Secretary has never promulgated an actual policy requiring longer winddown periods. To the contrary, regulations warn that a termination takes effect without any additional notice to TPS holders after sixty days.

Plaintiffs' equal protection claim is equally infirm. The district court incorrectly applied the *Arlington Heights* standard rather than the deferential rational basis test that the Supreme Court in *Trump v. Hawaii* held applies in circumstances like these where the Secretary must weigh country conditions evidence and make sensitive foreign policy judgments concerning aliens and their home countries. But even under *Arlington Heights*, Plaintiffs' arguments fail because they impermissibly depend on statements that do not show racial animus toward *any* country's nationals—let alone these countries' nationals, and that are remote in time and context from the challenged decisions.

13

Indeed, the district court only identified a *single* statement specific to *any* of the three countries at issue here (Honduras), and it is an entirely unremarkable observation about "the need for 'migration management' and 'repatriation flights.'" 1-ER-29. The proposition that such a statement demonstrates unconstitutional animus is preposterous.

The district court's errors are compounded because it entered universal relief in violation of §1252(f)(1) and ignored the Supreme Court's weighing of the merits and equities in indistinguishable circumstances. Indeed, the court's errors are so manifest and its rhetoric so distant from the realities of this case that this is the unusual case in which reassignment is warranted if the Court remands for proceedings other than dismissal.

## STANDARD OF REVIEW

This Court reviews "an order regarding preliminary … relief for abuse of discretion, but review[s] any underlying issue of law de novo." *Nobert v. San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (citation omitted).

## ARGUMENT

## I. THE TPS STATUTE FORECLOSES JUDICIAL REVIEW OF PLAINTIFFS' CLAIMS

### A. The Decision to Terminate TPS Is Unreviewable

This Court should reverse the postponement order because the TPS statute plainly forecloses judicial review of Plaintiffs' claims. The statute provides that "*[t]here is no judicial review of any determination* of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state" for TPS. §1254a(b)(5)(A) (emphasis added). Plaintiffs seek judicial review of the Secretary's determinations with respect to termination of TPS for three countries. By foreclosing "judicial review," §1254a(b)(5)(A) forecloses those claims.

1. The plain meaning of the statute's broad terms confirms its broad sweep. *See Patel v. Garland*, 596 U.S. 328, 338-39 (2022) (examining the ordinary meaning of broadening terms in §1252(a)(2)(B)(i)'s review bar). The term "determination" covers action by the Secretary regarding TPS designations. *See Merriam-Webster's Dictionary* (2025), Determination ("the act of deciding definitely and firmly"); *Black's Law Dictionary* 450 (6th ed. 1990) (defining determination as "[t]o settle or decide by choice of alternatives or

15

possibilities."); *Webster's New Collegiate Dictionary* 346 (1990) ("the act of deciding definitively and firmly").

The modifier "any," in the phrase "any determination," has a similarly expansive meaning. *Patel*, 596 U.S. at 338 ("[a]s this Court has repeatedly explained, the word 'any' has an expansive meaning" encompassing "judgments of 'whatever kind'") (cleaned up). And the term "respecting" too "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018); *see Webster's New Collegiate Dictionary* 1004 (defining "respect" as "a relation to or concern with something usually specified"). Indeed, the Supreme Court held that materially similar jurisdiction-stripping language in the Immigration and Nationality Act was so expansive that it precluded judicial review of factual findings. *Patel*, 596 U.S. at 337-40 (statute barring review of "any judgment regarding the granting of relief" covers "any authoritative decision" on the matter).

Applying §1254a(b)(5)(A) here is straightforward. Plaintiffs directly challenge Secretary Noem's "determination[s] … with respect to … the termination" of the Honduras, Nicaragua, and Nepal TPS

designations. §1254a(b)(5)(A). 4-ER-361-64; 5-ER-412-15; 6-ER-556-59. Plaintiffs' APA claims challenge the evidence and reasoning the Secretary relied on to reach her TPS terminations. They principally argue that the terminations were not based on an objective review of country conditions. Dkt.17 at 15-17. Because §1254a(b)(5)(A) bars any judicial review of TPS terminations, let alone challenges to the Secretary's country-specific findings, this Court must vacate and remand with instructions to dismiss. §1254a(b)(5)(A); *see NTPSA I*, 150 F.4th at 1017; *Ramos*, 975 F.3d at 895. Plaintiffs also argue that the Secretary did not sufficiently explain her reasons for selecting a 60-day winddown period for the terminations. 1-ER-24-26. But that, too, was a country-specific determination announced in a country-specific Federal Register notice. It is literally a "determination" "with respect to" a "termination," and there is nothing procedural or collateral about Plaintiffs' challenge to it. §1254a(b)(3)(C). Plaintiffs last argue that the Secretary's country-specific determinations were infected with discriminatory animus. Dkt.17 at 20-22. Again, that claim seeks to interrogate the Secretary's country-specific reasoning and motivations. Each of Plaintiffs' challenges to the terminations falls squarely within the statute's scope,

17

so this Court should vacate the district court's order and remand with instructions to dismiss.

The district court nevertheless concluded that the term "determination" limited the review bar's preclusive effect to "the single act of deciding whether the country conditions continue to be met for the purposes of designating or terminating TPS." 1-ER-16; 1-ER-18. That conclusion is irreconcilable with §1254a(b)(5)(A), which specifies what kinds of determinations it covers: *any* determinations—that is, determinations "of whatever kind," *Patel*, 596 U.S. at 338—*with respect to* TPS terminations.

The district court failed to give any meaning to the broadening terms "any" and "with respect to," however—thereby violating the presumption that Congress does not "intend to make any portion of a statute superfluous" and that this Court must "give effect to every word of a statute whenever possible." *In Re Svenhard's Swedish Bakery*, —F.4th—, 2025 WL 2627837, *4 (9th Cir. Sep. 12, 2025) (cleaned up); 1-ER-16-20. Indeed, "[i]t is a 'cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or

18

insignificant.'" *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation omitted)). And the district court's reasoning further ignores that the review bar plainly extends to some determinations, such as the effective date or duration of a TPS extension, §1254a(b)(1), (b)(2)(A), that do not necessarily turn on country conditions.

This Court has enforced comparable limitations on judicial review in other contexts and should do so here. For example, the Court rejected a procedural challenge to a decision that merely attempted to work around a limitation on judicial review. *Skagit Cnty.*, 80 F.3d at 386. It rejected both procedural and substantive challenges under a bar on APA review of "any determination, decision, or order" related to operation of certain prison programs. *Reeb v. Thomas*, 636 F.3d 1224, 1226-28 (9th Cir. 2011) (interpreting 28 U.S.C. § 3625). And it held that a bar on review of "[a]ny determination made by a district court under this section" foreclosed both "constitutional and evidentiary" review of certain tax assessments. *Nicholas v. United States*, 633 F.2d 829, 830 (9th Cir. 1980) (interpreting 26 U.S.C. §7429(f)).

The plain text also distances this case from *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), on which the district court

relied. 1-ER-17. *McNary*'s conclusion that litigants could raise "collateral challenges to unconstitutional practices and policies," *McNary*, 498 U.S. at 479, to administration of an immigration program depended on the fact that Congress barred judicial review only of "a determination respecting an" individual worker's "application." *Ramos*, 975 F.3d at 889 (quoting former 8 U.S.C. §1160(e)(1)); *see Reno v. CSS*, 509 U.S. 43, 64 (1993) (interpreting "the phrase 'a determination respecting an application for adjustment of status'"). *McNary* emphasized that Congress *could* bar judicial review of collateral challenges if it used more expansive language. 498 U.S. at 494 (citing 8 U.S.C. §1329 as an example). Congress did so here, barring review of "*any determination* of the [Secretary] *with respect to* the … termination … of a [TPS] designation." §1254a(b)(5)(A) (emphasis added); *see Bouarfa v. Mayorkas*, 604 U.S. 6, 19 (2024) (holding that INA provisions limiting judicial review provide "clear and convincing evidence of congressional intent to preclude judicial review"). So *McNary* and *Reno* support the government, not Plaintiffs.

The court's heavy reliance on the presumption in favor of judicial review and legislative history, 1-ER-18, were equally mistaken. The

presumption and legislative history can apply only if the statute is ambiguous. *Gonzalez v. Herrera*, 151 F.4th 1076, 1081 (9th Cir. 2025); *Garcia v. USCIS*, 146 F.4th 743, 754 (9th Cir. 2025). This statute is anything but: it unequivocally bars "judicial review" of "any determination" "with respect to" these TPS terminations, plainly seeking to foreclose judicial review and rebutting the review presumption. *See* H.R. Rep. No. 101-245, at 14 (1989) ("Moreover, none of the [Secretary's] decisions with regard to granting, extending, or terminating TPS will be subject to judicial review."). Courts routinely find that similar language bars judicial review, rebutting the presumption of judicial review and leaving it with no role to play. *See Bd. of Governors v. MCorp Fin., Inc.*, 502 U.S. 32, 42, 44 (1991); *Washington v. U.S. Dep't of State*, 996 F.3d 552, 560-64 (9th Cir. 2021); *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019). Just so here.

Finally, the court's parade-of-horribles, premised on the Secretary's theoretical use of TPS in trade or diplomatic negotiations, 1-ER-17-19, "cannot surmount the plain language of the statute." *Truck Insur. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 284 (2024). And the major-questions doctrine is irrelevant here, where Congress plainly "meant to

confer the power the agency has asserted" and Secretaries across multiple administrations, since the TPS statute was enacted, have terminated TPS designations. *West Virginia v. EPA*, 597 U.S. 697, 722 (2022); *see* 1-ER-20; *see, e.g.*, *Termination of Designation of Lebanon Under Temporary Protected Status Program*, 58 Fed. Reg. 7582 (Feb. 8, 1993); *Termination of the Designation of Montserrat Under the [TPS] Program*, 69 Fed. Reg. 40,642 (July 6, 2004); *Six-Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination of Guinea's Designation for Temporary Protected Status*, 81 Fed. Reg. 66,064 (Sept. 26, 2016).

2. At minimum, Section 1254a(b)(5)(A) bars review of Plaintiffs' arbitrary-and-capricious claims. "If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency *decision* is arbitrary, capricious, or procedurally defective." *Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004). In related litigation, the Supreme Court has twice granted the government's stay applications, which relied on this same judicial-review argument. *See Noem v. Nat'l TPS All.*, No. 25A326, Appl. For Stay 19; *Noem v. Nat'l TPS All.*, No. 24A1059, Appl. For Stay 15-20. To

22

grant such relief, the Supreme Court necessarily determined that the government is likely to succeed on the merits of the reviewability argument. *NTPSA*, — S. Ct. —, 2025 WL 2812732, at *1; *NTPSA*, 145 S. Ct. at 2728-29.

This Court, too, previously held that "the TPS statute precludes review of non-constitutional claims that fundamentally attack the Secretary's specific TPS determinations, as well as the substance of her discretionary analysis in reaching those determinations." *Ramos v. Wolf*, 975 F.3d 872, 892 (9th Cir. 2020), *vacated upon reh'g en banc*, 59 F.4th 1010, 1011 (9th Cir. 2023).[2] Foreclosing judicial review conforms with a statutory scheme that "does not dictate any substantive guidelines or restrictions on the manner by which the Secretary may reach her TPS determinations" and does not "set forth or define the conditions in the foreign state that the Secretary must consider … or how she should weigh these conditions." *Id*. at 891; §1254a(b)(1), (b)(3).

---

[2] Although non-precedential, *Ramos* "still carries informational and perhaps even persuasive precedential value." *DHX Inc. v. Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005) (Beezer, J., concurring). The Secretary cites *Ramos* in this brief for persuasiveness only.

Thus, even if some collateral challenges were reviewable, *but see supra* at pp. 11-22, the district court's decision empowers Plaintiffs to directly (and impermissibly) challenge the Secretary's discretionary TPS terminations. Dkt.17 at 15-17. Plaintiffs did not challenge a guidance document or regulation distinct from a termination, and the district court never pinpointed any statutory criteria that the Secretary overlooked. Instead, Plaintiffs challenge the evidence and reasoning the Secretary relied on to reach her TPS terminations. They principally argue that the terminations were not based on an objective review of country conditions. Dkt.17 at 15-17. Plaintiffs also argue that the Secretary did not sufficiently explain her reasons for selecting a 60-day winddown period for the terminations. 1-ER-24-26. But those are precisely the types of ordinary APA claims that fall within the core of § 1254a(b)(5)(A)'s judicial review bar. *Ramos*, 975 F.3d at 889.

Plaintiffs cannot evade that bar by characterizing an arbitrary-and-capricious challenge as procedural. *See*, e.g., *Skagit County Pub. Hosp. Dist. No. 2* v. *Shalala*, 80 F.3d 379, 386 (9th Cir. 1996) (no-review provision applies when "procedure is challenged only in order to reverse the individual [unreviewable] decision"). To hold otherwise "would

24

eviscerate the statutory bar, for almost any challenge to [a determination] could be recast as a challenge to its underlying methodology." *DCH Reg'l Med. Ctr.* v. *Azar*, 925 F.3d 503, 505-507 (D.C. Cir. 2019).

The decision in *NTPSA I*, 150 F.4th at 1014-15, is consistent with that position.[3] In *NTPSA I*, a panel of this Court reasoned in a preliminary posture that it could engage in limited review of "[t]he extent of statutory authority granted to the Secretary" to determine whether she can reconsider a TPS extension, *id.* at 1017; it expressly did not reach the Plaintiffs' arbitrary and capricious claims, *id.* at 1024. It further emphasized that it could engage in review because the Secretary's action in that case—the *vacatur* of a TPS termination—was "not 'a determination ... with respect to the designation, or termination or

_____

[3] The government maintains that *NTPSA I* and that panel's subsequent decision in *Nat'l TPS Alliance v. Noem*, —F.4th—, 2025 WL 2661556 (9th Cir. Sept. 17, 2025), erroneously concluded that some of the plaintiff's claims are subject to judicial review and erred on the underlying merits. And the government expects to seek relief from *NTPSA I*, which became moot before the government was able to pursue rehearing en banc or certiorari. *See, e.g.*, *Donovan v. Vance*, 70 F.4th 1167, 1173 (9th Cir. 2023) (recognizing that "vacatur is generally automatic in the Ninth Circuit when a case becomes moot on appeal"). *NTPSA I* presently remains subject to the Ninth Circuit's administrative order pausing government deadlines during the lapse in appropriations.

extension' of a country for TPS." *NTPSA I*, 150 F.4th at 1017 (quoting §1254a(b)(5)(A)). The Court also reiterated that "Congress has provided a means for the Secretary to account for changes in country conditions or political priorities: she can terminate TPS[.]" *Id*. at 1021; *see* §1254a(b)(3)(A)-(B). Because the Secretary exercised her indisputable authority to terminate these TPS designations within the statutorily prescribed period, courts lack authority to review them. §1254a(b)(5)(A); *see NTPSA I*, 150 F.4th at 1017; *Ramos*, 975 F.3d at 892.

## B. The Winddown Period Is Unreviewable for Additional Reasons

A TPS termination may take effect "at the [Secretary's] option" "after such period after the effective date of the determination as the [Secretary] determines to be appropriate in order to provide for an orderly transition[.]" §1254a(d)(3). The effective date must be at least the later of 60 days after Federal Register publication of the termination or the expiration of the most recent extension, §1254a(b)(3)(B), but the statute otherwise does not constrain the Secretary's discretion. Here, the Secretary acknowledged her discretion and elected to provide the default 60-day winddown period. 4-ER 364; 5-ER-415; 6-ER-558.

In addition to the TPS statute's review bar, the winddown period is unreviewable for two additional independent reasons. *First*, it is committed to agency discretion because there is no "meaningful standard against which to review the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *Oakland v. Lynch*, 798 F.3d 1159, 1165 (9th Cir. 2015); 5 U.S.C. §701(a)(2). The statute commits the effective date of a TPS termination to the Secretary's discretion by providing her with the "option"—that is, "the right or power to choose," BLACK'S LAW DICTIONARY (12th ed. 2024)—to select the transition period that she "determines to be appropriate." §1254a(d)(3); 5 U.S.C. §701(a)(2). The Court has held that similar language, giving officials the "option" to assume a veteran's delinquent home mortgage, made the decision unreviewable under this exception. *Rank v. Nimmo*, 677 F.2d 692, 699 (9th Cir. 1982).

So too here, where statutes and regulations similarly provide no guidance about what factors the Secretary may consider in selecting a country-specific winddown period. §§1254a(b)(3)(C), (d)(2)-(3); 8 C.F.R. §244.19; *see Idrees v. Barr*, 923 F.3d 539, 542 (9th Cir. 2019) (certification was unreviewable where statutes and regulations "contain[] no standard

for how the agency should exercise its discretion"). Because there is no judicially manageable standard to evaluate what country-specific winddown period should follow a particular TPS termination, the district court erred in evaluating the merits of Plaintiffs' claim. 5 U.S.C. §701(a)(2); *see Chaney*, 470 U.S. at 830; *Idrees*, 923 F.3d at 542.

*Second*, judicial review of the winddown period is also barred by §1252(a)(2)(B)(ii), which provides that "[n]otwithstanding any other provision of law (statutory or nonstatutory) … and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review" any "decision or action of the Attorney General or the Secretary … the authority for which is specified under this subchapter to be in [their] discretion[.]" §1252(a)(2)(B)(ii); *see Patel*, 596 U.S. at 347. The TPS statute brims with discretion, using the permissive terms "may," "option," and "as the Secretary determines to be appropriate," "which brings along the usual presumption of discretion." *Vega v. USCIS*, 65 F.4th 469, 471 (9th Cir. 2023) (cleaned up); *see* §1254a(d)(2)-(3); *see, e.g.*, *Arctic Slope Regional Corp. v. FERC*, 832 F.2d 158 (D.C. Cir. 1987) (a regulation permitting agency to take action that it "determines to be appropriate" "trumpeted" discretion). Because the

28

Secretary's selection of a post-termination winddown period is a "judgment, decision, or action" specified to be in the Secretary's discretion, §1252(a)(2)(B)(ii) also bars review judicial review.

## II.   PLAINTIFFS' APA CLAIMS ARE MERITLESS.

If the Court reaches the merits, it should still reverse. Plaintiffs press two APA theories with respect to each termination. They argue that the Secretary did not objectively review country conditions before deciding to terminate the designations and that the Secretary selected impermissible winddown periods. Both theories fail.

### A.   Plaintiffs' APA challenge fails because it merely seeks reweighing of evidence the Secretary considered.

The district court erred in holding Secretary Noem's TPS terminations were likely arbitrary and capricious because they were not based on an objective review of country conditions. 1-ER-22-24. "The arbitrary and capricious standard is a deferential standard of review under which the agency's action carries a presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014). A "court is not to substitute its judgment for that of the agency." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citations omitted).

Secretary Noem's decisions to terminate the Honduras, Nicaragua, and Nepal TPS designations were "founded on a rational connection [to] the facts"—all that the APA requires. *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010). The record shows that, consistent with the statute, she consulted with appropriate agencies, evaluated the statutory factors, and considered country conditions and ultimately decided that termination of TPS was warranted because the conditions present at the time of their TPS designations no longer existed. §1254a(b)(1)(B); 4-ER-361-64; 5-ER-412-14; 6-ER-559-62. Nothing more was required.

Regarding Honduras and Nicaragua, the Secretary concluded that the conditions caused by a 1998 hurricane had improved in the intervening 26 years and both countries could adequately handle their nationals' return. 4-ER-361-64; 5-ER-412-14. She did so after reviewing detailed country conditions reports covering environmental, political, and economic conditions in the two countries. 4-ER-373-407, *see* 4-ER-368-72 (administrative record index); 5-ER-423-553, *see* 417-22 (administrative record index). In particular, the reports discussed the impact of extreme weather events, as well as current data on violence

30

and crime, health, infrastructure, and economic growth. *E.g.*, 4-ER-373-94; 5-ER-423-45.

Based on her review, the Secretary specifically noted Nicaragua has improved its roads, school infrastructure, and access to healthcare, and now enjoys a stable economy, and regularly accepts the return of its nationals. 5-ER-414. Nicaragua is also "a growing tourism, ecotourism, agricultural, and renewable energy leader." *Id.*; *see, e.g.*, 5-ER-423-38. Similarly, Honduras regularly accepts the return of nationals subject to removal orders, and the majority of its citizens have gained access to water, sanitation, and electricity since Hurricane Mitch. 4-ER-363. Both the Honduran government and foreign organizations have made significant investments in the country's infrastructure. 4-ER-363; *see, e.g.*, 4-ER-373-85. Ultimately, the evidence before the Secretary did not establish that the conditions caused by the 1998 hurricane prevented the return of Honduran or Nicaraguan nationals in 2025, requiring the termination of those TPS designations. §1254a(b)(3)(B).

Regarding Nepal, again, the Secretary reviewed country conditions reports discussing its recovery from the 2015 earthquake along with current economic, environmental, and health data. 6-ER-571-90, *see* 565-

31

69 (administrative record index). In particular, the reports discussed Nepal's economic growth and its rebuilding of damaged infrastructure, including earthquake resilient housing. *E.g.*, 6-ER-581-90. The Secretary also reviewed former Secretary of State Antony Blinken's 2024 report recommending termination. 6-ER-571-79. Secretary Blinken noted that Nepal had abandoned its National Reconstruction Authority in 2021 after "rebuilding had been completed for a majority of impacted structures" and concluded that TPS was no longer warranted. 6-ER-572.

Secretary Noem likewise concluded that termination was appropriate, explaining that "88.36% of damaged households" had been rebuilt and "81.43% of damaged [health] facilities" had been reconstructed since the 2015 earthquake, and Nepal consequently "disbanded" its reconstruction authority. 6-ER-560-61, *see* 609-18, 692-96. The Secretary also considered Nepal's "improvements to its preparedness and response capacity," "disaster-resilient housing, infrastructure, and community systems," "economic growth" and the increase of "purchasing power of lower income households," as well as the Nepali government's regular acceptance of the return of its nationals with removal orders. *Id.*

32

The Secretary's reasoned determinations show that she considered appropriate factors and that the TPS terminations here constitute lawful exercises of her authority to determine whether an earthquake, flood, or other natural disaster has caused "substantial, but temporary, disruption of living conditions in the area affected" such that the foreign state is "unable, temporarily" to handle the adequate return to the state of aliens who are nationals of the state[.]" §1254a(b)(1)(B)(i)-(ii). And her path to reaching these determinations is readily discernable: Conditions in each country significantly improved in the many years since the respective natural disasters, and each country demonstrated its ability to adequately handle the return of its nationals, rendering further TPS designation unwarranted.

The Secretary's decisions are thus "within the bounds of reasoned decisionmaking." *Balt. Gas*, 462 U.S. at 105, and they satisfy APA review. Indeed, common sense supports the same conclusion: a finding that *temporary* protected status based on a natural disaster was no longer warranted a decade—or even *quarter century*—after that disaster had occurred is eminently reasonable.

The district court erred by impermissibly "mak[ing] its own judgment about the appropriate outcome." *San Luis*, 776 F.3d at 994 (citation omitted); *see River Runners*, 593 F.3d at 1070 ("The agency's action … need only be a reasonable, not the best or most reasonable, decision." (cleaned up)).  It based its holding that the Secretary likely acted arbitrarily and capriciously on its conclusion that her TPS terminations were "preordained" rather than based on "an objective review of country conditions."  1-ER-22.

But the evidentiary record belies that conclusion.  As discussed, the three Federal Register notices detail numerous conditions in each country which establish that the statutory factors for TPS designation are no longer satisfied; *i.e.*, neither the 1998 hurricane nor the 2015 earthquake currently prevents the affected countries from adequately handling their nationals' return.  §1254a(b)(1)(B)(i)-(ii).

The district court ignored this analysis, focusing instead on nonstatutory factors it thought the Secretary should have discussed, like inflation, political violence or crime, recurrent weather events, and even Russia's invasion of Ukraine.  1-ER-23.  That was wrong for at least three reasons.

34

*First*, that was legal error. The TPS designations related to a 2015 earthquake and 1998 hurricane and whether those disasters mean that those countries are "unable, temporarily, to handle adequately" the return of their citizens. §1254a(b)(1)(B)(ii). Congress requires the Secretary to periodically review each designation to decide "whether the conditions for [a] *designation*" under §1254a(b)(1) (emphasis added) "continue to be met." The Secretary did so. The statute nowhere requires a comparative analysis of conditions at the time of each subsequent TPS *extension*, as the district court thought. *See* §1254a(b)(3)(A)-(C); *Ramos*, 975 F.3d at 892-93 (rejecting argument that the Secretary failed to consider "intervening events in the TPS terminations at issue"). Nor does it require the Secretary to address whether U.S. citizens face risks when traveling to the countries, as Plaintiffs previously asserted, Dkt.13-1 at 17-18.

The district court never explained why the statute required the Secretary to consider the additional matters it thought relevant, which the original designations never mentioned. *See* 1-ER-23 (Nepal's inflation rate; "political violence and crime" in Honduras). And, contrary to Plaintiffs' prior assertion, Dkt.13-1 at 17-18, the Secretary was not

35

required to explain why she declined to discuss irrelevant evidence in the termination notices, *see* §1254a(b)(1)(B)-(C). Courts are "generally not free to impose additional judge-made procedural requirements on agencies," *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (cleaned up), and the court's atextual analysis lacks merit.

*Second*, the district court erred on the facts. The Secretary *did* consider the evidence the court claimed (1-ER-23) she overlooked. For example, she considered violence and crime in Honduras and recurrent weather events in Nicaragua like hurricanes, including hurricanes Julia and Bonnie. *Compare* 1-ER-23 *with, e.g.*, 4-ER-373-78, 387-91, 398-407, 5-ER-421-43, 446-71-73, 499, 516-553. For Nepal, she considered inflation, the effects of the COVID-19 pandemic, and the economic impact of the war in Ukraine. *Compare* 1-ER-23 *with, e.g.*, 6-ER-576-78, 581-84, 589-608, 627-28, 640, 653-76. Likewise, Secretary Noem also considered evidence Plaintiffs previously claimed was overlooked. *Compare, e.g.*, Dkt.13-1 at 17-18 (Honduras travel advisory), *with* 4-ER-395-97 (considering Honduras travel advisory).

*Third*, rather than decide whether the terminations were "within the bounds of reasoned decisionmaking," *Balt. Gas*, 462 U.S. at 105, the

district court selectively reweighed the evidence and reached its own conclusion, 1-ER-23-24. That was impermissible, both under basic principles of APA review, *Overton Park*, 401 U.S. at 416; *San Luis*, 776 F.3d at 994, and because second-guessing specific country-conditions findings is at the core of the bar on judicial review in §1254a(b)(5)(A), *supra* §I.A. Even if the district court could reweigh the evidence based on its own views, its own analysis would be erroneous because it does not bear on whether Honduras, Nicaragua, and Nepal can adequately handle the return of their nationals.

As for the conclusion that the Secretary's TPS terminations were "preordained" despite satisfying the statutory factors, 1-ER-22, that is not a cognizable basis for relief under the APA. Agency decisions that are prompted by administration policy priorities—even if this were one— are not vulnerable to arbitrary-and-capricious invalidation solely for that reason. Just the opposite: The law is clear that "a court may not set aside an agency's policymaking decision solely because it may have been … prompted by Administration priorities." *Department of Commerce v. New York*, 588 U.S. 752, 781 (2019). Instead, "[a] change in administration brought about by the people casting their votes is a

perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part). After all, "[i]t is expected—perhaps even critical to the functioning of government—for executive officials to conform their decisions to the administration's policies." *Ramos*, 975 F.3d at 897-98.

That a different administration may pursue different policy priorities is thus a feature of our constitutional structure, not a basis for invalidating agency decisions. "[T]he President's power necessarily encompasses general administrative control of those executing the laws, through the Executive Branch of government, of which he is the head." *Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (cleaned up). And, contrary to the court's rationale (1-ER-23), it is not unlawful to "implement the President's policy directives to the extent permitted by law." *Sherley v. Sebelius*, 689 F.3d 776, 784 (D.C. Cir. 2012). The Constitution does not permit Plaintiffs or the district court to countermand the President's determinations of policy for the executive branch. *See, e.g., id.* (rejecting argument that agency impermissibly

disregarded comments in favor of *reducing* research where an executive order mandated research *expansion*).

Even if it were unlawful for an executive agency to carry out the President's policy priorities, Plaintiffs have come nowhere close to showing that the challenged decisions were preordained. Executive Order 14,159 merely directed the Secretary to "ensure[] that designations of [TPS] are consistent" with the statute, "appropriately limited in scope," and "made for only so long as may be necessary to fulfill" the statute. Ordering DHS to comply with the TPS statute and to act "appropriately" and as "necessary," without more, in no way preordained a decision about any TPS designation of any country. And nothing in the Federal Register notices suggested otherwise. The notices reference the order only in "see" and "see also" cites, consistent with the limited and nondeterminative nature of the order. 4-ER-363 n.10; 5-ER-414 n.4; 6-ER-560 n.10; *cf. Gray v. Hudson*, 28 F.4th 87, 102 (9th Cir. 2022) (evidence referred to "only in a single 'see also' cite" with other evidence had "no noticeable effect" on lower court's analysis). The order preordained nothing but the careful review of each designation for statutory compliance that the Secretary accomplished here. And in concluding that the Secretary took the

President's instruction to conduct a careful review as a command to ignore legal requirements, the district court impermissibly upended the presumptions of regularity and good faith that courts are required to afford to agency actions. *See*, *e.g.*, *Overton Park*, 401 U.S. at 415 ("the Secretary's decision is entitled to a presumption of regularity").

All told, Plaintiffs are not likely to prevail on the merits of their first APA claim.

## B. The Secretary permissibly adhered to the statutory default winddown period.

Even if the Court could review the 60-day winddown period, *but see supra* §I.B, the district court erred in rejecting that period as likely arbitrary and capricious. 1-ER-24-26. Congress provided that the default winddown period is 60 days and left the Secretary with unfettered discretion whether to opt for a longer period. §1254a(b)(3)(C); *see CASA*, 2025 WL 1907378, at *16 (acknowledging "Congress chose to allow for a termination with only 60 days of public notice"). The district court rejected that period on the view that DHS has an existing policy of providing at least six months and the Secretary did not adequately explain her departure from that policy. 1-ER-24 (quoting *FDA v. Wages & White Lion*, 604 U.S. 542, 569-70 (2025)). That was error.

40

The change-in-position doctrine, which requires an agency to acknowledge and explain a departure in official agency regulations, guidance, and policies from the agency's prior regulations, guidance, or policies, does not apply here because there is no established and ossified prior policy to demand an explanation for a deviation from. *See, e.g.*, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (regulation); *Wages*, 604 U.S. at 570-71 (guidance); *Fox Television*, 556 U.S. at 517 (enforcement policy). No immigration statute, regulation, guidance, or policy required the Secretary to provide at least six months of post-termination winddown. 1-ER-24-26. In fact, they say the opposite. The regulations, echoing the statutory default, expressly warn that TPS protections ordinarily end "upon the sixtieth (60th) day after the date notice of termination is published in the Federal Register." 8 C.F.R. §244.19; *see* 8 C.F.R. §244.13(b).

Nor has DHS made any "hard-and-fast commitment" to provide a longer specific winddown period, *Wages*, 604 U.S. at 573, let alone one that could have conceivably engendered any reliance interest for TPS recipients from the instant countries. That means that both *Wages* and *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 32 (1996), support the government,

41

not Plaintiffs, contrary to the district court's reasoning. 1-ER-24. *Wages* rejected a claim when the plaintiffs failed to show a "hard-and-fast commitment" to the supposed policy. *Yang* likewise acknowledged that the agency must first "announce" a policy before any unexplained departure can be arbitrary and capricious. 519 U.S. at 32. DHS has never announced a policy of a six-or-more-month winddown period from which Plaintiffs claim it departed.

Plaintiffs and the district court instead infer an unstated policy based on DHS's supposed "prevailing practice" of usually granting a longer winddown period. Even if courts could infer unstated agency policies, past practice would not support such an inference here. Plaintiffs rely for their inferential policy on TPS terminations in the past decades—which are remote in time, related to different countries, or both. Of those terminations, four had no winddown period, three had periods of less than six months, seven had six-month periods, four had 12-month periods, and four had 18-month periods. 6-ER-703-05 (Plaintiffs' chart); *see* 1-ER-24 (relying on chart). That variation reflects the fact-specific nature of the decision and the Secretary's decision here

cannot fairly be described as departing from any "prevailing practice." 1-ER-24.

Rather, the scattered, country-specific decisions Plaintiffs cite do not establish any DHS policy or practice regarding the length of termination winddowns that could constrain the Secretary's discretion or render arbitrary and capricious her selection of the statutory default period here. The Secretary correctly stated in the Honduras and Nicaragua terminations that the 60-day winddown periods are "consistent with the precedent of previous TPS country terminations." 4-ER-363; 5-ER-414. And in the Nepal termination she correctly acknowledged that some prior terminations had winddowns of six or more months but others had no winddown period. 6-ER-561 n.24.

In any event, the Secretary considered the reliance interests of TPS holders before declining to opt for a longer winddown period, thus rendering the change-in-position doctrine further inapplicable. *See* 4-ER-464 ("consider[ing] putative reliance interests"); 5-ER-415 (same); 6-ER-561 (same); *see also* 3-ER-150 (considering impact of winddown on Nepali TPS holders).

43

Last, this claim could not support the district court's §705 order even if it had any merit. It could at most support a longer winddown period after the termination became effective—*not* invalidation of the termination itself. Even assuming an APA violation for the winddown period, there is no basis for vacating the terminations wholesale, and preliminary relief cannot exceed the possible final relief available in an action. *See Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) ("A flawed rule need not be vacated," with less "serious" errors cutting against vacatur); *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (preliminary relief must be "of the same character as that which may be granted finally").

## III. PLAINTIFFS' EQUAL PROTECTION CLAIMS ARE MERITLESS

Plaintiffs also challenge the terminations as unconstitutionally discriminatory. That argument is unlikely to succeed, whether under the highly deferential standard the district court should have applied or the heightened scrutiny it incorrectly selected.

A.    **The Rational Basis Test Governs Any Adjudication of Plaintiffs' Equal Protection Claim, and the Challenged Decisions Readily Pass the Test.**

If the Court concludes that Plaintiffs' equal protection claim is reviewable, it should still reverse. The district court erred in concluding that strict scrutiny applies to the claim and in its alternative holding that Plaintiffs would likely succeed even under rational-basis review.

1.    The district court erroneously applied strict scrutiny to Plaintiffs' constitutional challenge. 1-ER-26-28. That contravened nearly a century of Supreme Court precedent recognizing that "'the power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)). More recently, in *Trump v. Hawaii*, the Court reiterated that rational basis review governs equal protection challenges to immigration policy choices because "'[a]ny rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution.'" 585 U.S. 667, 704 (2018) (quoting *Mathews v. Diaz*, 426 U.S. 67, 8182 (1976)).

45

Reviewing immigration policy decisions for rational basis aligns with the well-established principle that "[t]he fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Mathews*, 426 U.S. at 80. Indeed, "[t]he fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship or, indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification." *Id.* at 78.

The court's own stated rationale—that the Secretary exhibited "animus against immigrants," 1-ER-29—confirms that *Hawaii*, 585 U.S. 667, governs any equal protection claim. Aliens have no fundamental right to be in the United States, and alienage is not a protected class. *Korab v. Fink*, 797 F.3d 572, 577 (9th Cir. 2014). *Federal* classifications amongst aliens—which are inherent in the country-specific TPS statute—are subject only to rational basis review. *Id.* (discriminatory *state* classifications receive heightened scrutiny); *see Ram v. INS*, 243 F.3d 510, 517 (9th Cir. 2001) ("'Line-drawing' decisions made by Congress or the President in the context of immigration and naturalization must

be upheld if they are rationally related to a legitimate government purpose.").

The district court invoked the strict scrutiny standard of *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977), on the basis that it "governs claims of racial animus and Plaintiffs specifically allege that the Secretary's Nepal, Honduras, and Nicaragua TPS terminations were motivated by racial animus." 1-ER-27. That decision addressed whether a local zoning ordinance was racially invidious—a context entirely unlike the federal government's "power to expel or exclude aliens," *Fiallo*, 430 U.S. 792 (cleaned up). *See Arlington Heights*, 429 U.S. at 267. Rather, rational basis, long recognized as applying in the context of alienage and consistent with *Hawaii*, is the appropriate test. In concluding that the *Arlington Heights* standard applies, the court cabined *Hawaii* to "'matters of entry and national security'" rejected its applicability here. 1-ER-27-28. That was error for two reasons.

*First*, TPS determinations "involve 'classifications … defined in light of changing political and economic circumstances'"—judgments that are "'frequently of a character more appropriate to either the Legislature or the Executive.'" *Hawaii*, 585 U.S. at 702 (citation omitted). A TPS

designation is necessarily about foreign country conditions. *See Sanchez v. Mayorkas*, 593 U.S. 409, 412 (2021) ("The Government may designate a country for the [TPS] program when it is beset by especially bad or dangerous conditions, such as arise from natural disasters or armed conflicts."). A designation under the statute specifically hinges on a determination by the Secretary that (1) there is an ongoing armed conflict in the foreign state and return would be unsafe, or (2) there has been a natural disaster in the foreign state, the foreign state is temporarily unable to adequately handle the return of its nationals, and the foreign state has requested designation, or (3) there are extraordinary, temporary conditions in the foreign state that prevent safe return, unless the Secretary finds permitting the aliens to remain temporarily in the United States is not in the national interest of the United States. §1254a(b)(1)(A)-(C). The same considerations are relevant to termination of a designation. §1254a(b)(3)(B). Thus, the statute contemplates that the Secretary will have the ability "to respond to changing world conditions" in times of armed conflict or natural

disaster, *Mathews*, 426 U.S. at 81-82,[4] and the possible bases for a TPS designation listed in the statute necessarily bear upon foreign relations and national security.[5]  *See Hawaii*, 585 U.S. at 704; *see also Biden v. Texas*, 597 U.S. 785, 805-06 (2022) (noting that "the Court has taken care to avoid 'the danger of unwarranted judicial interference in the conduct of foreign policy,' and declined to 'run interference in [the] delicate field of international relations' without 'the affirmative intention of the Congress clearly expressed.'") (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115-16 (2013)); *Am.-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995) ("[A]lienage classifications are closely connected to matters of foreign policy and national security."); *Poursina v. USCIS*, 936 F.3d 868, 871, 874 (9th Cir. 2019) ("the 'national interest' standard invokes broader economic and national-security

---

[4] The district court determined that *Mathews* is inapposite because it "concerned whether Congress may classify noncitizens based on class [and] there was no allegation of racial animus." 1-ER-27.  But the court did not address that *Hawaii* was based on a religious animus claim, and the Supreme Court there relied on *Mathews*.  *See* 585 U.S. at 704.

[5] For example, in this case, the designations were based on natural disasters in each country, and the foreign state requested the designation.  Thus, both the designations and later terminations required the Secretary "to respond to changing world events," and bore upon foreign policy and national security. *Mathews*, 426 U.S. at 81-82.

49

considerations"); *cf.* §1189(d)(2) (for purpose of statute designating foreign terrorist organizations, defining "national security" as "the national defense, foreign relations, or economic interests of the United States").

*Second*, it is immaterial that TPS holders are already present in the United States. Both the determination at issue in *Hawaii* and TPS determinations implicate the sort of "line-drawing" decisions "in the context of immigration and naturalization [that] must be upheld if they are rationally related to a legitimate government purpose." *Ram*, 243 F.3d at 517. Moreover, in summarizing the "upshot of [its] cases" on this issue, *see Hawaii*, 585 U.S. at 704, the Supreme Court relied on *Mathews*, where the Court applied rational basis review to uphold limitations on eligibility for federal medical insurance challenged by *resident* aliens, *Mathews*, 426 U.S. at 83. *Hawaii* also approvingly cited a decision applying rational basis review to reject an equal protection claim brought by aliens within the United States. 585 U.S. at 704 (citing *Rajah v. Mukasey*, 544 F.3d 427, 433 (2d Cir. 2008)). And that decision likewise accords with earlier constitutional challenges also brought by aliens *already within* the United States in which the Supreme Court repeatedly

50

cautioned against adopting a rigorous standard of review. *See Galvan v. Press*, 347 U.S. 522, 531 (1954); *Harisiades v. Shaughnessy*, 342 U.S. 580, 590 (1952).

Rational-basis review also makes sense because TPS designations, extensions, and terminations are precisely the kind of immigration policy decisions where there is a "lack of competence on the part of the courts," *Hawaii*, 585 U.S. at 704, to probe the Executive Branch's decisions. *See Harisiades*, 342 U.S. at (1952) ("However desirable worldwide amelioration of the lot of aliens, we think it is peculiarly a subject for international diplomacy.  It should not be initiated by judicial decision … [and] must be entrusted to the branches of the Government in control of our international relations and treatymaking powers.").  Again, TPS determinations involve unique, country-specific analyses that "implicate relations with foreign powers" and "involve classifications defined in the light of changing political and economic circumstances." *Hawaii*, 585 U.S. at 702 (cleaned up).  Congress's decision to shield TPS determinations from judicial review underscores the conclusion that the courts have limited competence in this area.  §1252a(b)(5)(A).

**2.**    The Secretary's TPS determinations easily pass rational basis review because they are "facially legitimate and bona fide" and "plausibly related" to the government's "stated objectives." *Hawaii*, 585 U.S. at 704-05; *see Kleindienst v. Mandel*, 408 U.S. 753, 769-70 (1972) (judicial review of "[p]olicies pertaining to the entry of aliens and their right to remain here" is limited to whether the Executive gave a "facially legitimate and bona fide" reason for its action); *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980) ("Where ... there are plausible reasons for [the] action, our inquiry is at an end."). Like the proclamation at issue in *Hawaii*, the Secretary's determinations are "premised on legitimate purposes." 585 U.S. at 706. Specifically, the Federal Register notices explain that each termination is based on improvements in each country and is supported with evidence reflecting those improvements. *See* Nepal Termination, 6-ER-556-60; Nicaragua Termination, 5-ER-412-16; Honduras Termination, 4-ER-361-65.[6]

---

[6] In *Hawaii*, the Supreme Court noted that "[a] conventional application of *Mandel* [would ask] only whether the policy is facially legitimate and bona fide [and] would put an end to [the Court's] review," but that the government had "suggested that it may be appropriate here for the inquiry to extend beyond the facial neutrality of the order." *Hawaii*, 585 U.S. at 704. For that reason, the Supreme Court "assume[d] that [it could] look behind the face of the Proclamation to the extent of applying

Even though the Supreme Court "hardly ever strikes down a policy as illegitimate under rational basis scrutiny," *Hawaii*, 585 U.S. at 705, and here the Secretary provided thorough reasoning for the terminations that easily pass rational-basis review, the district court reached the extraordinary conclusion that these terminations bore no rational connection to the fact that the disasters underlying each designation occurred a decade or quarter century previously and that the associated conditions no longer existed. *See* 1-ER-30-31. In essence, the district court concluded that failing to treat *temporary* protected status as a *permanent* entitlement was explainable only as a product of irrational and unconstitutional animus.

That conclusion is untenable, and the district court reached it only by ignoring the reasons the Secretary provided for the terminations. *See*

---

rational basis review," and "consider[ed] whether the entry policy [was] plausibly related to the Government's stated objective to protect the country and improve vetting processes." *Id.* at 704-05. Here, the TPS statute provides for a country-specific determination to be made as to designation and termination. *See* §1254a(b). Even if the Court goes beyond whether the terminations were "facially legitimate and bona fide," the appropriate inquiry under *Hawaii* is whether the terminations were plausibly related to the purpose set forth in the TPS statute, which is that the conditions for designation are no longer met. *See* §1254a(b)(3)(B).

Nepal Termination, 6-ER-556-60; Nicaragua Termination, 5-ER-412-16;
Honduras Termination, 4-ER-361-65. Nor did the court explain its
conclusion that the Secretary's exercise of her statutory authority could
possibly be "incompatible with the expressed or implied will of Congress,"
1-ER-31 (quotation marks and citation omitted), let alone how that
exercise, based on articulated and supported country-specific findings
was not "facially legitimate and bona fide," or based on "plausible
reasons." *Hawaii*, 585 U.S. at 704-05; *see* §1254a(b)(3)(B) (providing the
conditions under which the Secretary "shall" terminate a TPS
designation).

The terminations pass rational-basis review because they are
"facially legitimate," "bona fide," and based on "plausible reasons."
*Hawaii*, 585 U.S. at 704-05.

## B. Plaintiffs' Claim Fails Even Under the *Arlington Heights* Standard

Even if the *Arlington Heights* standard applies, Plaintiffs' equal
protection claim still fails. That standard requires a showing that a
"racially discriminatory purpose has been a motivating factor in the
[government's] decision." *Arlington Heights*, 429 U.S. at 265. Plaintiffs
bear the burden of proof to establish discriminatory intent. *See Carrillo-*

*Lopez*, 68 F.4th at 1139. Under *Arlington Heights*, courts consider "circumstantial and direct evidence of intent." 429 U.S. at 266. Considerations include whether the action "'bears more heavily on one race than another'"; "[t]he historical background of the decision ..., particularly if it reveals a series of official actions taken for invidious purposes"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence" or "[s]ubstantive departures"; and "[t]he legislative or administrative history," including "contemporary statements by members of the decisionmaking body." *Id.* at 266-68. The Court "must consider the totality of the evidence," and "must also consider the evidence in context." *Carrillo-Lopez*, 68 F.4th at 1140.

Plaintiffs try but fail to meet this standard through statements taken out of context, without any direct link to the Secretary's determinations, and that fall far short of establishing animus.

The district court ruled that Plaintiffs were likely to succeed in showing that the Secretary's terminations of TPS for Nepal, Honduras, and Nicaragua were motivated by racial animus. 1-ER-28-30. That holding relied on statements taken out of context, lacking any direct link

to the Secretary's determinations, and that fall far short of establishing animus. They are indistinguishable from the statements the Supreme Court held were inadequate to prove a similar claim in *DHS v. Regents*. 591 U.S. 1, 34-35 (2020) (statements "remote in time and made in unrelated contexts" failed "to raise a plausible inference that the rescission was motivated by animus" under *Arlington Heights*). Just like the statements alleged in *Regents*, the statements the district court and Plaintiffs invoke "do not qualify as 'contemporary statements' probative of the decision at issue." *Regents*, 591 U.S. at 35.

For example, the district court cited allegations that the Secretary "has described immigration as an invasion happening on purpose … to remake the foundation of this country.'" 1-ER-29 (quoting 3-ER-252 at 7:14-15). The court did not acknowledge that the Secretary's comments, from an interview in March 2024, were far removed from the decisions made here, were not about the countries in question, and were not even about TPS. *See* 3-ER-252. And, contrary to the district court's characterization, the Secretary did not speak broadly about all immigration; instead, she referred to a discrete time period, and her comments pertained to individuals who were "sent by their country's

leadership" and whose entry was facilitated by the prior administration.
3-ER-252.

The district court also referred to comments in which the Secretary criticized the prior extension of TPS for Venezuela, selectively quoting them to suggest—incorrectly—that the Secretary's comments pertained to these TPS determinations. 1-ER-29. The court relied on comments the Secretary made during her confirmation hearing, 1-ER-29, but the Secretary did not indicate that TPS extensions would not be allowed, as the district court thought. Instead, the Secretary's comments emphasized that TPS was meant to be temporary, criticized the prior administration's improper use of TPS, and addressed other countries not at issue here. 3-ER-180.

Likewise, the court said that the Secretary called "TPS [] an 'immigration scheme[] that make[s] Americans less safe,'" 1-ER-29 (quoting 3-ER-345), but the Secretary did not call TPS "a scheme," and the comments the Secretary did make referred to the prior administration's actions regarding Venezuela. Similarly, the Secretary criticized the prior administration's "exploit[ation]" of the TPS program, not all TPS beneficiaries. 3-ER-276; 1-ER-29. Criticism of the prior

administration's Venezuela TPS actions does not constitute direct or circumstantial evidence of racial animus in decisions about TPS for Honduras, Nepal, or Nicaragua.

The only statement the district court cited that involved *any* of the three countries actually at issue in this case was a social media post by the Secretary after her meeting with the Honduran Minister of Foreign Affairs about "the need for 'migration management' and 'repatriation flights.'" 1-ER-29 (quoting 3-ER-260). The district court thought this statement showed animus, but identified nothing about the statement that reflects racial animus or is connected to TPS at all. To the extent the post has any relevance to this case, it is to underscore the foreign-policy issues and the Secretary's role. That the district court thought such a mundane statement about "migration management and repatriation flights" was a valid basis to take the extraordinary step of invalidating agency action as the product of unconstitutional racial basis demonstrates how profoundly the district court misapprehended its role. That is particularly true as the obvious import of the optics was to convey *amity* with Honduras, rather than animus.

58





3-ER-260.

The district court compounded its errors by relying on statements made by *others*—the President and Vice President, in 2023 and 2024, while they were campaigning for the offices they now hold. 3-ER-305-06, 3-ER-316. Those statements just add another layer of remoteness; not only were they made in different contexts, on different subjects, and remote in time from the decisions issue, but they were not even made by the decisionmaker. *See Ramos*, 975 F.3d at 897 (rejecting the argument that alleged animus on the part of other White House officials could be

viewed as a motivating factor in the Secretary's TPS decisions). Those statements, too, cannot discharge Plaintiffs' burden to show animus by the Secretary in the challenged decisions.

The district court cited the campaign statements supposedly to indicate the "political climate surrounding the Secretary's comments on immigrants," but that too was error. 1-ER-30 (citing *Mi Familia Vota v. Fontes*, 129 F.4th 691, 726 (9th Cir. 2025)). *Regents* squarely held that remote-in-time statements, like campaign statements, do not suffice. 591 U.S. at 34-35. Nor does this Court's consideration of the "charged political climate" in *Mi Familia* suggest otherwise. That case merely held that claims of illegal voting contributed to a finding of animus when the legislature enacted legislation purporting to remedy a supposed voter fraud issue that its own investigation had discredited. 129 F.4th at 726. That is no license for the district court's attempt to evade *Regents*.

In sum, even if the *Arlington Heights* standard applies, Plaintiffs are unlikely to succeed in demonstrating that a discriminatory purpose was a motivating factor in the Secretary's TPS terminations. The district court impermissibly relied on out-of-context statements, including discussions of other countries and statements by officials other than

60

Secretary Noem, that are insufficient to show that Plaintiffs are likely to meet their burden of proof.

## IV. STATUTORY AND EQUITABLE CONTRAINTS FORECLOSE UNIVERSAL RELIEF

### A. Section 1252(f)(1) Bars Postponement Under §705

The Court should also reverse because the district court impermissibly restrained the Secretary's operation of the TPS statute. 8 U.S.C. §1252(f)(1); *see Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). The statute provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to *enjoin or restrain* the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings … have been initiated.

§1252(f)(1) (emphasis added). This provision "generally prohibits lower courts from entering injunctions that order federal officials to take or refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 550.

As this Court recognized in *NTPSA I*, the TPS statute is a covered provision because Congress placed it in Chapter 4 of Title II of the INA— the chapter §1252(f)(1) shields. 150 F.4th at 1018 & n.8; *see* Illegal

Immigration Reform and Immigrant Responsibility Act, div. C, Pub. L. No. 104-208, §§306, 308, 110 Stat. 3009-546 (1996); *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022) ("[T]he text of the United States Code cannot prevail over the Statutes at Large when the two are inconsistent.") (cleaned up).

Nevertheless, the district court reasoned that §1252(f)(1) was inapplicable because §705 relief is distinct from an injunction. 1-ER-21. That conclusion missed a key point: §1252(f)(1) is not limited to injunctions, but instead prohibits any orders that "enjoin *or restrain*" the operation of a covered statute, "[r]egardless of the nature of the action or claim[.]" 8 U.S.C. §1252(f)(1) (emphasis added). That language is far-reaching. In interpreting analogous language, the Supreme Court held that the Tax Injunction Act, 28 U.S.C. §1341, which barred orders that "suspend or restrain" tax collection, stripped courts of jurisdiction to enter not just injunctive relief, but also declaratory relief. *California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982). The same rationale extends here. *See United States v. Texas*, 599 U.S. 670, 690-701 (2023) (Gorsuch, J., concurring) (agreeing that courts cannot use vacatur under 5 U.S.C. §706 to "sidestep" §1252(f)(1)).

62

The court's order unquestionably "restrain[s]" the Secretary from exercising her authority under the TPS statute. To "restrain" in §1252(f)(1) means to "check, hold back, or prevent (a person or thing) from some course of action." *Aleman Gonzalez*, 596 U.S. at 549. The district court's order restrains the operation of the TPS statute by preventing the Secretary from terminating three TPS designations, requiring the government to continue implementing three TPS designations, and barring Executive officials from enforcing the immigration laws against TPS recipients. *See Texas*, 597 U.S. at 797 (explaining that a district court injunction requiring the government to take action "violated" §1252(f)(1)). The district court ignored this language and the practical effect of its order.[7]

Because the district court's postponement order "enjoins or restrains the operation of" the TPS statute on a non-individual basis, it must be vacated. *See* §1252(f)(1); *Aleman Gonzalez*, 596 U.S. at 552.

---

[7] The district court additionally relied on *Immigrant Defenders*, 145 F.4th at 989-90, which reasoned that §1252(f)(1) did not bar 5 U.S.C. §705 relief. *Immigrant Defenders* was wrongly decided, and the government's petition for rehearing en banc remains pending in that appeal. The government additionally acknowledges that *NTPSA I*, 150 F.4th at 1018-19, rejected this argument, and likewise preserves its challenge to the validity of that decision.

**B.    The District Court Exceeded Its Authority by Granting Universal Relief**

The district court also erred by ordering universal §705 relief.  *See Imm. Def.*, 145 F.4th at 995.  That provision states that, "to the extent necessary to prevent irreparable injury," a reviewing court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."    5 U.S.C. §705.    The statutory reference to "necessary and appropriate process" incorporates traditional equitable principles.  *Cf. Starbucks Corp. v. McKinney*, 602 U.S. 339, 347 (2024) (holding that the statutory phrase "just and proper" invokes traditional equitable standards").    And the Supreme Court recently held that "equitable relief in federal courts is that 'traditionally accorded by courts of equity' at the time of our founding," which does not include universal relief.  *Trump v. CASA, Inc.*, 606 U.S. 831, 856 (2025).  Rather, our equitable traditions "embrace the rule that courts generally 'may administer complete relief *between the parties*." *Id.* at 851.  Accordingly, a court crafting equitable relief must focus on whether it "offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is

whether [court ordered relief] will offer complete relief *to the plaintiffs before the court*." *Id*. at 852.

*Immigrant Defenders* confirmed that *CASA*'s "complete-relief principle for crafting injunctive relief" applies to §705 orders "because the factors used to determine whether to issue a §705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." 145 F.4th at 995. In doing so, this Court stayed a district court's universal §705 order in an immigration case except as to the Plaintiff's "current or future clients." *Id*. at 996.

The upshot of *CASA* and *Immigrant Defenders* is plain: even assuming that the court had jurisdiction to provide relief under 5 U.S.C. §705 (it did not), it overstepped by providing universal relief instead of limiting its order to the parties in this case. 1-ER-37-38; *see CASA*, 606 U.S. at 856; *Imm. Def.*, 145 F.4th at 995-96.

The district court reasoned that it was empowered to provide universal relief because it could potentially set aside the Secretary's TPS terminations under 5 U.S.C. §706 as part of a future final judgment. 1-ER-37. That reasoning fails on multiple levels. For one thing, it assumes that universal vacatur is a remedy under 5 U.S.C. §706, a point

the government disputes. For another, possible future relief gave the court no license "to exceed its [equitable] power" with respect to 5 U.S.C. §705, particularly where Congress specified that relief is only available "to the extent necessary to prevent irreparable injury[.]" 5 U.S.C. §705; *CASA*, 606 U.S. at 861; 1-ER-37. Plaintiffs could not possibly make that showing because they only represent 300 Honduran, 900 Nepali, and 25 Nicaraguan TPS holders and never sought class certification before seeking §705 relief. Dkt.1 at 4 ¶13; *see CASA*, 606 U.S. at 849 ("[B]y forging a shortcut to relief that benefits parties and nonparties alike, universal injunctions circumvent Rule 23's procedural protections and allow courts to create *de facto* class actions at will.") (cleaned up).

The district court's implementation concerns, 1-ER-37, are misplaced because TPS beneficiaries *affirmatively* register and periodically re-register for TPS, and the Secretary is empowered to stagger the validity of TPS documentation following TPS terminations— mechanisms that could potentially implement a narrower stay, which were overlooked entirely in *NTPSA I*, 150 F.4th at 1028, and render that

decision easily distinguishable.[8]    §1254a(c), (d)(2); 8 C.F.R. §244.7, 244.17(a).   Further, *NTPSA I*'s rationale—that it would be "replacing Secretary Mayorkas's positive determination, and Secretary Noem's negative determination, with a judicially created patchwork," 150 F.4th at 1028—is wholly inapplicable here because this case only involves TPS terminations (without any allegedly conflicting prior determination) made as part of the statutorily required review preceding the end of each TPS extension.   §1254a(b)(3)(A)-(B).

### C.    The Balance of Equities Weighs Against Postponement

The court also erred because the equities here clearly favor the government.   The Supreme Court has twice weighed the equities and the government's likelihood of success on its claim that §1254a(b)(5)(A) bars judicial review of the Secretary's termination of Venezuela's TPS designation, and it has twice concluded that the government is entitled to a stay enabling the Secretary's TPS determinations to take effect during litigation.   *Noem v. NTPSA*, — S. Ct. —, 2025 WL 2812732 (Oct.

---

[8] *NTPSA I* is factually distinct because the plaintiffs represented "more than 84,000 members who are Venezuelan TPS holders in all fifty states," 150 F.4th at 1028, whereas Plaintiffs here represent fewer than 1,300 TPS holders from Nepal, Nicaragua, and Honduras.

3, 2025); *Noem v. NTPSA*, 145 S. Ct. 2728 (2025). Those interim orders "inform how a court should exercise its equitable discretion in like cases." *Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025). Because this case "does not otherwise differ from" the Supreme Court's TPS orders in *NTPSA*, 2025 WL 2812732, at *1, and *NTPSA*, 145 S. Ct. at 2728-29, "in any pertinent respect[,]" this Court's equitable analysis should begin and end there. *Boyle*, 145 S. Ct. at 2654 (indistinguishable stay orders "squarely control[]" like cases).

In concluding that the balance of equities favored Plaintiffs, the court disregarded the Supreme Court's order in *NTPSA*, 145 S. Ct. at 2728-29, and reasoned a universal stay was warranted because these TPS terminations would harm the economy, reduce tax revenue and contributions to social programs, and lead to adverse health consequences for TPS recipients. 1-ER-31-35. But the court failed to acknowledge that those consequences stem from the statute itself, which empowers the Secretary to terminate a TPS designation that no longer satisfies the applicable statutory criteria. And that the equities favor the government is underscored by the fact that Plaintiffs did not even *ask* the Supreme Court to vacate this Court's stay, presumably because the

equities here are indistinguishable from those the Supreme Court considered in *NTPSA*.

The court also speculated that aliens who previously received *temporary* protection could lose work authorization and be ordered removed, potentially separating them from family in the United States. 1-ER-31-32. But aliens have no fundamental right to work in the United States. *Sagana v. Tenorio*, 384 F.3d 731, 743 (9th Cir. 2004). And "the burden of removal alone cannot constitute the requisite irreparable injury." *Nken*, 556 U.S. at 435. The court's emphasis on the possibility of removal also overlooked that TPS termination is not equivalent to a final removal order; instead, it only means that the government can commence removal proceedings. §§1101(a)(47), 1229a(a)(3). At bottom, Plaintiffs cannot demonstrate that the balance of equities tips in their favor because their alleged harms are an outgrowth of the temporary status afforded by the TPS statute itself. *See Nken*, 556 U.S. at 435.

On the other side of the balance, the order supplants the Secretary's discretion-laden judgment about whether the conditions underlying these disaster-related TPS designations continued to be met. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in

chambers) (noting that the government "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people"). That injury is especially acute because rules and policies governing immigration "implement[] an inherent executive power." *United States, ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950). The court's order "is not merely an erroneous adjudication of a lawsuit between private litigants, but an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *INS v. Legalization Assist. Proj.*, 510 U.S. 1301, 1305-06 (1993) (O'Connor, J., in chambers) (granting a stay).

Accordingly, because the balance of equities favors the government, this Court must reverse the court's order. *NTPSA*, 2025 WL 2812732 at *1; *NTPSA*, 145 S. Ct. at 2728-29; *see Nken*, 556 U.S. at 435.

## V. THE CASE SHOULD BE REASSIGNED ON REMAND

Finally, this Court should reassign the case if it remands for proceedings other than for dismissal. This Court has authority to reassign a case to a different trial judge in "unusual circumstances," where "the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously

expressed views or findings determined to be erroneous or based on evidence that must be rejected" or where "reassignment is advisable to preserve the appearance of justice." *In re Ellis*, 356 F.3d 1198, 1211 (9th Cir. 2004) (en banc); 28 U.S.C. §§1651(a), 2106. Either problem suffices for reassignment, *Ellis*, 356 F.3d at 1211, and both are present here.

*First*, this case should be reassigned because the district court's decisions have relied on extreme rhetoric suggested by neither party, outside the record, and with no bearing on this case. *See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1046 (9th Cir. 2015) (reassigning when judge's views were "both well-established and inappropriately strong"). The court opined—in the first line of the opinion—that the TPS terminations told Plaintiffs "to atone for their race, leave because of their names, and purify their blood." 1-ER-2. The court further wrote that it "shares" Plaintiffs' "concerns" and refuses to "shut its eyes to the country's shifting attitudes toward immigrants." 1-ER-18-19. The court situated removal of illegal aliens as the moral equivalent of the horrors of "the transatlantic slave trade" in America's "long history of transporting individuals against their will," opining that "America has seen this pattern before" because "[m]any freed slaves were sent to

countries to which they had no connection whatsoever" and some states "passed laws demanding freed slaves to leave." 1-ER-19 n.1.

No party suggested that comparison. The district court's analogy to the slave trade is purely one of its own invention—and includes extensive citations for that purpose that were the apparent product of the district court's original research (and certainly were not supplied by Plaintiffs.) The court next compared the challenged terminations to "the Chinese Exclusion Act," opining that "Plaintiffs here face similar tides." 1-ER-20 n.2. No party suggested that comparison, either. And the court said that it could not "ignore[e]" the "Secretary's animus against immigrants and the TPS program." 1-ER-29.

A judge is unlikely to be able to set aside publicly announced views that a policy is racist, asks aliens to "atone for their race" or "purify" their putatively impure blood, or is akin to the horrors of the transatlantic slave trade. *See Cegavske*, 800 F.3d at 1046. Nor were these views that the district court injected into this case mere one-offs, but instead were incontestably central to the district court's reasoning. The court has already reiterated those comparisons to the slave trade and Chinese Exclusion Act in denying a stay pending appeal, spending pages of the

opinion block-quoting the §705 opinion's judicially injected analogy to the slave trade. Dkt.87 at 3-5. Those pages reiterated that the court "did not forget that this country has bartered with human lives" in the slave trade and refused to "shut its eyes" to her perception of the country's "attitudes toward immigrants." *Id.* A "reasonable observer" could hardly fail to "conclude" that the court's views "are both well-established and inappropriately strong," which renders reassignment is appropriate. *Cegavske*, 800 F.3d at 1046.

*Second*, reassignment is also warranted to preserve the appearance of justice. *Ellis*, 356 F.3d at 1211. The extreme rhetoric Judge Thompson employed indicates her "strong views" on the issues in this case, and a reasonable person aware of her prior opinion would question her ability to "put out of [her] mind" the conclusions she previously drew. *Id.* At the §705 hearing, Judge Thompson admonished government counsel "to think about the oath that each of you took as you became lawyers and what it is that you're defending … today[.]" 2-ER-45. Judge Thompson even permitted an amicus brief for the plaintiffs but rejected one for the government because she would not find the latter brief helpful. 1-ER-7; 1-ER-94. Moreover, Judge Thompson also ignored precedent. She

disregarded *CASA* based on her incorrect view that it was decided with "limited briefing and no argument." Dkt.60 at 1; 2-ER-82-83. And in doing so, Judge Thompson also disregarded *Boyle*'s admonition that the Supreme Court's emergency rulings "squarely control[]" in "like cases." 145 S. Ct. at 2654; 1-ER-35-36; 2-ER-84 (likening following *CASA* to "enter[ing] the star chamber"). Accordingly, to "preserve the appearance of justice," *Ellis*, 356 F.3d at 1211, this Court should reassign this case on remand

## CONCLUSION

This Court should vacate the postponement order and remand with instructions to dismiss. If the Court remands for additional proceedings, it should reassign the case.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

YAAKOV M. ROTH
*Principal Deputy Assistant*
*Attorney General*

*/s/ Drew C. Ensign*
DREW C. ENSIGN
*Deputy Assistant Attorney General*
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-2000

DREW.C.ENSIGN@USDOJ.GOV

WILLIAM H. WEILAND
*Acting Assistant Director*

LAUREN BRYANT
CATHERINE ROSS
AMANDA SAYLOR
ERIC SNYDERMAN
JEFFREY M. HARTMAN
*Trial Attorneys*

Dated: October 20, 2025

## **BRIEF FORMAT CERTIFICATION**

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Ninth Circuit Rule 32-1(a), (f), I certify that this Brief:

(1) was prepared using 14-point Century Schoolbook type;

(2) is proportionally spaced; and,

(3) contains 13,787 words, exclusive of tables of contents and authorities, and certificates of counsel.

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6(b), I certify that the following cases raise the same or related challenges to the Secretary's administration of the TPS statute:

- *National TPS Alliance, et al., v. Kristi Noem, et al.*, 773 F. Supp. 3d 807 (N.D. Cal. Mar. 31, 2025), *affirmed* 150 F.4th 1000 (9th Cir. 2025). The Supreme Court stayed the district court's §705 order. *NTPSA v. Noem*, 145 S. Ct. 2728 (2025)

- *National TPS Alliance, et al., v. Kristi Noem, et al.*, — F.Supp.3d —, 2025 WL 2578045, *1 (N.D. Cal. Sep. 5, 2025), *appeal pending* No. 25-5724 (9th Cir.). The Supreme Court stayed the district court's judgment. *NTPSA v. Noem*, 606 U.S. — 2025 WL 2812732 (Oct. 3, 2025)

- *Haitian Evangelical Clergy Association et al. v. Donald J. Trump, et al.*, — F. Supp. 3d —, 2025 WL 1808743 (E.D.N.Y. July 1, 2025) (final judgment addressing Haiti's partial TPS vacatur), *appeal filed* (2d Cir. Sept. 25, 2025)

- *CASA Inc., et al., v. Kristi Noem, et al.*, — F. Supp. 3d —, 2025 WL 1907378 (D. Md. July 10, 2025), *denial of stay affirmed by* 2025 WL 2028397 (4th Cir. July 21, 2025)

- *Haitian Americans United, Inc., et al. v. Donald J. Trump, et al.*, 1:25-cv-10498 (D. Mass.) (addressing Haiti and Venezuela TPS determinations)

- *Miot v. Trump*, 25-cv-2471 (D.D.C.) (addressing Haiti's partial vacatur)

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 20, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the ACMS system. All parties were served electronically through the ACMS system.

/s/ Drew C. Ensign
DREW C. ENSIGN
*Deputy Assistant Attorney General*